1  TYLER G. NEWBY (CSB No. 205790)
   tnewby@fenwick.com
2  ARMEN N. NERCESSIAN (CSB No. 284906)
   anercessian@fenwick.com
3  FENWICK & WEST LLP
   555 California Street, 12th Floor
4  San Francisco, CA 94104
   Telephone:    415.875.2300
5  Facsimile:    415.281.1350

6
   Attorneys for Plaintiff
7  TEKION CORP.

8

9                  UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11  TEKION CORP., a Delaware corporation,      Case No.: _____

12                 Plaintiff,                  **COMPLAINT FOR DAMAGES AND
                                               FOR INJUNCTIVE AND
13        v.                                   DECLARATORY RELIEF**

14
    CDK GLOBAL, LLC, a Delaware limited        **DEMAND FOR JURY TRIAL**
15  liability company,

16                 Defendant-Respondent.

17

18

19

20

21

22

23

24

25

26

27

28
    COMPLAINT FOR DAMAGES AND FOR                      CASE NO. _____
    INJUNCTIVE AND DECLARATORY RELIEF

FENWICK & WEST LLP

**INTRODUCTION**

1.    Auto dealership management systems ("DMS") are sophisticated, specialized software products that are mission critical for franchise, i.e., new car, dealerships.  Nationwide, approximately 18,000 franchise dealerships rely on DMS to conduct all essential operations, and for legal and regulatory compliance.  DMS providers are stewards of their customers' (the dealers) essential data—the historical and daily information, on which DMS operate and without which dealers cannot function.  Plaintiff Tekion Corp. ("Tekion") brings this action to put a stop to Defendant CDK Global, LLC's ("CDK") unlawful and anticompetitive conduct in the DMS market for franchise dealerships in the United States.

2.    CDK is the incumbent industry giant in the DMS market for franchise dealers.  Its share of this market is approximately 60% by revenue, and its share of the submarket for large enterprise franchise dealers in the United States is even greater.  But its product has fallen behind the capabilities of 21st century technology and franchise dealership needs.  Suddenly faced with competition from providers of superior, modern DMS, like Tekion, CDK attempts to maintain its dominant position in the market through unlawful, anticompetitive practices intended to prevent and discourage franchise dealerships from switching to an alternative DMS provider.  This harms competition in the DMS market for franchise dealers, and it harms both franchise dealers and the car-buying public.

3.    Among many other functions, a DMS enables dealerships to perform all aspects of: inventory management (vehicles, parts, and accessories); sales and finance (initial customer contact, credit checks, insurance, and delivery); customer relationship management (monitoring, maintaining, and personalizing customer information and interactions, improving the customer experience, increasing customer loyalty); service and parts operations (scheduling service appointments, monitoring technician productivity, ensuring parts availability); accounting and reporting (tracking performance in real time, payroll services, monthly mandatory reporting, trends, and more); legal and regulatory compliance (maintaining accurate records for all manners of compliance, audits, and financial reporting requirements in a highly regulated industry); integration and data access (enabling integration within the dealership and dealership group, and with third

parties from suppliers to auto manufacturers). The DMS touches every aspect of the modern franchise auto dealership. Franchise dealers typically spend more on their DMS than on any other software product they use. Upon information and belief, on average, dealers spend over $75,000 per year on their DMS, not counting fees for implementation and ancillary services.

4.     A DMS operates on dealership data, both historical and generated during daily operations. The data, which comprises the entire record of a dealership's past and present business, includes vehicle sales and service history, inventory data, financial information, payroll-related information, all manner of customer information, and sales leads. The data also includes records required for mandatory quarterly and annual financial statements, and information that franchise dealerships must submit to original equipment manufacturers ("OEMs", e.g., General Motors, Ford, Toyota, etc.) for, e.g., warranty audits and disputes related to sales or service issues. Although dealer data resides on systems owned and controlled by the DMS provider, the data unambiguously belongs to the dealer. Indeed, some states have passed laws codifying dealer ownership of the data and ensuring dealer control over it. (CDK has opposed and challenged such laws, reflecting its strategy to control the franchise DMS market through control of dealer data.)

5.     Barriers to entry into the franchise DMS market are high. First, a DMS is a complex, purpose-built platform that must work at scale and across innumerable interrelated functions for businesses operating in a complex, regulated industry that affects the national economy. Second, a DMS must be integrated with every OEM (there are over 40) and with several other third-party providers. Because the market for DMS for franchise dealers had become so stagnant, many OEMs do not know how to enable integration with a new DMS. In addition, because dealers rely on their DMS for every daily function, for legal and other compliance purposes, and for integration with the rest of the automotive ecosystem, they are understandably cautious about switching to a new provider, in the rare case that one comes along. CDK unfairly exploits these inherent barriers to competition in the DMS market by introducing additional obstacles that dealers have no choice but to accept, thus raising the costs for new entrants like Tekion.

6.     The needs of auto dealerships have changed with the advent of new technology that enables greater automation, integration, data-keeping, and customer service possibilities and

FENWICK & WEST LLP

expectations.  Barry Cohen—the Vice President and Chief Information Officer ("CIO") of Asbury Automotive Group, a Fortune 500 company and one of the largest franchise auto retailers in the United States—recently explained to a Georgia court that today's dealerships rely on DMS for "almost everything," from tracking repair orders, to maintaining vehicle inventory, to interfacing with banks to obtain auto loans, to managing accounting functions.  He described CDK's DMS as "antiquated."

7.    California-based Tekion entered the franchise DMS market in 2016 to address these needs.  Because Tekion's DMS was built natively on the cloud, rather than (like CDK's) for individual on-premises or hosted installations, it provides dealerships with several significant advantages, including regular, real-time updates and enhancements that do not require significant downtime or manual installation.  Tekion's DMS also offers the power of new technology, like data analytics, machine learning, and artificial intelligence, that modernize and elevate dealership operations and enhance consumer experiences.  At a dealer's discretion, Tekion's DMS enables the integration of retail, service, parts, accounting, customer relationship management, and analytics functionality in an all-in-one seamless and connected platform.  Tekion's modern DMS poses a significant competitive threat to CDK's position in the DMS market for franchise dealers and CDK is well aware of that threat.

8.    In January 2024, Tekion announced a partnership with Asbury, which has approximately 158 dealerships across 15 states, including two in California.  Explaining Asbury's decision to trial Tekion's DMS at four dealerships in a pilot program, Mr. Cohen testified that,

"Tekion is a very interesting company that was started in 2016. The CIO of Tesla realized that there was a big void in the automotive industry and so he started up this DMS company. So it's very exciting.  It's game-changing.  It's transformative.  Our company's mission statement is to be the most guest-centric automotive company in retail.  And so we feel like this aligns very well with our North Star, and we're very passionate about getting onto this platform. It will replace not only CDK, but 15 other vendors that we have.  So there's a bunch of bolt-ons, stove pipes that will go away.  It'll make us very efficient.  It'll make it easy to train new employees.  But the guest experience will be truly amazing."

9. Because CDK knows that its legacy product cannot compete with modern entrants, it has been attempting to entrench (and perpetuate) its market power through other, anticompetitive means. For example, in 2018, the FTC challenged CDK's unlawful and anticompetitive acquisition of Auto/Mate, an "innovative, disruptive challenger" in the DMS space that posed an "emerging threat" to CDK's position, for "a price that was far in excess of its original standalone valuation," to rid itself of the competition. A true and correct copy of the FTC's redacted administrative complaint in *In the Matter of CDK Global and Auto/Mate*, File No. 1710156, Docket No. 9382 is attached as **Exhibit A**. As CDK touted, "We are so serious about acquiring new customers that we bought the DMS [Auto/Mate] that has been kicking our butts." Exhibit A at ¶ 54. CDK dropped the acquisition after the FTC's challenge.

10. CDK's most frequent anticompetitive practice has been to abuse its ability to control access to the data belonging to franchise dealerships. Franchise dealerships that decide to move from one DMS provider to another must have meaningful access to their data sufficiently in advance of the move—typically several months—to validate and integrate their data in the new DMS. The actual switch to a new DMS happens in an instant, usually at the stroke of midnight, after which the new DMS becomes the sole system of record for the dealership. Without the validation period, a move could cause massive disruption to daily operations and significant legal and regulatory risk. The negative impacts of such disruptions can be devastating, as a recent ransomware attack on CDK demonstrated. This widely publicized attack deprived the thousands of franchise dealerships that used CDK of access to their DMS, and, consequently, to their essential data. Over just four weeks, this disruption is estimated to have cost those dealers over $1 *billion*.

11. Historically, DMS providers, including CDK, facilitated dealership access to their own data, including for the purpose of data migrations to different DMS providers. Now, however, faced with a threat to its dominance, CDK uses various anticompetitive and unlawful tactics to prevent dealers in California and elsewhere from gaining timely access to their own data, frustrating dealers' efforts to migrate to a competitor like Tekion. These tactics include forcing dealerships to work exclusively through CDK to access and transfer the dealerships' own data; restricting dealerships to a rudimentary CDK self-help tool that provides incomplete data in an irregular and

unusable format; refusing to commit to or honor a reliable data transfer schedule, including by pretextually terminating CDK service with insufficient time and access to the dealerships' data; and threatening and then instituting legal action against those, like Asbury, who seek to switch to competitors.  Thus, acting with knowledge that dealers may be forced to recommit to CDK rather than risk the disruption of a delayed or failed switch to a different, even superior, DMS product, CDK has become captor, rather than steward, of its customers' data.  Its conduct excludes others, including Tekion, from the DMS market for franchise dealers.

12.    As an example of the unfair and unlawful disruption that CDK's tactics represent for franchise dealers and DMS competitors such as Tekion, Asbury recently was forced to seek judicial intervention just to obtain its own data from CDK for purposes of conducting a four-dealership pilot program with Tekion's DMS platform.[1]  On August 29, 2024, a Georgia state court issued a preliminary injunction ordering CDK to provide Tekion with the data needed for the four dealerships.  A true and correct copy of the August 29, 2024, preliminary injunction order in *Asbury Automotive Group, Inc. v. CDK Global, LLC*, Case No. 24-A-04939-3 (Superior Court of Gwinnett Court, State of Georgia), is attached as **Exhibit B**.

13.    Tekion's pilot program with Asbury is a critical opportunity for Tekion to demonstrate its superior technology not only to Asbury—a major customer crucial to Tekion's success as a newcomer—but to the entire industry, which is well aware of the program.[2]  On information and belief, of the six primary publicly traded franchise dealership groups, five are currently CDK customers.  Thus, Tekion's success with Asbury could change the DMS market for franchise dealers.  Other franchise dealership groups that currently use CDK as their DMS provider,

---

[1]  Asbury, CDK in legal fight over dealer data ahead of Tekion pilot | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-cdk-legal-fight-over-dealer-data-ahead-tekion-pilot.

[2]  Asbury 4-store Tekion DMS pilot could precede companywide switch by 2026 | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-4-store-tekion-pilot-could-precede-full-dms-switch-2026;*see also* Tekion Selected by Asbury Automotive Group to Elevate Guest Experiences (yahoo.com), *available at* https://finance.yahoo.com/news/tekion-selected-asbury-automotive-group-160000562.html; Asbury to deploy Tekion cloud tool | Auto Remarketing, *available at* https://www.autoremarketing.com/ar/asbury-to-deploy-tekion-cloud-tool/

FENWICK & WEST LLP

including Doral Automotive Group, Regal Automotive Group, Lou Bachrodt Auto Mall, and Action Nissan, Inc. d/b/a Universal Nissan, Universal Hyundai, and Universal Genesis (collectively, "Universal"), have also contracted for Tekion's DMS. CDK has held these groups' data hostage in one form or another, thwarting competition in the franchise DMS market, and harming the dealers, and, by extension, the car-buying public. CDK's unfair and unlawful conduct has deterred additional franchise dealerships from transitioning from CDK to Tekion's DMS.

14.     In addition, CDK's unfair and unlawful conduct has interfered with and delayed Tekion's ability to meet contractual obligations, including launch dates for several dealer groups. CDK's tactics cause reputational and competitive harms to Tekion and to franchise dealers looking to switch their DMS, and they have immediate negative financial impacts on Tekion by raising Tekion's costs of competing with CDK. Tekion typically collects the great majority of its implementation fees on the date on which its DMS actually launches at a dealership, and it collects no subscription fees at all until that launch date. Moreover, because of the substantial lead-time and planning required for a franchise dealership to switch DMS solutions, it is difficult for Tekion to obtain a substitute dealership for a reserved slot, such that the resources that Tekion allocated for the launch go to waste.

15.     CDK's conduct constitutes a violation of Section 2 of the Sherman Act, for monopolization or attempted monopolization of the franchise DMS market in the United States; tortious interference with Tekion's contractual and prospective economic relations with Asbury and other dealerships; and unfair competition under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* CDK's conduct has harmed and will continue to harm competition, and to injure Tekion, including through Tekion's loss of goodwill, reputation, market share, revenue, and profits. It also harms franchise dealers and the consumers whom they serve. Accordingly, Tekion brings this action to seek damages and injunctive relief to redress and prevent CDK's unlawful, unfair, and anticompetitive conduct.

## THE PARTIES

16.     Tekion is a corporation organized and existing under the laws of Delaware, with its principal place of business and headquarters in Pleasanton, California. Tekion is a technology

FENWICK & WEST LLP

company that provides innovative and cloud-native solutions for the automotive retail industry, including an end-to-end cloud-based DMS product that connects consumers, dealers, and manufacturers in a seamless interface.

17.    CDK is a corporation organized and existing under the laws of Delaware, with its principal place of business and headquarters in Austin, Texas (formerly, Hoffman Estates, Illinois). Until 2022, CDK was a publicly traded company with reported global revenues of over $1.5 billion every year since 2014.  In 2022, however, a private equity firm took CDK private for roughly $8.7 billion.[3]  CDK is registered to do business in California and has multiple offices throughout California—including offices in San Jose, California; Petaluma, California; and Orange, California.

## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15, and under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Tekion's asserted state law claims because they are transactionally related to, and factually interdependent with, those arising under federal antitrust law and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

19.    The Court has personal jurisdiction over CDK under Cal. Code Civ. Proc. § 410.10 and the Due Process Clause of the United States Constitution.  CDK is engaged in continuous and systematic business in the state of California, including because it is registered to do business in California, has multiple offices located in California, and employs many employees in California. Further, upon information and belief, CDK provides DMS for well over a hundred California-based franchise auto dealerships, and its tortious and anticompetitive conduct described herein arises out of and relates to CDK's significant contacts with California.  CDK otherwise intentionally avails itself of the markets in California through its business activities, such that the exercise of jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

---

[3] CDK completes sale to investment firm Brookfield Business Partners | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/cdk-completes-sale-investment-firm-brookfield-business-partners.

FENWICK & WEST LLP

20.     Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. § 22, because a "substantial part of the events or omissions" on which the claim is based occurred in this district.

21.     ***Divisional Assignment.***    Under N.D. Cal. Civil L.R. 3-2(c), (d), because a substantial part of the events or omissions alleged occurred in Alameda County, the case should be assigned to the San Francisco Division or the Oakland Division.

### CDK'S CONDUCT AND RELATED MARKET IMPACTS

**I.      DMS Is Essential To Franchise Dealership Operations.**

22.     To manage their operations, franchise dealers use specialized software known as DMS, which, among other things, centralizes their own data.  "The core of a DMS is a database containing information about a dealer's customers, vehicles, accounting, parts, and services."  *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1272 (9th Cir. 2021).  The information contained in the DMS database is used by a suite of complementary software tools that integrate and manage all aspects of dealership operations, including customer relationship management ("CRM"), internet connectivity, telephones, website management, inventory, service scheduling, finance and insurance, and accounting.  DMS, and the data maintained within it, is an auto dealership's central nervous system.

23.     DMS streamlines dealership operations by automating routine operational tasks, improving the accuracy of dealer data, allowing for comprehensive and reliable reporting and analytics, and enhancing the customer experience of dealership clients through faster service, personalized communication, and efficient transaction processing.  In addition, dealerships use DMS to maintain important records that they need for legal and compliance purposes.

24.     In part to meet contractual obligations for participation in OEM incentive programs, which is an important element of profitability for franchise dealers, dealers use DMS to share information about, e.g., sales, inventory, parts, service, and warranties, with the OEMs.

25.     Auto retailers use DMS, in conjunction with complementary software modules, to perform a wide array of functions necessary to the operations of each dealership, including:

        a.      ***Inventory Management***.  Dealerships can use inventory data to track every vehicle or other product in their inventory.  This includes tracking cars, parts,

FENWICK & WEST LLP

and accessories. The inventory system can monitor stock levels, reorder parts automatically, and provide insights into which vehicles are selling well and which are not. This helps in maintaining optimal inventory levels, reducing carrying costs, and improving the financial health of the dealership and turnover rate.

b. ***Sales and Finance***. Sales data within DMS can be used to provide end-to-end management of the sales process, from initial customer contact to finalizing the sale. The sales module can integrate with credit reporting agencies and financial institutions to streamline the financing and insurance processes. This integration ensures that sales teams can quickly provide customers with financing options and accurate quotes, thereby enhancing the consumer experience and expediting the sales cycle.

c. ***Customer Relationship Management (CRM)***. Dealerships also leverage customer data to track and maintain customer relationships, interactions, preferences, and purchase history, enabling personalized communication, customer service, and marketing efforts. This targeted approach can improve customer satisfaction and loyalty, leading to repeat business and referrals.

d. ***Service and Parts Operations***. As service is a key revenue and profit generator for dealerships, dealerships use operational data to schedule service appointments, manage work orders, and ensure that parts are available for repairs, thus reducing wait times and improving customer satisfaction. The services and parts operations system can also monitor the productivity of technicians and thus track the profitability of the service department.

e. ***Accounting and Reporting***. DMS allows for real-time tracking of the dealership's financial performance. Dealerships leverage DMS, together with complementary software products, to handle payroll, accounts payable

and receivable, and to submit mandatory monthly and other reporting to their OEMs. The reporting capabilities that DMS facilitates can provide valuable insights into sales trends, financial health, and operational efficiency, enabling data-driven decision-making.

    f.    ***Legal and Regulatory Compliance***. Automotive dealerships must adhere to various legal and regulatory requirements. DMS helps ensure compliance by maintaining accurate records, providing audit trails, and facilitating the necessary reporting. This reduces the risk of fines and penalties associated with non-compliance.

    g.    ***Integration and Data Access***. A modern DMS can integrate with other software systems, such as manufacturer systems, third-party vendors, and marketing platforms. This integration allows for the flow of information across the dealership, improving operational efficiency. Additionally, cloud-based DMS solutions like Tekion's provide access to data from anywhere, at any time, which is essential for managers who need to make informed decisions on the go.

26. For modern franchise dealerships, there are no realistic alternatives for a DMS, particularly given the connections that DMS facilitates with other critical participants in the automotive retail system such as OEMs, data providers, lenders, and other third parties.

27. Recent cyberattacks on CDK show the importance of a DMS to dealership operations and a risk associated with CDK's dominant position in the industry. As was widely reported in *Automotive News*, *Bloomberg*, and other news outlets, on June 19, 2024, CDK suffered multiple ransomware attacks that encrypted its critical files and disrupted its provision of DMS for thousands of dealerships across North America.[4] Affected dealerships had no access to their CDK

---

[4] Timeline: CDK Global cyberattacks | Automotive News (autonews.com), *available at* https://www.autonews.com/retail/timeline-cdk-global-cyberattacks; CDK Cyberattack: What Is It, Who Is Responsible and What's the Fallout? - Bloomberg, *available at* https://www.bloomberg.com/news/articles/2024-06-24/cdk-cyberattack-what-is-it-who-is-responsible-and-what-s-the-fallout.

FENWICK & WEST LLP

DMS services for weeks, which made it challenging for them to sell or service cars, pay employees, track and order car parts, submit OEM-mandated reporting to OEMs as required by their franchise agreements, offer financing, manage inventory, and ensure data security.[5]  Anderson Economic Group, a premier automotive consulting firm, estimated that the attack and subsequent software outage resulted in 56,200 lost new-vehicle sales and dealership losses collectively totaling $1.02 billion.[6]  According to a forecast from J.D. Power and GlobalData, the attack contributed to a year-over-year drop in new-vehicle sales of as much as 7.2 percent, comparing sales in June 2024 with those from June 2023, despite strong demand for new vehicles in June 2024.[7]  The outage caused substantial negative impacts on the Q2 earnings of dealer groups that used CDK for their DMS, including Asbury.[8]  AutoNation Inc., a large publicly traded dealership group which uses CDK, said its net income plunged 52% to $130.2 million in the second quarter of 2024 partly because of lost revenue and hits to vehicle sales stemming from the June 19 CDK Global cyberattacks. AutoNation reported that the incident reduced earnings per share by an estimated $1.50—totaling a $32.3 million loss due to one-time costs alone.[9]

28.    Launching or migrating to a new DMS is a significant, risky undertaking for a dealership.  Among other tasks, the franchise dealer must re-engineer its myriad business processes for inventory management, payroll, sales, services, parts, and accounting, to make them compatible

---

[5] *See also* note 6, *supra*.

[6] Dealers lost $1.02B from CDK cyberattack, revised AEG study says | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/dealers-lost-102b-cdk-cyberattack-revised-aeg-study-says.

[7] J.D. Power-GlobalData U.S. Automotive Forecast for June 2024 | Business Wire, *available at* https://www.businesswire.com/news/home/20240626332772/en/J.D.-Power-GlobalData-U.S.-Automotive-Forecast-for-June-2024.

[8] CDK Global cyberattacks mar Q2 public dealership group results | Automotive News (autonews.com), *available at* https://www.autonews.com/retail/cdk-global-cyberattacks-mar-q2-public-dealership-group-results.  Asbury Q2 earnings: CDK cyberattack fuels 86% drop in profit | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-q2-earnings-cdk-cyberattack-fuels-86-drop-profit.

[9] AutoNation: CDK attack to cut Q2 earnings per share by $1.50 | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/autonation-cdk-attack-cut-q2-earnings-share-150; *see also* note 8, *supra*.

FENWICK & WEST LLP

FENWICK & WEST LLP

with the new infrastructure. It must also develop training materials and set up IT and business controls required for compliance with federal regulations. For publicly traded dealer groups and dealer groups operating many dealerships (enterprise dealerships) this requires trialing the implementation on a small scale, with internal and external auditors testing the process, before a larger rollout. And, because DMS is mission-critical, dealerships cannot operate without it for even short amounts of time.

## II.    CDK Dominates The DMS Market For Franchise Dealers.

29.    The franchise DMS industry in the United States is concentrated, with CDK holding the largest market share. CDK's software business started over half a century ago, as the Dealer Services division of Automatic Data Processing (ADP). According to estimates from Matt Gillrie, CEO and owner of the Gillrie Institute, a DMS consulting firm that helps dealerships with major vendors, CDK is the dominant leader, with about 60 percent of the market.[10] CDK boasts on its website that "2.6% of the U.S. GDP is transacted through CDK Global."[11]

30.    By revenue, CDK has a 60% share of DMS market for franchise dealerships, and its share of the submarket for large enterprise franchise dealers in the United States is larger still.

31.    As Asbury's CIO recently described it, CDK's DMS product is "an antiquated system that was created 30 years ago." The user interface is outmoded, unintuitive, and cumbersome. CDK creates (often arbitrary) obstacles to integration with third-party products and vendor services, which can result in data inconsistencies or gaps. The performance of CDK's DMS can be slow, especially during peak usage times, causing delays and frustration for users. Dealerships have reported to Tekion that CDK's customer support can be unresponsive or slow to resolve issues, leaving users without timely assistance. Because CDK's DMS lacks regular updates and enhancements, its DMS does not evolve to meet new industry demands or technological advancements.

---

[10] Why all eyes are on Tekion in 2024 | Automotive News (autonews.com), *available at* https://www.autonews.com/retail/why-all-eyes-are-tekion-2024.

[11] Dealer Management System (DMS) | CDK Global, *available at* https://www.cdkglobal.com/dms.

### III.    Tekion Is An Innovator In The Franchise DMS Market.

32.     Tekion was founded in 2016 by Jay Vijayan, a former Chief Information Officer of Tesla, Inc.  Tekion's team includes former executives and engineers from Tesla, Oracle, Microsoft, Cisco, JFrog, Amazon, Salesforce, and other leading technology companies.

33.     Tekion offers the world's first end-to-end cloud-based DMS platform.[12]   Its centralized approach allows for greater scalability, flexibility, and integration, and it allows for continuous updates without the need for significant downtime or manual intervention.  Tekion also incorporates artificial intelligence and machine learning processes into its DMS, and it provides predictive analytics, personalized customer experiences, and smarter decision-making tools tailored to the workflows of individual dealerships.  With a cloud-native platform and highly configurable application, Tekion can roll out updates and new features more frequently and with less disruption to the end-user, ensuring that the software evolves with the changing needs of its customers and the automative retail marketplace.  Unlike CDK's outdated legacy technology, which was designed prior to widespread adoption of the Internet, Tekion's DMS is designed to be fast, scalable, secure, and user-friendly.  It connects the entire spectrum of the automotive retail ecosystem through one seamless platform, enabling superior automotive retail experiences that modern day consumers have come to expect.

34.     Tekion's DMS is also designed to integrate seamlessly with other tools and services, including third-party applications, that a dealership might use.  Tekion provides developer-friendly open APIs to facilitate fast and easy data sharing between dealers and their chosen service providers.  Tekion's DMS offering thus gives dealers more choice and control over their own data and operations.  Unlike CDK, Tekion allows dealers to own and access their data freely and securely, and to integrate with third-party vendors of their choice.

35.     Tekion provides its DMS to dealerships by subscription, with transparent pricing that reflects the value and performance of its platform, and also lower upfront costs compared to traditional DMS solutions like CDK's.

---

[12] Tekion |First End-to-End Cloud Native Automotive Platform, *available at* https://tekion.com/.

FENWICK & WEST LLP

36.     Because of its innovative, cloud-based implementation, Tekion's DMS offers significant advantages over CDK's, and enables dealers to streamline and automate their workflows, reduce errors and inefficiencies, lower operating costs, enhance customer satisfaction and loyalty, and increase revenue and profitability.

37.     As a new entrant in the DMS industry, Tekion currently serves only a small fraction of the franchise dealerships in the United States.  But there has been growing interest in Tekion's innovative technology.  On February 16, 2023, Tekion contracted to provide DMS services to three dealerships in the Doral Auto Group.  On July 18, 2023, Tekion entered an agreement to provide its DMS to two dealerships operated by Regal Auto Group.  In December 2023 and March 2024, Tekion entered into contracts with Lou Bachrodt Auto Mall, which houses five stores, each for a different car manufacturer.  On February 2, 2024, Tekion entered an agreement with Universal to provide its DMS to three dealerships it operates.  These agreements included an implementation schedule, with the bulk of Tekion's fees (and the start of the monthly subscription fees) coming due at the "Go-Live" date—the date on which the dealership begins operating with Tekion's DMS.

38.     In late 2023, Tekion won a critical opportunity to showcase its advanced technology to franchise dealers, entering into a contract with Asbury, one of the largest dealership groups in the United States.  Under the agreement, Asbury would pilot Tekion's DMS at four dealerships by September 2024, and in time for the 2024 holiday season.  If the pilot was a success, Asbury would launch Tekion's DMS in all of its dealerships over the course of the next few years.  As of December 2023, Asbury operated 158 new-vehicle dealerships, representing 31 brands; in 2022, it retailed 151,179 new vehicles, ranking fifth on *Automotive News*' list of the Top 150 dealer groups in the United States.[13]  The contract with Asbury—and the ongoing business relationship that it contemplates—presents a cannot-miss milestone for Tekion.  The Asbury pilot program is critical to Tekion's future success more broadly, serving as a high-profile proof of concept of Tekion's technology.

---

[13] Asbury Automotive will partner with Tekion on DMS pilot | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-automotive-will-partner-tekion-dms-pilot.

Fenwick & West LLP

**IV.    CDK Unlawfully Forecloses Competitors From The Franchise DMS Market.**

39.    CDK is well aware of the competitive threat from modern DMS providers.  As Asbury's CIO explained to the Court in Georgia, "if an enterprise public company like Asbury can go on [Tekion's] system, anybody can go on [Tekion's] system."  Because its legacy DMS cannot compete on its merits, CDK has decided to take unlawful advantage of its market power, of the control it has over dealer data access, of the time and planning required for a dealer to switch DMS providers, and of the potentially devastating consequences to a dealer of a failed or delayed data migration.

40.    As its Chief Transformation Officer recently admitted under oath, CDK can easily prepare data needed for dealership migrations to new DMS providers and has done so in the past within a matter of days of a dealership request.  Starting in early 2023, however, CDK began to withhold approvals necessary to facilitate data transfers to Tekion, demanding that dealers seeking to obtain their data to perform a DMS transition first pay any accounts receivable.  This new requirement was pretextual, and, on information and belief, not contractual.  At first, the process for obtaining approvals from accounts receivable requests would take about thirty days.  But, CDK has begun withholding accounts receivable approvals for longer and longer periods of time, even for dealerships current on their payments—not infrequently over a hundred days, and often over two months after the request was made, necessarily delaying the transition.  For instance, upon information and belief, Lou Bachrodt Auto Mall submitted its request for approval on February 23, 2024, but CDK withheld that basic approval, i.e. the first step in the migration process, *for 159 days*, until July 31, 2024*.*  Meanwhile, as described in greater detail below, in the case of Universal, CDK refused to transfer dealership data needed for a transition to Tekion for almost two-and-a-half months after Universal satisfied any final payment obligations it had to CDK, and long after CDK had provided accounts receivable approvals.

41.    CDK also has manufactured pretexts to force transitions to occur on timelines that risked leaving dealers without continuous DMS support, knowing the pressure that this would exert on the dealerships to remain with CDK.  In the case of Doral Automotive Group, CDK refused to facilitate the dealer's access to its own data, including for the purpose of transitioning to another

Fenwick & West LLP

DMS provider, until Doral first terminated its contract with CDK. After that, CDK refused to provide Doral with its data until the date of termination, July 31, 2024—in other words, on the day of the transition to Tekion—which would have left Doral without a functioning DMS during the Tekion implementation. CDK eventually agreed to deliver the data to Tekion a month before the termination date, June 30, 2024, which was still insufficient for the dealer and Tekion to ensure a smooth transition and comply with their respective contractual obligations. Upon information and belief, CDK's conduct was intended to force the dealership to renew with CDK.

42.     Likewise, upon information and belief, Regal Automative Group requested accounts receivable approval for a data migration on May 21, 2024, in advance of launching Tekion's DMS at the end of July. As of early August 2024, CDK was still unreasonably withholding approval, which threatened to delay Regal's transition to Tekion's platform. Via a LinkedIn post seeking help from anyone who could offer it, Holden Scott, Executive Manager of Regal Nissan, publicized the obstacles that CDK has imposed to prevent its own transition to Tekion's platform:

> I'm reaching out because we're facing a challenge at Regal Nissan and need your support. We are transitioning our DMS from CDK to Tekion, which was initially scheduled for the last week of July. Unfortunately, the recent CDK security breach delayed our data transfer.
>
> Tekion has rescheduled us for the first week of September, but CDK plans to cut off our access at the end of August. This would leave us with a gap in our DMS coverage, which we cannot afford.
>
> We're willing to pay the monthly fee for an extension, but CDK has not yet agreed. We're looking to resolve this amicably, as the delay was beyond our control.
>
> If anyone in my network has connections at CDK or advice on who to contact to facilitate this extension, your assistance would be invaluable. We're committed to making this transition smoothly and efficiently, and any help would be greatly appreciated.

A true and correct copy of the post from Regal Nissan is attached as **Exhibit C**.

43.     CDK's recent dealing with Universal similarly illustrates the improper and pretextual nature of CDK's tactics of withholding franchise dealership data. Universal is another CDK DMS customer seeking to convert to Tekion. Upon information and belief, in August 2024,

after Universal informed CDK of its intention to switch to Tekion, CDK issued a "Final Obligations Letter" that purported to set forth Universal's remaining payment obligations to CDK. Within two days, Universal had provided payment in full. CDK nevertheless continued to refuse to give Universal its own data for almost two and a half additional months, seeking to delay release of the data until the last day of the term (which would not leave adequate time for Universal to transfer to a new DMS), and despite providing the accounts receivable approvals in late September. As a result, Universal had to delay deployment of Tekion DMS, and Universal had no choice but to make a legal demand to CDK seeking immediate release of the data. A true and correct copy of Universal's correspondence to CDK, dated November 20, 2024, is attached as **Exhibit D**. "Universal reached out multiple times to everyone at CDK who had been involved in this matter, but not a single person from CDK even responded." Ex. D at 2.

44.     As CDK no doubt understands, Asbury is a likely bellwether for change in the franchise DMS market, away from CDK. With respect to Asbury, therefore, CDK outright refused to provide data access to Asbury or allow the necessary data transfer. The Tekion-Asbury contract required Asbury to provide Tekion with data for the four dealerships in the pilot program by May 2024, so that Tekion could enable launch of the pilot program in September 2024. Shortly after the public announcement of the pilot, Asbury requested that CDK provide complete and full access to its customer data for the four dealerships, using the standard authorization process that typically took five or fewer days to complete.

45.     On January 25, 2024, contrary to its routine past practice of processing Asbury's data requests, CDK informed Asbury that it would first need to send a "cancellation request." Upon information and belief, CDK had not previously required such a cancellation prior to providing data extraction and transfer to Asbury or other dealers, nor does Asbury's agreement with CDK require such a cancellation. CDK's cancellation request was a pretext and a stall tactic. Nevertheless, on February 5, 2024, Asbury sent CDK a cancellation request for the four dealerships, to be effective on December 31, 2024. CDK continued to refuse to transfer the data, directing Asbury to obtain the data itself through an inadequate customer self-help tool. The self-help tool did not provide complete and reliable data sets that Asbury needed for the Tekion pilot program with the four

dealerships. When Asbury attempted to access its own data through its CDK account, moreover, counsel for CDK sent Asbury a cease-and-desist letter and subsequently disabled that Asbury account.

46.    Not content with frustrating Asbury's efforts to obtain its own data, on May 30, 2024, CDK sued Asbury, in state court in Cook County, Illinois, for its decision to partner with Tekion on the pilot program. A true and correct copy of the complaint in *CDK Global, LLC v. Asbury Automotive Group, Inc.* Case No. 2024CH05116 (Circuit Court of Cook County, Chancery Division) is attached as **Exhibit E**. CDK's lawsuit was a warning to other dealerships not to partner with CDK's competitors. The potential chilling effect from such lawsuits is particularly acute for individual dealerships or small dealer groups, which are ill-equipped for handling the demands of legal actions and may not want to deal with the hassle, risk, and expense attendant to protracted litigation.

47.    Unable to obtain its own data from CDK for the pilot program, Asbury sued CDK in state court in Gwinnett County, Georgia on June 3, 2024, and filed a motion for a preliminary injunction seeking to enjoin CDK from its improper withholding of Asbury's data. A true and correct copy of the complaint in *Asbury Automative Group, Inc. v. CDK Global, LLC*, Case No. 24-A-04939-3 (Superior Court of Gwinnett County, State of Georgia), which alleges claims against CDK for breach of contract, conversion, tortious interference with business relations, and tortious interference with contractual relations, is attached as **Exhibit F**; and a true and correct copy of Asbury's preliminary injunction motion, and supporting declaration of Barry Cohen, is attached as **Exhibit G**. As Asbury explained in its moving papers, by refusing to provide Asbury with its data, CDK sought to coerce Asbury into adopting CDK's own DMS product, CDK Unify. *See, e.g.*, Ex. F at ¶ 37 ("It appears that CDK is attempting to force Asbury into adopting the new CDK Unify program by not allowing Asbury access to its Client Data ….").

48.    CDK withdrew its Illinois complaint against Asbury on or around June 28, 2024, having asserted similar causes of action against Asbury as counterclaims in Asbury's Georgia suit.

49.    On August 28, 2024, the Superior Court of Gwinnett County held an evidentiary hearing on Asbury's preliminary injunction motion against CDK. Asbury presented testimony

FENWICK & WEST LLP

from Barry Cohen, its CIO, about the plan to potentially transition DMS from CDK to Tekion over the course of four years. The testimony showed that even though Asbury's contract with CDK allowed Asbury to work with a different DMS, CDK refused to enable access to all of Asbury's data and limited Asbury to using the rudimentary CDK self-help tool. Mr. Cohen also testified that the CDK self-help tool did not allow Asbury to obtain the necessary data, including critically important CRM data and historical data.

50.     CDK presented testimony from Dan Flynn, its Chief Transformation Officer. Mr. Flynn admitted that CDK could provide the data needed for Asbury's Tekion pilot program using its internal tools with little burden and within five days. Mr. Flynn also testified that CDK did not itself use the self-help tool to which it referred Asbury for migration purposes, that he was unfamiliar with the format, completeness, and reliability of the data output by the self-help tool, that the self-help tool was not in fact covered by CDK's contract with Asbury, and that he was not aware of any dealer that had used the tool to migrate data to a different DMS provider.

51.     Following the hearing, the Superior Court of Gwinnett County found against CDK and enjoined it to provide Asbury with the data necessary for Asbury's Tekion pilot program. *See* Ex. B.

52.     CDK's refusal to allow Asbury to access its own data thwarted Asbury's pilot program with Tekion, delaying it to October 2024 and threatening to jeopardize the entire contract.

53.     CDK's refusals to release data for Asbury, Doral, Regal, Lou Bachrodt Auto Mall, and Universal, for purposes of a switch away from CDK, are not isolated incidents. They are part of a broader pattern of anticompetitive and unlawful conduct by CDK to lock dealers in to using its DMS, by holding their data hostage and thus forcing dealerships looking to switch to a competitor DMS to continue to rely on CDK's DMS. CDK now routinely takes more than two months to provide the preliminary accounts-receivable approvals that it requires to move forward with data transfer. Since the start of 2023, at least 62 dealerships have been forced to postpone their Tekion Go-Live date, collectively resulting in significant losses to Tekion, increased implementation costs, unpredictability of its implementation calendar, and poor onboarding experiences for its customers. In many of these 62 cases, these launches have been postponed several times. CDK's pattern of

FENWICK & WEST LLP

interference also threatens to delay the enrollment of new dealerships in the pipeline for transition, which includes 21 scheduled to Go-Live through Q1 2025. Tekion and other potential entrants into the DMS space are thus at risk of incurring continuing economic harm from CDK's efforts to frustrate dealer access to their data and delay data transfers, including due to increased implementation costs because of the CDK-imposed delays.

54.     CDK's obstruction of dealer efforts to access their own data has an anticompetitive effect on the franchise DMS market, in which CDK enjoys approximately 60% share by revenue. Dealers will not move to competitor DMS providers if doing so risks being without a DMS, and without their own data, or if they have to bring or defend lawsuits just for the right to access and use what is indisputably theirs. If dealers are effectively foreclosed from contracting with and trialing new DMS providers, staying with CDK even when superior alternatives are available, then CDK's market position will become even more entrenched. This harm is of particular concern given that five out of the six largest public dealer groups—Asbury, AutoNation, Group 1, Lithia, and Sonic—use CDK as their primary DMS.[14]  As Asbury's CIO testified, if Asbury can change DMS providers, any dealer can. But, of course, if others see that CDK can prevent even Asbury from overcoming CDK's stranglehold on the market, then they will be dissuaded from even making the attempt.

55.     CDK's conduct also has caused delays in Tekion's implementation of DMS services for its customers, resulting in economic harm to Tekion. Tekion does not begin collecting monthly subscription fees until the date of launch with each customer, and it collects half or more of its implementation fees on that launch date. These fees are critical for Tekion's revenue, financial health, and attractiveness to investors.

## V.    CDK Attempts To Tie Complementary Products to Its Franchise DMS Product.

56.     Recognizing the importance of data to dealer operations, some states, like Arizona, have enacted legislation intended "to ensure that dealers retain control over their data." *CDK Glob.*

---

[14] CDK cyberattack Day 10: DMS restored for Group 1, more dealerships (autonews.com), *available at* https://www.autonews.com/dealers/cdk-cyberattack-day-10-dms-restored-group-1-more-dealerships/.

FENWICK & WEST LLP

*LLC v. Brnovich*, 16 F.4th 1266, 1272 (9th Cir. 2021) (considering CDK's challenge to Ariz. Rev. Stat. §§ 28-4651 to -4655); *see also, e.g.*, Mont. Code Ann. §§ 30-11-717, 30-11-718, 30-11-719, Or. Rev. Stat. § 650.123, and W. Va. Code § 17A-6A-15a(h)(2)(C). CDK, which understands the power that control over dealer data gives it for entrenching its share of the franchise DMS market, tried to block the Arizona "Dealer Law," which the legislature passed unanimously. CDK failed, but its conduct, as the Ninth Circuit described it, is illustrative of another branch of CDK's illegal attempts at market dominance through data control.

57.    As noted, dealers often use separate software applications that complement their DMS to manage other aspects of their business. Those applications require access to dealer data as stored in the DMS. The Arizona Dealer Law prohibited DMS providers from "tak[ing] any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use" data the dealer stored in its DMS, or to impose charges "beyond any direct costs incurred" for database access. *See* Ariz. Rev. Stat. §§ 28-4651(5), 28-4653(A)(3). And as long as a dealer-authorized third-party integrator complies with industry security standards, DMS providers may not prohibit the third party "from integrating into the dealer's data system," nor may they otherwise "plac[e] an unreasonable restriction on integration." *Id.* §§ 28-4651(1), (9), 28-4653(A)(3)(b).

58.    As the Court explained, "in the past, CDK allowed dealers to share access to the DMS with third-party data-integration companies that would extract a dealer's data from the DMS and reformat it for use in the dealer's other software applications. But a few years ago, CDK began to prohibit that practice." *Brnovich*, 16 F.4th at 1272. That is because CDK began offering its own data integration services "at significantly higher prices than independent data integrators." *Id.* In addition to charging a premium for these integration services, CDK offered its own versions of the complementary applications for which integration would otherwise be required. The Arizona Dealer Law was a threat to CDK's practices in this regard.

59.    Digital retail applications are software platforms that enable OEMs to create online "showrooms" where potential car buyers can browse inventory, customize vehicles, schedule test drives, and complete purchase transactions. These applications complement the DMS for franchise

dealerships and provide a seamless and efficient shopping experience for customers, streamlining various aspects of the sales process, including financing and trade-ins, and offering a multi-channel shopping experience that allows customers to buy vehicles online, in-store, or in a hybrid process. Digital retail applications enable OEMs to enhance customer satisfaction, simplify operations, and stay competitive with vertically integrated automobile manufacturers, such as Tesla.

60.    Separate from its DMS, Tekion offers OEMs digital retailing functionality that is technologically capable of integrating seamlessly with whatever DMS is used within an OEM's network of franchise dealers.  Tekion built such a platform for General Motors ("GM DRP").  To enhance the customer experience, GM mandated the DRP program for its dealers across the country, many of which were on CDK's DMS.  Before 2021, CDK's dealership-level DMS product permitted integrations with the GM DRP that Tekion built.  Thus, for example, if a vehicle was sold via the GM DRP (which Tekion designed and deployed) it would be removed automatically from the relevant dealer's inventory, even if that dealer used a CDK DMS, and all transaction details would be pushed to the accounting module of the dealer's CDK DMS to facilitate closure. But in 2021, CDK acquired its own competing digital retail application, Roadster.[15]  After the Roadster acquisition, CDK terminated its integration agreements with both Tekion and GM for GM DRP and attempted to tie the use of Roadster to its DMS product.  By refusing to permit integration by any competing digital retail platform with CDK's monopoly franchise DMS platform, CDK attempted to force any OEM, such as GM, that aspired to adopt a digital retail platform to purchase Roadster.  At the same time, Honda/Acura also was launching its own digital retailing experience on Tekion's platform.  Because over 50% of Honda/Acura dealers were on CDK's DMS, Honda/Acura asked CDK to enable integration of the DMS with Tekion's digital retailing platform. CDK initially refused.

61.    CDK's attempt to tie its Roadster digital retailing product to its DMS threatened both to extend CDK's existing monopoly into the adjacent market for digital retailing products and

---

[15] CDK Global acquires digital retailing provider Roadster for $360M | Automotive News (autonews.com), available at https://www.autonews.com/dealers/cdk-global-acquires-digital-retailing-provider-roadster-360m.

FENWICK & WEST LLP

entrench and perpetuate CDK's existing monopoly in the franchise DMS market. Through its conduct, CDK sought to increase the barriers to entry faced by competitors and entrants into both product markets. Competitors of CDK's Roadster product, such as Tekion, would be foreclosed from the digital retailing product market due to the incompatibility of their products with the majority of franchise dealers in any OEM's network who are dependent on CDK's monopoly franchise DMS product. Correspondingly, CDK would perpetuate its existing monopoly in the franchise DMS market by effectively requiring competitors to simultaneously enter the adjacent digital retailing application market.

## INTERSTATE COMMERCE

62.     CDK is engaged in, and its activities substantially affect, interstate trade and commerce. CDK provides DMS to dealers across the nation.

## RELEVANT PRODUCT MARKET

63.     The relevant product market for the purposes of this complaint is the market for DMS for franchise dealerships in the United States. Nationwide, approximately 18,000 franchise dealerships rely on DMS to conduct all essential operations. There are no reasonably interchangeable substitutes for DMS, and franchise dealers—in particular, multi-dealer groups with more complex operations—could not switch to another DMS in the face of a small but significant and non-transitory increase in price.

64.     Franchise DMS have distinct qualities that other business software products, such as independent (used car) DMS, do not have. For instance, a franchise DMS must have OEM integrations and certifications for each dealer to communicate with OEMs to share new car sales and parts information, and perform warranty services, among other things. Independent dealerships do not need to maintain such OEM integrations or certifications, and thus these requirements are not needed for independent DMS products or general business software that independent dealers use. In addition to OEM certification, franchise dealers generally require software features not required for independent dealers, including complex automobile repair and parts software modules. In addition, independent DMS providers often lack other software modules important to a franchise dealer, such as accounting and payroll modules.

FENWICK & WEST LLP

65.     Franchise dealers do not use independent DMS providers or general business software as a competitive restraint in negotiations with franchise DMS providers. Franchise dealers are also reluctant to switch to a new DMS provider, given the high switching costs, the risks of disruption to their daily operations and compliance obligations, and the need for reliable and secure access to their data. Thus, franchise DMS is the relevant product market in which to analyze the anticompetitive effects of CDK's conduct.

## RELEVANT GEOGRAPHIC MARKET

66.     For purposes of this lawsuit, the United States of America is the relevant geographic market. There are very few providers in the franchise DMS market in the United States. They provide a specialty product for United States-based franchise auto dealers, which operate physically in the United States. For such dealers, the only reasonable substitute for one franchise DMS provider would be another franchise DMS provider operating within the United States and serving United States-based dealers.

## MARKET AND MONOPOLY POWER

67.     In addition to CDK and Tekion, only Reynolds & Reynolds, Dealertrack, Auto/Mate, and a small handful of other companies offer DMS services to franchise dealers in the United States. But CDK has approximately 60% market share by total DMS revenue for franchise dealers, and an even greater share of the submarket for large enterprise franchise dealers in the United States. CDK provides DMS to five of the six publicly owned large enterprise dealer groups.

68.     High barriers to entry perpetuate CDK's market power. A DMS is a sophisticated and specialized product essential to users in a regulated industry of national importance. DMS providers also act as the repositories for dealers' data, often many years' worth, and they must make that data interoperable with DMS. Without reliable access to their data, dealers cannot meet daily operational and business needs or legal and commercial compliance requirements. For these and related reasons, DMS contracts are often long, and switching to a new DMS system is expensive, time-consuming, and risky, involving, among other steps, high-volume data migrations.

69.     Dealers cannot risk being without a fully functional DMS, and they cannot be sure that a new DMS functions properly unless they have validated its operation with their own data,

FENWICK & WEST LLP

well in advance of the switchover date. CDK's conduct described above makes timely validation difficult if not impossible; it is safer for a dealer to renew with CDK than to exercise its right to contract freely with an alternative DMS provider, even a superior one. Nor can dealers risk the cost and disruption of litigation, or even threatened litigation, just to secure the rights that they already have in their own data (nor should they have to). CDK's practices have delayed and foreclosed dealer adoption of competing franchise DMS, including from Tekion.

70.    Not surprisingly, new entrants into the franchise DMS market are rare. Tekion, which entered the market in 2016, is among the newest entrants and the first to develop a cloud-native DMS. Given CDK's current practices and control of the majority of the market, it is highly unlikely that there will be other meaningful expansion into the market for franchise DMS products and services. Notwithstanding the growing interest among dealers in Tekion's DMS product, CDK's anticompetitive conduct threatens Tekion's survival.

## CAUSAL ANTITRUST INJURY

71.    CDK's anticompetitive conduct has caused substantial and continuing harm to new entrants and existing competitors in the DMS industry. The harm constitutes cognizable antitrust injuries.

72.    CDK intended the various anticompetitive practices described above to restrict competition from alternative DMS providers, including newcomer Tekion. By withholding, delaying, and impeding dealers' meaningful access to their own data, CDK prevented, delayed, and discouraged dealers from switching DMS providers to, e.g., Tekion, notwithstanding any competitor's superior offering.

73.    Because CDK's outdated legacy product cannot compete with competitors' offerings on merit, CDK has intentionally resorted to anticompetitive conduct to prevent dealers from accessing their data for the purpose of switching DMS providers. CDK's conduct has hampered competition in the franchise DMS market, and it has harmed dealers and consumers, as well. Tekion's injuries, which include lost revenues and increased costs, are the result of that conduct.

FENWICK & WEST LLP

74.    But for CDK's anticompetitive conduct, innovative DMS providers like Tekion would have gained a more rapid and substantial foothold in the franchise DMS market.  The harm to the competitive process, and to Tekion in particular, will be reasonably ascertainable through proof to be submitted at trial.

### CDK THREATENS TEKION WITH MERITLESS LEGAL ACTION FOR HELPING FRANCHISE DEALERS OBTAIN AUTHORIZED ACCESS TO THEIR OWN DATA

75.    As described above, CDK has delayed, denied, or impeded meaningful dealer access to their own data in order to transfer it to a DMS of their choice.

76.    In addition, CDK is actively hostile to dealership efforts to obtain their data from CDK's systems, including through legal threats and abusive legal process.  For instance, when Asbury attempted to extract DMS data for its switch to Tekion, CDK brought a lawsuit against it (since withdrawn) accusing Asbury of violating the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51, among other claims, and seeking to enjoin Asbury from accessing their own data or working with Tekion.  Ex. E at 11-13.

77.    Some dealerships, including several in California, have sought Tekion's assistance with accessing their data that they have stored in CDK's DMS so that they can migrate it to Tekion's DMS.  Using the dealership's CDK-issued credentials, Tekion provides the dealers with technical assistance in accessing their own data from CDK's DMS.  This assistance includes providing the dealer with equipment, automation tools, and knowhow.  Some of these activities occur in California and in this district.  Tekion's assistance is lawful, reasonable, and necessary for enabling dealerships to exercise their lawful rights of access to their own data and to switch DMS providers.  At all times Tekion acts on behalf of and with the consent and authorization of the dealerships, who own the data stored in CDK's DMS data and who have valid credentials for accessing their data on CDK's systems.

78.    In furtherance of its anticompetitive scheme to prevent franchise dealers from accessing and migrating their own data to Tekion, on December 6, 2024, CDK sent Tekion a letter styled "Cease and Desist/Notice of Legal Action," a true and correct copy of which is attached as **Exhibit H**.  In that letter, CDK mischaracterizes the nature of Tekion's assistance, and states that,

FENWICK & WEST LLP

FENWICK & WEST LLP

"Based on the evidence gathered to date, CDK has reason to believe that Tekion is engaged in the persistent violation of multiple state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract. Violation of these laws exposes Tekion to civil and criminal penalties, including liability for statutory damages, actual damages, attorneys' fees and injunctive relief."

79. In its December 6th letter, CDK directly threatened CDK with legal action: "Finally, this letter puts Tekion on notice of threatened or impending litigation concerning the allegations contained herein."

### FIRST CAUSE OF ACTION

### (Monopolization Under 15 U.S.C. § 2)

80. Tekion incorporates the allegations of the preceding paragraphs by reference.

81. Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

82. The market for franchise DMS products and services is a well-defined relevant antitrust market. CDK has substantial market power in this market, as evidenced by its dominant market share and as otherwise alleged in this Complaint.

83. CDK has engaged and continues to engage in various forms of anticompetitive conduct to limit and exclude competition in the franchise DMS market from Tekion and others. Such conduct includes withholding or delaying dealers' access to their own data, thereby preventing, delaying, and foreclosing dealers from switching to a competing franchise DMS, and threatening and initiating legal action against dealers that intend to switch from CDK's DMS. There is no legitimate business justification for such conduct, which constitutes monopolization in violation of Section 2 of the Sherman Act.

84.    In addition to substantial harm to competition generally, CDK's conduct has caused specific antitrust injuries to Tekion, including loss of revenue, loss of market share, and increased costs and expenses.

85.    CDK's conduct occurred in and affected interstate commerce.

86.    Because Tekion, franchise dealerships, and the car-buying public have all suffered antitrust injuries as a result of CDK's anticompetitive conduct, CDK is liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial and in accordance with 15 U.S.C. § 2.

87.    In addition, under 15 U.S.C. § 26, Tekion is entitled to permanent injunctive relief against further losses and damages caused by CDK's anticompetitive conduct.

## SECOND CAUSE OF ACTION

### (Attempted Monopolization Under 15 U.S.C. § 2)

88.    Tekion incorporates the allegations of the preceding paragraphs by reference.

89.    Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 2.

90.    The market for franchise DMS products and services is a well-defined relevant antitrust market.  CDK has substantial market power in this market, as evidenced by its dominant market share and as otherwise alleged in this Complaint.

91.    CDK has engaged and continues to engage in various forms of anticompetitive conduct to limit and exclude competition from Tekion and others.  Such conduct includes withholding or delaying dealers' access to their own data, thereby preventing, delaying, and discouraging dealers from switching to a competing franchise DMS, and threatening and initiating legal action against dealers that intend to switch from CDK's DMS.  There is no legitimate business justification for such conduct, which constitutes attempted monopolization in violation of Section 2 of the Sherman Act.

92.    CDK has engaged in and continues to engage in the anticompetitive conduct described in this Complaint with the specific intent of excluding competition and obtaining an

FENWICK & WEST LLP

unlawful monopoly such that it has a dangerous probability of success in monopolizing the relevant market.

93.    CDK's conduct has caused substantial harm to competition and specific antitrust injuries to Tekion, including loss of revenue, loss of market share, and increased costs and expenses.

94.    CDK's conducts occurred in and affected interstate commerce.

95.    Because Tekion, dealers, and the car-buying public have all suffered antitrust injury to its business as a result of CDK's anticompetitive conduct, CDK is liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial and in accordance with 15 U.S.C. § 2.

96.    In addition, Tekion is entitled under 15 U.S.C. § 26 to permanent injunctive relief against further losses and damages caused by CDK's anticompetitive conduct.

## THIRD CAUSE OF ACTION

### (Tortious Interference With Contract)

97.    Tekion incorporates the allegations of the preceding paragraphs by reference.

98.    Tekion has valid and enforceable contracts with many dealerships that currently use CDK's DMS and are seeking to switch to Tekion, including but not limited to Asbury, Doral Automative Group, Regal Automotive Group, Lou Bachrodt Auto Mall, and Universal, as well as over a dozen California-based dealerships that currently use CDK DMS that are slated to Go-Live in 2025.

99.    CDK was asked to comment on Asbury and Tekion's announcement of the Asbury pilot program, and Asbury, Regal, Doral, Lou Bachrodt Auto Mall, and Universal also each requested that CDK provide the data necessary for their respective transitions to Tekion's DMS. Accordingly, CDK knew about these contracts and about dealership plans to transition from CDK to Tekion.

100.    CDK acted intentionally to induce a disruption or breach of the Tekion contracts with these dealerships by refusing to provide the dealerships with meaningful access to their own data, employing tactics that would potentially leave dealerships without an operational DMS during the transition.

FENWICK & WEST LLP

101.    CDK's conduct has caused an actual breach of Tekion's contracts with dealerships, by delaying the transfer of data needed in advance of a transition, and in many instances has resulted in postponement of contractually agreed "Go-Live" dates.  For instance, in the case of Asbury, the contractual start date for pilot program has been delayed for at least a month, even with Asbury having to resort to judicial intervention to address CDK's conduct.

102.    CDK's actions were motivated by its desire to quash Tekion, a newcomer to the DMS industry, and to force dealership groups including but not limited to Asbury, Regal, Doral, Lou Bachrodt Auto Mall, and Universal to stay on CDK's platform by holding their data hostage.

103.    CDK "is not justified in inducing a breach of contract simply because [it] is in competition with one of the parties to the contract and seeks to further [its] own economic advantage at the expense of the other."  *See, e.g.*, *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 36 (1941) (reversing lower court grant of demurrer on tortious interference with contract cause of action against competitor).  CDK cannot, "under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor"—here, Tekion.  *See id.* at 37.

104.    As a direct and proximate result of CDK's conduct, Tekion has suffered economic harm, including loss of revenue, loss of market share, and increased costs and expenses, including by causing delay of dates on which the majority of implementation fees are due, and on which monthly subscription fees begin, under Tekion's contracts with dealerships.

105.    Tekion is entitled to recover damages from CDK for CDK's tortious interference with Tekion's contracts, in an amount to be proven at trial.

106.    In addition, to stop and prevent continuing irreparable harm to Tekion, Tekion is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the DMS industry.

### **FOURTH CAUSE OF ACTION**

### **(Tortious Interference With Prospective Economic Advantage)**

107.    Tekion incorporates the allegations of the preceding paragraphs by reference.

108.     Tekion has valid and enforceable contracts with many dealerships that currently use CDK's DMS and are seeking to switch to Tekion, including but not limited to Asbury, Doral Automative Group, Regal Automotive Group, Lou Bachrodt Auto Mall, and Universal, as well as over a dozen California-based dealerships that currently use CDK DMS that are slated to Go-Live in 2025.

109.     CDK was asked to comment on Asbury and Tekion's announcement of the Asbury pilot program, and Asbury, Regal, Doral, Lou Bachrodt Auto Mall, and Universal also each requested that CDK provide the data necessary for their respective transitions to Tekion's DMS. Accordingly, CDK knew about these contracts and about dealership plans to transition from CDK to Tekion.

110.     Tekion's contracts with dealerships are not only valid agreements in and of themselves, but they also reflect prospective business relationships and future economic expectancies for Tekion.  For example, Tekion's contract with Asbury contemplates that Asbury would eventually transition all of its dealerships to Tekion's DMS if the pilot program is successful, and industry publicity about the pilot program will lead to other economic opportunities among other dealerships and/or dealer groups.  Also, given Tekion's monthly subscription model, its contracts with dealerships reflect forward-looking economic relationships.

111.     CDK acted intentionally to induce a disruption or breach of the Tekion contracts with these dealerships by refusing to provide the dealerships with meaningful access to their own data, employing tactics that would potentially leave dealerships without an operational DMS during the transition.  As part of its unlawful scheme, CDK instigated meritless legal action against Asbury, to serve as a warning to other dealerships considering a switch to Tekion.  The threat of a lawsuit, together with the uncertainty associated with the schedule for data transfer, has had a chilling effect on dealership conversions from CDK's DMS to Tekion's.

112.     CDK's conduct has caused an actual breach of Tekion's contracts with dealerships, by delaying the transfer of data needed in advance of a transition, and in many instances has resulted in postponement of contractually agreed "Go-Live" dates.  For instance, in the case of Asbury, the

contractual start date for pilot program has been delayed for at least a month, even with Asbury having to resort to judicial intervention to address CDK's conduct.

113.    CDK's conduct was wrongful by some legal measure other than the fact of interference itself, as it violated the policy or spirit of antitrust laws.

114.    CDK's actions were motivated by its desire to quash Tekion, a newcomer to the DMS industry, and to force dealership groups including but not limited to Asbury, Regal, Doral, Lou Bachrodt Auto Mall, and Universal to stay on CDK's platform by holding their data hostage.

115.    CDK "is not justified in inducing a breach of contract simply because [it] is in competition with one of the parties to the contract and seeks to further [its] own economic advantage at the expense of the other." *See, e.g.*, *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 36 (1941) (reversing lower court grant of demurrer on tortious interference with contract cause of action against competitor). CDK cannot, "under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor"—here, Tekion. *See id.* at 37.

116.    As a direct and proximate result of CDK's conduct, Tekion has suffered economic harm, including loss of revenue, loss of market share, and increased costs and expenses, including by causing delay of dates on which the majority of implementation fees are due, and on which monthly subscription fees begin, under Tekion's contracts with dealerships.

117.    Tekion is entitled to recover damages from CDK for CDK's tortious interference with Tekion's business relationships in an amount to be proven at trial.

118.    In addition, to stop and prevent continuing irreparable harm to Tekion, Tekion is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the DMS industry.

### **FIFTH CAUSE OF ACTION**

**(For Violations of California's Unfair Competition Law,**

**Business and Professions Code § 17200, *et seq.*)**

119.    Tekion incorporates the allegations of the preceding paragraphs by reference.

FENWICK & WEST LLP

120.    Tekion has valid and enforceable contracts with many dealerships that currently use CDK's DMS and are seeking to switch to Tekion, including Doral Automative Group, Regal Automotive Group, Lou Bachrodt Auto Mall, and Universal, as well as over a dozen California-based dealerships that currently use CDK DMS that are slated to Go-Live in 2025.

121.    CDK was asked to comment on Asbury and Tekion's announcement of the Asbury pilot program, and Asbury, Regal, Doral, Lou Bachrodt Auto Mall, and Universal each requested that CDK provide the data necessary for their respective transitions to Tekion's DMS.  Accordingly, CDK knew about these contracts and about dealership plans to transition from CDK to Tekion.

122.    CDK acted intentionally to induce a disruption to or breach of the Tekion business relationships these dealerships by withholding, delaying, or impeding dealership access to their own data.  CDK also employed tactics, and invented pretexts, that would potentially leave dealerships without any operational DMS during the transition.  CDK refused to provide Tekion with the necessary data for the Asbury pilot program, which is an important public proof of concept of the Tekion DMS.

123.    CDK has thus engaged in unfair and unlawful course of conduct, which constitutes an unfair business practice within the meaning of California Business and Professions Code § 17200, *et seq.*  CDK's conduct threatened an incipient violation of antitrust laws, violated the policy or spirit of antitrust laws, such that it its effects are comparable to or the same as a violation of the law, and it otherwise significantly threatens or harms competition within the DMS market.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

124.    CDK's actions were motivated by its desire to impede Tekion's growth in the DMS market and to entrench its current market position.

125.     As a direct and proximate result of CDK's conduct, Tekion has suffered economic harm, including loss of revenue, loss of market share, and increased costs and expenses.  As an example, CDK's delay in providing customer data for on-boarding dealerships such as Doral Automotive Group, Regal Automotive Group, Lou Bachrodt Auto Mall, and Universal has caused Tekion economic harm and threatens Tekion's ability to provide its innovative DMS to other dealerships.

FENWICK & WEST LLP

126.     Tekion is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the DMS market.

127.     Tekion is also entitled to restitution of any money or property that CDK acquired or retained by means of its unfair conduct.

## SIXTH CAUSE OF ACTION

### For Declaratory Judgment Under 28 U.S.C. § 2201

128.     Tekion incorporates the allegations of the preceding paragraphs by reference.

129.     CDK's December 6, 2024, letter styled "Cease and Desist/Notice of Legal Action" established the existence of an actual and justiciable controversy between Tekion and CDK as to CDK's (false) accusations that "Tekion is engaged in the persistent violation of multiple state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract.  Violation of these laws exposes Tekion to civil and criminal penalties, including liability for statutory damages, actual damages, attorneys' fees and injunctive relief."

130.     Contrary to CDK's false allegations, Tekion's provision of technical assistance to dealers to access and export their own data from their CDK accounts using the dealers' CDK access credentials, all with the express authorization of the dealers, does not violate state or federal laws, and is not "hacking."  Franchise dealerships own the data stored in the DMS products that they use, including CDK's DMS, and they have the right to access their data, including through use of authorized, CDK-issued credentials.  Franchise dealerships, including in California, also have the right to seek assistance to access their data through use of their authorized credentials.  The dealerships' authorization precludes any claim under, e.g., the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, which bars certain access "without authorization or exceeding authorized access."

131.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Tekion seeks a declaration that it has not violated the Federal Computer Fraud and Abuse Act, California's Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, or any other "state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright

FENWICK & WEST LLP

infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract," as described in CDK's December 6, 2024, letter.

## PRAYER FOR RELIEF

WHEREFORE, Tekion prays for judgment against CDK as follows:

a.   For declaratory relief under 28 U.S.C. § 2201 that Tekion's provision of assistance to dealerships is migrating from CDK's DMS product to Tekion's does not violate the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, California's Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, the Copyright Act., or any other "state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract."

b.   For compensatory damages according to proof at trial, and treble damages under 15 U.S.C. § 15(a).

c.   For punitive damages according to proof at trial.

d.   For restitution and disgorgement of any ill-gotten gains or profits obtained by CDK as a result of its unfair and unlawful conduct.

e.   For an award of attorneys' fees and costs under 15 U.S.C. § 26.

f.   For an injunction pursuant to 15 U.S.C. § 26 and Tekion's related state law claims, in the absence of an adequate self-help tool data migration tool for dealerships to obtain a complete and accurate copy of their data in a structured format, (i) requiring CDK to provide to Tekion any dealership data needed for a migration within ten (10) calendar days of a dealership's request for it; and (ii) enjoining CDK from engaging in any conduct that interferes with Tekion's contractual and prospective economic relations with Asbury, Doral, Regal, Lou Bachrodt Auto Mall, Universal, and other dealerships that use or intend to switch from CDK's DMS to Tekion's DMS.

g.   For pre- and post-judgment interest as allowed by law.

h.   For such other and further relief as the Court may deem just and proper.

1

### DEMAND FOR JURY TRIAL

2      Tekion hereby requests a trial by jury.

3

4   Dated: December 9, 2024                      Respectfully submitted,

5                                        By: */s/ Tyler G. Newby*

6

7                                        Tyler G. Newby (CSB No. 205790)
                                         tnewby@fenwick.com
                                         Armen N. Nercessian (CSB No. 284906)
8                                        anercessian@fenwick.com
                                         FENWICK & WEST LLP
9                                        555 California Street, 12th Floor
                                         San Francisco, CA  94104
10                                       Telephone: 415.875.2300
                                         Facsimile:  415.281.1350
11

12                                       Attorneys for Plaintiff
                                         TEKION CORP.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP