# EXHIBIT F

E-FILED IN OFFICE - JM
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
24-A-04939-3
6/3/2024 8:38 PM
TIANA P. GARNER, CLERK

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | |
|---|---|
| ASBURY AUTOMOTIVE GROUP, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | 24-A-04939-3 |
| v. ) | |
| ) | Civil Action No. _____ |
| CDK GLOBAL, LLC, ) | |
| ) | JURY TRIAL REQUESTED |
| Defendant. ) | |

**VERIFIED COMPLAINT FOR DAMAGES AND
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Asbury Automotive Group, Inc. ("Plaintiff" or "Asbury"), by and through undersigned counsel, hereby files this Complaint for Damages and Injunctive Relief against Defendant CDK Global, LLC ("Defendant" or "CDK") and shows the following:

**INTRODUCTION**

1.  This action requests specific performance, declaratory and immediate injunctive relief as a result of Defendant CDK's improper refusal to give Asbury complete and full access to Asbury's own proprietary client data. Pursuant to a relationship that spanned over a decade, CDK provides Asbury data management technology and software that enables Asbury to run all aspects of its automotive business with dealerships in Georgia and multiple states across the country. Indeed, the data stored by CDK is necessary and critical to the daily operation of Asbury's business.

2.  Asbury and CDK entered into a new contract in 2019 under which CDK continued to provide technology support services for Asbury's dealerships. The contract had an initial exclusivity term with some exceptions, including a contracted-for exclusion for 3 dealership

locations. This exclusion was specifically negotiated by Asbury to permit it flexibility to explore a partnership with another technology provider.

3. Consistent with its contractual right to do so, Asbury identified a new market participant in the dealership data management space and competitor of CDK, Tekion Corporation ("Tekion") that offers cutting edge and improved data management strategies that will significantly improve Asbury's data management and its business. Asbury announced that it entered into a contract with Tekion to conduct a pilot program following the end of the agreed upon exclusivity period. Provided that the pilot program is successful, Asbury will move its dealerships to Tekion in 2025 and 2026.

4. After Asbury announced the pilot program with Tekion, CDK refused to transfer Asbury's client data from the four selected dealerships ("Four Dealerships") in an unveiled attempt to impede Asbury from proceeding with the Tekion pilot program. CDK intent has become quite clear, that it intends to quash its competitor, Tekion, and force Asbury to stay on CDK's platform by holding its data hostage in direct violation of the parties' agreement.

## THE PARTIES, JURISDICTION AND VENUE

5. Asbury is one of the largest franchised automotive retailers in the United States, which owns and operates numerous car dealerships across the nation, including approximately 157 new vehicle dealerships across 15 states, including Georgia.

6. Asbury is a corporation organized under the laws of Delaware, with its headquarters and principal place of business located in Duluth, Georgia.

7. CDK offers various information technology services to retail automotive groups, including Asbury.

8. CDK is a corporation organized under the laws of Delaware, with its headquarters and principal place of business located in Hoffman Estates, Illinois. CDK is registered to do business in Georgia and may be served with process via its Registered Agent: CT Corporation System, 289 S Culver St, Lawrenceville, GA, 30046-4805.

9. This Court has personal jurisdiction over CDK because CDK is registered to do business in the State of Georgia and this lawsuit arises out of CDK's business transactions and tortious acts committed in Georgia. *See* O.C.G.A. § 9-10-91.

10. Venue is proper in this Court because a substantial part of the events, omissions, and damages giving rise to the claims occurred in this district. *See* O.C.G.A. § 9-10-93.

## FACTS

*Asbury and CDK's Relationship and Prior Course of Performance*

11. Asbury and CDK (the "Parties") have been business partners for more than thirteen years. Throughout this relationship, CDK has provided Asbury with proprietary software application programs and computer hardware designed to automate Asbury's business functions. For example, CDK provides Asbury with a Document Storage and Document Archiving System ("DSDA") that stores all of Asbury's historical documents. CDK also provides Asbury with a Client Relationship Manager ("CRM") platform, which allows Asbury to efficiently and accurately store and access its customer lead data.

12. In order to be able to use CDK's products and services, Asbury provides CDK with its proprietary and confidential business information, including customer data, vehicle and parts inventories, sales history, and financial records. In return, CDK has agreed to protect Asbury's ownership and right to possess its data. The data stored by CDK is essential to Asbury's business and is what allows it to conduct day-to-day operations.

13. Throughout the course of the Parties' relationship, CDK's services to Asbury have also, necessarily, included transferring Asbury's data to other designated dealer management system ("DMS") providers at Asbury's request and direction. Until recently, Asbury has never had prior issues requesting and/or having its own data transferred to another DMS provider.

*The Parties' Contract*

14. On April 22, 2019, Asbury and CDK entered into the Master Services Agreement ("MSA"). A true and correct copy of the MSA is attached to this Complaint as Exhibit **1**. The MSA is governed by New York law. *Id.* § 19(J).

15. When negotiating the terms of the MSA, Asbury intentionally structured the contract to allow it to eventually move to a different DMS provider if it wanted to.

16. The Parties agreed the "Initial Term" of the MSA would run through April 22, 2024, and provide Asbury the option to renew the Agreement for up to two (2) successive periods of one (1) year each (the "Renewal Period"). *Id.* § 3(A). On or about April 22, 2024, the Parties renewed the MSA for another year—until April 22, 2025. Thus, the Renewal Period runs from April 22, 2024 through April 22, 2025.

17. Section 4(B) of the MSA, titled "Qualified Exclusivity," provides "that all retail motor vehicle dealer locations owned by Asbury . . . now or in the future, will license, and pay for, the Core Applications and Services at all times during the *Initial Term* of this Agreement." *Id.* § 4(B) (emphasis added). That said, there are several carve outs to the Qualified Exclusivity during the Initial Term, including "up to three (3) retail motor vehicle dealer locations owned by Asbury or one of its affiliates."

4

18. Section 2 of the MSA identifies the services CDK agreed to provide "in accordance with the terms and conditions of this Agreement." *Id.* § 2(A). Section 2 does not require Asbury to *exclusively* use CDK's services at all of its dealership locations.

19. Neither Section 4 nor any other section of the MSA requires Asbury to exclusively license and pay for CDK's core products and services at all Asbury locations during the *Renewal Period*.

20. The MSA defines "Client Data" as: "any [Asbury] file or other information provided by [Asbury] to CDK (including information of [Asbury's] customers) and any extract, database, output, reports, or derivative works created by [Asbury], and any [Asbury] business or transaction information produced by or for [Asbury] using the Products and Services or Software[.]" *Id.* § 8(A).

21. The MSA makes clear the Client Data is Asbury's proprietary data. It states that Asbury's Client Data "shall be and remain[s] the exclusive and confidential property" of Asbury. *Id.* § 8(A). The MSA also states, "CDK does not claim ownership over any Client Data . . . ." *Id.* § 7(A). Under the MSA, Asbury is "free to extract, aggregate, use, store, modify, compile, retransmit, and distribute" its own Client Data. *Id.* § 8(A).

22. Throughout the Parties' thirteen-year business relationship, Asbury would often request CDK provide DMS providers with certain data extractions related to Asbury's Client Data. For each request, CDK would promptly and cooperatively assist in providing the DMS provider access to Asbury's Client Data

*Asbury and Tekion Reach an Agreement for a Pilot Program and Asbury Requests its Client Data*

23. On December 8, 2023, Asbury and technology provider Tekion Corporation ("Tekion") reached an agreement for a trial program under which Asbury would start using

Tekion's dealership management technology—instead of CDK's—for four dealerships (the "Four Dealerships"), effective September 2024, following the termination of the exclusivity period in the Initial Term of the MSA. Asbury also contracted with Tekion to move additional dealerships beginning in 2025 and 2026 so that it can be fully moved to Tekion's services by 2027. Upon information and belief, in early 2024, CDK became aware through various news outlets of Asbury's new partnership with Tekion.[1]

24. As part of its deal, and prior to the required launch with Tekion in fall 2024, Asbury needs to provide its Client Data for the Four Dealerships to Tekion, so Tekion can begin loading the data into its products and software (just like CDK did at the start of the CDK-Asbury relationship) and timely launch the pilot program.

25. The agreement between Asbury and Tekion requires Asbury's Client Data pertaining to the Four Dealerships be transferred to Tekion by May 2024 so that Tekion can timely launch and complete the pilot program in order to install the Four Dealerships. Despite Asbury's best efforts to complete the transfer of its own Client Data, the Client Data was not received by that time because CDK is wrongly holding the Client Data hostage. As a result, Asbury has been working with Tekion in good faith to agree upon an alternative installation date for the Four Dealerships because CDK's improper conduct has obstructed the pilot program and contracted-for installation of the Four Dealerships by September 2024. The pilot program cannot be further delayed because such a delay impacts the completion of the pilot program, which impacts when the Four Dealerships can be installed, which, in turn, impacts Asbury's contractual obligations to

---

[1] *See, e.g.*, Mark Hollmer, *Asbury Automotive will test Tekion's DMS platform*, Automotive News (Jan. 10, 2024), a true and correct copy of this article is attached to this Complaint as **Exhibit 2**; Business Wire, *Tekion Selected by Asbury Automotive Group to Elevate Guest Experiences*, Yahoo! Finance (Jan. 9, 2024), https://finance.yahoo.com/news/tekion-selected-asbury-automotive-group-160000562.html.

Tekion to begin moving dealerships in 2025 as well as jeopardizing Asbury's plan for dealership data management on a global basis, which is the linchpin of its business.

26. Rolling out a new DMS is one of the most difficult and risky projects a dealer group can undertake because Client Data is the linchpin of the business. Asbury commissioned Tekion to conduct a pilot program on the Four Dealerships because Tekion is a new market participant offering a competitive and improved DMS product that will significantly support and enhance Asbury's business. During the pilot program, Asbury must re-engineer many business processes including inventory management, payroll, sales, services, parts, and accounting. In addition to perfecting these processes, Asbury also has to develop training materials and set up IT and business controls required to be compliant with federal regulations. This must be done on a small scale and verified by internal and external auditors before a large, full-scale rollout can be contemplated. It is for this reason that Asbury exercised the contracted-for Extension Period under the MSA, so that it continues to receive the CDK contracted-for services under the MSA during the pilot program and prior to an enterprise rollout with Tekion. It is estimated that the pilot program will take six to eight months; and if successful, an enterprise rollout will take between two to three years.

27. On January 16, 2024, Asbury promptly requested—through CDK's "FTP Request Form"—that CDK provide Tekion complete and full access to its Client Data related to the Four Dealerships Asbury identified as part of its pilot program with Tekion. A true and correct copy of this request is attached as **Exhibit 3**.

28. In response to this request, on January 25, 2024, CDK told Asbury that Asbury would first need to send a "cancellation request" for the subject dealerships. A true and correct copy of this email correspondence is attached as **Exhibit 4**.

7

29. CDK's cancellation request is a red herring and stall tactic. Nothing in the MSA requires a cancellation in order for Asbury to obtain its own Client Data, and CDK has never previously required such a cancellation prior to providing extractions of Asbury's Client Data. Nonetheless, in an effort to obtain the necessary data as quickly as possible, and per CDK's instruction, on February 5, 2024, Asbury sent CDK a cancellation request for the Four Dealerships, to be effective on December 31, 2024 (*i.e.*, during the Renewal Period). *See id.*

30. Even after Asbury submitted a cancellation request—as per CDK's instruction—CDK *still* would not release the Client Data. CDK's meritless excuses continued. On February 7, 2024, CDK refused Asbury's request for access to its Client Data because, CDK stated, "a CDK facilitated data transfer . . . is only available upon the termination of a location during the transition assistance period or the termination or expiration of our agreement." Instead, CDK pointed Asbury to its own "data warehouse" and the CDK "Data—Your Way" tool, neither of which provide the full and complete data sets that Asbury requested. *See id.*

31. Additionally, CDK stated (incorrectly) that Asbury's request to terminate "all CDK Services" for the Four Dealerships as of December 31, 2024 was not permitted because the MSA "does not permit termination of core products and services prior to the transition assistance period." *Id.*

32. Contrary to CDK's assertion, the MSA only requires Asbury to "license, and pay for, the Core Application and Services at all times during the *Initial Term* of this Agreement," not the Renewal Period (or any other period). **Exhibit 1** § 4(B) (emphasis added). And, even then, the MSA directly provides for at least 3 locations owned by Asbury or an Asbury Affiliate to be "Excluded Locations" that are not subject to the exclusivity requirement. MSA § 4(B). In other words, the MSA directly contemplates that Asbury would be free to have up to three locations

explore other data management solutions even during the exclusivity period, which no longer applies. Therefore, Asbury's request to cancel CDK's services during the Renewal Period at the Four Dealerships (out of approximately 157 dealership locations), although not required, was well within Asbury's rights under the MSA.

33. Ultimately, Asbury cannot fully and accurately extract its Client Data without CDK's cooperation. For example, the tools offered by CDK do not allow Asbury to extract *any* data from the DSDA system in bulk, which holds Asbury's own Client Data. As another example, Asbury only has access to *replicated* CRM data but does not have access to the actual SQL databases needed to verify the completeness and accuracy of the Client Data.

34. Asbury has attempted to extract its Client Data on its own, to no avail. In fact, on May 23, 2024, counsel for CDK sent a cease and desist letter regarding Asbury's attempts to access its Client Data. As a result, the Asbury account was disabled. In light of this letter, Asbury employees discontinued efforts to obtain Asbury's Client Data—and Asbury's account was disabled.

35. By contrast, CDK is able to easily, efficiently, and accurately extract the requested Client Data, as it has done many times before at Asbury's request.

36. CDK has no justification for refusing to extract and transfer the requested Client Data. Upon information and belief, CDK refuses to provide the requested Client Data simply because CDK does not want Asbury to use Tekion's services at the Four Dealerships.

37. Asbury has recently learned that CDK released its own new dealership management product called CDK Unify. It appears that CDK is attempting to force Asbury into adopting the new CDK Unify program by not allowing Asbury to take its Client Data to a CDK competitor. CDK is keenly aware of the substantial harm it is causing Asbury's business by withholding

9

Asbury's Client Data, the linchpin of its business. Wrongly withholding Asbury's Client Data rather than complying with the agreed upon contractual terms that provide a clear termination of the exclusivity period following the Initial Term and permit Asbury to freely contract with competitors and explore other data management products is substantially injurious to Asbury's business.

38. Indeed, restricting customers' access to their own data and engaging in other anticompetitive behavior is not new to CDK, which is currently embroiled in numerous antitrust lawsuits that have been consolidated into an MDL. *See In Re: Dealer Management Systems Antitrust Litigation*, MDL 2817 (N.D. Ill.).

39. Without its Client Data, Asbury is unable to implement its pilot program at the Four Dealerships and will be unable to launch with the Four Dealerships in fall 2024 as required. As such, the Four Dealerships that are contractually obligated to switch to Tekion's services will be unable to operate.

40. Obtaining the Client Data for Asbury's Four Dealerships is also necessary for Asbury to fulfill its agreement with Tekion to implement its pilot program, pursuant to the confidential contract between the parties. Asbury was obligated to provide Tekion its Client Data pertaining to the Four Dealerships by May 2024 in order to ensure a timely launch in September 2024. Because CDK is refusing to transfer the Client Data, Asbury is working with Tekion to arrange an alternative date for launch in October 2024. Nonetheless, there is grave concern about postponing the Four Dealerships' launch data beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sale volume months so the launch cannot happen during that time. Therefore, every day that CDK refuses to transfer Asbury's Client Data is another day that Tekion is not able to complete the pilot program and

another day closer to not being able to install the Four Dealerships, as required by contract. Every day delayed also further jeopardizes Asbury's plan to move dealerships beginning in 2025. As such, CDK's actions are causing significant and irreparable harm to Asbury.

41. On April 2, 2024, CDK contacted Tekion without Asbury's permission with respect to the Asbury-Tekion pilot program. CDK threatened "that any remote or in-person access by Tekion to screen displays generated by CDK Products and Services, or to such Products and Services directly, including through software and/or the use of CDK login credentials, would constitute a material breach of the MSA." A true and accurate copy of this correspondence is attached as **Exhibit 5**. CDK also threatened that Tekion's actions could be considered to be inducing Asbury's non-compliance with the MSA and thus "actionable as tortious interference." *Id.*

42. CDK's statements to Tekion in the April 2, 2024 letter are untrue as the MSA permits Asbury to reduce the number of dealerships using CDK's core services now that the Parties are in the Renewal Period.

43. By May 2024, months after Asbury's original request, CDK still has refused to provide Asbury with its Client Data. On May 9, 2024, Asbury sent CDK a formal demand letter requesting that CDK immediately provide the requested Client Data. To date, CDK still has not done so. CDK has never articulated that it neither could transfer the data nor that doing so would be burdensome.

44. Because CDK continues to refuse to extract the Client Data to which Asbury is entitled, Asbury now has no choice but to file this lawsuit and seek assistance from the Court.

## COUNT I
## Breach of Contract

45. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

46. The MSA is a valid and enforceable contract between CDK and Asbury.

47. Asbury has complied with all provisions of the MSA.

48. The MSA entitles Asbury to its own Client Data.

49. By holding the Client Data hostage, despite repeated requests by Asbury, CDK has breached the terms of the MSA including, but not limited to, Sections 7(A) and 8(A) of the MSA.

50. New York law implies in every contract a covenant of good faith and fair dealing. *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318, 662 N.E.2d 763, 769 (N.Y. 1995). CDK has breached the implied covenant of good faith and fair dealing by, *inter alia*, (i) failing to use reasonable efforts to provide and/or (ii) arbitrarily or irrationally refusing to provide Asbury the requested Client Data that it is plainly entitled to under the MSA.

51. Because of CDK's improper conduct, Asbury does not have its requested Client Data. Until and unless CDK provides that Client Data to Asbury, Asbury cannot implement its pilot program with Tekion at the Four Dealerships and cannot timely launch with the Four Dealerships.

52. As a direct and proximate result of CDK's breach, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

53. Further, as a direct and proximate result of CDK's breach, Asbury has suffered damages in an amount to be determined at trial.

## COUNT II
### Conversion

54. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

55. Asbury has title to and a right to possess the Client Data.

56. CDK has actual possession of the Client Data.

57. Asbury has demanded CDK to provide the Client Data.

58. CDK has continually refused to provide access to the Client Data.

59. The Client Data is valuable.

60. As a consequence of CDK's refusal, Asbury does not have its requested Client Data. Until and unless CDK provides that Client Data to Asbury, Asbury cannot implement its pilot program with Tekion at the Four Dealerships and cannot timely launch with the Four Dealerships.

61. As a direct and proximate result of CDK's conduct, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

62. Further, as a direct and proximate result of CDK's conduct, Asbury has suffered damages in an amount to be determined at trial.

## COUNT III
### Tortious Interference with Contractual Relations

63. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

64. Asbury and Tekion have entered into a valid, enforceable contract.

65. CDK has acted improperly and without privilege in holding hostage the requested Client Data and in contacting Tekion directly, without Asbury's consent, and misrepresenting the terms of the MSA.

66. In withholding the Client Data and contacting Tekion directly, CDK has acted purposefully and/or maliciously with intent to injure Asbury's contractual relationship with Tekion.

67. As a result of CDK's misconduct, including improperly withholding the Client Data, it has halted and impaired Asbury and Tekion's contractual relationship because their pilot program cannot go forward.

68. CDK's withholding of Client Data has proximately resulted in Asbury's inability to implement its contracted-for services with Tekion, including executing its pilot program with Tekion at the Four Dealerships.

69. As a direct and proximate result of CDK's conduct, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

70. Further, as a direct and proximate result of CDK's conduct, Asbury has suffered damages in an amount to be determined at trial.

## COUNT IV
## Tortious Interference with Business Relations

71. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

72. CDK has acted improperly and without privilege in holding hostage the requested Client Data and in contacting Tekion directly, without Asbury's consent, and misrepresenting the terms of the MSA.

73. In withholding the Client Data and contacting Tekion directly, CDK has acted purposefully and/or maliciously with intent to injure Asbury's business relationship with Tekion.

74. As a result of CDK's conduct, including improperly withholding the Client Data, it has halted and impaired Asbury and Tekion's business relationship because their pilot program cannot go forward.

75. CDK's withholding of Client Data has proximately resulted in Asbury's inability to implement its pilot program with Tekion at the Four Dealerships.

76. As a direct and proximate result of CDK's conduct, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

77. Further, as a direct and proximate result of CDK's conduct, Asbury has suffered damages in an amount to be determined at trial.

## COUNT V
## Declaratory Judgment

78. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

79. The Declaratory Judgments Act gives courts the power "to declare rights and other legal relations of any interested party. . . in any civil case in which it appears to the court that the ends of justice require that the declaration should be made." O.C.G.A. § 9-4-2.

80. An actual controversy exists between Asbury and CDK with respect to: (a) whether the MSA requires Asbury to use CDK as its exclusive provider of CDK's core products and services during the Renewal Period; and (b) whether the MSA requires CDK to complete the transfer of Asbury's Client Data to Asbury when requested as consistent with the Parties' course of performance.

81. Based on the foregoing, Asbury respectfully requests the Court declare that: (a) Asbury has no obligation under the MSA to use CDK as its exclusive provider of core products and services during the Renewal Period; and (b) the MSA requires CDK to complete the transfer of Asbury's Client Data to a DMS provider like Tekion when requested consistent with the Parties' MSA and course of performance.

82. Declaratory relief will resolve the dispute between Asbury and CDK regarding their rights and obligations under the MSA.

## COUNT VI
## Attorney's Fees Pursuant to O.C.G.A. § 13-6-11

83. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

84. CDK has acted in bad faith, has been stubbornly and maliciously litigious, and has caused Asbury unnecessary trouble and expense.

85. More specifically, CDK has acted in bad faith by concocting and stringing together numerous meritless excuses for refusing to provide Asbury's Client Data.

86. In addition, CDK has acted in bad faith by improperly contacting Tekion with the intention of threatening and interfering with Asbury's business and contract with Tekion.

87. CDK is therefore liable to Asbury for all of Asbury's costs and expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

88. Accordingly, Asbury seeks to recover its statutory attorneys' fees, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays for judgment in favor of Asbury and against Defendant CDK on all counts in this Complaint, and that the Court grant the following relief:

a. Specific performance requiring Defendant CDK to provide the requested Client Data to Tekion immediately;

b. Injunctive relief, enjoining Defendant CDK from refusing to provide Asbury access to its Client Data, which was first requested on January 16, 2024;

c. Actual damages, to include injury to Asbury's loss of present and prospective business;

d. For a declaration that the MSA does not require Asbury to use CDK as its exclusive provider of CDK's Core Products and Services during the Renewal Period;

e. For a declaration that the MSA requires CDK to complete transfer of Asbury's Client Data upon request by Asbury, as consistent with the Parties' prior course of performance;

f. Attorneys' fees and costs;

g. Pre- and post- judgment interest as allowed by law; and

h. Any and all such other and further legal and equitable relief as the Court deems necessary, just, and proper.

## REQUEST FOR TRIAL BY JURY

Asbury respectfully requests trial by jury for all issues so triable.

Respectfully submitted this 3rd day of June, 2024.

**McGuireWoods LLP**

/s/ M. Laughlin Allen
M. Laughlin Allen
Georgia Bar No. 901999
McGuireWoods LLP
1075 Peachtree Street, N.E., 35th Floor
Atlanta, GA 30309
Tel: (404) 443-5738
Fax: (404) 443-5773

Email: mlallen@mcguirewoods.com

Benjamin L. Hatch
Virginia Bar No. 70116 (to be admitted *pro hac vice*)
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Tel: (202) 857-1700
Fax: (202) 857-1737
Email: bhatch@mcguirewoods.com

Jodie H. Lawson
NC Bar No. 42900 (to be admitted *pro hac vice*)
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2000
Fax: (704) 343-2300
Email: jlawson@mcguirewoods.com

*Attorneys for Plaintiff Asbury Automotive Group, Inc.*

24-A-04939-3

<u>VERIFICATION OF BARRY COHEN</u>

I, Barry Cohen, being duly sworn under oath, hereby state that the following is true and correct to the best of my knowledge, information, and belief, which is based on my personal knowledge:

1. I am over 18 years old and believe in the obligations of an oath.

2. I am the Vice President and Chief Information Officer of Asbury Automotive Group, Inc. ("Asbury"). I have served in this role for over 10 years and haves worked at the company for more than 13 years.

3. I have read the allegations in all Paragraphs of Asbury's Verified Complaint for Damages and Declaratory and Injunctive Relief regarding Defendant CDK Global, LLC's breach of contract, conversion, tortious interference with contractual relations, and tortious interference with business relations as well as Asbury's request for a declaratory judgment and attorney's fees.

4. All such allegations are true and correct to the best of my knowledge, information and belief.

_____
Barry Cohen

Sworn to and subscribed before me
This 3 day of June, 2024.
_____
Notary Public
My Commission Expires: 10·30·27



19