# EXHIBIT G

E-FILED IN OFFICE - JM
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

24-A-04939-3

6/3/2024 8:38 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **ASBURY AUTOMOTIVE GROUP, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   Civil Action No. _____  24-A-04939-3 |
| **CDK GLOBAL, LLC,** | ) |
| | ) |
| **Defendant.** | ) |

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION & EXPEDITED CONSIDERATION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Plaintiff Asbury Automotive Group, Inc. ("Asbury"), pursuant to O.C.G.A. §§ 9-5-1 and 9-11-65, moves the court for a preliminary injunction against Defendant CDK Global, LLC ("CDK") and requests that the Court expedite the consideration of this Motion.

## I.    INTRODUCTION

Asbury is an automotive retailer with dealerships in multiple states across the country, including Georgia.  CDK provides information technology services to the automotive retail industry and is one of two dominant service providers in a field that has long been characterized by the presence of two large providers.  Asbury has utilized CDK's technology services for over a decade to manage Asbury's data.  Asbury relies on the data maintained by CDK's software to run all aspects of its business; indeed, the data stored by CDK is necessary and critical to the daily operation of Asbury's business.  Asbury and CDK entered into a Master Services Agreement ("MSA") in 2019 under which CDK provided technology support services for some 89 dealerships of Asbury.  This contract had an initial exclusivity term—a period in which, with some exceptions, Asbury was generally required to keep these dealerships supported by CDK.

That initial exclusivity period ended in April of this year. Asbury elected to extend its contract at that time for a year, but critically, the extension period of the contract does not require exclusivity. Knowing that it would be freed from the exclusivity requirement as of April 2024, Asbury considered whether a competitor of CDK could offer it better service or prices, or both. Asbury identified Tekion Corporation ("Tekion"). A relatively new market participant in the dealership data management space and competitor of CDK, Tekion offers cutting edge and improved data management strategies that stand to significantly improve management of Asbury's data. Asbury announced in January 2024, that it would conduct a pilot program with Tekion. Under this pilot program, Asbury would have data from only four of its stores transferred from CDK to Tekion for the pilot program. If the pilot program is successful, Asbury could then transfer more of its stores to Tekion in 2025 and 2026, all of which is consistent with the non-exclusivity period of Asbury's contract with CDK.

CDK has fought Asbury's request to transfer the data from the four selected dealerships (the "Four Dealerships") to Tekion at every turn by CDK. Indeed, CDK has in bad faith refused to transfer the Four Dealerships' data even though this is a function CDK has historically routinely performed with ease and at no charge.[1] Rather, CDK told Asbury it could come get its own data, which Asbury attempted. The tools CDK provides to access customer data directly proved wholly inadequate, however, and then, in a bizarre turn, CDK accused Asbury of wrongfully attempting to access *its own data*. Asbury's every effort to get just the Four Dealerships transferred has been rejected by CDK, even when Asbury offered to pay for the transfer—an offer Asbury was not required to make under its agreement with CDK but which Asbury ultimately advanced to try and

---

[1] CDK has transferred Asbury's data at Asbury's request to other dealer management systems ("DMS") at no charge on numerous occasions, including as recently as May 2024.

resolve the impasse. It is thus apparent at this point that CDK intends to quash any competition by Tekion, and that CDK intends to attempt to retain Asbury's business by brute force refusal to yield up *Asbury's own data*. Asbury has been left with no choice but to seek the Court's intervention to direct CDK to yield up Asbury's data to Tekion.

The significance of this issue goes well beyond the Four Dealerships' data that CDK is refusing to transfer. As a direct consequence of CDK's bad faith, Asbury is unable to proceed with its pilot program and planned move to Tekion. Asbury will lose out on financial commitments it has made to Tekion if Asbury cannot have its data transferred in a timely fashion. And, even more significantly, if Asbury cannot run the pilot program with Tekion, its ability to shift its stores to Tekion in 2025 and 2026 will be severely impaired, resulting in massive disruption to Asbury's business. CDK's conduct has thus caused and will continue to cause significant and irreparable harm to Asbury.

Accordingly, Asbury respectfully requests that the Court issue an order (i) granting Asbury's motion for a preliminary injunction on an expedited basis to prevent CDK's gamesmanship, anti-competitive conduct, and bad faith, and (ii) requiring CDK to immediately yield up Asbury's data, in the form and manner requested on January 16, 2024, just as CDK has done in the past and as CDK is obligated to do under the plain letter of the parties' contract. As demonstrated below, all four factors considered in connection with Asbury's request weigh <u>heavily</u> in favor of granting a preliminary injunction. *See City of Waycross v. Pierce Cty. Bd. of Comms.*, 300 Ga. 109, 111 (2016) (articulating factors to consider for granting preliminary injunction).

*Irreparable Harm.* First, CDK's conduct, if not enjoined, will make it <u>impossible</u> for Asbury to move forward with its pilot program with Tekion, which was scheduled to commence in May 2024, and prevent the contracted-for launch of the Four Dealerships with Tekion in

September 2024.  Thereafter, Asbury has contracted with Tekion to move additional dealerships beginning in 2025 and 2026 so that it can be fully moved over to Tekion's services by 2027.  The negative impact to Asbury's business caused by CDK's refusal to provide access to Asbury's data cannot be overstated—Asbury cannot proceed with the Tekion pilot program without its data, which means that Asbury will not be able to complete the pilot program.  Consequently, Asbury will not be able to meet the contractually required launch of the Four Dealerships by September 2024 and therefore will be unable to proceed with its contractually agreed move of additional stores through 2025 and 2026.

Quite literally, Asbury will suffer irreparable harm unless the Court intervenes.  Data management is the lifeblood of Asbury's business and CDK's bad faith and unlawful conduct have prevented it from implementing its data management plan with Tekion now and into the future.  Further, Asbury and CDK *agreed* that this type of irreparable injury and damage would entitle Asbury to injunctive relief pursuant to their contract.  *See* Master Services Agreement § 19(H), attached as Ex. 1 to Verified Compl.  Every day that goes by without the Four Dealerships' data further delays the time that Asbury will be able to implement the pilot program with Tekion and jeopardizes Asbury's ability to comply with the Tekion agreement to launch Four Dealerships by September 2024, and further jeopardizes Asbury's plan to move dealerships beginning in 2025.  Thus, Asbury will suffer immediate irreparable harm unless the Court intervenes to enforce Asbury's contractual rights under the MSA.  *See*, *e.g.*, *MasterMind Involvement Mktg., Inc. v. Art Inst. of Atl., LLC*, 389 F. Supp. 3d 1291, 1295 (N.D. Ga. 2019) (granting preliminary injunction under nearly identical circumstances).

*Balancing of Harm.*  In contrast to the irreparable harm Asbury will suffer, the burden on CDK is, for all practical purposes, non-existent.  CDK has quickly and efficiently completed data

transfers for Asbury with minimal effort in the past.  Because Asbury cannot proceed with its pilot program or the contracted-for launch with Tekion without the requested data, the irreparable harm to Asbury greatly outweighs any burden to CDK.

*Likelihood to Succeed on the Merits.*  CDK's conduct in withholding Asbury's data is in violation of the parties' contract; amounts to conversion; and constitutes tortious interference with the contract and business relationship between Asbury and Tekion.  As demonstrated below, there is substantial likelihood that Asbury will prevail on the merits of its claims at trial.

*Public Interest.*  Lastly, granting this Motion will support Georgia's bedrock public policy of freedom of contract and promoting competition.  CDK's conduct in withholding Asbury's data contravenes the terms of their contract *and* inhibits Asbury's ability to contract with other vendors, and is designed and intended to thwart competition in the marketplace by making it impossible for retail concerns similar to Asbury to seek other data management solutions.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Asbury and CDK's Prior Course of Performance and Master Services Agreement

Asbury and CDK (the "Parties") have been business partners for more than thirteen years.  *See* Affidavit of Barry Cohen ("Aff.") ¶ 5, attached hereto as **Exhibit 1**.  Throughout this relationship, CDK has provided Asbury with software application programs and computer hardware designed to automate Asbury's automotive dealerships.  *Id*.  For example, CDK provides Asbury with a Document Storage and Document Archiving System ("DSDA") that stores all of Asbury's historical documents. *Id*.  CDK also provides Asbury with a Client Relationship Manager ("CRM") platform, which allows Asbury to store and access its customer data.  *Id*.  To be able to use CDK's products and services, Asbury provides CDK with its proprietary and confidential business information, including customer data, inventory information, sales history, and financial

records.  *Id*. at ¶ 6.  In return, CDK has agreed to protect Asbury's ownership and right to possess its data.  *Id*.  The data stored by CDK is <u>essential</u> to Asbury's business and is what allows it to conduct day-to-day operations.  *Id*.

On April 22, 2019, the Parties entered into the MSA, which is the contract at issue in this case.  *Id*. at ¶ 8.  The MSA makes clear the Client Data is Asbury's proprietary data.  *Id.* at ¶ 11.  "Client Data" means: "any [Asbury] file or other information provided by [Asbury] to CDK (including information of [Asbury's] customers) and any extract, database, output, reports, or derivative works created by [Asbury], and any [Asbury] business or transaction information produced by or for [Asbury] using the Products and Services or Software[.]"  MSA § 8(A).  Under the MSA, Asbury's Client Data "shall be and remain[s] the exclusive and confidential property" of Asbury; "CDK does not claim ownership over any Client Data . . . ."; and Asbury is "free to extract, aggregate, use, store, modify, compile, retransmit, and distribute" its own Client Data.  *Id.* §§ 7(A), 8(A).  Throughout the course of the Parties' relationship, CDK's services to Asbury have also, necessarily, included transferring Asbury's data at Asbury's request and direction.  Aff. ¶ 7.  Until recently, Asbury has never had issues requesting and/or having its own data transferred to another DMS provider from CDK.  *Id*.

The Parties agreed the "Initial Term" of the MSA would run through April 22, 2024, and provide Asbury the option to renew the Agreement for up to two (2) successive periods of one (1) year each (the "Extension Period").  *See* MSA § 3(A).  On or about April 22, 2024, the Parties renewed the MSA for another year—until April 22, 2025.  Thus, the Extension Period runs from April 22, 2024 through April 22, 2025.  Aff. ¶ 10.

While the MSA contains an exclusivity clause, it applies <u>only</u> to the Initial Term (and, even then, does not apply to the "Excluded Locations").  Section 4(B) of the MSA, titled "Qualified

Exclusivity," provides "that all retail motor vehicle dealer locations owned by Asbury . . . now or in the future, will license, and pay for, the Core Applications and Services at all times during the *Initial Term* of this Agreement."  MSA § 4(B) (emphasis added).  Thus, after April 22, 2024, Asbury was free to use other vendors to supply the "Core Applications and Services" CDK provided at some of Asbury's dealership locations.  Further, "Excluded Locations" is an exception to the exclusivity requirement during the Initial Term for up to three dealer locations.  MSA § 4(B).  Asbury specifically and intentionally negotiated this provision to allow it to explore a relationship with other vendors and move to a different DMS provider if it wanted to.  Aff. ¶ 9. Thus, even during the Initial Term (which is now concluded), Asbury had the contractual right to have at least three dealer locations managed by a different vendor, such as Tekion.

**B.      Asbury and Tekion Reach an Agreement for a Pilot Program and Asbury Requests its Client Data**

On December 8, 2023, Asbury and Tekion reached an agreement for a trial pilot program under which Asbury would start using the dealership management technology provided by Tekion—instead of CDK—for the Four Dealerships, effective September 2024, following the termination of the exclusivity period in the Initial Term of the MSA.  Aff. ¶ 12.  Asbury also contracted with Tekion to move additional dealerships to Tekion dealership management technology beginning in 2025 and 2026 so that Asbury can be fully moved to Tekion services by 2027.  *Id*.  Soon after, various news outlets publicized Asbury's new partnership with Tekion.  *Id.* at ¶ 13.

Rolling out a new DMS is one of the most difficult and risky projects a dealer group can undertake because managing Client Data is the linchpin of the business.  *Id.* ¶ 14.  Asbury commissioned Tekion to conduct a pilot program at the Four Dealerships because Tekion is a new market participant offering a competitive and improved DMS product that will significantly

support and enhance Asbury's business.  During the pilot program, Asbury must re-engineer many business processes including inventory management, payroll, sales, services, parts, and accounting.  *Id.*  In addition to perfecting these processes, Asbury also has to develop training materials and set up IT and business controls required to be compliant with federal regulations. *Id.*  This must be done on a small scale and verified by internal and external auditors before a large, full-scale rollout can be contemplated.  *Id.*  It is for this reason that Asbury exercised the contracted-for Extension Period under the MSA, so that Asbury continues to receive the contracted-for services under the MSA during the pilot program and prior to an enterprise rollout with Tekion.  It is estimated that the pilot program will take six to eight months; and if successful, an enterprise rollout will take between two to three years.  *Id.*

As part of its deal, and prior to launching with Tekion in September 2024, Asbury needs to provide its Client Data related to the Four Dealerships to Tekion so Tekion can begin loading the data into its products and software (just like CDK did at the start of the CDK-Asbury relationship) to initiate and complete the pilot program.  Aff. ¶ 15.  Accordingly, on January 16, 2024, Asbury promptly requested—through CDK's "FTP Request Form"—that CDK provide complete and full access to its Client Data related to the Four Dealerships that are part of its pilot program with Tekion.  *Id.* at ¶ 17.  In response to this request, on January 25, 2024, CDK told Asbury that Asbury would first need to send a "cancellation request" for the subject dealerships. *Id.* at ¶ 18.  Despite there being no such requirement in the MSA, on February 5, 2024, Asbury sent CDK a cancellation request for the Four Dealerships to be effective on December 31, 2024— within the Extension Period.  *Id.* at ¶ 19.

Notwithstanding the fact that Asbury has done everything that CDK has asked it to do, CDK has still refused to release the Client Data.  *Id.* at ¶ 20.  On February 7, 2024, CDK refused

Asbury's request for access to its Client Data because, CDK stated, "a CDK facilitated data transfer . . . is only available upon the termination of a location during the transition assistance period or the termination or expiration of our agreement." *Id*. at ¶ 21. Instead, CDK pointed Asbury to its "data warehouse" and "Data—Your Way" tool, neither of which provide the full and complete data sets that Asbury requested. *Id*. Additionally, CDK stated (incorrectly) that Asbury's request to terminate "all CDK Services" for the Four Dealerships as of December 31, 2024 was not permitted because the MSA "does not permit termination of core products and services prior to the transition assistance period." *Id*. at ¶ 22.

Asbury cannot fully and accurately access its Client Data without CDK's cooperation—it is impossible as a practical matter. *Id*. at ¶ 23. For example, the tools offered by CDK do not allow Asbury to extract <u>any</u> data from the DSDA system, which holds Asbury's own Client Data. *Id*. As another example, Asbury only has access to <u>replicated</u> CRM data but does not have access to the actual SQL databases needed to verify the completeness and accuracy of the Client Data. *Id*. By contrast, CDK is able to easily, efficiently, and accurately extract the requested Client Data, as it has done many times before at Asbury's request. *Id*. at ¶ 24. Asbury has tried to access its Client Data, to no avail. Even more egregious, after telling Asbury to "come and get its own data," on May 23, 2024, counsel for CDK sent Asbury's counsel a cease and desist letter regarding Asbury's attempts to access its Client Data—and Asbury's account was disabled. *Id.* at ¶ 23.

Obtaining the Client Data for Asbury's Four Dealerships is <u>necessary</u> for Asbury to fulfill its agreement with Tekion to implement its pilot program, which is required for Asbury to operate its automotive business pursuant to the confidential contract between the parties. *Id.* at ¶ 27. Asbury was obligated to provide Tekion its Client Data pertaining to the Four Dealerships by may 2024 in order to ensure a timely launch in September 2024. *Id*. Because CDK is refusing to

transfer the data, Asbury is working with Tekion to arrange an alternative date for launch in October 2024. *Id.* Nonetheless, there is grave concern about postponing the Four Dealership launch date beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sales volume months so the launch cannot happen during that time. *Id.* Thus, every day that CDK refuses to transfer Asbury's Client Data is another day that Tekion is not able to complete the pilot program and another day closer to not being able to install the Four Dealerships, as required by contract. Every day also further jeopardizes Asbury's plan to move dealerships beginning in 2025. *Id.* CDK is keenly aware of the substantial harm to Asbury's business caused by not having access to its Client Data. *Id.* at ¶ 26.

On April 2, 2024, CDK contacted Tekion without Asbury's permission with respect to the Asbury-Tekion pilot program. *Id.* at ¶ 28. CDK threatened "that any remote or in-person access by Tekion to screen displays generated by CDK Products and Services, or to such Products and Services directly, including through software and/or the use of CDK login credentials, would constitute a material breach of the MSA." *Id.* CDK also threatened that Tekion's actions could be considered to be inducing Asbury's non-compliance with the MSA and thus "actionable as tortious interference." *Id.* These statements are untrue as the MSA exclusivity provision has concluded and the MSA permits Asbury to reduce the number of dealerships using CDK's core services now that the Parties are in the Extension Period.[2]

The agreement between Asbury and Tekion required Asbury to begin transferring its Client Data pertaining to the Four Dealerships by May 2024, so that Tekion can timely launch the pilot

---

[2] Even if the Parties were still in the Initial Term (which they are not), the Exclusivity Provision would have still permitted Asbury to exclude up to three (3) of its dealership locations from the requirement of using CDK's Core Products and Services. *See* MSA § 4(B). Thus, the MSA specifically contemplated that Asbury—whether in the Initial Term or Renewal Period—could contract with another vendor.

program.  *Id*. at ¶ 15.  Despite Asbury's best efforts to obtain its own Client Data, the Client Data has not been transferred because CDK is wrongly holding the Client Data hostage.  *Id*.  As a result, Tekion cannot timely launch the pilot program and Asbury's plan to launch with the Four Dealerships in September 2024 pursuant to the contract with Tekion has been obstructed by CDK's improper conduct.  *Id*. at ¶ 16.  On May 9, 2024, Asbury sent CDK a formal demand letter requesting that CDK immediately provide Tekion with Asbury's Client Data.  *Id*. at ¶ 29.  To date, CDK still has not done so and has instead manufactured excuses for further delay.  *Id*.  To ensure that Tekion is able to perform the contracted-for services as soon as possible, and to ensure that Asbury can comply with its contractual obligations to Tekion for a planned launch of the Four Dealerships in accordance with their confidential contract as well as Asbury's contracted-for dealership data management with Tekion that is needed to run its business, Asbury needs to obtain its Client Data <u>immediately</u>.  *Id*. at ¶¶ 15, 27.

### C.    Asbury Undertakes Good Faith Efforts to Obtain the Contractually-Agreed Transfer of its Client Data

Having been refused at every turn by CDK to transfer its Client Data for the Four Dealerships in order meet its contracted-for pilot program with Tekion, Asbury engaged counsel and sent a demand letter to CDK on May 9, 2024.  *See* **Exhibit 2**.  The letter outlined the contracted-for provisions in the MSA that CDK was overlooking and sought immediate transfer of Asbury's Client Data.  *See id*.  Further, Asbury explained the irreparable harm being imposed upon Asbury by having its Client Data being held hostage by CDK such that it is not able to complete the pilot program with Tekion, proceed with the planned move to Tekion, or adequately plan for or carry out Asbury's data management that is the linchpin of its business.  *See id*.  CDK responded on May 22 and 23, 2024.  *See* **Exhibit 3**.  On May 31, 2024, Asbury's counsel responded to explain that Asbury was not terminating the MSA by exercising its contractual right to remove

11

the Four Dealerships from the MSA, that even though Asbury did not read the MSA to require payment to obtain transfer of its Client Data, Asbury would be willing to pay the hourly time and costs to transfer the Four Dealerships in order to obtain the necessary Client Data to meet its contractual obligations with Tekion, and again requesting immediate transfer of its Client Data. *See* **Exhibit 4**.   Unfortunately, despite multiple good faith efforts to obtain its Client Data as required by the MSA, CDK continued to refuse to comply with Asbury's requests, thereby necessitating immediate relief from the Court.

## III.    LEGAL ARGUMENT & CITATION TO AUTHORITY

Plaintiff is entitled to a preliminary injunction to ensure Plaintiff has access to its own Client Data under Georgia and New York law, as well as under the terms of the MSA.

As an initial matter, the MSA at issue contains a choice of law provision that designates New York law.  *See* MSA § 19(J).   Plaintiffs have also asserted conversion claims and tortious interference claims arising under Georgia law and can similarly show a likelihood of success on the merits of those claims, warranting injunctive relief.[3]

### A.    Preliminary Injunction Standard

Georgia courts have broad discretion in granting an interlocutory injunction.  *SRB Inv. Servs., LLLP v. Branch Banking & Tr. Co.*, 289 Ga. 1, 5 (2011).  Injunctive relief is particularly

_____

[3]The choice of law provision does not apply to Asbury's tort claims. Georgia courts draw a distinction between applying choice of law provisions that govern the "agreement" compared to "any and all claims arising out of the relationship." *See Baxter v. Fairfield Financial Services,* Inc., 307 Ga. App. 286 (2010); *Young v. W.S. Badcock Corp.*, 222 Ga. App. 218 (1996). Under Georgia conflict-of-law rules, the substantive law of the place where the tort was allegedly committed is the law by which liability is determined. *Baxter*, 307 Ga. App. at 292. ("Because the provision in Young limited itself to the terms of the agreement, Georgia law applied to the fraudulent representation claim because the representations allegedly occurred in Georgia. . . .").

appropriate where, as here, the withholding of injunctive relief would leave Asbury without an adequate remedy.  *See Rash v. Toccoa Clinic Med. Assocs.*, 253 Ga. 322, 327 (1984).

In evaluating Asbury's request for an injunction, the Court must balance the equities which includes consideration of whether: "(1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest." *City of Waycross v. Pierce Cnty. Bd. of Comms.*, 300 Ga. 109, 111 (2016).  As this is a balancing test, Asbury need not prove all four factors to obtain the interlocutory injunction.  *Id.*  Further, the Court need only find that Asbury has a substantial likelihood of succeeding on one of its claims—not all.  *Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cnty. Water & Sewer Auth.*, 981 F. Supp. 1469, 1472 (N.D. Ga. 1997).

Here, a balancing of the equities weighs strongly in favor of requiring CDK to complete the transfer of Asbury's Client Data to Tekion.  Accordingly, Plaintiff is entitled to the injunctive relief it seeks.

### B.    Asbury will suffer irreparable harm unless interim injunctive relief is granted pending a final decision on the merits.

The most important factor in the Court's analysis is whether there is a substantial threat of irreparable injury to the moving party.  *See City of Waycross*, 300 Ga. at 111.  When the moving party alleges its vendor is withholding its electronic information thereby negatively impacting its ability to run its business, such constitutes irreparable harm.  *See MasterMind Involvement Mktg., Inc. v. Art Inst. of Atl., LLC*, 389 F. Supp. 3d 1291, 1295 (N.D. Ga. 2019).  For example, in *MasterMind,* the defendants, a group of art institutes, filed a counterclaim and moved for a preliminary injunction

requesting that the court order the plaintiff, a marketing company, to transfer control of the defendants' social media accounts and login information—which the marketing company was holding hostage pending further payment from the defendants—back to the defendants. *Id.* at 1293. The court found that because the defendants "rely heavily on their ability to market and advertise through social media" and "their inability to do so has had a negative impact on their reputation and business," they would suffer irreparable harm absent a preliminary injunction. *Id.* at 1295.

The circumstances here are even more critical. Asbury relies on its Client Data to run its dealerships. Aff. ¶ 6. As part of the agreement with Tekion, Asbury has contractually agreed to complete a pilot program with Four Dealerships and to launch the Four Dealership with Tekion services by September 2024. *Id.* at ¶ 27. To do so, Asbury needs to send its Client Data for those Four Dealerships to Tekion by May 2024. *Id.* Because CDK has refused to transfer the data, Asbury has been working with Tekion to arrange an alternative date for launch in October 2024. *Id.* Nonetheless, there is grave concern over postponing the Four Dealership launch date beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sales volume months so the launch cannot happen during that time. *Id.* Most importantly, every day that goes by without its Client Data jeopardizes Asbury's plan to move dealerships to Tekion beginning in 2025. *Id.* Without the benefit of the Tekion pilot program at the Four Dealerships, Asbury will be unable to assess how the full conversion of its other stores to Tekion might work in practice. CDK's refusal to provide the Client Data thus risks putting Asbury's entire business model in jeopardy. *See id.* at ¶ 14.

In fact, the parties agreed that any breach of Sections 7 or 8 of the MSA—which deals with CDK and Asbury's use of the Client Data and is the source of Asbury's breach of contract claim—constituted "irreparable injury and damage," entitling the injured party to injunctive relief. *See* MSA,

§ 19(H) (titled "Remedies"). Thus, just as the *MasterMind* court found the defendants suffered irreparable harm without their ability to market and advertise through their social media accounts, so should this Court find Asbury suffers irreparable harm without its Client Data which not only enables the Four Dealerships to function pursuant to contract, but also to stay on course for the eventual full conversion of Asbury's stores to Tekion, which Asbury has contractually agreed to and put significant time and resources in. *See* 389 F. Supp. 3d at 1295; *see also River Servs. Co. v. Peer*, No. 17-2691, 2017 WL 1407894, at *3 (E.D. La. Apr. 20, 2017) (granting preliminary injunction and ordering defendants to transfer control of plaintiffs' website domains and passwords because "[i]f Defendants are allowed to continue to hold [plaintiffs'] websites hostage and refuse to transfer control, Plaintiffs will suffer a disruption of business and customer relations")); *Ardis Health, LLC v. Nankivell*, No. 11 Civ. 5013, 2011 WL 4965172, at *2-3 (S.D.N.Y. Oct. 19, 2011) (granting preliminary injunction and ordering defendants to provide access information for plaintiffs' website, email accounts, and social media accounts because plaintiffs' inability to so access negatively impacted plaintiffs' "reputation and ability to remain competitive").

Asbury was required to provide its Client Data pertaining to the Four Dealerships to Tekion by May 2024 to allow Tekion time to upload the data and launch the pilot program. *Id*. at ¶¶ 15-16. Every day that goes by in which CDK improperly withholds Asbury's Client Data is another day that Asbury cannot complete the pilot program and another day closer to not being able to install the Four Dealerships, as required by the confidential contract. *Id*. at ¶¶ 16, 27. Wrongly withholding Asbury's Client Data—in an effort to strongarm Asbury into staying with CDK—rather than complying with the agreed upon contractual terms that provide a clear termination of the exclusivity period following the Initial Term and permit Asbury to freely contract with competitors and explore other data management products is substantially injurious to Asbury's business. *Id*. at ¶ 26. CDK knows this.

*Id.* But, restricting customers' access to their own data and engaging in other anticompetitive behavior is not new to CDK, which is currently embroiled in numerous antitrust lawsuits that have been consolidated into an MDL. *Id.*; s*ee also In Re: Dealer Management Systems Antitrust Litigation*, MDL 2817 (N.D. Ill.). CDK's improper withholding of Asbury's Client Data means that Asbury has not been able to provide Tekion with the data it needs to launch the pilot program which, in turn, means that Asbury's operations cannot timely commence.

### C.    The balance of hardships weighs in favor of granting interim injunctive relief pending a final decision on the merits.

The impact on CDK in requiring it to transfer Asbury's Client Data to Asbury is practically non-existent. In their prior course of performance, when Asbury has requested its Client Data, CDK has done so quickly and easily—indeed as recently as May 2024. Aff. ¶¶ 7, 24. This request is no different. Yet CDK is withholding the Client Data not because transferring it would be burdensome—but because (i) CDK dislikes Asbury's new partnership with Tekion, CDK's competitor, and (ii) CDK is attempting to force Asbury into testing CDK Unify, CDK's new product, against Asbury's wishes. *Id.* at ¶ 26. In fact, in refusing to transfer Asbury's data, CDK has not stated it *could not* transfer the data or even that it would be burdensome to do so. *Id.* at ¶ 29. Meanwhile, the harm that would accrue to Asbury if the Court does *not* grant this motion, as described in *supra* § III(B), is irreparable as it completely prohibits the Asbury-Tekion pilot program from moving forward, thereby preventing Asbury from conducting its business at the Four Dealerships and threatening the planned move to Tekion in 2025 altogether.

Moreover, in the MSA, CDK expressly agreed that injunctive relief could be granted for a breach related to Sections 7 or 8, as Asbury has alleged here. *See* MSA § 19(H).

Therefore, the immediate and irreparable harm Asbury will continue to suffer absent injunctive relief far outweighs the negligible harm, if any, that CDK would experience from a

preliminary injunction.  Thus, the injunction should be issued because a balancing of the risk of harm weighs heavily if not exclusively in favor of Asbury.

**D.    Asbury is likely to succeed on the merits of its claims against CDK.**

**1.    Asbury is likely to prevail on its breach of contract claim against CDK.**

To prevail on a breach of contract claim under New York law, Asbury must show "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (internal citations omitted).  As discussed above, Asbury and CDK entered into the MSA, a valid contract.  And Asbury has performed in accordance with the MSA, which requires Asbury to use CDK as the <u>exclusive</u> provider of core products and services <u>only</u> during the Initial Term, <u>not</u> the Extension Period.  Asbury complied with the MSA and used CDK as its exclusive provider of core products and services during the Initial Term.  Asbury's pilot program with Tekion was not set to begin until the Extension Period, ensuring Asbury complied with the MSA.  Although not required, Asbury also complied with CDK's demand that Asbury first "cancel" its services for the Four Dealerships participating in the Tekion pilot program, prior to transferring Asbury's data.

Meanwhile, CDK is refusing to complete a transfer of Asbury's Client Data notwithstanding its lengthy prior course of performance where CDK regularly provided Asbury with its Client Data, upon request, and its contractual promise that it "does not claim ownership over any Client Data."  MSA § 7(A); *see also id.* § 8(A) (promising that Asbury's Client Data "shall be and remain the exclusive and confidential property of" Asbury).  Thus, CDK is in breach of its promise under the MSA that the Client Data would remain *only* the exclusive and confidential property of Asbury.

Further, "[i]mplicit in all contracts is a covenant of good faith and fair dealing." *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289 (N.Y. 1995). This encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* Here, Asbury has reasonably understood that it is entitled to its Client Data pursuant to the parties MSA, since the data is, undisputedly, Asbury's. CDK's position that Asbury can have its data it just has to "come and get the data itself" is nonsensical, impractical, and inconsistent with the parties' prior course of performance, where Asbury would request its data (as it has here) and CDK would transfer it to the DMS provider. Put simply: Asbury cannot "aggregate, use, store, modify, compile, retransmit, [or] distribute" its Client Data, *see* MSA, § 8(A), if it does not have the ability to access its Client Data. This is particularly true when CDK disables Asbury's access to the system. *See* Aff. ¶ 23. It is indisputable that CDK has the ability to provide access to the requested data, CDK is simply choosing not to because (i) it wants to retain Asbury's business and force Asbury into testing CDK Unify, and (ii) CDK wants to maintain its market dominance and avoid the implication that other solutions to data management exist. Thus, in exercising its discretion in refusing to transfer the Client Data, CDK has acted arbitrarily, in bad faith, and its own self-interest, all to the detriment of Asbury.

Finally, CDK's refusal to honor the MSA and allow Asbury access to its Client Data has delayed the implementation of its pilot program with Tekion, which means that Asbury cannot conduct business operations at its Four Dealerships pursuant to contract. Furthermore, if Asbury is unable to proceed with the pilot program, it will be unable to assess how the Tekion services work in practice on a larger scale.

### 2.     Asbury is likely to prevail on its conversion claim against Defendant CDK.

To make a claim for conversion, Asbury must show: "(1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Bo Philips Co. v. R.L. King Props., LLC*, 336 Ga. App. 705, 707 (2016).

In *MasterMind*, the court found the defendants were likely to succeed on a conversion claim under nearly identical facts. 389 F. Supp. 3d at 1294. It found "[the defendants] ha[d] valid legal title to the social media accounts and login information; that MasterMind currently has actual possession of the social media accounts and login information; that the AI Defendants [] demanded return of the accounts and login information, and that MasterMind has refused to transfer back the accounts and login information to [them]." *Id.* Just as in *MasterMind*, Asbury has valid legal title to its Client Data (indeed, the parties so agreed in the MSA); CDK has actual possession of the Client Data; Asbury demanded return of the Client Data; and CDK has refused to comply. As such, Asbury is likely to prevail on its conversion claim.

### 3.     Asbury is likely to prevail on its tortious interference claims against CDK.

To sustain a cause of action for tortious interference with contractual or business relations, Asbury must show that CDK: (1) acted improperly and without privilege (i.e., as a stranger to the business relationship); (2) acted purposefully and with malice with the intent to injure; (3) induced a breach of contractual obligations or caused Tekion to discontinue or fail to enter into an anticipated business relationship with Asbury; and (4) CDK's tortious conduct proximately caused damage to Asbury. *Metro Atl. Task Force for the Homeless, Inc. v. Ichthus Community Tr.*, 298 Ga. 221, 230 (2015). The cause of action for tortious interference with contractual relations also

19

requires proof of an existing contract with a third party. *See Tap Room, Inc. v. Peachtree-Tsg Assocs., LLC*, 270 Ga. App. 90, 92 (2004).

CDK is a stranger to Asbury and Tekion's business relationship and contract. While Tekion and CDK offer similar services, Asbury's engagement with Tekion—at this time—is limited to the Four Dealerships; the rest of Asbury's approximately 90 dealerships are still using CDK products and services. By reaching out to Tekion and accusing it of wrongdoing and by withholding the Client Data from Asbury, CDK has acted improperly and without privilege.

CDK took these improper actions <u>after</u> news reports came out about the Asbury-Tekion contract. And, CDK went so far as to send a letter to Tekion warning that its business with Asbury could result in "tortious interference"—a meritless accusation. CDK's letter evidences its intent to injure the Asbury-Tekion relationship and contract. The letter, coupled with the withholding of Client Data in the face of an established and contrary course of performance, demonstrates that CDK's actions have been made purposefully and with malice to injure Asbury's contract and business relationship with Tekion.

And thus far, CDK's actions have thwarted the pilot program. Unless and until Asbury has its Client Data, the pilot program cannot go on. Aff. ¶ 26-27. Furthermore, CDK is attempting to force Asbury into adopting the new CDK Unify program, to the exclusion of Tekion. *Id*. at ¶ 26. Thus, CDK's conduct is a proximate cause of Asbury's inability to complete its pilot program with its business and contractual partner Tekion; to meet the contractually required launch of the Four Dealerships by September 2024, and to proceed with its contractually agreed move for additional

stores through 2025 and 2026.[4]  This is not mere coincidence but rather the entire point of CDK's

bad faith approach.

     **E.**       **Granting a preliminary injunction will not disserve the public interest.**

Granting the preliminary injunction would only foster Georgia's "bedrock public policy of

freedom of contract." *Nat'l Cas. Co. v. Ga. Sch. Bds. Assoc.-Risk Mgmt. Fund*, 304 Ga. 224, 232

(2018); *see also Beckman v. Cox Broadcasting Corp.*, 250 Ga. 127, 130 (1982) (noting the

"public's interest in promoting competition and the freedom of individuals to contract"); *HI Tech.

Corp. v. Quality Inv. Props. Suwanee, LLC*, 369 Ga. App. 859, 867 (2023) ("[I]t is paramount

public policy of this state that courts will not lightly interfere with the freedom of parties to

contract.").

CDK's withholding of Asbury's Client Data runs counter to the MSA <u>and</u> impedes

Asbury's ability to freely contract with a competitor of CDK.  Nothing in the MSA prohibits

Asbury from acting as it has during the Extension Period, and there is no question that Asbury is

entitled to its own Client Data.  Indeed, CDK's prior course of performance supports that.  CDK

would ask this Court to interpret the MSA in a manner that inhibits competition and the freedom

of entities like Asbury from contracting with others on the open market, all as part of CDK's effort

to maintain its market dominance.  CDK is trying to strongarm Asbury to use CDK Unify by

holding Asbury's data hostage so that it cannot proceed with the Tekion pilot program, and so that

Asbury will be unable to move forward with Asbury's planned move to Tekion.  Thus, granting

this Motion and ordering CDK to complete the transfer of the Client Data to Asbury only <u>serves</u>

---

[4] Asbury is also likely to prevail on its claim for attorneys' fees and expenses under O.C.G.A. §
13-6-11 because CDK has knowingly and willfully withheld Asbury's Client Data—for the sole
purpose of impairing Asbury's relationship with Tekion—and it has continued to do so despite
Asbury's demands to return it prior to instituting this litigation.

the "public's interest in promoting competition and the freedom of individuals to contract." *Beckman*, 250 Ga. at 130 (explaining how covenants not to compete are disfavored because they inhibit competition and freedom of contract).

## IV.    CONCLUSION

Asbury asks this Court to grant injunctive relief pending a decision on the merits of its claims.  CDK's improper withholding of Asbury's Client Data makes CDK liable for breach of contract, conversion, tortious interference with business relations, and tortious interference with contractual relations.  Thus, for the reasons stated above and set forth in Asbury's Verified Complaint, Asbury respectfully requests the Court enter an order requiring CDK to complete the transfer of the Client Data as per Asbury's January 16 request.  Due to the time sensitivity of this matter, Asbury respectfully requests that a hearing on this Motion be held as soon as possible.


Respectfully submitted this 3rd day of June, 2024.


   /s/ M. Laughlin Allen     
M. Laughlin Allen
Georgia Bar No. 901999
MCGUIREWOODS LLP
1075 Peachtree Street, N.E.
35th Floor
Atlanta, GA 30309
Tel: (404) 443-5738
Fax: (404) 443-5773
Email: mlallen@mcguirewoods.com

Benjamin L. Hatch
Virginia Bar No. 70116 (to be admitted *pro hac vice*)
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Tel: (202) 857-1700

Fax: (202) 857-1737
Email: bhatch@mcguirewoods.com

Jodie H. Lawson
NC Bar No. 42900 (to be admitted *pro hac vice*)
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2000
Fax: (704) 343-2300
Email: jlawson@mcguirewoods.com

*Attorney for Plaintiff Asbury Automotive Group, Inc.*

## **CERTIFICATION OF SERVICE & EFFORTS TO NOTIFY DEFENDANT**

Pursuant to O.C.G.A. § 9-11-65, I hereby certify that, immediately upon filing this Motion,

I notified CDK Global, LLC by providing a copy to counsel at:

Matthew Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
*Counsel for CDK Global LLC*


 */s/ M. Laughlin Allen*
M. Laughlin Allen
Georgia Bar No. 901999


189784867_21

24

# Exhibit 1

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

| | |
|---|---|
| ASBURY AUTOMOTIVE GROUP, INC.,    ) | |
|          ) | |
|      **Plaintiff,**        ) | |
|          ) | |
| **v.**          ) | |
|          ) | **Civil Action No. _____** |
| CDK GLOBAL, LLC,        ) | |
|          ) | **JURY TRIAL REQUESTED** |
|      **Defendant.**      ) | |

## AFFIDAVIT OF BARRY COHEN

I, Barry Cohen, being duly sworn under oath, deposes and states:

1.    I am over 18 years old and believe in the obligations of an oath.

2.    I have personal knowledge of the matters set out in this Affidavit. All of the facts stated herein are based on my personal knowledge and all are true and correct.

3.    I offer this affidavit in support of Plaintiff Asbury Automotive Group, Inc.'s ("Asbury") Verified Complaint for Damages and Declaratory and Injunctive Relief and Motion for Preliminary Injunction and Expedited Consideration.

4.    I am the Vice President and Chief Information Officer of Asbury. I have served in this role for over 10 years and have worked at the company for more than 13 years.

5.    Asbury and CDK Global, LLC ("CDK," and together with Asbury, the "Parties") have been business partners for more than thirteen years. Throughout this relationship, CDK has provided Asbury with proprietary software application programs and computer hardware designed to automate Asbury's business functions. For example, CDK provides Asbury with a Document Storage and Document Archiving System ("DSDA") that stores all of Asbury's historical

1

documents. CDK also provides Asbury with a Client Relationship Manager ("CRM") platform, which allows Asbury to store and access its customer lead data.

6.      In order to be able to use CDK's products and services, Asbury provides CDK with its proprietary and confidential business information, including customer data, vehicle and parts inventories, sales history, and financial records. In return, CDK has agreed to protect Asbury's ownership and right to possess its data. The data stored by CDK is essential to Asbury's business and is what allows it to conduct day-to-day operations.

7.      Throughout the course of the Parties' thirteen-year business relationship, CDK's services to Asbury have also included transferring Asbury's data to other designated dealer management system ("DMS") providers at Asbury's request and direction, and at no charge. For each request, CDK would promptly and cooperatively assist in providing the DMS provider access to Asbury's Client Data. CDK's most recent transfer of Asbury's Client Data to another DMS provider was in May 2024. Until now, Asbury has never had prior issues requesting and/or having its own data transferred to another DMS provider.

8.      On April 22, 2019, Asbury and CDK entered into the Master Services Agreement ("MSA"). A true and correct copy of the MSA was attached to the Verified Complaint as **Exhibit 1.**

9.      The MSA's "Initial Term" ran from April 22, 2019 through April 22, 2024. On or about April 22, 2024, the Parties extended the MSA for another year, from April 22, 2024 until April 22, 2025 (the "Extension Period").

10.     When negotiating the terms of the MSA, Asbury intentionally structured the MSA with a carve out to the Initial Term (MSA § 4(B)) to allow Asbury to explore moving to a different DMS provider. Asbury also negotiated the MSA such that after the Initial Period and during the

2

Extension Period, Asbury is free to transfer its Client Data if it wanted to because there is no exclusivity requirement during the Extension Period.

11.     The MSA makes clear the Client Data—as defined in the MSA—is Asbury's proprietary data.

12.     On December 8, 2023, Asbury and technology provider Tekion Corporation ("Tekion") reached an agreement memorialized in a confidential contract for a trial program under which Asbury would start using Tekion's dealership management technology—instead of CDK's—for four dealerships (the "Four Dealerships"), effective September 2024, following the termination of the exclusivity period in the Initial Term of the MSA. Asbury also contracted with Tekion to move additional dealerships beginning in 2025 and 2026 so that it can be fully moved to Tekion's services by 2027.

13.     Soon after, various news outlets publicized Asbury's new partnership with Tekion.[1]

14.     Rolling out a new DMS is one of the most difficult and risky projects a dealer group can undertake because Client Data is the linchpin of the business. Asbury commissioned Tekion to conduct a pilot program on the Four Dealerships because Tekion is a new market participant offering a competitive and improved DMS product that will significantly support and enhance Asbury's business. During the pilot program, Asbury must re-engineer many business processes including inventory management, payroll, sales, services, parts, and accounting. In addition to perfecting these processes, Asbury also has to develop training materials and set up IT and business controls required to be compliant with federal regulations. This must be done on a small scale and

---

[1] *See, e.g.*, Mark Hollmer, *Asbury Automotive will test Tekion's DMS platform*, Automotive News (Jan. 10, 2024), attached to the Verified Complaint as **Exhibit 2**; Business Wire, *Tekion Selected by Asbury Automotive Group to Elevate Guest Experiences*, Yahoo! Finance (Jan. 9, 2024), https://finance.yahoo.com/news/tekion-selected-asbury-automotive-group-160000562.html.

verified by internal and external auditors before a large, full-scale launch can be contemplated. It is for this reason that Asbury exercised the contracted-for Extension Period under the MSA, so that it continues to receive the CDK contracted-for services under the MSA during the pilot program and prior to an enterprise rollout with Tekion. It is estimated that the pilot program will take six to eight months; and if successful, an enterprise rollout will take between two to three years.

15.    As part of its deal, and prior to the contractually required launch with Tekion in September 2024, Asbury needs CDK to provide Asbury's Client Data related to the Four Dealerships to Tekion, so Tekion can begin loading the data into its products and software (just like CDK did at the start of the CDK-Asbury relationship) to complete the pilot program.

16.    The agreement between Asbury and Tekion required Asbury to transfer its Client Data pertaining to the Four Dealerships to Tekion by May 2024 so that Tekion can timely launch and complete the pilot program in order to install the Four Dealerships by September 2024. Despite Asbury's best efforts to obtain its own Client Data, the Client Data was not transferred by that date because CDK is—and has been—wrongly holding the Client Data hostage. As a result, Asbury has been working with Tekion in good faith to agree upon an alternate installation date for the Four Dealerships because CDK's improper conduct has obstructed the pilot program and contracted-for installation of the Four Dealerships by September 2024. The pilot program cannot be further delayed because such a delay impacts the completion of the pilot program, which impacts when the Four Dealerships can be installed, which, in turn, impacts Asbury's contractual obligations to Tekion to begin moving dealerships in 2025 as well as jeopardizing Asbury's plan for dealership data management on a global basis which is the linchpin of its business.

17.    On January 16, 2024, Asbury promptly requested—through CDK's "FTP Request Form"—that CDK provide complete and full access to its Client Data related to the Four Dealerships Asbury identified as part of its pilot program with Tekion.

18.    In response to this request, on January 25, 2024, CDK told Asbury that Asbury would first need to send a "cancellation request" for the subject dealerships.

19.    Nothing in the MSA requires a cancellation in order for Asbury to obtain its own Client Data, and CDK has never previously required such a cancellation prior to providing extractions of Asbury's Client Data. Nonetheless, in an effort to obtain the necessary data as quickly as possible, and per CDK's instruction, on February 5, 2024, Asbury sent CDK a cancellation request for the Four Dealerships, to be effective on December 31, 2024.

20.    Even after Asbury submitted a cancellation request—as per CDK's instruction—CDK *still* would not release the Client Data.

21.    On February 7, 2024, CDK refused Asbury's request for access to its Client Data because, CDK stated, "a CDK facilitated data transfer . . . is only available upon the termination of a location during the transition assistance period or the termination or expiration of our agreement." Instead, CDK pointed Asbury to its own "data warehouse" and the CDK "Data— Your Way" tool, neither of which provide the full and complete data transfer that Asbury requested and needs in order to proceed with its contract with Tekion.

22.    Additionally, CDK stated that Asbury's request to terminate "all CDK Services" for the Four Dealership locations as of December 31, 2024 was not permitted because the MSA "does not permit termination of core products and services prior to the transition assistance period." CDK's position is inconsistent with the deal that I was involved in negotiating between Asbury and CDK and that is memorialized in the MSA because Asbury specifically negotiated

5

that it would be permitted a narrow exception to exclusivity during the Initial Term and that there was no exclusivity during the Extension Period.

23.    Asbury cannot fully and accurately access its Client Data without CDK's cooperation.  For example, the tools offered by CDK do not allow Asbury to extract *any* data from the DSDA system, which holds Asbury's own Client Data.  As another example, Asbury only has access to *replicated* CRM data but does not have access to the actual SQL databases needed to verify the completeness and accuracy of the Client Data.  In fact, an Asbury employee had been trying to access Asbury's own Client Data after CDK refused Asbury's request made on January 16, 2024 and began taking Asbury on the proverbial run around regarding its request for its Client Data.  On May 23, 2024, CDK's counsel, Matthew Provance, sent a cease and desist letter to Asbury's counsel, Benjamin Hatch, regarding Asbury's attempts to access its Client Data.  In light of this letter, an Asbury employee discontinued efforts to obtain Asbury's Client Data—and Asbury's account was disabled.

24.    By contrast, CDK is able to easily, efficiently, and accurately extract the requested Client Data, as it has done many times before at Asbury's request.

25.    CDK has no justification for refusing to extract and transfer the requested Client Data.

26.    CDK has recently released a new dealership management product called "CDK Unify."  It appears that CDK is attempting to force Asbury into adopting the new CDK Unify program by not allowing Asbury access to its Client Data.  CDK is keenly aware of the substantial harm to Asbury's business caused by not having access to its Client Data, the linchpin of its business.  Wrongly withholding Asbury's Client Data rather than complying with the agreed upon contractual terms that provide a clear termination of the exclusivity period following the Initial

Term and permit Asbury to freely contract with competitors and explore other data management products is substantially injurious to Asbury's business. Indeed, restricting customers' access to their own data and engaging in other anticompetitive behavior is not new to CDK, which is currently embroiled in numerous antitrust lawsuits that have been consolidated into an MDL. *See In Re: Dealer Management Systems Antitrust Litigation*, MDL 2817 (N.D. Ill.).

27.    Obtaining the Client Data for the Four Dealerships is necessary for Asbury to fulfill its agreement with Tekion to implement its pilot program, pursuant to the confidential contract between the parties. Asbury was obligated to provide Tekion its Client Data pertaining to the Four Dealerships by May 2024 in order to ensure a timely launch in September 2024. Because CDK is refusing to transfer the data, Asbury is working with Tekion to arrange an alternative date for launch in October 2024. Nonetheless, there is grave concern about postponing the Four Dealership launch date beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sales volume months so the launch cannot happen during that time. Thus, every day that CDK refuses to transfer Asbury's Client Data is another day that Tekion is not able to complete the pilot program and another day closer to not being able to install the Four Dealerships, as required by contract. Every day also further jeopardizes Asbury's plan to move dealerships beginning in 2025. As such, CDK's actions are causing significant and irreparable harm to Asbury.

28.    On April 2, 2024, CDK contacted Tekion without Asbury's permission with respect to the Asbury-Tekion pilot program. CDK threatened "that any remote or in-person access by Tekion to screen displays generated by CDK Products and Services, or to such Products and Services directly, including through software and/or the use of CDK login credentials, would constitute a material breach of the MSA." CDK also threatened that Tekion's actions could be

7

considered to be inducing Asbury's non-compliance with the MSA and thus "actionable as tortious interference."

29.    By May 2024, months after Asbury's original request, CDK still has refused to transfer Asbury's Client Data.  On May 9, 2024, Asbury sent CDK a formal demand letter requesting that CDK immediately provide Tekion with the requested Client Data.  To date, CDK still has not done so. CDK has never articulated that it neither could transfer the data nor that doing so would be burdensome.  Further, even though it is not required by the MSA, Asbury has offered to pay for any costs of the transfer.

30.    Further affiant sayeth not.

_____
Barry Cohen

Sworn to and subscribed before me
This 3 day of June, 2024.
_____
Notary Public
My Commission Expires: 10·30·27



8

# EXHIBITS 2-4 INTENTIONALLY OMITTED