VINEET BHATIA (*admitted pro hac vice*)
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*admitted pro hac vice*)
sraymond@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street
Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
MADELINE YZURDIAGA (SBN 344676)
myzurdiaga@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Defendant CDK Global, LLC*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEKION CORP., a Delaware corporation | Case No. 3:24-cv-08879-JSC |
| Plaintiff, | |
| vs. | **DEFENDANT CDK GLOBAL, LLC'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** |
| CDK GLOBAL, LLC, a Delaware limited liability company | |
| Defendant. | Date       April 24, 2025<br>TIME:     10:00 a.m.<br>PLACE:  San Francisco Courthouse, Courtroom 8 – 19th Floor 450 Golden Gate Avenue, San Francisco, CA 94102 |

**Table of Contents**

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................ 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ........................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ......................................... 5

        A.      CDK and Competition in the DMS Market ........................................ 5

        B.      CDK's Customer Contracts and Customer Transitions to DMS Competitors ........ 6

        C.      CDK's Alleged Sherman Act Violations .............................................. 7

        D.      CDK's Alleged Tying Misconduct ...................................................... 8

        E.      CDK and Tekion's Legal Disputes ...................................................... 8

III.    LEGAL STANDARD ..................................................................................... 9

IV.     TEKION FAILS TO STATE A CLAIM FOR MONOPOLIZATION .............................. 9

        A.      Tekion Fails to Plausibly Allege that CDK Possesses Monopoly Power .............. 10

        B.      Tekion Fails to Plausibly Allege Anticompetitive Conduct ................... 14

        C.      Tekion Fails to Plausibly Allege a Cognizable Antitrust Injury ............. 21

V.      TEKION FAILS TO STATE A CLAIM FOR ATTEMPTED MONOPOLIZATION ..... 23

VI.     TEKION FAILS TO STATE A SECTION 2 VIOLATION BASED ON TYING .......... 23

VII.    THE COURT SHOULD DISMISS THE REMAINING CLAIMS .............................. 24

        A.      This Court Should Not Consider Tekion's Request for Declaratory Relief ........ 24

        B.      The Court Should Further Decline to Exercise Supplemental Jurisdiction .......... 25

VIII.   CONCLUSION ........................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acri v. Varian Associates, Inc.*,
   114 F.3d 999 (1997)............................................................................................24

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   4 F. Supp. 3d 1123 (D. Ariz. 2014)............................................................13, 15, 19

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016).........................................................................14, 19

*American Tobacco Co. v. United States*,
   328 U.S. 781 (1946).............................................................................................9

*Arcell v. Google LLC*,
   --- F. Supp. 3d ---, 2024 WL 3738422 (N.D. Cal. Aug. 9, 2024) ....................19, 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................7, 9

*Aurora Astro Products LLC v. Celestron Acquisition, LLC*,
   691 F. Supp. 3d 1132 (N.D. Cal. 2023) .............................................................8, 9

*Authenticom, Inc. v. CDK Global, LLC*,
   874 F.3d 1019 (7th Cir. 2017)..........................................................................2, 12

*Barry Wright Corp. v. ITT Grinnell Corp.*,
   724 F.2d 227 (1st Cir. 1983)................................................................................15

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................16

*Bepco, Inc. v. Allied-Signal, Inc.*,
   106 F. Supp. 2d 814 (M.D.N.C. 2000)................................................................18

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012).............................................................................23

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)........................................................................................3, 19

*In re California Bail Bond Antitrust Litigation*,
   2020 WL 3041316 (N.D. Cal. Apr. 13, 2020) ......................................................7

*Cascade Health Solutions v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008).........................................................................13, 21

i

*CDK Global, LLC v. Tekion Corp.*,
  No. 3:25-cv-01394 (N.D. Cal.) ............................................................................ 2, 5

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
  880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................ 7

*County of Tuolumne v. Sonora Community Hospital*,
  236 F.3d 1148 (9th Cir. 2001) .............................................................................. 23

*Countrywide Home Loans, Inc. v. Mortgage Guaranty Insurance Corp.*,
  642 F.3d 849 (9th Cir. 2011) ............................................................................ 23, 24

*Distance Learning Co. v. Maynard*,
  2020 WL 2995529 (N.D. Cal. June 4, 2020) ...................................................... 9

*Dreamstime.com LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) .............................................................................. 17

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ............................................................................ 8, 11

*Federal Trade Commission v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ......................................................................... *passim*

*Feitelson v. Google Inc.*,
  80 F. Supp. 3d 1019 (N.D. Cal. 2015) ............................................................ 15, 21

*Federal Trade Commission v. Facebook*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................... 10, 11

*In re German Automotive Manufacturers Antitrust Litigation*,
  612 F. Supp. 3d 967 (N.D. Cal. 2020) .............................................................. 9

*Goodin v. Vendley*,
  356 F. Supp. 3d 935 (N.D. Cal. 2018) .............................................................. 4

*Kinderstart.com LLC v. Google, Inc.*,
  2007 WL 831806 (N.D. Cal. Mar. 16, 2007) ................................................... 8, 13

*Korea Kumho Petrochemical v. Flexsys America LP*,
  2008 WL 686834 (N.D. Cal. Mar. 11, 2008) ............................................... 9, 10, 11

*Liveuniverse, Inc. v. Myspace, Inc.*,
  2007 WL 6865852 (C.D. Cal. Jun. 4, 2007) ..................................................... 16

*LiveUniverse, Inc. v. MySpace, Inc.*,
  304 F. App'x 554 (9th Cir. 2008) ....................................................................... 21

*Malheur Forest Fairness Coalition v. Iron Triangle, LLC*,
  699 F. Supp. 3d 1086 (D. Or. 2023) ............................................................... 10, 11

*In re Meta Pixel Tax Filing Cases*,
    724 F. Supp. 3d 987 (N.D. Cal. 2024) ................................................................. 18

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ................................................................................ 15

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .............................................................................. 15

*PNY Technologies, Inc. v. SanDisk Corp.*,
    2014 WL 2987322 (N.D. Cal. July 2, 2014) ........................................................ 15

*POURfect Products v. KitchenAid*,
    2010 WL 1769413 (D. Ariz. May 3, 2010) .......................................................... 11

*Primo v. Pacific Biosciences Of California, Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................... 18

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    2013 WL 3936394 (C.D. Cal. July 30, 2013) ..................................................... 15

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ......................................................... 19, 20

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*,
    532 F.3d 963 (9th Cir. 2008) ................................................................................ 22

*Southern Pacific Communications Co. v. American Telephone & Telegraph Co.*,
    556 F. Supp. 825 (D.D.C. 1982) .......................................................................... 17

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
    144 F. Supp. 3d 1088 (N.D. Cal. 2015) (Koh, J.) ............................................... 24

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ................................................................................ 19

*Staley v. Gilead Scis., Inc.*,
    446 F. Supp. 3d 578 (N.D. Cal. 2020) ................................................................... 7

*Synthes, Inc. v. Emerge Med., Inc.*,
    2012 WL 4473228 (E.D. Pa. 2012) ...................................................................... 11

*Tampa Electric Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) .............................................................................................. 15

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
    512 F.2d 1264 (9th Cir. 1975) ................................................................................ 9

*United States v. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ................................................................................................ 8

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................................................ 19

*Western Parcel Express v. United Parcel Service Of America, Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) .................................................................. 15

*Whyte Monkee Products LLC v. Netflix, Inc.*,
    --- F. Supp. 3d. ---, 2024 WL 4876163 (N.D Cal. Nov. 22, 2024) ........................ 13

*Wietschner v. Monterey Pasta Co.*,
    294 F. Supp. 2d 1102 (N.D. Cal. 2003) .................................................................. 4

**Statutes & Regulations**

15 U.S.C. § 2 ................................................................................................................ 8

Federal Rule of Civil Procedure 12(b)(6) ........................................................... *passim*

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that, pursuant to this Court's Order dated January 6, 2025, on April 24, 2025, at 10:00 a.m., before the Honorable Jacqueline S. Corley, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, Courtroom 8, 19th Floor, Defendant CDK Global, LLC ("CDK") will and hereby does move for an order dismissing Plaintiff Tekion's ("Plaintiff" or "Tekion") complaint (ECF 1) ("Complaint"). The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the pleadings and papers on file in this action, the arguments of counsel, and any other matter that the Court may properly consider.

Tekion's alleged antitrust claims should be dismissed under Federal Rule of Civil Procedure 12(b)(6), on grounds that they fail to state a claim as a matter of law. The Court should decline to exercise its discretionary judicial remedial powers under the Declaratory Judgment Act and its discretionary jurisdiction over Tekion's alleged state law claims.

## STATEMENT OF ISSUES TO BE DECIDED

Whether Tekion's Complaint fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Tekion's antitrust claims fail as a matter of law under controlling Ninth Circuit precedent addressing allegedly anti-competitive, unilateral conduct by a monopolist, including refusals to deal or exclusive dealing arrangements. *See, e.g.*, *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 982–88, 993–1003 (9th Cir. 2020) (concluding  that monopolist technology company's practices— refusing to sell patent licenses to competitor cell phone chip manufacturers, selling cell phone chips only to companies that license its patents, and entering exclusive dealing agreements with cell phone manufacturers to maintain its cell phone chip monopoly—did not violate the Sherman Act); *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.* ("*Aerotec II*"), 836 F.3d 1171, 1174, 1180–84 (9th Cir. 2016) (affirming summary judgment in favor of manufacturer on competitor's Sherman Act claims alleging, *inter alia*, that manufacturer engaged in *de facto* exclusive dealing by entering quantity-

discount repair agreements that lasted 3–7 years, and engaged in monopolization by refusing to deal under competitor's preferred terms and limiting availability of parts). Tekion complains that CDK, its competitor in the automotive dealership management system ("DMS") industry, has violated the Sherman Act's monopolization and attempted monopolization prohibitions by making it more difficult for customers to switch from CDK's DMS platform to Tekion's DMS platform by allegedly *delaying*, by up to *seven months*, the transfer of customer data necessary to switch platforms. But CDK's supposed "anticompetitive conduct" is nothing more than CDK's enforcement of its valid contracts, voluntarily entered into by its own customers, which provide for an orderly transition process for switching from CDK's DMS product to another provider's system and transferring customer data to that competitor.

At bottom, Tekion seeks through this lawsuit to engineer a competitive edge by requiring CDK to help Tekion obtain CDK's customers at CDK's expense, on Tekion's preferred timeline, and in contravention of CDK's arms-length negotiated customer contracts. That is not what the antitrust laws are designed to do. Rather than redress any antitrust injury or anticompetitive conduct, Tekion's Complaint improperly uses federal antitrust law as a vehicle for disrupting the negotiated contractual relationship between private parties (CDK and its customers) to gain a competitive advantage for itself. *See Qualcomm*, 969 F.3d at 997 (noting "persuasive policy arguments" that caution against "using the antitrust laws to remedy what are essentially contractual disputes between private parties engaged in the pursuit of technological innovation").

CDK and Tekion are competitors who offer DMS software—the proverbial central nervous system for auto dealers—to their franchise dealer customers. The franchise DMS market is dynamic and competitive, with multiple DMS providers, including newer entrants like Tekion, and ongoing technological innovation. Tekion boasts an "innovative," "superior," and lower-cost DMS software that already has lured away *nearly 100* of CDK's franchise dealer customers. Compl. ¶¶ 13, 37, 53. Indeed, Tekion does not even attempt to allege that CDK has monopoly power based on franchise dealer customers—because it cannot. *See, e.g.*, *Authenticom, Inc. v. CDK Glob., LLC*, 874 F.3d 1019, 1022, 1025 (7th Cir. 2017) (stating that with approximately 30% and 40% of the DMS franchise market, respectively, "neither Reynolds [CDK's competitor] nor CDK is a monopolist").

At most, Tekion claims that CDK generates 60% of the *revenue* from franchise DMS subscriptions. This is an implausible measure of market power in the franchise DMS market where, as the Complaint concedes, Tekion sells its DMS at a lower price point and CDK's franchise DMS revenues include sales from complementary products and services *in addition* to the DMS software.

Tekion's attempt to manufacture CDK's dominant market power based on revenue is like using revenue to measure a luxury car manufacturer's market power in the auto manufacturing industry—it doesn't work. A car maker who sells more expensive cars will have higher revenues than its competitors who sell less expensive cars, even though the high-end manufacturer sells fewer cars overall. In fact, this was the case with Mercedes Benz in 2023, who ranked 3rd among manufacturers by revenue but ranked only 12th in the industry based on vehicles sold—Mercedes' revenues reflected its cars' higher price points and expanded functionality, not its market power.

When a franchise dealer customer wants to switch from CDK to another DMS provider like Tekion, CDK offers transition services subject to contractual terms and conditions. As in any business, however, transitions are not always smooth. For example, "widely reported" cyberattacks on CDK's system in June 2024 allegedly forced CDK to push the data migration of one franchise DMS customer by *under two months* and "*threatened to delay* [the customer]'s transition to Tekion's platform." *Id.* ¶¶ 27 & n.4, 42.[1] In another instance, a legal dispute between CDK and its customer over the customer's contractual rights and obligations resulted in an alleged seven-month delay in the delivery of the customer's DMS data, which allegedly *postponed* the customer's Tekion launch date by *one month*. Such business disruptions allegedly have resulted in delivery delays of CDK customers' DMS data ranging from 2.5 to 7 months, which allegedly has postponed or threatened to postpone these transitioning customers' go-live dates on Tekion's DMS platform.

Tekion claims in this action that CDK's months-long data-delivery delays force dealer customers to work exclusively with CDK to transfer their data, frustrating their efforts to switch providers and imposing costs on Tekion. Even if true, the Complaint's allegations fail to state a Section 2 Sherman Act violation. In *Federal Trade Commission v. Qualcomm*, the defendant

---

[1] Emphasis is added throughout this brief unless otherwise indicated.

technology company held market power that far exceeds CDK's alleged market share here—between 70% and over 90% market share of the relevant chip markets over relevant periods. 969 F.3d at 983. Qualcomm's conduct—refusing to deal with rival chip suppliers, conditioning sales to phone manufacturers on their obtaining a patent license from Qualcomm, and structuring its agreements with phone manufacturers as *de facto* exclusive deals—allegedly impaired rival chip suppliers' opportunities, deterred rivals' entry in the market, and coerced customers into purchasing chips from defendant thereby foreclosing competition in the chip market. *Id.* at 994–96, 1001–04. The Ninth Circuit nonetheless rejected the claims, finding that Qualcomm's practices did not have an anticompetitive effect in the relevant market, but rather the opposite. *Id.* 992–94, 1001–04. Tekion's claims here are even weaker than those alleged in *Qualcomm* and should be dismissed for four independent reasons:

First, Tekion fails to plausibly allege that CDK has monopoly power. Tekion claims that CDK controls 60% of the franchise DMS market when measured by revenue, which is both an implausible measure of market power and insufficient to establish dominant market power as a matter of law. *E.g.*, *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). The implausibility of Tekion's claim that CDK is a monopolist is further revealed by the Seventh Circuit's decision in *Authenticom v. CDK Global*, which establishes CDK does not have monopoly power in the franchise DMS market. 874 F.3d at 1022, 1025.

Second, Tekion's alleged anticompetitive conduct, like Qualcomm's, does not plausibly impair market opportunities for CDK's rivals, foreclose competition, or reduce the quality of the DMS market—and therefore does not rise to the level of an antitrust violation. The crux of Tekion's allegations is that CDK should have offered ***faster transition services*** to move its customers to Tekion's platform on Tekion's preferred timeline. This is not anticompetitive conduct as a matter of law. Thus, even if CDK were a monopolist (and it is not), its alleged unilateral conduct to delay customers' transitions to a rival would not violate the Sherman Act.

Third, Tekion fails to allege a cognizable antitrust injury. It is black-letter law that "antitrust laws . . . were enacted for the protection of competition not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (cleaned up). Yet, Tekion alleges only ***its own***

financial losses from the alleged postponements, or potential postponements, of the launch dates for Tekion's new (and CDK's former) DMS customers, which oddly stem from Tekion's successful competition in the franchise DMS market by convincing CDK's customers to switch to Tekion's platform. Tekion alleges harm to **competitors**, not to competition and that is fatal to its claim.

Fourth, Tekion fails to allege an antitrust violation based on tying. Tekion claims that CDK "attempted to tie" the use of its digital retail application, Roadster—a platform that allows auto makers to create online vehicle "showrooms"—to its DMS software. Compl. ¶ 59. But Tekion bases this claim exclusively on (1) CDK's termination of its DMS integration agreement concerning Tekion's digital retail application it made for General Motors; and (2) the allegation that CDK "**initially refused**" Honda/Acura's request to integrate Tekion's digital retailing platform with CDK's DMS. *Id.* ¶ 60. Tekion's allegations fail to show, or even permit an inference of, unlawful tying under the rule-of-reason analysis that controls in this Circuit.

Together, these pleading deficiencies warrant dismissal, with prejudice, of Tekion's antitrust claims. Because Tekion's federal antitrust claims fail as a matter of law, and the parties are not diverse for purposes of federal jurisdiction, the Court should decline to exercise both its discretionary remedial powers under the Declaratory Judgment Act and its discretionary supplemental jurisdiction over Tekion's remaining state law claims.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    CDK and Competition in the DMS Market

DMS software is the equivalent of an auto dealership's "central nervous system." *Id.* ¶ 22. It handles everything from inventory management, sales, and accounting, to maintaining records for legal and regulatory compliance. *See id.* ¶ 25. The "modern" DMS also can integrate with other software products, including products that original equipment manufacturers ("OEMs") like General Motors use in their daily operations. *Id.* ¶¶ 25, 59. CDK provides DMS software and related products and services to franchise auto dealerships to help them manage their operations and data. *See id.* ¶¶ 1, 22, 25. CDK is one of many participants in the DMS market, including Reynolds & Reynolds, Dealertrack, Auto/Mate, and Tekion. *Id.* ¶¶ 1, 67. Tekion alleges CDK has "approximately 60% market share by total DMS revenue for franchise dealers." *Id.* ¶ 67.

Tekion entered the market in 2016 and quickly has gained a foothold. *Id.* ¶ 7; *see id.* ¶¶ 8, 13, 37, 53. As alleged, "there has been growing interest" in Tekion's supposedly "innovative" and "superior" DMS software, which Tekion claims to sell at a lower price point than CDK's DMS. *Id.* ¶¶ 13, 36–37. Tekion's product allegedly offers a variety of benefits to its customers. *See id.* ¶¶ 7, 33–34 (detailing Tekion's DMS software's functionality). For these reasons, franchise dealer giant Asbury Automotive Group has publicly recognized Tekion's DMS as a product that "will replace not only CDK, but 15 other vendors that" it has. *Id.* ¶ 8. Tekion likewise claims its DMS "poses a significant competitive threat to CDK's position in the DMS market for franchise dealers." *Id.* ¶ 7.

While Tekion may be newer to the franchise DMS market than CDK, Tekion has capitalized on what it describes as the "growing interest in Tekion's innovative technology." *Id.* ¶ 37. The Complaint alleges that more than 83 dealers have switched, or are in the process of switching, from CDK to Tekion since 2023, including Asbury, Doral Automotive Group, Regal Automotive Group, Lou Bachrodt Auto Mall, Action Nissan, Universal Hyundai, and Universal Genesis. *Id.* ¶¶ 13, 53. Asbury, one of the six largest public dealer groups in the country, recently kicked off a four-dealership pilot program with Tekion's DMS, which, if successful, may lead Asbury to transition its entire fleet of dealerships from CDK to Tekion. *Id.* ¶¶ 38, 54. According to the Complaint, Asbury's transition from CDK to Tekion is a significant move, signaling to the franchise DMS industry that "if Asbury can change DMS providers, any dealer can." *Id.* ¶ 54.

**B.    CDK's Customer Contracts and Customer Transitions to DMS Competitors**

As demonstrated by the exhibits Tekion attaches to and relies on in its Complaint, CDK's negotiated DMS customer agreements provide an orderly process for customers who decide to switch to another DMS provider. In the case of Asbury—a CDK customer Tekion centers on in the Complaint—CDK's agreement calls for an initial five-year term. *See* Compl., Ex. E (*CDK v. Asbury* Complaint ("CDK Compl.")) (ECF 1-5) ¶¶ 2, 18; Compl., Ex. F (*Asbury v. CDK* Complaint ("Asbury Compl.")) (ECF 1-6) ¶¶ 2, 16–18. After the initial term, Asbury may renew the contract under the same terms for up to two consecutive one-year renewal terms or, if Asbury decides to switch DMS providers, enter a "transition assistance period" that runs on a monthly basis. *See* CDK Compl. ¶¶ 18, 22; Asbury Compl. ¶ 16; *see id.* ¶¶ 30–31 (referencing the transition assistance

period). Once the initial or renewed terms end, the parties move to the transition assistance period, during which CDK will facilitate Asbury's transition to the new provider's DMS system, provided the customer is up to date on its payments and otherwise has complied with, and is not in material breach of, the negotiated agreement. *See* CDK Compl. ¶ 28; Asbury Compl. ¶¶ 30–31.[2]

Sometimes CDK's customer data transitions run smoothly. Other times they don't. As the Complaint alleges, a cyberattack on CDK's system delayed CDK's transfer of customer Regal Automotive Group's data from late July 2024 to early September 2024. Compl. ¶ 42. With Asbury, when the initial five-year term expired in April 2024, Asbury chose to renew its contract under the same initial terms for one year rather than move to the transition assistance period. *E.g.*, CDK Compl. ¶¶ 2–3, 18; Asbury Compl. ¶ 16. Despite renewing its contract, Asbury demanded that CDK provide transition services so that Asbury could launch, by September 2024, a four-dealership pilot program using Tekion's DMS subject to an agreement Asbury and Tekion had entered during the CDK contract's initial term. CDK Compl. ¶¶ 4, 23, 25, 28; *see* Asbury Compl. ¶¶ 23–25. Asbury and CDK disagree over CDK's data transition obligation for the four pilot dealerships prior to the "transition assistance period," as well as the contractual terms and conditions in effect during the contract renewal period, and the parties are actively litigating these issues in an ongoing case in Georgia state court. *See generally* CDK Compl.; Asbury Compl.; Compl., Ex. B (ECF 1-2) ("*Asbury* Order"). In any event, Asbury and Tekion's pilot program has been underway since October 2024, with CDK's and Asbury's dispute over data transition allegedly postponing Asbury and Tekion's pilot program launch by ***only one month***. *See* Compl. ¶¶ 44, 52.

## C.    CDK's Alleged Sherman Act Violations

Tekion claims that CDK has engaged in an extra-contractual practice of withholding its franchise dealer customers' data and delaying their transitions to Tekion. *Id.* ¶¶ 83, 91. Specifically, Tekion alleges that CDK: (1) withheld "accounts receivable approvals" for Lou Bachrodt Auto Mall for 159 days; (2) "refused to transfer" Universal's necessary data "for almost two-and-a-half

---

[2] CDK and its customers negotiate their agreements based on the customer's business needs, so the term period and exclusivity and other commercial terms vary by customer. CDK's customers' specific contractual terms are outside the scope of this Rule 12(b)(6) motion, as Tekion did not attach any customer agreements to the Complaint.

months;" (3) "refused to facilitate" Doral's data access until one month before its termination date with CDK; (4) rescheduled Regal Automotive's late-July 2024 data migration for the first week of September 2024 due to a CDK security breach; and (5) following a February 5, 2024 cancellation request (to be effective December 31, 2024), did not deliver Asbury's data until on or about September 20, 2024, in accordance with a court order. *Id.* ¶¶ 40–43, 45, 51; *Asbury* Order at 2.

Tekion claims that CDK's data delays have **postponed** "at least 62" of Tekion's new dealer customers' DMS launch dates since 2023 and may **postpone** 21 additional new customer launches scheduled in early 2025. Compl. ¶ 53. Because of how Tekion structures its customer payments, these delays allegedly have caused Tekion financial harm such as increased costs. *Id.* ¶¶ 53, 55.

### D.     CDK's Alleged Tying Misconduct

In 2021, CDK acquired Roadster, a digital retailing product ("DRP") that allows car manufacturers to create online "showrooms" for buyers and which may be integrated with DMS software. *Id.* ¶¶ 59–60. Tekion alleges that CDK unlawfully "attempted to tie" Roadster to its DMS software by terminating the parties' DRP–DMS integration agreement and "initially refus[ing]" to integrate Tekion's DRP with its DMS at Honda/Acura's request. *Id.* ¶ 60. Even when taken as true for proposes of Rule 12(b)(6), none of these allegations give rise to a cognizable antitrust claim.

### E.     CDK and Tekion's Legal Disputes

Tekion is aware of the general contractual arrangement between CDK and its customers, as the parties historically have worked together to transfer and convert customer data as their customers have migrated back and forth. *See* Compl., Ex. H (ECF 1-8) ("Cease & Desist") at 1. Recently, however, Tekion has resorted to self-help by bypassing CDK's facilitated data transition process and obtaining unauthorized access directly to CDK's DMS software. *Id.* at 1–2. On December 6, 2024, CDK sent Tekion a cease-and-desist letter concerning the unauthorized access. *Id*. at 1. Then, **three days later**, Tekion went on the offensive and filed this lawsuit. ECF 1. In this action, Tekion seeks to use antitrust, and its resulting treble damages, to eviscerate CDK customers' contractual terms and conditions and excuse its own bad conduct.

Because Tekion has refused to stop its unlawful practice of obtaining unauthorized access to CDK's DMS, CDK has filed its own lawsuit against Tekion and third-party InDesign Data, LLC in this Court. *See CDK Global, LLC v. Tekion Corp.*, No. 3:25-cv-01394 (N.D. Cal.).

## III.    LEGAL STANDARD

A Rule 12(b)(6) motion should be granted "where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *In re Cal. Bail Bond Antitrust Litig.*, 2020 WL 3041316, at *5 (N.D. Cal. Apr. 13, 2020) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts are not bound to accept as true "a legal conclusion couched as a factual allegation" or "naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (alteration in original). On a Rule 12(b)(6) motion, courts may consider the complaint's well-pleaded allegations, documents referenced by the complaint, documents central to the plaintiff's claims, and facts subject to judicial notice. *E.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1058 (N.D. Cal. 2012).

## IV.    TEKION FAILS TO STATE A CLAIM FOR MONOPOLIZATION

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To plead a monopolization claim, Tekion must allege "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Qualcomm*, 969 F.3d at 990 (internal quotation marks omitted). Additionally, "the possession of monopoly power will not be found unlawful . . . unless it is accompanied by an element of anticompetitive ***conduct***," such as "anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Id.* (emphasis in original). Likewise, to constitute an "antitrust injury," the plaintiff's alleged loss must "flow[] from an anticompetitive aspect or effect of the defendant's behavior." *Kinderstart.com LLC v. Google, Inc.*, 2007 WL 831806, at *10 (N.D. Cal. Mar. 16, 2007) (quoting *Rebel Oil Co. v. Atlantic*

*Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)). Tekion fails to allege monopoly power, anticompetitive conduct, or antitrust injury, and cannot cure these deficiencies with amendment.

### A.    Tekion Fails to Plausibly Allege that CDK Possesses Monopoly Power

"Monopoly power is the power to control prices or exclude competition." *United States v. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). "Monopoly power differs in degree from market power, requiring 'something greater.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992)). Tekion does not allege direct evidence of CDK's monopoly power. *See* Compl. ¶¶ 67–70 (basing CDK's alleged monopoly power on its purported market share and alleged high barriers to entry, rather than alleged restricted output or supracompetitive prices). To establish monopoly power indirectly, Tekion must (1) define the relevant market, (2) "show that [CDK] owns a dominant share of that market," and (3) explain "that there are significant barriers to entry and . . . that existing competitors lack the capacity to increase their output in the short run." *Aurora Astro Prods. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1147 (N.D. Cal. 2023) (omission in original).

Tekion cannot allege that CDK controls a dominant share of the franchise DMS market because CDK ***does not*** have franchise DMS market power. At most, CDK's market share is ***less than 45%*** by franchise dealer DMS customers. *See Authenticom*, 874 F.3d at 1022, 1025 (reversing preliminary injunction on a § 1 claim, stating that CDK held "over 40% of the [DMS] market and [its competitor] Reynolds around 30%" and that "neither Reynolds nor CDK is a monopolist"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 941 (N.D. Ill. 2023) (finding at summary judgment that CDK and competitor DMS provider Reynolds "***together*** control 70 percent of the U.S. franchise dealership market"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 939 (N.D. Ill. 2018) ("[B]y dealer-customers, . . . . CDK has approximately 45 percent of [the DMS market].");[3] *see also* Compl., Ex. A (ECF 1-1) at ¶ 8 (alleging CDK and Auto/Mate's since-

---

[3] This Court may take judicial notice of documents on file in other federal courts and may consider those judicially noticeable materials on a Rule 12(b)(6) motion. *E.g.*, *Whyte Monkee Prods. LLC v. Netflix, Inc.*, --- F. Supp. 3d. ---, 2024 WL 4876163, at *2 & n.3 (N.D Cal. Nov. 22, 2024).

abandoned merger would have resulted in CDK "control[ling] approximately 47% of the franchise DMS market" post-acquisition). Recognizing this, Tekion claims that CDK has an approximate 60% share of the franchise DMS market based on an implausible measure of franchise DMS market power—revenue—to prop up its flimsy monopolization claim. Tekion fails to plausibly allege market power for three independent reasons:

First, a 60% market share—even if accepted as true—does not establish market power as a matter of law. "Courts generally require a 65% market share to establish a prima facie case of market power." *Aurora Astro Prods.*, 691 F. Supp. 3d at 1147 (quoting *Eastman Kodak*, 125 F.3d at 1206); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (holding a market share "amounting to **over two-thirds** of the entire domestic field of cigarettes" constituted a "substantial monopoly"); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1274 (9th Cir. 1975) ("We do, however, wish to remind the trial court when considering this case on remand of Judge Learned Hand's famous dictum that while 90% of the market 'is enough to constitute a monopoly; ***it is doubtful whether sixty or sixty-four per cent would be enough*** . . . .'"); *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 980 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (granting motion to dismiss when complaint alleged that defendant auto manufacturers held "approximately a 50% share of the broader luxury car market" because "[c]ourts generally require a 65% market share to establish a prima facie case of market power" (cleaned up)); *Distance Learning Co. v. Maynard*, 2020 WL 2995529, at *7, 8 (N.D. Cal. June 4, 2020) (granting motion to dismiss when complaint only alleged a 53.8% market share because a monopolization claim "generally requires a 65% market share").

Second, Tekion's 60% market share allegation is the type of "naked assertion[] devoid of further factual enhancement" that cannot survive a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 678. At this stage, while Tekion "need not necessarily quantify [CDK's] market share with precision, [Tekion] must assert some ***facts*** in support of its assertions of market power that suggest those assertions are plausible." *Korea Kumho Petrochem. v. Flexsys Am. LP*, 2008 WL 686834, at *9 (N.D. Cal. Mar. 11, 2008) (emphasis in original) (granting motion to dismiss Section 2 monopolization claim). Tekion fails to do so. Tekion's Complaint cites to—but does not directly

quote—an executive of a DMS consulting firm who vouches for the "estimated" 60% figure. *See* Compl. ¶ 29 & n.10 ("According to estimates from Matt Gillrie, CEO and owner of the Gillrie Institute, a DMS consulting firm that helps dealerships with major vendors, CDK is the dominant leader, with about 60 percent of the market." (citing an online *Automotive News* article)). Because the cited article sits behind a paywall and because Tekion did not include it as an exhibit, the Court should not credit it as lending any factual support to Tekion's otherwise conclusory market share allegation.

CDK has not been able to access this article behind the paywall, but it has located a print *Automotive News* article that, based on both articles' authors and first sentences, could be the print version of the article Tekion cited. This print article reports, "According to Gillrie, CDK remains the leader with about 60 percent of the market."[4] This article does not lend credence to Tekion's allegation. The article does not even elucidate whether Mr. Gillrie is the source of the 60% figure (as Tekion alleges) or of the claim that CDK is the "leader" of the market, and its context suggests that the 60% estimate is by dealer customers, not by revenue as Tekion alleges. *See* Ex. 1 at 27 ("Vijayan [Tekion's founder] previously said Tekion has more than 1,000 dealerships under contract. According to Gillrie, CDK remains the leader with about 60 percent of the market.").

Even if the *Automotive News* article supported Tekion's 60% market-share allegation, Tekion still fails to meet the plausibility threshold. The allegation that Mr. Gillrie "estimates" CDK owns "about 60 percent of the market" amounts to mere guesswork about an unknown "market," measured on an unknown basis. Compl. ¶ 29. It is unclear (1) what Mr. Gillrie's "estimates" are based on; (2) whether Mr. Gillrie is referring to a franchise-specific DMS market, or the auto DMS market more broadly (which includes independent, or used, dealerships that CDK's DMS also services); or (3) how Mr. Gillrie measures CDK's supposed market share—by revenue (as Tekion alleges), customers, or some other basis. The allegations are therefore unsupported by any factual support to permit the Court to conclude that CDK plausibly holds a 60% market share.

---

[4] *See* Mark Hollmer, *Tekion's sights set on growth milestones*, AUTOMOTIVE NEWS, Apr. 15, 2024, attached as Exhibit 1, at 3, 27.

CDK's Notice of Motion and Motion to Dismiss
Case No.: 3:24-cv-08879-JSC

*Malheur Forest Fairness Coalition v. Iron Triangle, LLC*, is instructive, even though that Court found that the plaintiff there sufficiently pled a dominant market share. 699 F. Supp. 3d 1086, 1108 (D. Or. 2023). In *Malheur*, the defendant argued plaintiff's "over 95%" allegation was insufficient, based on another decision, *FTC v. Facebook*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021), which rejected the alleged market share "in excess of 60%" as insufficient. *Malheur*, 699 F. Supp. at 1108. The *Malheur* Court distinguished *Facebook* by explaining that "a bare assertion that market share 'exceeds 60%' or constitutes 'a majority' does nothing but restate the market share requirement without any facts about what the defendant's market share actually is," whereas "'over 95%' alleges a range of only 5% under a complete 100% market share, plausibly alleging more than just a bare recitation of the market share element." *Id.*

Here, Tekion's "approximately 60%" allegations, Compl. ¶¶ 2, 54, 67, like the FTC's "over 60%" allegation, "ultimately fall short of plausibly establishing that [CDK] holds market power," *Facebook*, 560 F. Supp. 3d at 18. Thus, Tekion's market share allegations are insufficient, and its monopolization claim should be dismissed on that basis. *See, e.g.*, *Synthes, Inc. v. Emerge Med., Inc.*, 2012 WL 4473228, at *11 (E.D. Pa. 2012) (calling plaintiff's "over 50% market share" allegation a "threadbare recital[] unsupported by any factual allegations" that the Court "need not accept . . . as true"); *POURfect Prods. v. KitchenAid*, 2010 WL 1769413, at *2 (D. Ariz. May 3, 2010) (dismissing Section 2 claim for failure to allege plausible "facts showing that the defendant owns a dominant share of the market" where complaint "makes only a conclusory allegation regarding monopoly power").

<u>Third</u>, the Complaint contains no factual allegations that show why "total DMS revenue for franchise dealers" is a valid measure of market power in the DMS industry, as opposed to the obvious measure by franchise dealership customers. Compl. ¶ 67. If anything, the Complaint supports the opposite. Tekion openly alleges that it sells its DMS with "lower upfront costs compared to traditional DMS solutions like CDK's." *Id.* ¶ 35. And the Complaint acknowledges that CDK's revenues stem not only from DMS subscriptions, but also from additional integrated services and separate software applications that complement its DMS software. *See id.* ¶¶ 57–59 (alleging how dealers use separate software applications, which CDK offers and integrates, that

complement DMS software). Accordingly, whether CDK is responsible for 60% of franchise DMS revenue says nothing about CDK's dominance in the franchise DMS market. Consider, for example, the auto manufacturer analogue: in 2023, Mercedes Benz, a luxury car manufacturer, was the 3rd largest manufacturer by revenue, but it ranked only 12th by vehicles sold.[5] Mercedes earns more revenue than other manufacturers because it sells more expensive cars with more features and functionality, not because it dominates the market. The more appropriate measure of market power in the franchise DMS market is the number of franchise dealerships under DMS contract, but Tekion does not even attempt to allege that CDK has dominant market power on that basis— because it can't.

**B.      Tekion Fails to Plausibly Allege Anticompetitive Conduct**

Even if Tekion plausibly alleged CDK's monopoly power (it does not), the Complaint still fails to plausibly allege anticompetitive conduct, which is fatal to Tekion's monopolization claim. *See, e.g.*, *Qualcomm*, 969 F.3d at 990 (finding that an anticompetitive conduct must accompany monopoly power for liability to attach); *Kinderstart.com*, 2007 WL 831806 at *10, 12 (explaining antitrust injury must flow from defendant's anticompetitive conduct or effect).

"Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)) (vacating jury verdict in favor of plaintiff on attempted monopolization claim). "Whether or not the defendant's conduct is anticompetitive requires the court to focus on whether the alleged unlawful conduct harms prices or quality of the goods or services in the relevant market." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.* ("*Aerotec I*"), 4 F. Supp. 3d 1123, 1137–38 (D. Ariz. 2014) (granting defendant's summary judgment motion on Section 2 monopolization claim), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) ("*Aerotec II*").

---

[5] The Top 10 Automotive OEMs (by Annual Revenue), Direct Industry/Emag (Feb. 9, 2023), https://emag.directindustry.com/2023/02/09/the-top-10-automotive-oems-by-annual-revenue-ev-autonomous-cars-vehicles-manufacturer/; Worldwide Car Sales: Top-Selling Manufacturers, Road Genius, https://roadgenius.com/cars/statistics/sales-by-manufacturer/ (last updated Oct. 11, 2024).

Tekion alleges that CDK delayed the delivery of several of its franchise dealer customers' DMS data to slow their transitions to Tekion for DMS services. Compl. ¶¶ 40–43, 45, 52–55, 83, 91. According to Tekion, the alleged data delay has resulted in the postponement or potential postponement of dozens of dealerships'—dealerships that in fact have left, or are in the process of leaving, CDK for Tekion—"Go-Live date" with Tekion's DMS software. *Id.* ¶ 53. Tekion also points to a lawsuit CDK filed against franchise DMS customer Asbury Automotive Group, which Tekion alleges CDK filed to frustrate Asbury's transition to Tekion and to chill competition. *Id.* ¶¶ 46, 83. CDK disputes these allegations, but even when taken as true as required on this Rule 12 motion, the allegations do not plausibly allege anticompetitive conduct for four separate reasons:

First, the Complaint does not even facially suggest that CDK has impaired its rivals' opportunities to provide DMS software and services to franchise auto dealers. Nor does the Complaint plausibly allege that CDK's actions have harmed the quality or pricing of DMS software in the market. To the contrary, Tekion alleges that ***at least 83*** of CDK's franchise dealer customers have opted to contract with Tekion for its DMS software, *id.* ¶¶ 13, 53; that Tekion is an "[i]nnovator" in the market, *id.* 13:1; and that Tekion has developed a superior DMS and other DMS-integrated products that it offers at lower prices, *id.* ¶¶ 31, 33–36, 60; *see also, e.g.*, *id.* ¶¶ 8 (noting that Tekion "will replace not only CDK, but 15 other vendors" that large dealer Asbury uses in its business), 13 & 37 (cataloguing the "growing interest in Tekion's innovative technology" in the franchise DMS market, including from the Doral Auto Group, Regal Auto Group, Lou Bachrodt Auto Mall, Universal Nissan, Universal Hyundai, and Universal Genesis franchise dealerships, which all have contracted for Tekion's DMS services), 38 (discussing Tekion's pilot agreement with Asbury, which is intended to lead to the launch of Tekion's DMS at all of Asbury's 158 dealerships).

These allegations illustrate a ***competitive*** market in which CDK's rivals, like Tekion, successfully enter the DMS industry, successfully compete for franchise DMS customers, and successfully innovate. The Complaint lacks any allegations that Tekion (or any other competitor) has lost a single contract or customer because of CDK's alleged conduct, and Tekion points to no examples showing that CDK's conduct has lessened competition in the DMS market more broadly.

Tekion instead alleges that CDK has failed to timely transfer customers' data to Tekion, but this is nothing more than the sort of unilateral, refusal-to-deal theory that the Ninth Circuit rejected under the Sherman Act in *Qualcomm* and other appeals. *See* 969 F.3d at 993–97; *see also Aerotec I*, 4 F. Supp. 3d 1123 at 1139 (rejecting plaintiff's refusal-to-deal theory, finding that defendant's "delay[] [of] shipments of replacement parts or with[olding] [of] some technical data" from plaintiff "does not show an anticompetitive effect. Rather, it suggests that [defendant]'s conduct, even though possibly injurious to [plaintiff], has a pro-competitive effect on the market as a whole, because dissatisfaction with [defendant]'s ability to provide parts and data for repairs actually increases the demand for alternatives to [defendant]-branded" products), *aff'd*, 836 F.3d at 1184.

Second, the crux of Tekion's Complaint is that CDK's alleged data-transfer delays effectively force customer franchise dealerships that want to switch DMS providers into a *de facto* exclusive arrangement with CDK while CDK transitions their data. Notably, Tekion **does not** challenge CDK's negotiated customer contract terms, such as Asbury's initial five-year term with partial exclusivity, as unlawful exclusive dealing. Instead, Tekion attacks the time it takes CDK to transfer its customers' DMS data **after the customer has elected to leave CDK** for a competitor like Tekion. The longest delay alleged—*i.e.*, the unilaterally imposed *de facto* exclusive period—is approximately seven months. *See* Compl. ¶¶ 40 (alleged delays of "over a hundred days," "often over two months," "almost two-and-a-half months"), 41 (data transfer allegedly delayed until "a month before the [CDK contract's] termination date"), 42 (data transfer allegedly rescheduled from "the last week of July" for "the first week of September"), 45 & 51 & *Asbury* Order (alleged delay from February 5, 2024, until approximately September 20, 2024).

This alleged delay does not rise to the level of an antitrust violation as a matter of law. As this Court knows, the Ninth Circuit rejected this very theory in *Qualcomm* when it held that Qualcomm's allegedly exclusive dealing agreements with customer Apple, which did not "delay[] Apple's transition to [Qualcomm competitor] Intel by any more than one year," "did not have the actual or practical effect of substantially foreclosing competition" in the relevant market, and therefore did not constitute actionable anticompetitive behavior under the Sherman Act. 969 F.3d

at 1004–05. Thus, CDK's alleged months-long delays do not rise to the level of an unlawful exclusive dealing arrangement that violates the Sherman Act.

Indeed, courts in this Circuit and nationwide have blessed exclusive dealing arrangements that are far more onerous than the seven-month data-transfer delay alleged here. *See, e.g.*, *Omega Envir., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 & n.6 (9th Cir. 1997) (finding district court erred by denying defendant's motion for judgment as a matter of law on exclusive dealing claim concerning one-year exclusivity contracts); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1023, 1030–32 (N.D. Cal. 2015) (dismissing exclusive dealing claim where challenged agreement required exclusivity for two years but had practical effect of requiring exclusivity "for the lifetime of the covered [cell phone] models"); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4–8 (N.D. Cal. July 2, 2014) (dismissing exclusive dealing claim involving exclusive contracts with 1- to 3-year terms); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 3936394, at *2– 5 (C.D. Cal. July 30, 2013) (dismissing exclusive dealing claims concerning contracts with two- to five-year terms); *W. Parcel Exp. v. United Parcel Serv. Of Am., Inc.*, 65 F. Supp. 2d 1052, 1064– 65 (N.D. Cal. 1998) (granting summary judgment on Section 1 claim concerning alleged "exclusive dealing" contracts, and characterizing contracts with three-year term as having "relatively short durations"); *see also, e.g.*, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 322, 334–35 (1961) (upholding a 20-year requirements contract); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453– 55 (6th Cir. 2007) (affirming dismissal of antitrust claims concerning multi-year exclusive dealing agreements); *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236–38 (1st Cir. 1983) (upholding a two-year requirements contract as reasonable). Where ***multi-year*** exclusive dealing arrangements do not violate federal antitrust laws, it follows that CDK's alleged ***months-long*** data transfer delays do not give rise to an antitrust violation as a matter of law.

<u>Third</u>, Tekion complains of anticompetitive harm to competitors (*i.e.*, itself), not to competition or the competitive process. *See, e.g.*, Compl. ¶¶ 14, 42, 52, 53, 55, 73 (alleging reputational and financial harm from postponed launch dates and threatened transition delays). Yet, "to make out a § 2 violation, the anticompetitive harm identified must be to *competition itself*, not merely to competitors." *Qualcomm*, 969 F.3d at 996 (emphasis in original). Tekion's only

allegations of "[f]oreclose[d] [c]ompetit[ion]" and "harm to the competitive process" and "consumers" are conclusory. Compl. 15:1, ¶¶ 2, 15, 71–74. The Complaint therefore fails to "provide the grounds of [Tekion's] entitlement to relief" beyond mere "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

Further, "to be condemned as exclusionary, a monopolist's act must have anticompetitive effect. That is, it must harm the competitive ***process*** and thereby harm consumers. In contrast, harm to one or more ***competitors*** will not suffice." *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *10 (C.D. Cal. Jun. 4, 2007) (emphasis in original) (quoting *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001)). As here, the *Liveuniverse* social media network plaintiff alleged that its competitor engaged in anticompetitive exclusionary conduct that purportedly foreclosed competition. But the defendant's alleged misconduct—various changes to its platform that prevented plaintiff from "free-riding" on defendant's investment in its own product—like CDK's alleged misconduct here, affected ***the plaintiff competitor***, not competition writ large. *Id.* at *11-13, 15. Accordingly, the alleged misconduct did not rise to the level of actionable exclusionary conduct. *Id.* at *15. The same is true here. Even assuming that CDK's data transfer delays are exclusionary, as alleged, they only hurt Tekion and therefore do not constitute anticompetitive conduct.

Tekion's allegations that CDK's conduct harms dealer customers by delaying their transitions to Tekion's DMS likewise do not constitute anticompetitive conduct. Harm to CDK's own customers "does not, by itself, constitute harm to the competitive process that ***thereby*** harms ***consumers*** as a whole." *Dreamstime.com LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022) (cleaned up and emphasis in original) (citing *Qualcomm*, 969 F.3d at 987) (affirming dismissal of monopolization claim, finding plaintiff failed to allege anticompetitive conduct in the alleged market based on defendant's mistreatment of plaintiff as its customer); *see also Qualcomm*, 969 F.3d at 992 (reversing district court's summary judgment ruling in part because "alleged economic harms to OEMs—who are Qualcomm's ***customers***, not its competitors" were not "directly" anticompetitive because they did "not involve restraints on trade or exclusionary conduct in the area of effective competition" (emphasis in original) (internal quotation marks omitted)).

Here, the Complaint does not allege that CDK's alleged delays caused any dealer customer to lose access to its DMS software or otherwise experience a business disruption that affects consumer car buyers. Moreover, CDK's alleged refusal to give customers access to their data beyond a "rudimentary CDK self-help tool" may very well lead frustrated dealer customers straight to Tekion's, or other competitor DMS providers', doorstep—thereby promoting competition rather than frustrating it. Compl. ¶ 11; *see Dreamstime.com*, 54 F.4th at 1141 ("Google's alleged mistreatment of customers may lead harmed customers . . . to spend more on paid search opportunities with Google's competitors. These allegations do not constitute anticompetitive conduct.").

<u>Fourth</u>, Tekion's exhibits and other judicially noticeable material undercut the Complaint's allegations of anticompetitive conduct and intent. For example, Tekion points to Regal Automotive Group's allegedly delayed data migration as an example of CDK's alleged misconduct, but the Complaint and the LinkedIn post it quotes in support state that "the ***recent CDK security breach*** delayed [the dealership's] data transfer" from July to September. Compl. ¶ 42; Compl., Ex. C (ECF 1-3); *see also S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 1045–46 (D.D.C. 1982), *as amended* (Jan. 10, 1983) (rejecting, based on a full evidentiary record, plaintiffs' argument that purported delays were anticompetitive where delays were "short-lived" and "caused by mere human error or temporary operational difficulties"). Tekion also alleges CDK improperly has refused to deliver dealerships' DMS data, for purposes of transitioning to another DMS provider, until dealer customers have terminated their contracts and paid outstanding bills. Compl. ¶¶ 40–41. Yet, ***Tekion*** requires customers to come current on accounts payable before contract termination, and ***Tekion*** only provides customers with a DMS data export within 30 days of contract termination or expiration and upon request. *See* Tekion, Master Subscription Agreement (eff. Sept. 26, 2024), https://tekion.com/legal/agreements/us-arc-msa at 12–13 §§ 12.4, 12.5.[6] That

---

[6] A copy of the MSA is attached as Exhibit 2. This Court may take judicial notice of Tekion's Master Subscription Agreement because it is publicly available from Tekion's website, and its contents can be accurately determined. *See In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1001 (N.D. Cal. 2024) (taking judicial notice of defendant's online terms of service on Rule 12(b)(6) motion).

CDK's Notice of Motion and Motion to Dismiss
Case No.: 3:24-cv-08879-JSC

Tekion's customer contracts contain similar—indeed, more onerous—terms than CDK's undercuts any claim that CDK's such practices are anticompetitive. *See Bepco, Inc. v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 832 (M.D.N.C. 2000) (rejecting attempted monopolization claim where alleged anticompetitive conduct was based on defendant's "core return policy" with analogous terms as plaintiff's and other industry participants). Tekion cannot base its alleged monopolization claim on conduct that is common to the industry and in which Tekion itself participates; "[a] plaintiff may not use the federal antitrust laws to protect it from the rigors of competition." *Id.*

Additionally, Tekion alleges and Asbury has stated publicly that their pilot program has been underway since October 2024, with Asbury's executives reporting promising feedback and a future "full[] roll[] out" on Tekion's DMS. Compl. ¶ 52; Asbury Auto. Grp, Inc. (ABG) Q4 2024 Earnings Call Tr. (Jan. 30, 2025) at 3, 8–9.[7] Neither CDK's alleged delay in delivering Asbury's data nor CDK's lawsuit against the dealer group has foreclosed or even limited competition, and the Complaint lacks any factual allegations of such anticompetitive effects to render plausible Tekion's conclusory allegations to the contrary. Further, CDK's complaint against Asbury belies Tekion's allegation that CDK instituted the action as an intimidation tactic, as opposed to a genuine business dispute. *See* Compl. ¶ 46; CDK Compl. ¶¶ 18, 22–28. This Court also should reject Tekion's efforts to use the preliminary injunction proceedings between Asbury and CDK as proof of CDK's alleged antitrust violations. The parties' legal disputes do not concern federal antitrust law, *see* Asbury Compl. ¶¶ 45–82, and litigation remains ongoing and largely unadjudicated.[8]

Tekion alleges that CDK has engaged in unlawful delay practices with the intent to foreclose competition, but even if true those allegations fail to show the requisite anticompetitive conduct to state a monopolization claim. It is black-letter law that CDK's alleged "anticompetitive aspirations"—presumed true for purposes of this motion—are "not sufficient alone to establish

---

[7] A copy of the earnings call transcript is attached as Exhibit 3. The Court may take judicial notice of this earnings call transcript and consider it on this Rule 12 motion. *See Primo v. Pac. Bioscis. Of Cal., Inc.*, 940 F. Supp. 2d 1105, 1115 n.1 (N.D. Cal. 2013).

[8] Further, although outside the scope of the pleadings, the preliminary injunction order granted limited relief as compared to the remedy Asbury requested during the hearing, and the parties continue to litigate Asbury's request to expand the injunction as well as CDK's counterclaims.

liability" under § 2. *Aerotec II*, 836 F.3d at 1184. CDK is under no "duty to aid" Tekion while it wins away CDK's customers. *See id.* (affirming summary judgment in favor of defendant on Sherman Act claims based on de facto exclusive dealing and refusal-to-deal theories); *see also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (reaffirming that "there is no duty to aid competitors" in federal antitrust law). Tekion's failure to allege anticompetitive conduct is therefore fatal to its monopolization claim.

### C.    Tekion Fails to Plausibly Allege a Cognizable Antitrust Injury

"[C]ausal antitrust injury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (concluding plaintiff failed to sufficiently allege antitrust injury and affirming dismissal of Section 2 monopolization claim). "To allege antitrust injury, a plaintiff must allege injury to 'competition in the market as a whole'—such as marketwide reduction in output or increase in prices—'not merely injury to itself as a competitor.'" *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1109–10 (N.D. Cal. 2022) (quoting *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024–25 (9th Cir. 2013)) (dismissing § 2 claim for failure to plead antitrust injury).

"The antitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Brunswick*, 429 U.S. at 488. Yet, as discussed above, Tekion's allegations center on the alleged harm *it* has experienced from CDK's alleged delay practices—not harm to competition or consumers more broadly. Because Tekion has failed to allege a causal antitrust injury "of the type the antitrust laws were intended to prevent," Tekion's monopolization claim should be dismissed. *Arcell v. Google LLC*, --- F. Supp. 3d ---, 2024 WL 3738422, at *4 (N.D. Cal. Aug. 9, 2024) (quoting *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021)).

Specifically, Tekion complains that it has suffered lost subscription fees, increased costs, and reputational harms because CDK's data migration delays have forced Tekion to postpone the DMS go-live dates, or threatened to delay the enrollment, of several new customers that Tekion has won away from CDK. *See* Compl. ¶¶ 14, 42, 52–53, 55, 73. "This theory fails to connect [Tekion's] supposed injury to competition generally." *Reilly*, 578 F. Supp. 3d at 1110. For example, Tekion does not allege that CDK's alleged delay practices "stifle[] marketwide output or increase[] prices"

for franchise DMS software. *Id.* Instead, the Complaint states that Tekion offers its competing DMS software for less than CDK. Compl. ¶¶ 35–36. Tekion likewise fails to allege that any delays in CDK's customer migrations to Tekion—the alleged source of Tekion's economic and reputational injuries—"has any deleterious impact on competition." *Reilly*, 578 F. Supp. 3d at 1110. Tekion points to no lost business—for it or any other franchise DMS competitor—or DMS migration freeze among franchise DMS users because of CDK's alleged conduct. Rather, by its own account, Tekion is steadily gaining a foothold in the DMS market due to the perceived merit of its DMS product. *E.g.*, Compl. ¶¶ 13 & 37 (alleging "growing interest in Tekion's innovative technology" and identifying multiple dealers that have moved from CDK to Tekion for DMS), 53 (referencing "at least 62 dealerships" that have transitioned from CDK to Tekion since 2023 and an additional 21 "new dealerships in the pipeline for transition" from CDK with early 2025 launch dates). And Tekion has won the business of large franchise dealer, Asbury, whose transition from CDK to Tekion allegedly signals to the market that "***any dealer*** can" change DMS providers. *Id.* ¶¶ 38, 54.

Tekion's allegations of future dealer stagnation in the DMS market from CDK's alleged conduct, as well as the allegation that Tekion "would have gained a ***more*** rapid and substantial foothold in the franchise DMS market" absent CDK's alleged misconduct, are too threadbare and speculative to plead an antitrust injury. *Id.* ¶¶ 54, 74. Courts routinely have dismissed antitrust allegations alleging similar conclusory and speculative harms. *See, e.g.*, *Arcell*, 2024 WL 3738422 at *4 (rejecting "bare assertions" of "lost consumer choice, innovation, and . . . quality" as "devoid of further factual enhancement" when "Plaintiffs do not allege any specific facts that competitors who had adopted such improvements, or potential entrants who sought to compete on these axes, abandoned their attempts to compete in the search market due to the default contracts"); *Feitelson*, 80 F. Supp. 3d at 1029 (rejecting allegations that challenged exclusive agreements "*could* have the ultimate result" of forcing competition from the market, removing defendant's "incentive to innovate" where "there are no facts alleged that would render these threatened injuries more concrete than hypothetical, as there are no facts alleged to indicate that [d]efendant's conduct has prevented consumers from freely choosing among search products or prevented competitors from innovating" (emphasis in original)).

## V.    TEKION FAILS TO STATE A CLAIM FOR ATTEMPTED MONOPOLIZATION

To plead an attempted monopolization claim under Section 2 of the Sherman Act, Tekion must allege (1) that CDK "has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health*, 515 F.3d at 893 (vacating jury verdict in favor of plaintiff on attempted monopolization). Like a monopolization claim, "[a] claim for attempted monopolization requires allegations of anticompetitive conduct and antitrust injury." *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (concluding that plaintiff's attempted monopolization claim "necessarily fails" for the failure to plead anticompetitive conduct and antitrust injury on the Section 2 monopolization claim). Because Tekion's anticompetitive conduct and antitrust injury allegations fail to state a cognizable claim for monopolization, the same allegations cannot support an attempted monopolization and should be dismissed on that basis. *Id.*

## VI.    TEKION FAILS TO STATE A SECTION 2 VIOLATION BASED ON TYING

The Complaint alleges that CDK "attempted to tie" its Roadster digital retailing product to its DMS software. *E.g.*, Compl. ¶ 60. At the outset, Tekion's claim-specific allegations do not appear to base the alleged Section 2 claims on any tying attempts. *See id.* ¶¶ 83 (alleging monopolization based on CDK's withholding or delaying franchise dealers' access to DMS data and threatened or instituted lawsuits against transitioning DMS customers), 91 (same). If Tekion intends to base its claims on an alleged tying theory, its sparse allegations fail to state a claim.

To state an antitrust claim for unlawful tying, Tekion must "demonstrate[] that [the tie] is an unreasonable restraint on competition in the relevant market." *Cnty. of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001) (internal quotation marks omitted). Under the rule of reason analysis, which the Ninth Circuit requires for alleged ties involving applications integrated with platform software, "the plaintiff must allege an 'actual adverse effect on competition' caused by the tying arrangement." *Brantley v. NBC Univ., Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984)); *see Epic Games*, 67 F.4th at 997 ("holding that *per se* condemnation is inappropriate for ties involving software that serves as a platform for third-party applications" (cleaned up)).

Tekion fails to carry its burden. The Complaint contains **_no_** factual allegations concerning **_any_** adverse effects on competition from CDK's alleged tying efforts. At most, Tekion alleges that "CDK initially refused" a request to enable DMS integration with Tekion's digital retailing platform for Honda/Acura. Compl. ¶ 60. That is plainly insufficient to support Tekion's sweeping allegations of future harm from foreclosed competition in the digital retailing product market. *See id.* ¶ 61. Thus, any effort to ground the alleged monopolization or attempted monopolization claims on CDK's alleged tying attempts fails.

## VII.    THE COURT SHOULD DISMISS THE REMAINING CLAIMS

Tekion invokes federal jurisdiction based on its federal antitrust claims and the Court's discretionary supplemental jurisdiction over the alleged state law claims. *Id.* ¶ 18. Tekion's failure to state any claim under the Sherman Act for which relief can be granted warrants dismissal of the federal antitrust claims. The Court therefore should decline to exercise its conferred remedial power under the Declaratory Judgment Act, decline to exercise supplemental jurisdiction over the remaining state law claims, and dismiss the Complaint in its entirety.

### A.    This Court Should Not Consider Tekion's Request for Declaratory Relief

In *Countrywide Home Loans, Inc. v. Mortgage Guaranty Insurance Corp.*, the Ninth Circuit clarified that a court may decline to exercise its remedial powers under the Declaratory Judgment Act ("DJA") when the Court does not have mandatory subject matter jurisdiction over any non-declaratory claims. 642 F.3d 849, 853 (9th Cir. 2011) (reversing district court's remand of removed action between diverse parties, holding district court was required to rule on defendant's motion to stay pending arbitration under the Federal Arbitration Act before exercising its discretion under the DJA). Specifically,

> the appropriate inquiry for a district court in a Declaratory Judgment Act case is to determine whether there are claims in the case that exist independent of any request for purely declaratory relief, that is, claims that would continue to exist if the request for a declaration simply dropped from the case.

*Id.* at 855 n.2 (quoting *Snodgrass v. Provident Life & Acc. Ins. Co.*, 147 F.3d 1163, 1167–68 (9th Cir. 1998)).

CDK's Notice of Motion and Motion to Dismiss
Case No.: 3:24-cv-08879-JSC

After dispensing with Tekion's antitrust claims, the only remaining claims for the Court to consider are the DJA claim and three state law claims. *See* Compl. ¶¶ 97–131. Because the parties are not diverse—both are Delaware citizens, *id.* ¶¶ 16–17—this Court does not have "subject matter jurisdiction over the [non-declaratory] claim[s] alone," and the alleged state law claims are unrelated to the DJA claim and therefore need not "be joined with [the claim] for declaratory relief." *Countrywide Home Loans*, 642 F.3d at 855 n.2 (first alteration in original) (quoting *United Nat'l Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1113 (9th Cir. 2001)). Thus, in making "the appropriate inquiry," the Court should conclude that, after dismissing the Sherman Act claims, no claims over which the court has federal jurisdiction would exist if the DJA claim "dropped from the case." *Id.* Indeed, declining to exercise its remedial powers under the DJA is appropriate in this case where CDK has filed a separate federal lawsuit against Tekion and a third-party to this suit concerning the issues alleged in Tekion's DJA claim. Dismissal of the DJA claim is therefore warranted and appropriate.

**B.    The Court Should Further Decline to Exercise Supplemental Jurisdiction**

Courts regularly decline to exercise supplemental jurisdiction over state law claims asserted in federal court when the underlying federal law claims fail. *See, e.g.*, *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096–97 (N.D. Cal. 2015) (Koh, J.) (declining to exercise supplemental jurisdiction over state law claims after dismissing federal claim that served as basis for the court's original federal jurisdiction, concluding balance of factors favors dismissing remaining state law claims where "this case has yet to proceed beyond the pleadings, and there has been no discovery conducted to date"); *see also Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (1997) ("Even more clearly under the statutory scheme, while courts 'shall' have supplemental jurisdiction under § 1367(a), they 'may' decline to exercise it under § 1367(c)."). As discussed, Tekion's federal antitrust claims and DJA claim should be dismissed. This Court therefore should decline to exercise supplemental jurisdiction over Tekion's state law claims.

**VIII.    CONCLUSION**

In light of the foregoing, CDK respectfully requests that the Court grant this motion.

Dated: February 10, 2025

**SUSMAN GODFREY L.L.P.**

By:  _/s/ Vineet Bhatia_

VINEET BHATIA (_admitted pro hac vice_)
SHAWN RAYMOND (_admitted pro hac vice_)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street
Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com

JESSE-JUSTIN CUEVAS (SBN 307611)
MADELINE YZURDIAGA (SBN 344676)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
jcuevas@susmangodfrey.com
myzurdiaga@susmangodfrey.com

_Attorneys for Defendant CDK Global, LLC_