TYLER G. NEWBY (CSB No. 205790)
tnewby@fenwick.com
ARMEN N. NERCESSIAN (CSB No. 284906)
anercessian@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:    415.875.2300
Facsimile:    415.281.1350

ADAM GAHTAN (NY Bar No. 2812501)
(Admitted *pro hac vice*)
agahtan@fenwick.com
ERICA R. SUTTER (CSB No. 309182)
esutter@fenwick.com
CORTNAY-BETH CYMROT (NY Bar No. 5960323)
(Admitted *pro hac vice*)
ccymrot@fenwick.com
FENWICK & WEST LLP
902 Broadway, Suite 18
New York, NY 10010-6035
Telephone:    212.430.2600

Attorneys for Plaintiff
TEKION CORP.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TEKION CORP., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>CDK GLOBAL, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.: 3:24-cv-08879-JSC<br><br>**PLAINTIFF TEKION CORP.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Hearing Date: June 26, 2025<br>Time: 10:00 a.m. |

FENWICK & WEST LLP

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.    ISSUES TO BE DECIDED ........................................................................................ 3

II.   RELEVANT FACTS ................................................................................................. 3

    A.    The Franchise DMS Market ........................................................................... 3

    B.    CDK's Anticompetitive Conduct Harms Competition in The Market ................... 4

III.  ARGUMENT ........................................................................................................... 6

    A.    Tekion States a Claim for Monopolization .......................................................... 7

        1.    *CDK Has Monopoly Power in the Franchise DMS Market* ...................... 7

            a.    CDK's Market Share Is Sufficient To Establish Market
                  Power ........................................................................................ 8

            b.    Revenue Is an Appropriate Measure of Market Share ................. 10

            c.    Earlier Cases Did Not Establish CDK's Market Share ................ 11

        2.    *CDK Engages in Anticompetitive Conduct* ............................................ 12

            a.    Tekion States a Prima Facie Case ............................................ 12

            b.    CDK Mischaracterizes Tekion's Theories .................................. 14

            c.    Tekion's Exhibits And CDK's Extraneous Materials Do Not
                  "Undercut" Tekion's Allegations ............................................... 18

        3.    *CDK's Actions Are Causing Antitrust Injury* ........................................ 19

    B.    CDK States a Claim for Attempted Monopolization .......................................... 23

    C.    The Court Can Hear Tekion's DJA and State Law Claims .................................. 23

CONCLUSION ................................................................................................................. 25

FENWICK & WEST LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FENWICK & WEST LLP

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acri v. Varian Assocs., Inc.*,
114 F.3d 999 (9th Cir. 1997) (en banc)..................................................................24

*Allen v. Dairy Farmers of Am., Inc.*,
748 F. Supp. 2d 323 (D. Vt. 2010)........................................................................10

*Am. President Lines, LLC v. Matson, Inc.*,
633 F. Supp. 3d 209 (D.D.C. 2022) ................................................8, 20, 22, 23

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)...............................................................................................9

*Arcell v. Google LLC*,
No. 22-cv-02499, 2024 WL 3738422 (N.D. Cal. Aug. 9, 2024) ....................21, 22

*Argonaut Ins. Co. v. St. Francis Med. Ctr.*,
17 F.4th 1276 (9th Cir. 2021) ..............................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................6

*Authenticom, Inc. v. CDK Glob., LLC*
874 F.3d 1019, 1021–22 (7th Cir. 2017)...............................................................12

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1990)................................................................................25

*Brillhart v. Excess Ins. Co. of Am.*,
316 U.S. 491 (1942)..............................................................................................24

*Brittain v. Twitter, Inc.*,
No. 19-cv-00114, 2019 WL 2423375 (N.D. Cal. June 10, 2019)........................25

*Broughton v. Cutter Laby's*,
622 F.2d 458 (9th Cir. 1980)................................................................................25

*City of Mishawaka, Ind. v. Am. Elec. Pwr. Co., Inc.*,
616 F.2d 976 (7th Cir. 1980)................................................................................13

*CollegeNet, Inc. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Or. 2018) ......................................................................10

*Copeland v. Energizer Holdings, Inc.*,
716 F. Supp. 3d 749 (N.D. Cal. 2024) ...................................................................6

FENWICK & WEST LLP

*Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*,
     99 F.3d 937 (9th Cir. 1996) ........................................................................... 7

*Dairy, LLC v. Milk Moovement, Inc.*,
     No. 21-cv-02233, 2023 WL 3437426 (E.D. Cal. May 12, 2023) ........................................ 10

*Distance Learning Co. v. Maynard*,
     No. 19-cv-03801, 2020 WL 2995529 (N.D. Cal. June 4, 2020) ........................................ 9

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
     111 F.4th 337 (4th Cir. 2024) ...................................................................... 13

*E. & J. Gallo Winery v. Proximo Spirits, Inc.*,
     583 F. App'x 632 (9th Cir. 2014) ................................................................ 24

*Feitelson v. Google*,
     80 F. Supp. 3d 1019 (N.D. Cal. 2015) .................................................... 17, 22, 25

*Forsyth v. Humana, Inc.*,
     114 F.3d 1467 (9th Cir. 1997), *overruled on other grounds by Lacey v.*
     *Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) ......................................... 7

*Free FreeHand Corp. v. Adobe Sys. Inc.*,
     852 F. Supp. 2d 1171 (N.D. Cal. 2012) .............................................. 12, 13, 14

*FTC v. Brown Shoe Co.*,
     384 U.S. 316 (1966) ............................................................................... 16

*FTC v. Facebook, Inc.*,
     560 F. Supp. 3d 1 (D.D.C. 2021) .............................................................. 9

*FTC v. Surescripts, LLC*,
     424 F. Supp. 3d 92 ................................................................................. 17

*FTC v. Qualcomm, Inc.*,
     969 F.3d 974 (9th Cir. 2020) ............................................................ 15, 17

*FTC v. Wilh. Wilhelmsen Holding ASA*,
     341 F. Supp. 3d 27 (D.D.C. 2018) ........................................................... 10

*Gov't. Emps. Ins. Co. v. Dizol*,
     133 F. 3d 1220 (9th Cir. 1998) ............................................................... 24

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
     896 F.2d 1542 (9th Cir. 1989) ................................................................ 18

*Her Majesty the Queen in Right of Can. v. Van Well Nursery, Inc.*,
     No. 20-cv-00181, 2022 WL 23539 (E.D. Wash. Jan. 3, 2022) ........................................ 10

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.*,
    425 U.S. 738 (1976) ............................................................................................ 16

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (9th Cir. 1980) ................................................................................ 8

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ....................................................................... 8, 9, 12

*In re Bare Escentuals, Inc. Secs. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ............................................................ 18

*In re Delta Dental Antitrust Litig.*,
    484 F. Supp. 3d 627 (N.D. Ill. 2020) ................................................................ 11

*In re eBay Seller Antitrust Litig.*,
    545 F. Supp. 2d 1027 (N.D. Cal. 2008) ................................................ 12, 13, 15

*In re German Automotive Manufacturers Antitrust Litigation*,
    612 F. Supp. 3d 967 (N.D. Cal. 2020) ................................................................ 9

*In re Meta Pixel Tax Filing Cases*,
    724 F. Supp. 3d 987 (N.D. Cal. 2024) ......................................................... 18, 19

*In re Suboxone Antitrust Litig.*,
    967 F.3d 264 (3d Cir. 2020) ............................................................................... 13

*Klein v. Facebook, Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) ........................................................... 7, 10

*La. Wholesale Drug. Co., Inc. v. Sanofi-Aventis*,
    No. 07 Civ. 7343, 2008 WL 169362 (S.D.N.Y. Jan. 18, 2008) .......................... 16

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ......................................................................... 11, 19

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ............................................................................... 16

*LiveUniverse, Inc. v. MySpace, Inc.*
    No. CV 06-6994, 2007 WL 6865852 (C.D. Cal. June 4, 2007) .......................... 21

*LLC v. Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ............................................................................... 20

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) ............................................................................ 25

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) .............................................................................. 6

FENWICK & WEST LLP

FENWICK & WEST LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*MLW Media LLC v. World Wrestling Ent'mt., Inc.*,
    No. 22-cv-00179, 2023 WL 4053802 (N.D. Cal. June 15, 2023) ........................................ 13

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
    909 F.2d 1245 (9th Cir. 1990) ................................................................................... 7, 8, 23

*N.E. Ins. Co. v. Masonmar, Inc.*,
    No. 13-cv-00364, 2013 WL 2474682 (E.D. Cal. June 7, 2013) ........................................ 24

*Natchitoches Parish Hosp. Svc. Dist. v. Tyco Int'l, Ltd.*,
    262 F.R.D. 58 (D. Mass. 2008) ...................................................................................... 10

*Newcal Indus. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) .................................................................................... 7, 10

*Omega Envt'l, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ....................................................................................... 17

*Pepper v. Apple Inc.*,
    No. 11-cv-06714, 2019 WL 4783951 (N.D. Cal. Aug. 22, 2019) ..................................... 24

*PNY Techs., Inc. v. Sandisk Corp.*,
    No. 11-cv-04689, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ........................................ 17

*Primo v. Pacific Biosciences of California, Inc.*,
    940 F. Supp. 2d 1105 (N.D. Cal. 2013) .......................................................................... 19

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
    199 F. Supp. 2d 362 (M.D.N.C. 2002) ............................................................................ 16

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ........................................................................... 7, 8, 20, 23

*Richards Indus. Park, LP v. F.D.I.C.*,
    572 F. App'x 499 (9th Cir. 2014) ..................................................................................... 9

*S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*,
    556 F. Supp. 825 (D.D.C. 1982), *as amended* (Jan. 10, 1983) ....................................... 18

*Simon & Simon, PC v. Align Tech., Inc.*,
    No. 20-cv-03754, 2024 WL 710623 (N.D. Cal. Feb. 21, 2024) ....................................... 15

*Syufy Enters. v. Am. Multicinema, Inc.*,
    793 F.2d 990 (9th Cir. 1986) ........................................................................................... 8

*Tele Atlas N.V. v. Naviteq Corp.*,
    No. C-05-01673, 2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ...................................... 13

*Teradata Corp. v. SAP SE*,
    No. 18-cv-03670, 2018 WL 6528009 (N.D. Cal. Dec. 12, 2018) ....................................... 7

*Total Vision, LLC v. Vision Serv. Plan*,
   717 F. Supp. 3d 922 (C.D. Cal. 2024) ................................................................ 25

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
   512 F.2d 1264 (9th Cir. 1975) ........................................................................... 9

*United Food & Com. Workers Local 1776 v. Teikoku Pharma USA, Inc.*,
   74 F. Supp. 3d 1052 (N.D. Cal. 2014) ............................................................ 15

*United States v. CBS Inc.*,
   459 F. Supp. 832 (C.D. Cal. 1978) .................................................................... 8

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ....................................................................... 10, 23

*United States v. Live Nation Entm't, Inc.*,
   No. 24-cv-03973, 2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) .......................... 15

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ..................................................... 13, 14, 17, 23

*Whyte Monkee Prods. LLC v. Netflix, Inc.*,
   No. 23-cv-03438, 2024 WL 4876163 (N.D Cal. Nov. 22, 2024) ........................ 11

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................................................... 16

**Statutes**

18 U.S.C. § 1030, and ............................................................................................. 24

I Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1800c5 ........................... 23

Areeda & Hovenkamp, Antitrust Law .................................................................... 11

California Unfair Competition Law ............................................................................ 6

Clayton Act .......................................................................................................... 17

Sherman Act ................................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................................ 6

Fed. R. Civ. P. 15(a)(2) ......................................................................................... 25

Rule 8 .................................................................................................................... 6

Rule 12(b)(6) ..................................................................................................... 1, 6

FENWICK & WEST LLP

FENWICK & WEST LLP

1

## PRELIMINARY STATEMENT

2      The Court should deny Defendant CDK Global, LLC's ("CDK") Rule 12(b)(6) motion to

3  dismiss.  On the strength of (very) specific factual allegations, Plaintiff Tekion Corp. ("Tekion")

4  has easily pleaded cognizable legal theories of monopolization under Section 2 of the Sherman Act,

5  and state law unfair competition and contractual interference claims.  In its motion, CDK tries to

6  apply brightline rules about market share that the law rejects.  CDK also reductively

7  mischaracterizes Tekion's legal theory.  Under a standard Section 2 analysis, the Court must deny

8  CDK's motion if Tekion alleges merely a prima facie case of monopolization based on CDK's

9  conduct considered *in the aggregate*.  Because Tekion has made a prima facie case, CDK asks the

10  Court to take an improper approach: *dis*aggregate CDK's alleged conduct, assess discrete portions

11  of it, and then dismiss based on antitrust theories of harm that Tekion does not advance.  CDK's

12  arguments about the potential *pro*-competitive effects of its conduct are premature (and unavailing);

13  CDK might later try to rebut Tekion's prima facie case of monopolization on such grounds, but a

14  prima facie case alone defeats a motion to dismiss.  CDK also raises factual issues that are not

15  subject to resolution at this stage.

16      A franchise (new car) auto dealer cannot operate without a franchise Dealer Management

17  System (DMS).  A DMS, and only a DMS, enables a franchise dealer to manage sales, service,

18  inventory, customers, appointments, payroll, finance, mandatory legal and contractual disclosures,

19  communications with car manufacturers, and many other essential functions.  A franchise DMS

20  runs on the dealer's data—a complete set of information about the dealer's past transactions and

21  current affairs—which the franchise DMS provider integrates into the DMS for the dealer's benefit.

22  The provider is the data's steward, but the dealer owns and must have ready access to it (in some

23  states, by statute).  If a franchise dealer wishes to switch DMS providers, or even just try a new

24  one, it must have its data sufficiently in advance of the switch for the new provider to validate the

25  data in its system and ensure its interoperability with other systems and entities (e.g., car makers).

26  This takes time, and there is no going back: the switch happens in an instant, after which the new

27  DMS is the dealer's sole reference system of record, including for legal and regulatory obligations.

28  Switching is fraught, and dealers are naturally reluctant to do it.

As alleged, and therefore true at this stage, industry incumbent CDK is a monopolist in the franchise DMS market, controlling approximately 60% of it by revenue. But CDK's franchise DMS is antiquated. It does not meet the diverse new technological needs of modern franchise dealers. In contrast, Tekion's franchise DMS, launched in 2016, is transformative. It is also lower cost. CDK knows this, but, because it cannot compete on quality, it has engaged in a pattern of anticompetitive conduct that delays or prevents dealers from evaluating and switching to a competitor's franchise DMS. As detailed (and supported with many examples) in Tekion's Complaint, CDK impedes or denies a dealer's access to its own data, forcing the dealer to choose between staying with CDK or risking loss of access to its data and DMS. CDK's tactics range from pretextual restrictions on dealer access to meritless litigation. And they are effective. For example, just so that it could trial Tekion's product, a large franchise dealer group recently had to seek a preliminary injunction requiring CDK to turn over the group's own data. That court granted the extraordinary relief, but the message to other dealers was clear—CDK will make it too risky and expensive to evaluate or switch to a different (superior, lower-cost) franchise DMS.

Contrary to CDK's arguments, 60% market share is not insufficient for monopolization as a matter of law, particularly where, as here, barriers to entry are high. Nor is revenue the wrong measure of market share. It is often the preferred method, in fact, and it is certainly plausible at the pleading stage. And, contrary to CDK's assertions, Tekion does not rely on theories of refusal to deal or exclusive dealing. Even if it were, CDK overstates and misapplies those theories. Finally, Tekion has pleaded harm to competition in the relevant antitrust market. As Tekion's Complaint ("Compl.") sets out, CDK's unlawful conduct deters dealers from choosing superior, lower-cost alternatives by making franchise DMS switching costs too high; degrades quality in the franchise DMS market; enables CDK to maintain artificially high prices; and unnecessarily raises operational costs for dealers forced to stay with CDK. That is more than sufficient to plead viable antitrust claims.

FENWICK & WEST LLP

**I.     ISSUES TO BE DECIDED**

1.     Whether Tekion has adequately pleaded monopolization and attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, where it has alleged that CDK has monopoly power in the franchise DMS market and maintains its monopoly power unlawfully.

2.     Whether, if the Court dismisses Tekion's federal antitrust claims, the Court should hear Tekion's declaratory judgment and state law claims.

**II.     RELEVANT FACTS**

**A.     The Franchise DMS Market**

A DMS is specialized software critical to franchise auto dealers.  Compl. ¶¶ 1, 22–27.  It enables dealers to handle customer relationships, communications, websites, inventory, service, scheduling, finance, insurance, accounting, and more.  *Id*. ¶¶ 4, 22–25.  It is "an auto dealership's central nervous system."  *Id*. ¶ 22.  Even temporary loss of access to its franchise DMS can be catastrophic for a dealer.  *Id*. ¶ 27.  A franchise DMS runs on a dealer's own present and historical data, including data relating to past and present business, vehicle sales and service, inventory, finance, payroll, customers and sales leads, mandatory regulatory and financial reporting, and reports to original equipment manufacturers (OEM, e.g., vehicle manufacturers).  *Id*. ¶ 4.

There are very few providers of DMSs to franchise dealers.  Compl. ¶¶ 66–67.  Tekion, which launched in 2016, is among the most recent entrants.  *Id*. ¶ 70.  This is no surprise, as there are high barriers to entry into the franchise DMS market.  *Id*.  ¶¶ 5, 68.  Franchise DMSs are complex to design, set up, and operate.  *Id*. ¶¶ 5, 28, 68.  They must integrate and inter-operate with over 40 OEMs and other third-party providers.  *Id*. ¶ 5.  On average, franchise dealers spend over $75,000 per year on their DMS.  *Id*. ¶ 3.  Because a franchise DMS is critical to dealer operations, dealers are cautious about switching providers.  *Id*. ¶¶ 5, 65.  A switch from one franchise DMS to another happens in an instant, after which the new franchise DMS becomes the dealer's sole system of record, including for crucial legal and regulatory purposes.  *Id*. ¶ 10.  To ensure transition with no downtime or loss of data access, a dealer and the new franchise DMS provider must have the dealer's data well in advance, to validate and integrate the data with the new franchise DMS.  *Id*. ¶¶ 10, 69.  Those factors (and others) make it challenging and costly for new franchise DMS

FENWICK & WEST LLP

providers to break into the market. *Id.* ¶ 5.

CDK is the incumbent monopolist in the franchise DMS market. Compl. ¶ 2. It controls approximately 60% of the market by total franchise DMS revenue, which is a dominant share, and an even greater share of the submarket for enterprise franchise dealers, i.e. dealer groups with many individual dealerships. *Id.* ¶¶ 2, 29–30, 54, 67. CDK's antiquated franchise DMS lacks many modern features that dealers increasingly expect and must be able to deliver to their car buying customers. *Id.* ¶¶ 2, 6, 31. Tekion's franchise DMS is cloud-based and incorporates modern technology and processes such as data analytics, machine learning, and artificial intelligence. *Id.* ¶¶ 7, 33–34. It provides regular, real-time updates and enhancements that do not require significant downtime or manual installation, it integrates retail, service, parts, accounting, customer relationship management, and analytics functions, and it enables dealers to provide more personalized service for their customers, the car-buying public. *Id.* ¶¶ 7, 33–34. One of the largest franchise dealer groups described Tekion's DMS as "very exciting," "game-changing," and "transformative." *Id.* ¶ 8. It is also lower-priced than CDK's. *Id.* ¶¶ 34–35.

## B. CDK's Anticompetitive Conduct Harms Competition in The Market

Threatened with innovation by providers of superior, modern franchise DMSs, CDK has maintained its dominant market position through a pattern of unlawful, exclusionary practices that discourage and delay franchise dealers from considering or switching to competing products. Compl. ¶¶ 2, 9–15, 39–61. Primary among these practices, CDK has been unlawfully abusing its role as steward of its customers' data—the data that franchise dealers provided to CDK in the first place, without which CDK could not offer franchise DMS services. *Id.* ¶¶ 11, 40–46.

Although CDK had historically cooperated with dealers to facilitate access to their data, including when dealers planned to switch to a competing franchise DMS, CDK has begun restricting or blocking dealer access without legitimate justification. Compl. ¶¶ 11, 40–46. For example, CDK began demanding payment for franchise DMS services as a prerequisite to returning custody of a dealer's own data to the dealer, if the purpose of data access was a switch to a new franchise DMS provider. *Id.* ¶¶ 40, 43. But payment for outstanding franchise DMS services is not a contractual condition of dealer access to their data. *Id.* ¶ 40. And even when dealers capitulate

FENWICK & WEST LLP

and pay, CDK manipulates the timing of approval to create uncertainty and risk to the dealer through a combination of erratic access delivery and long, arbitrary delays. *Id.* ¶¶ 40–45, 53. For one dealer, CDK unilaterally withheld even the initial data-transfer approval for 159 days. *Id.* ¶ 40. For another, CDK refused the dealer's access to its own data for almost two and a half months after CDK acknowledged payment approval. *Id.* These delays increase costs for dealers and, because franchise DMS data migrations must adhere to a precise schedule with no loss of data access, CDK's delays threaten dealers' ability to explore and switch to alternative providers. *Id.* ¶¶ 10, 28, 53–54, 68. CDK also strategically withdraws its services and support to dealers at arbitrary times to impede dealers' migration to other providers. *Id.* ¶ 11. At least two dealers' transition efforts were compromised because CDK arbitrarily terminated contracts or refused to continue providing transition support. *Id.* ¶¶ 42–43. These tactics have no legitimate business or contractual rationale and will force franchise dealers to delay exploration of alternatives, or to remain with CDK at the risk of losing all franchise DMS access. *Id.* ¶¶ 39–50, 53.

CDK has directed some dealers to a self-help data access tool, but the tool does not provide access to a complete data set, and it produces some data in unusable formats. Compl. ¶¶ 44–46. Indeed, CDK does not itself use that tool. *Id.* ¶ 50. CDK also threatened to sue, and in fact did sue, dealers that attempted to access their own data using their own credentials. *Id.* ¶¶ 44–46, 49–50. This conduct is exclusionary. As a CDK officer recently admitted under oath, CDK can easily and quickly collect and provide all dealer data, as it used to do. *Id.* ¶ 50. CDK has gone so far as to sue Asbury Automotive Group, its own customer and the United States' third largest franchise dealer, in retaliation for Asbury's decision to run a pilot program with Tekion's competing franchise DMS. *Id.* ¶ 46. There are approximately 158 new-vehicle dealerships in Asbury's group. *Id.* ¶ 38 Just to obtain access to its own data for the *four* dealers in the pilot, Asbury had to sue CDK in Georgia. *Id.* ¶ 47–51. Following an evidentiary hearing, the court in Georgia issued a preliminary injunction requiring CDK to release Asbury's data so that it could run the Tekion pilot. *Id.* ¶ 51. Yet CDK's tactics nevertheless delayed the pilot program and threatened Asbury's attempt to find an alternative product for all its franchise dealers. *Id.* ¶¶ 8, 38, 52. The Georgia ruling illustrates CDK's unlawful tactics, but by forcing suit, CDK clearly threatened other franchise

FENWICK & WEST LLP

dealers: CDK will make it more difficult, time-consuming, expensive, and riskier than usual even to *evaluate* a competing franchise DMS. *Id.* ¶ 54.

Understanding the leverage that its control over dealer data gives it in the franchise DMS market, CDK has opposed state laws intended to "ensure that dealers retain control over their data." Compl. ¶¶ 4, 56. And it has engaged in tactics unrelated to data control to maintain its dominant position in the franchise DMS market in the face of competition from superior, newer, lower-priced products. For example, in 2018, CDK attempted to purchase a competing franchise DMS provider, Auto/Mate, which had been "kicking [CDK's] butts," but abandoned that acquisition after the FTC sued to block that transaction as anticompetitive. *Id.* ¶ 9.

Unfortunately, CDK's tactics are effective, causing harm to consumers, i.e., franchise dealers, and stifling competition in the franchise DMS market. Compl. ¶¶ 73–74. Because of CDK's conduct, dealers have fewer choices of franchise DMS solutions, pay more for CDK's "antiquated" franchise DMS product, are deprived of expanded and improved features and functionality, and continue to incur higher operating expenses. *Id.* ¶¶ 33, 35, 54, 69. As addressed below, these are paradigmatic antitrust injuries that this lawsuit seeks to remedy.

## III.    ARGUMENT

The Court must deny CDK's Rule 12(b)(6) motion unless the Court finds that Tekion has failed to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff's burden at the pleading stage is light: Fed. R. Civ. P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "The Supreme Court has repeatedly recognized that the same Rule 8 standard applies to antitrust and non-antitrust cases alike." *Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 762 (N.D. Cal. 2024) (citations omitted). In ruling on this motion, the Court must accept all factual allegations in the Complaint as true and draw all reasonable inferences from those allegations in Tekion's favor. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Copeland*, 716 F. Supp. 3d at 761. Tekion has stated plausible claims for violations of Section 2 of the Sherman Act, tortious interference, violations of the California Unfair Competition Law, and declaratory relief.

FENWICK & WEST LLP

A.      **Tekion States a Claim for Monopolization**

To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must plead that defendant (1) possesses monopoly power in the relevant market, (2) has willfully acquired or maintained that power, and (3) has caused antitrust injury through its conduct. *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990). Plaintiff need not plead the elements of a Sherman Act claim with specificity. *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996). To survive a 12(b)(6) motion, a complaint "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Id.* (quotation omitted). Tekion easily meets that standard.

1.      *CDK Has Monopoly Power in the Franchise DMS Market*

Monopoly power is usually shown through indirect or circumstantial evidence of (1) a properly defined relevant market, (2) defendant's dominant share of that market, and (3) significant barriers to entry, expansion, or repositioning by competitors. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012). Monopoly power is essentially a question of fact that an antitrust plaintiff need not plead with specificity. *Cost Mgmt.*, 99 F.3d at 950 n.14 (reversing dismissal of Section 2 claims).

Relevant market is a factual, not legal, element. Tekion defines the relevant market as the market "for DMS[s] for franchise dealerships in the United States." Compl. ¶¶ 63–65. CDK does not dispute the market definition but, even if it had, Tekion's allegations suffice. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (relevant market allegations sufficient "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect").

CDK possesses approximately 60% of the relevant market by revenue. Compl. ¶¶ 2, 29–30, 54, 67. That is sufficient to establish Section 2 antitrust liability. "[A] plaintiff need not plead market share with specificity," and "courts frequently have held that a rough estimate of the defendant's market share is sufficient at the pleading stage." *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 777 (N.D. Cal. 2022); *see also Teradata Corp. v. SAP SE*, No. 18-cv-03670, 2018 WL 6528009, at *15, *19 (N.D. Cal. Dec. 12, 2018) (denying motion to dismiss where plaintiff alleged "market share on information and belief" ranging from "60% to 90%"). The Ninth Circuit rejects

"bright-line rules regarding market share." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 n.10 (9th Cir. 1995) (reversing summary judgment for defendant and finding market share of 44% sufficient where barriers to entry high).  "[A] market share as low as 45–70% may support a finding of monopoly power, if accompanied by other relevant factors." *Movie 1 & 2*, 909 F.2d at 1254 (citing *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975)); *accord Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980) (60–70%); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 996 (9th Cir. 1986) (60–69%); *United States v. CBS Inc.*, 459 F. Supp. 832, 836 (C.D. Cal. 1978) ("less than 50 percent").

Here, there are many "other relevant factors," including high barriers to entry.  *See*, Compl. ¶¶ 2, 5, 29–31, 54, 61, 63–65, 68–70.  These can include extensive regulation, licensing requirements, entrenched buyers, and high entry costs.  *See Rebel Oil*, 51 F.3d at 1439 (licensing requirements and entrenched buyers); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 225 (D.D.C. 2022) (government regulations).  A franchise DMS is a complex, purpose-built platform that must work at scale and across innumerable, interrelated, mission-critical functions for businesses operating in a complex, heavily regulated industry that affects the national economy.  Compl. ¶¶ 1, 3, 4, 22–25.  It must integrate with over 40 OEMs and with other third-party providers, and because the relevant market had become stagnant, many OEMs do not know how to integrate with a new franchise DMS.  *Id.* ¶ 5.  Significant technical difficulties and business disruption risks discourage dealers from switching providers.  *Id.* ¶¶ 5, 26, 65, 69.  As a result of those factors, new entrants into the market are rare.  *Id.* ¶¶ 70.  When a new provider *does* come along, CDK exploits the existing barriers and erects additional, artificial ones by, for example, restricting or blocking dealers' access to their own data.  *Id.* ¶¶ 5, 53–55, 61, 68–69.

### a.    CDK's Market Share Is Sufficient To Establish Market Power

CDK argues that the Court should dismiss Tekion's Complaint because "a 60% market share . . . does not establish market power as a matter of law."  Motion to Dismiss ("Br.") 11.  As addressed above, there is no brightline rule for market share, especially where factors like significant barriers to entry exist, and CDK's cases (Br. 10–11) do not support one.

For example, *Kodak* did not involve this issue; there, the court held as a matter of law that

"all parts" of a single brand of product or service could constitute a relevant antitrust product market. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1205–06 (9th Cir. 1997). Only in *dicta* did the court observe that a 65% market share is "generally" required for a prima facie case. *Id*. at 1206. The court in *Distance Learning* did *not* reject 53.8% market share as a basis for liability. It held that plaintiff had conflated shares of two different markets, acknowledging the "'gray area of the law' between the 30% and 65% thresholds identified by the Ninth Circuit." *Distance Learning Co. v. Maynard*, No. 19-cv-03801, 2020 WL 2995529, at *7 (N.D. Cal. June 4, 2020). *American Tobacco Co. v. United States*, 328 U.S. 781 (1946), affirms that a share over 66% is a "substantial" monopoly but does not rule out monopolies based on smaller percentages. *Id.* at 797. *In re German Automotive Manufacturers Antitrust Litigation*, 612 F. Supp. 3d 967 (N.D. Cal. 2020), suggests only that "approximately a 50% share" is insufficient *by itself* to support a monopolization claim, but the court dismissed the complaint for deficient identification of the relevant market. *Id.* at 980. And in *Twin City Sportservice*, the Ninth Circuit raised doubts about, but did not rule on, the sufficiency of a 50% market share. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 512 F.2d 1264, 1274 (9th Cir. 1975) (quoting *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945)). In *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 17–18 (D.D.C. 2021), "market share in excess of 60%" was insufficient only in view of an "idiosyncratically drawn" market and vague descriptions of share. *Id*. at 10, 17–18 (court "unable to understand exactly what the agency's '60%-plus' figure is even referring to, let alone able to infer the underlying facts that might substantiate it."). In contrast, Tekion alleges share based on revenue of an undisputed relevant product market. Compl. ¶¶ 2, 29–30, 54, 67.

CDK also argues that "the Court should not credit" Tekion's 60% allegation because Tekion did not attach the article on which that figure is partially based and the article "sits behind a paywall." Br. 11–12. Incorporating exhibits into the complaint is permissive; there is no requirement that a plaintiff attach documents that support its allegations. *Richards Indus. Park, LP v. F.D.I.C.*, 572 F. App'x 499, 502–03 (9th Cir. 2014) (citing 5A Wright, Miller & Kane, Federal Prac. & Proc. § 1327 (3d ed. 2004)). Tekion makes concrete factual allegations about CDK's market share by revenue. Compl. ¶¶ 29–30, 67. The article that Tekion cites (*id*. ¶ 29,

FENWICK & WEST LLP

n.10), is from a leading trade publication and supports the allegation. Indeed, so does the article that *CDK* relies on: "According to Gillrie, CDK remains the leader with about 60 percent of the market." Br. 12, Ex. 1 at 3. Finally, CDK argues that Mr. Gillrie's statements do not in fact support Tekion's allegations. Br. 12. But disputes like this, over the factual bases for market share allegations are inappropriate for resolution on a motion to dismiss. *Newcal*, 513 F.3d at 1051 (actual existence of market power "a factual question"); *see also, e.g.*, *Her Majesty the Queen in Right of Can. v. Van Well Nursery, Inc.*, No. 20-cv-00181, 2022 WL 23539, at *8 (E.D. Wash. Jan. 3, 2022) (dispute over factual allegations of ownership or market share raises a "question of fact [that] is inappropriate for resolution on a motion to dismiss"); *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 339–341 (D. Vt. 2010) (denying motion where defendant disputed factual predicates for plaintiff's monopoly power allegations).

### b.     Revenue Is an Appropriate Measure of Market Share

CDK argues that revenue is an inappropriate measure of market share as a matter of law, and that only *units* (dealerships) are a permissible measure. Br. 13–14. CDK also argues that the Court should dismiss because the Complaint "contains no factual allegations that show *why* 'total DMS revenue for franchise dealers'" is appropriate. *Id.* (emphasis added). CDK cites no law in support of its argument against revenue as a measure of market power, and no case in which a court dismissed a complaint for failure to plead market share by units. In fact, courts routinely rely on revenue to calculate market share. *See, e.g., Klein*, 580 F. Supp. 3d at 776–77 (denying motion to dismiss); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188 (3d Cir. 2005); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 59–61 (D.D.C. 2018); *Natchitoches Parish Hosp. Svc. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 65 (D. Mass. 2008) ("revenue market shares of 53.77– 65.26%" "passes muster"). But, again, disputes about how best to calculate market share are not properly addressed at the pleading stage. *See, e.g.*, *Klein*, 580 F. Supp. 3d at 776–79 (denying motion to dismiss; rejecting argument that allegations were implausible because plaintiff failed to explain how market shares were calculated); *Dairy, LLC v. Milk Moovement, Inc.*, No. 21-cv-02233, 2023 WL 3437426, at *9 (E.D. Cal. May 12, 2023) (arguments about sufficiency of market share allegations are "predominately factual and thus not suitable at the motion to dismiss stage");

FENWICK & WEST LLP

*CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 958–59 (D. Or. 2018) ("The parties primarily dispute the appropriate way to calculate market share. . . .  The Court cannot say that Plaintiff's calculation [of 60% total market share] is incorrect as a matter of law."; denying motion to dismiss); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 641–42 (N.D. Ill. 2020) (dispute over calculation of shares "not a basis for dismissal"; denying motion).[1]

In fact, "[r]evenue provides a more practicable common denominator for products whose physical units are not entirely comparable."  Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 535 (5th ed. 2024).  The 2023 Merger Guidelines list "[r]evenues in a relevant market" as the first metric, in part because revenues "often provide a readily available basis on which to compute shares and are often a good measure of attractiveness to customers."  U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 4.4.B (2023). Using Tekion and CDK as examples, the products in the franchise DMS market are not "entirely compatible": CDK's is antiquated, Compl. ¶¶ 6, 9, 31, 33, 39, 73, Tekion's is cloud-native, leverages new technology, and integrates better with other facets of the automotive retail ecosystem, *id.* ¶¶ 7, 9, 33, 34, 36, 39, 73.  Reflecting these differences, Tekion's franchise DMS offers "lower upfront costs compared to traditional DMS solutions like CDK's."  *Id.* ¶ 35.  Revenue is therefore, at minimum, a plausible measure, certainly at the pleading stage.

### c.     Earlier Cases Did Not Establish CDK's Market Share

CDK argues that the Court should reject Tekion's 60% allegation because it is inconsistent with findings in earlier cases, urging the Court to take judicial notice of those findings. Br. 4, 10–11.  Although a court may "take[] judicial notice of another court's opinion, it may do so not for the truth of the facts recited therein, but for the *existence* of the opinion. . . ."  *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (emphasis added) (error to take judicial notice of *validity* of extradition waiver).  *Whyte Monkee Prods. LLC v. Netflix, Inc.*, No. 23-cv-03438, 2024 WL

---

[1] CDK tries to illustrate its (flawed) revenue share argument by analogy to Mercedes-Benz's supposedly outsized revenue share in the (overall) automobile market. (Br. 3, 14), but the analogy is inapt.  Mercedes obtains a higher price than most other automobile OEMs due to its strong reputation for luxury and superior quality.  CDK sustains its high prices despite antiquated and inferior products due to its exclusionary and anticompetitive business practices that deprive its customers of the opportunity to consider competitive alternatives.  Compl. ¶¶ 6, 7, 9, 31, 33, 34, 39, 73.  In any event, this market-specific determination cannot be resolved at this stage.

FENWICK & WEST LLP

4876163, at *2 & n.3 (N.D Cal. Nov. 22, 2024), stands for the same proposition.  Thus, even if CDK *could* raise factual disputes now, and it cannot, the findings in the cases it cites do not provide useful predicates.  Nor could cases decided eight and seven years ago establish market share forever.  Markets evolve.  Indeed, the court in *Authenticom, Inc. v. CDK Glob., LLC* observed that CDK had *gained* market share over time.  874 F.3d 1019, 1021–22 (7th Cir. 2017).[2]

### 2.    *CDK Engages in Anticompetitive Conduct*

As described in detail in the Complaint, including by reference to specific examples, CDK illegally maintains a monopoly in the DMS market for franchise dealers by engaging in a pattern of conduct that thwarts dealer consideration of alternative DMSs.  CDK's exclusionary conduct harms competition by preserving CDK's ability to charge higher prices for its DMS than could be sustained in a competitive market, depriving dealers of expanded and improved franchise DMS features and functionality, forcing franchise dealers to incur higher operating expenses, and in other ways.  Most commonly, CDK denies or delays dealers' access to their own data, making it commercially untenable for them to consider alternative franchise DMS providers.  At this stage, the Court must consider CDK's conduct *in the aggregate*, and, if the *aggregate* facts state merely a prima facie case, CDK's motion must be denied.

### a.    Tekion States a Prima Facie Case

Anticompetitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive edge, or to destroy a competitor."  *Kodak*, 125 F.3d at 1208 (quotation omitted).  It is "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (quotation omitted).  *Proving* anticompetitive conduct generally involves burden-shifting: (1) the plaintiff must establish a prima facie case by alleging anticompetitive conduct resulting in harm to competition; (2) the defendant may try to rebut plaintiffs' prima facie case with evidence of procompetitive justification for its conduct; and (3) if

---

[2] In addition, the market *at issue* in *Authenticom* was the data integration market, not the DMS market, references to the DMS market were not to the *franchise* DMS market, and the court's observation about CDK's share in the DMS market was not material to its holding or to Authenticom's Section 1 claims.  *Id.* at 1023.

FENWICK & WEST LLP

the defendant offers a procompetitive justification, then the plaintiff must show that the anticompetitive harm outweighs those benefits. *See In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1032–33 (N.D. Cal. 2008) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001)). To *plead* anticompetitive conduct, a plaintiff need only allege facts in support of the prima facie case. *eBay*, 545 F. Supp. 2d at 1033; *MLW Media LLC v. World Wrestling Ent'mt., Inc.*, No. 22-cv-00179, 2023 WL 4053802, at *6–7 (N.D. Cal. June 15, 2023).

Anticompetitive conduct can take many forms. "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58; *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354–55 (4th Cir. 2024) ("[A]nticompetitive conduct comes in many different forms that cannot always be categorized."). And in evaluating a monopolization claim, a party's anticompetitive efforts "must be considered in their totality." *Duke Energy*, 111 F.4th at 355 (citing *U.S. v. Grinnell Corp.*, 384 U.S. 563, 576 (1966)). "[I]t is a misapplication of antitrust doctrine for a court to treat a plaintiff's allegations of anticompetitive conduct as if they were five completely separate and unrelated lawsuits, effectively tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* (internal citation and quotation omitted); *accord In re Suboxone Antitrust Litig.*, 967 F.3d 264, 270 (3d Cir. 2020) (noting defendant "incorrectly asks us to examine each of these acts individually"). "[I]t is not proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Free FreeHand*, 852 F. Supp. 2d at 1180 (quotation omitted) (denying motion to dismiss). Courts must analyze a monopolist's conduct "in the aggregate." *Tele Atlas N.V. v. Naviteq Corp.*, No. C-05-01673, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008); *accord City of Mishawaka, Ind. v. Am. Elec. Pwr. Co., Inc.*, 616 F.2d 976, 986 (7th Cir. 1980) (affirming trial court finding of antitrust violation under "monopoly broth" theory).

Tekion easily pleads a prima facie case. CDK's tactics, which depart from its previous practices, have interfered with the operations of multiple franchise dealers, and rendered other franchise dealers unlikely to switch for reasons unrelated to price or quality. Compl. ¶¶ 10–12, 39–46, 53–55. CDK's threats and initiation of meritless legal action intimidate dissatisfied customers into remaining with CDK. *Id.* ¶¶ 75–79. Asbury had to resort to seeking extraordinary judicial

FENWICK & WEST LLP

relief against CDK to get access to its own data, just to *try* a competitor's franchise DMS. *Id.* ¶¶ 47–51. The CDK tactics that forced Asbury into the lawsuit not only delayed the group's trial, but signaled to other dealers, including those without the resources to sue CDK, that there is too much risk to contemplate a switch. *Id.* ¶ 54. CDK has also threatened to make its digital retailing platform (Roadster) the only platform with which its franchise DMS would interoperate, thereby effectively compelling franchise dealers of any automotive OEM that aspires to adopt a digital retailing platform to purchase or remain with CDK's franchise DMS. *Id.* ¶¶ 56–61. This conduct, *considered in its totality*, states a prima facie case. *FreeHand*, 852 F. 2d at 1180.

### b.    CDK Mischaracterizes Tekion's Theories

CDK argues that Tekion has alleged no more than unilateral refusal to deal and exclusive dealing, both of which CDK argues are per se legal. Br. 16–17. CDK is wrong on both counts. First, Tekion does not allege unilateral refusal to deal or exclusive dealing as CDK's suggests. Second, even if those were Tekion's theories, refusal to deal and exclusive dealing arrangements are not, in fact, automatically legal. And throughout its arguments, CDK improperly dis-aggregates Tekion's allegations into separate acts and challenges each individually, rather than addressing CDK's *pattern* of exclusionary conduct. It does this in attempts to avoid the standard burden-shifting analysis under which a complaint will survive a motion to dismiss if plaintiff has pleaded merely a prima facie case of monopolization, based on defendant's *aggregate* conduct.

**Refusal to deal**. According to CDK, "Tekion instead alleges that CDK has failed to timely transfer customers' data to Tekion, but this is nothing more than the sort of unilateral, refusal-to-deal," that the Ninth Circuit rejects under the Sherman Act. Br. 16. CDK cites nothing from the Complaint in support of this mischaracterization of Tekion's allegations. In fact, Tekion does *not* allege that CDK has refused to deal with Tekion. Rather, Tekion alleges a pattern of anticompetitive conduct by CDK that thwarts or discourages its *dealer customers* from considering rival franchise DMS providers. *E.g.*, Compl. ¶¶ 10–12, 39–45, 53–54. Tekion receives data from CDK (when it does) only at the direction of CDK's dealer customers. Courts have distinguished a monopolist's refusal to deal, which might be permissible, from a monopolist's restraint of *counterparties* from dealing with the *monopolist's rivals*, which is illegal. *See Microsoft,* 253 F.3d

FENWICK & WEST LLP

at 64, 71–72, 75–76.  Here, Tekion alleges, among other things, that CDK has unlawfully impeded *dealers* from dealing with Tekion, CDK's rival.[3]

In addition to its mischaracterization of the allegations, CDK's reliance on *FTC v. Qualcomm, Inc.*, Br. 16 (citing 969 F.3d 974, 993–97 (9th Cir. 2020)), is misplaced.  Qualcomm refused to sell its chips to equipment manufacturers that did not also take licenses to its patents, and it conditioned royalty-free patent licenses to its chip-making rivals on their agreements to sell their own chips only to Qualcomm-licensed equipment manufacturers.  969 F.3d at 984–85.  Some equipment manufacturers objected to Qualcomm's policy, and the government sued.  *Id*. at 985–86.  The court held that the policy was not anticompetitive because, within limits, private parties are free to choose whom they do business with or not.  *Id*. at 994.  There are no analogous allegations here.  Because CDK's conduct does not fall within the narrow exception of a unilateral refusal to deal, the standard burden-shifting analysis applies.  *See, e.g., Qualcomm*, 969 F.3d at 991; *Simon & Simon, PC v. Align Tech., Inc.*, No. 20-cv-03754, 2024 WL 710623 at *2 (N.D. Cal. Feb. 21, 2024); Thus, at this stage, it is sufficient for Tekion to allege a prima facie case of anticompetitive conduct.  *eBay*, 545 F. Supp. at 1033.  Tekion (easily) clears that low bar.  CDK's arguments that Tekion's nascent success signals a competitive market (Br. 15), and that CDK's dilatory tactics are somehow *pro-competitive* (Br. 16), are not proper at the pleading stage.  While a "procompetitive benefit" might later *rebut* a prima facie case, a prima facie case is sufficient to survive a motion to dismiss.  *Id.*; *see United Food & Com. Workers Local 1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1067 & n.16 (N.D. Cal. 2014) (collecting cases).[4]

**Exclusive dealing.**  According to CDK, Tekion alleges that CDK's "data transfer delays effectively force customer franchise dealerships that want to switch . . . into a *de facto* exclusive arrangement with CDK while CDK transitions their data."  Br. 16.  On this basis, and again ignoring most of the Complaint, CDK then treats Tekion's claim as one for exclusive dealing.  Br. 16–17.

[3]    And because Tekion has plausibly alleged conduct other than refusal to deal, its Complaint survives CDK's motion to dismiss even if the facts could, somehow, *ultimately* reduce to that theory (they cannot).  *United States v. Live Nation Entm't, Inc.*, No. 24-cv-03973, 2025 WL 835961 at *2–3 (denying motion to dismiss where plaintiff "plausibly" alleged tying, even though facts might "ultimately show" unactionable form of refusal to deal) (S.D.N.Y. Mar. 14, 2025).

[4]    As Tekion will establish, CDK's conduct does *not* pro-competitively drive customers to CDK's rivals.  By design, it *prevents* franchise dealers from considering alternative providers.

FENWICK & WEST LLP

Because some courts have "blessed" consensual exclusive dealing arrangements of longer durations, CDK argues that its intentional and strategic delays in providing franchise dealers access to their own data do not "rise to the level of an antitrust violation as a matter of law." *Id.* CDK mischaracterizes Tekion's allegations in hopes, again, of avoiding the pleading implications of the burden-shifting analysis.

An exclusive dealing arrangement typically involves a contract that requires a buyer to purchase all or most of a given product from a single seller for a set period, thereby preventing the buyer from consuming or reselling another supplier's products or services. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). It arises most often in cases involving "requirements" type contracts, non-competition clauses, or discount arrangements that deprive competing sellers of retail outposts for their products. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 387 (M.D.N.C. 2002); *see, e.g.*, *FTC v. Brown Shoe Co.*, 384 U.S. 316, 320–22 (1966) (exclusive dealing contracts with shoe sellers "limit[ed] their trade with Brown's competitors,"); *LePage's Inc. v. 3M*, 324 F.3d 141, 157–59 (3d Cir. 2003) (rebate/discount scheme). Tekion does not allege that CDK entered consensual exclusive dealing arrangements with dealers, or that it "forced" dealers into "de facto" exclusive arrangements. "Exclusive dealing" is not in Tekion's Complaint, in words or conceptually. And although dealers *contract* for franchise DMSs, Tekion does not take issue with CDK's contracts per se, but with CDK's overall pattern of exclusionary conduct.

Contrary to CDK's arguments, moreover, the delays that result from that conduct are plenty long enough to cause anticompetitive harm, not that there is any minimum requisite period. *See, e.g.*, *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 740–41 (1976) (delay of government authorization by "some months" stated claim for conspiracy to monopolize); *La. Wholesale Drug. Co., Inc. v. Sanofi-Aventis*, No. 07 Civ. 7343, 2008 WL 169362, at *2 (S.D.N.Y. Jan. 18, 2008) (six months; denying motion to dismiss). Nor are Tekion's allegations limited to delay during the time when "CDK transitions [customer] data" (i.e., at the end of contracts). Br. 16. CDK's failure to give dealers access to their own data *at any time* is anticompetitive, because without access to their own data, dealers cannot meaningfully evaluate alternative franchise DMS providers. (In a separate

FENWICK & WEST LLP

part of its campaign to control dealer data, CDK fought against laws intended to *ensure* that dealers maintain access of their data generally; it lost.  Compl. ¶¶ 4, 56.)  Nor is delay the only harm: CDK's conduct discourages dealers from switching at all.  Compl. ¶ 54.

Even if Tekion's claims did involve exclusive dealing, its allegations would be sufficient. The law does *not* automatically "bless" such arrangements when they delay competition for only a few years or less.  Br. 17.  The inquiry is "fact intensive."  *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 104 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961)); *see also id.* at 104 (denying motion to dismiss where,"[e]ven if the contracts were short term and easily terminable, the FTC argues that their exclusive terms, when combined with the nature of the two relevant markets and Surescripts's dominant monopoly position, had the effect of foreclosing large parts of both markets and harming competition."); *Microsoft*, 253 F.3d at 70–71.  To be actionable under Section 2, moreover, exclusive dealing need not result in substantial foreclosure of competition. *See Microsoft*, 253 F.3d at 70–71.

And CDK's cases are distinguishable.  In each, duration (delay) was just one consideration. In *Qualcomm*, there was "no evidence" of a "viable competitor" during the alleged period of delay. 969 F.3d at 995, 1004.  *Omega Envt'l, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997), is a Clayton Act case about exclusive dealing contracts with *distributors*, which are "generally less cause for anticompetitive concern," and, on summary judgement, the court found that there was a viable alternative distribution route, further undermining the claim.  *Id.* at 1162–63.  In *Feitelson*, the Court dismissed, but with leave to amend because "the allegations . . . plausibly suggest that the [agreements], *though limited in duration and scope*, have the practical effect of foreclosing rivals."  *Feitelson v. Google*, 80 F. Supp. 3d 1019, 1031–32 (N.D. Cal. 2015) (emphasis added). The *PNY* court found multiple defects in the amended complaint, including plaintiff's failure to identify a retailer for which any of its exclusive dealing allegations were true, and to plead a lack of alternative channels of distribution.  *PNY Techs., Inc. v. Sandisk Corp.*, No. 11-cv-04689, 2014 WL 2987322, at *6–8 (N.D. Cal. July 2, 2014).  And in each case, the structure of the contract itself was significant.  *Qualcomm*, 969 F.3d at 1003; *Omega Envt'l, Inc.*, 127 F.3d at 1162–1166; *Feitelson*, 80 F. Supp. 3d at 1024–1025; *PNY Techs., Inc*, No. 11-cv-04689, 2014 WL 2987322, at

FENWICK & WEST LLP

*5–7. Tekion's allegations do not concern the structure of CDK's contracts, nor does Tekion allege that CDK had become the *exclusive* supplier of DMSs through its contracts. Tekion alleges that CDK maintains actionable monopoly power in the franchise DMS market through a pattern of unlawful conduct that delays or prevents dealers from exploring alternative franchise DMSs.

**Tying.** CDK argues that "[i]f Tekion intends to base its claims on an alleged tying theory, its sparse allegations fail to state a claim." Br. 23. Tekion did not make a standalone tying claim. Rather, Tekion alleged a series of interrelated, anticompetitive acts that *included* CDK's threats to tie its digital retailing product to its franchise DMS product. Compl. ¶¶ 10–12, 39–61, 75–79.

### c.     Tekion's Exhibits And CDK's Extraneous Materials Do Not "Undercut" Tekion's Allegations

Tekion alleges that a LinkedIn post reflects one dealer's frustration with CDK's exclusionary decision to deny the dealer access to its own data, leaving it with a gap in DMS coverage. Compl. ¶ 42; Ex. C. CDK argues that the LinkedIn post in fact shows that a "security breach" led to the delay. Br. 19. This raises a factual dispute, not a basis for dismissal.[5]

CDK asks the Court to take judicial notice of *Tekion's* Master Subscription Agreement (MSA), arguing that, because Tekion's terms are like CDK's, CDK's conduct cannot be anticompetitive. Br. 19–20. Generally, a court may not consider material outside of the complaint when ruling on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). The scope of judicial notice is narrow; a court may take notice of the *existence* of documents, for example, but not the truth of the matters asserted in them. *In re Bare Escentuals, Inc. Secs. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010). Relying on *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1001, 1006 (N.D. Cal. 2024), CDK asks the Court to *interpret* Tekion's MSA, conclude that Tekion's conduct in the market is the same as CDK's, and then draw legal conclusions from those (disputed) facts. In *Meta Pixel*, the court took notice only of the *existence* and *content* of a choice-of-law provision as it existed on a certain date,

---

[5] *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825 (D.D.C. 1982), *as amended* (Jan. 10, 1983), does not help CDK's arguments. That case was decided on a full evidentiary record. *See id.* at 851. Moreover, plaintiffs in that case proffered no evidence regarding the delays alleged. *Id.* at 1046, whereas Tekion has *already*, at the pleading stage, provided support for its allegations of the delays that CDK's anticompetitive conduct has caused. *See, e.g.*, ¶ 42–43, 53.

FENWICK & WEST LLP

but it refused to draw any inference against the plaintiffs on that basis. *Id*. Here, CDK's contracts are not before the Court, so there is nothing for the Court to compare. Even if there were, the Court cannot construe the parties' contracts or resolve factual disputes at this stage. Thus, there is no legal or factual basis for the Court to conclude that Tekion has "base[d] its alleged monopolization claim on conduct that is common to the industry and in which Tekion itself participates." Br. 20.

Citing *Primo v. Pacific Biosciences of California, Inc.*, 940 F. Supp. 2d 1105 (N.D. Cal. 2013) CDK asks the Court to take notice of an earnings call that, in CDK's view, shows that Tekion's supposed success with Asbury is evidence of a competitive market for DMS for franchise dealers. Br. 20. It is not clear from the footnote cited whether the court in *Primo* noticed an earnings call because it was one of many documents "referenced in, or attached to," the complaint, but in any event, the court noticed them for purposes of establishing that the statements had been made, not for their truth, in the context of a securities and fraud case *about* defendant's representations. *Primo*, 940 F. Supp. at 1114. Here, CDK asks the Court to rely on the earnings call to establish facts regarding the competitiveness of the franchise DMS market, not that Asbury in fact made a representation about its business. That is improper. *Lee*, 250 F.3d at 689.

CDK asks the Court to "reject" Tekion's allegations about the preliminary injunction proceedings between Asbury and CDK because that dispute does "not concern federal antitrust law" and is "largely unadjudicated." Br. 20. Not so. Asbury obtained a preliminary injunction— extraordinary relief based on an evidentiary record, including witness testimony—requiring CDK to turn over Asbury's data so that it could trial Tekion's franchise DMS product. It is irrelevant that Asbury's suit was not an antitrust suit. The fact of the injunction strongly supports Tekion's allegations that CDK hinders competition in the DMS market for franchise dealers, in part by denying dealers access to their own data. Tekion identified Asbury's suit and the court's order as examples of CDK's exclusionary conduct, not as legal precedent.

### 3.    *CDK's Actions Are Causing Antitrust Injury*

As it does with exclusionary conduct, CDK draws the contours of causal antitrust injury— that is, injury that flows from the unlawful conduct that the antitrust laws were intended to prevent—far too narrowly. There are many variations on antitrust injury but typically it takes the

FENWICK & WEST LLP

form of "reduced output, increased prices, or decreased quality in the relevant market." *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022); *see also Am. President Lines*, 633 F. Supp. 3d at 221 (citation omitted). As addressed below, CDK's conduct is causing those harms, and others, in the franchise DMS market. And there is no credible argument that the harm "flows from aspects of the defendant's conduct that are beneficial or neutral to competition." *Rebel Oil*, 51 F.3d at 1433. The harms to Tekion, franchise dealerships, and the franchise DMS market flow directly and entirely from CDK's exclusionary conduct. And, throughout its motion, CDK muddles the relevant consumers in this inquiry. *See, e.g.*, Br. 19 (Tekion's "Complaint does not allege that CDK's alleged delays caused . . . a business disruption that affects consumer car buyers."). The Court must consider harm to competition in the franchise DMS market including to franchise *dealers* and Tekion, not the car-buying public (though, to be sure, CDK's conduct harms car buyers too). CDK does not dispute that DMS for franchise dealers is the relevant market.

As discussed, CDK unreasonably and unnecessarily restricts franchise dealers' access to their own data, which impedes them from effectively evaluating or switching to potential alternative franchise DMS products. In addition to artificially increasing the costs incurred by rival franchise DMS providers, including Tekion, as well as depriving rivals of revenue and profits that otherwise would have been earned from the sale of their franchise DMS, CDK's exclusionary conduct, among other things, preserves CDK's ability to charge franchise dealers prices above the level that otherwise could be sustained in a competitive market, deprives franchise dealers of expanded and improved franchise DMS features and functionality, and forces franchise dealers to unnecessarily incur higher operating expenses. Compl. ¶¶ 11, 35–36, 54, 72. Contrary to CDK's argument, none of these alleged antitrust injuries is "speculative." Br. 22. CDK does not dispute that it charges higher prices than Tekion does, or that many franchise dealers have experienced and incurred the costs associated with the delays and business disruptions that flowed from CDK's actions to prevent dealers from evaluating a rival franchise DMS product, *see* Compl. ¶¶ 14, 42, 52–53, 55, 73. CDK claims that delays and disruption "only hurt Tekion and therefore do not constitute anticompetitive conduct," Br. 18, but, plainly, franchise dealers *are* directly harmed when they cannot quickly or efficiently evaluate alternatives. Compl. ¶¶ 5, 10, 26, 65, 69. In fact, such was the threat to

FENWICK & WEST LLP

Asbury's business that it was forced to sue CDK. *Id.* ¶¶ 47–51. And the Georgia court preliminarily enjoined CDK to return possession of Asbury's data to it, so that Asbury could trial a competitor's franchise DMS. *Id.* ¶¶ 49–51.

CDK contends that Tekion fails to allege that "delays in CDK's customer migrations to Tekion" have had "any deleterious impact on competition." Br. 22. To the contrary, that is *precisely* what Tekion has alleged and supported with detailed facts. *See, e.g.*, Compl. ¶ 53 (CDK makes switching so onerous and treacherous that it forces franchise dealers considering a switch to a rival franchise DMS to remain with CDK). *LiveUniverse, Inc. v. MySpace, Inc.*, on which CDK relies, Br. 21, is instructive. Plaintiff, which operated a social media website, alleged that its rival MySpace blocked or deleted LiveUniverse content and disabled links to LiveUniverse on the MySpace site. No. CV 06-6994, 2007 WL 6865852, at *11 (C.D. Cal. June 4, 2007). LiveUniverse focused on harm to its own business, alleging as to consumers only the inconvenience of having to visit more than one website. The court considered this a "fanciful" harm and rejected LiveUniverse's claim of antitrust injury. *Id.* at *15-16. There is nothing "fanciful" about the disruption franchise dealers face as the result of CDK's exclusionary conduct—a franchise DMS is essential to franchise dealer operation. Compl. ¶¶ 10–12, 39–45, 53–54.[6]

Likewise, CDK's argument that the Court should dismiss because Tekion alleges harm only to itself, not to competition generally, does not square with the facts or with CDK's cases. In *Arcell v. Google LLC*, No. 22-cv-02499, 2024 WL 3738422 (N.D. Cal. Aug. 9, 2024), the injury allegations were insufficient not because they failed to allege harm to competition or consumers, but because the plaintiffs did not identify "exactly what kind of choices, innovations, or quality improvements Plaintiffs expect would have occurred" or facts that "would lead to a plausible inference that those choices, innovations, or quality improvements would have emerged" absent Google's anticompetitive conduct. *Id.* at *4. Similarly, in *Feitelson*, the plaintiffs alleged an entirely "hypothetical loss of consumer choice and innovation." 80 F. Supp. 3d at 1029. Here,

---

[6] To be sure, Tekion also has suffered antitrust injury in the form of lost revenues, increased costs, and reputational injury from CDK's exclusionary actions. That harm also will support Tekion's other tort and unfair competition claims for damages. But in this context, the point is that the injuries incurred by Tekion flow from the same exclusionary CDK conduct that is reducing output, foreclosing competitors, and harming consumers/dealers.

FENWICK & WEST LLP

Tekion has *launched* an alternative franchise DMS, and it has alleged the specific ways in which CDK prevents dealers from using or even evaluating it. Compl. ¶¶ 9–12, 39, 53–54, 72. Tekion's allegations are not hypothetical, and they are more than sufficient to satisfy Tekion's pleading burden. *See*, *e.g.*, *Am. President Lines*, 633 F. Supp. 3d at 220–22 (plaintiff's allegations of "reduced output (i.e., fewer shipping choices), increased prices, and diminished quality of service" were "quintessential antitrust injuries."). CDK's conduct also results in higher prices and costs than would otherwise prevail. As CDK acknowledges, Tekion's franchise DMS is lower cost. Br. 2; Compl. ¶¶ 34–35. Thus, franchise dealers that are forced to remain with CDK pay more for their DMSs, and the switching costs for those that move to a competitor rise, in Asbury's case, by the costs of litigation. *Id.* ¶¶ 45–51, 75–79.

CDK's exclusionary conduct has also undeniably reduced quality in the franchise DMS market. Tekion's modern franchise DMS includes many technological improvements and advancements over CDK's legacy product—it is better for franchise dealers. Compl. ¶¶ 2, 7. In CDK's own words, Auto/Mate, another modern DMS provider had been "kicking [CDK's] butts." *Id.* ¶ 9. (In response, CDK tried to buy Auto/Mate but gave it up when the FTC deemed the transaction anticompetitive.) Asbury's CIO Barry Cohen testified in detail about how Tekion's franchise DMS product is a significant improvement over legacy systems like CDK's and will provide multiple technological, efficiency, and customer-service advantages for dealers. *Id.* ¶ 8. An unavoidable consequence of CDK's exclusionary conduct is that dealers are deprived of higher-quality franchise DMS solutions. CDK does not engage with these facts.

CDK argues that "Tekion does not allege that CDK's alleged delay practices 'stifle[] marketwide output or increase[] prices,'" Br. 21–22, but that is *exactly* what Tekion alleges. CDK also argues that there are no antitrust concerns here because Tekion "is steadily gaining a foothold in the DMS market." *Id.* at 22. CDK overstates and mischaracterizes Tekion's "success," and it ignores the unnecessary, pretextual delays that have in fact interfered with Tekion's growth. Compl. ¶ 53. CDK also ignores that its exclusionary conduct has deterred additional franchise dealers from evaluating or transitioning from CDK to Tekion's franchise DMS. *Id.* ¶ 13. But for

FENWICK & WEST LLP

CDK's actions, by now Tekion would have experienced far more success, and the market would be more competitive. *Id*. ¶¶ 54–55, 71–74.

CDK also misapplies the law. Total foreclosure from a market is not the standard for antitrust injury. *See Microsoft*, 253 F.3d at 70–71; *see also Am. President Lines*, 633 F. Supp. 3d at 221–22. There can be antitrust injury even when a plaintiff has achieved modest success. *See Dentsply*, 399 F.3d at 191 (3d Cir. 2005) (citing Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 64 (2d ed.2002)); *see also* I Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1800c5, at 22 (2d ed.2011) ("[I]njury results from the delay that the dominant firm imposes on the smaller rival's *growth*" (emphasis added)). CDK, a monopolist in the franchise DMS market, unlawfully stifles competition. That is all that is required at this stage.

## B.    CDK States a Claim for Attempted Monopolization

CDK moves the court to dismiss Tekion's claim for attempted monopolization solely on grounds that, in CDK's view, Tekion fails to state a claim for *monopolization*. Br. 23. If the Court holds that Tekion *does* state a monopolization claim, therefore, then it should deny CDK's motion. In any event, Tekion easily pleads the elements of attempted monopolization: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury. *Movie 1 & 2*, 909 F.2d at 1254 (citing *Transamerica Comput. Co., Inc. v. Int'l Bus. Mach. Corp.*, 698 F.2d 1377 (9th Cir. 1983), *cert denied*, 464 U.S. 955 (1983)); *see also* Compl. ¶¶ 88–96. For the elements of attempted monopolization that overlap with monopolization, Tekion's claims are sufficient for the reasons set forth above. *See supra* § III.A. As to requisite intent and the necessary level of monopoly power, Tekion alleges that CDK possesses the specific intent to destroy competition. Compl. ¶¶ 2, 41, 72–73, 92. And a lesser showing of market power is required in an attempted monopolization case than an actual monopolization case. *Rebel Oil*, 51 F.3d at 1438. Tekion's allegations, taken as true, are sufficient to plead attempted monopolization and warrant denial of CDK's motion to dismiss.

## C.    The Court Can Hear Tekion's DJA and State Law Claims

CDK argues that, because Tekion's "alleged state law claims are unrelated to the DJA

FENWICK & WEST LLP

claim," this Court lacks *mandatory* subject matter jurisdiction over the DJA claim.  Br. 25 (citing *Countrywide Home Loans, Inc. v. Mortgage Guar. Ins. Corp.*, 642 F. 3d 849, 855 n.2 (9th Cir. 2011)).  But it does not explain *why* Tekion's state law claims, which stem from CDK's efforts to *impede* dealers' data access, are "unrelated" to Tekion's DJA claim, which stems from CDK's accusations about Tekion's efforts to *facilitate* dealer access.  Even if there were no mandatory jurisdiction, the court may exercise its "unique and substantial discretion" to hear Tekion's DJA claim, guided by the Supreme Court's "*Brillhart*" factors.  *Argonaut Ins. Co. v. St. Francis Med. Ctr*, 17 F.4th 1276, 1280, 1284 (9th Cir. 2021) (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942)).  First, the DJA claim does not invite "needless determination of state law issues": it implicates a federal statute, 18 U.S.C. § 1030, and, to the extent it is premised on state law, it involves routine legal questions that are "not uncommon to federal courts."  *N.E. Ins. Co. v. Masonmar, Inc.*, No. 13-cv-00364, 2013 WL 2474682, at *3 (E.D. Cal. June 7, 2013).  Second, there is no concern about forum shopping, as the crux of Tekion's allegations sound in federal antitrust law.  Finally, there are no "parallel state proceedings involving the same issues and parties" that were "pending at the time the federal declaratory action is filed."  *Gov't. Emps. Ins. Co. v. Dizol*, 133 F. 3d 1220, 1225 (9th Cir. 1998).  Further, there is no dispute that Tekion has stated a claim: the demand letter that CDK sent Tekion before Tekion filed suit, "put[ting] Tekion on notice of threatened or impending litigation," Dkt. No. 1-8, goes beyond what is required to breed Tekion's "real and reasonable apprehension" that it will be subject to suit.  *E. & J. Gallo Winery v. Proximo Spirits, Inc.*, 583 F. App'x 632, 633–35 (9th Cir. 2014).

The Court can and should exercise supplemental jurisdiction over Tekion's state law claims.  Principles of "economy, convenience, fairness, and comity" govern, *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc), and "significant economies exist" where Tekion's state law claims are "inextricably tied to an understanding of the technology, platform markets, and the transactions" already at issue in a related case, *Pepper v. Apple Inc.*, No. 11-cv-06714, 2019 WL 4783951, at *1 (N.D. Cal. Aug. 22, 2019).  Here, CDK has sued Tekion in this District, in a case that has been administratively related before this Court.  *See* Dkt. No. 27.

## <u>CONCLUSION</u>

For the foregoing reasons, Tekion respectfully requests that the Court deny CDK's motion to dismiss in its entirety. Should the Court find any of Tekion's allegations insufficient, Tekion respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a)(2). If the court grants a motion to dismiss, "[t]he standard for granting leave to amend is generous." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1990). Indeed, in the Ninth Circuit, leave to amend should be granted "even if no request to amend the pleading was made, unless [the court] determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citing *Doe v. U.S.*, 58 F.3d 494, 497 (9th Cir. 1995)); *see also Total Vision, LLC v. Vision Serv. Plan,* 717 F. Supp. 3d 922, 940 (C.D. Cal. 2024) (granting leave to amend antitrust claims). Courts in this District routinely grant leave to amend to antitrust plaintiffs, with claims of varying strength. *See, e.g.*, *Feitelson*, 80 F. Supp. 3d at 1034 (granting leave to amend where claims were plausible); *Brittain v. Twitter, Inc.*, No. 19-cv-00114, 2019 WL 2423375, at *5 (N.D. Cal. June 10, 2019) (granting leave even where court doubted that plaintiffs could allege antitrust claims adequately). Here, contrary to CDK's argument (Br. 5), dismissal is not appropriate. As the facts alleged in Tekion's well-pleaded Complaint and this opposition make clear, it is far from "absolutely clear" that any deficiencies could not be cured by amendment. Absent such absolute clarity, dismissal with prejudice is unwarranted. *Broughton v. Cutter Laby's*, 622 F.2d 458, 460 (9th Cir. 1980).

Dated: March 24, 2025                     Fenwick & West LLP

                                          By: */s/ Adam Gahtan*
                                               Adam Gahtan
                                               Tyler G. Newby
                                               Armen N. Nercessian
                                               Erica R. Sutter
                                               Cortnay Beth-Cymrot

                                               Attorneys for Plaintiff
                                               Tekion Corp.