**PAGES 1 - 106**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline S. Corley, Judge

| | | |
|---|---|---|
| TEKION CORP., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **No. 3:25-cv-01394-JSC** |
| CDK GLOBAL, LLC, | ) ) | **No. 3:24-cv-08879-JSC** |
| Defendants, | ) ) | |
| _____ And related cross-action. _____ | ) ) ) | |

San Francisco, California

Thursday, June 26, 2025

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES:</u>**

For Tekion Corp.:

        Fenwick & West LLP
        555 California Street, 12th Floor
        San Francisco, CA 94104
    **BY:  TYLER G. NEWBY, ATTORNEY AT LAW**
         **ARMEN N. NERCESSIAN, ATTORNEY AT LAW**

        Fenwick & West LLP
        902 Broadway, 18th Floor
        New York, NY 10010
    **BY:  ADAM GAHTAN, ATTORNEY AT LAW**
         **CORTNAY-BETH CYMROT, ATTORNEY AT LAW**

(Appearances continued on the following page)

**REPORTED BY:  April Wood Brott, CSR No. 13782, Official United States Reporter**

**APPEARANCES (continued):**

For CDK Global, LLC

                    Susman Godfrey LLP
                    1000 Louisiana Street, Suite 5100
                    Houston, TX 77002
              BY:   **VINEET BHATIA, ATTORNEY AT LAW**
                    **ROBERT S. SAFI, ATTORNEY AT LAW**
                    **KATHERINE R. JAMES, ATTORNEY AT LAW**
                    **SHAWN L. RAYMOND, ATTORNEY AT LAW**

                    Susman Godfrey L.L.P.
                    1900 Avenue of the Stars, Suite 1400
                    Los Angeles, CA 90067
              BY:   **JESSE-JUSTIN CUEVAS, ATTORNEY AT LAW**
                    **MADELINE YZURDIAGA, ATTORNEY AT LAW**

                    Susman Godfrey LLP
                    One Manhattan West, 50th Floor
                    New York, NY 10001
              BY:   **AMY B. GREGORY, ATTORNEY AT LAW**
                    **MADELINE YZURDIAGA, ATTORNEY AT LAW**

For InDesign Data, LLC:

                    Winston & Strawn LLP
                    1901 L Street, N.W.
                    Washington, DC 20036
              BY:   **JOSHUA HAFENBRACK, ATTORNEY AT LAW**
                    **SYDNEY HARTMAN, ATTORNEY AT LAW**
                    **JADE BRIANA BAKER, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - June 26, 2025**                                    **10:18 A.M.** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Civil Action 25-1394, CDK Global, |
| 5 | LLC versus Tekion. |
| 6 | **THE COURT:**  Actually, you can call them both.  Sorry. |
| 7 | **THE CLERK:**  Okay.  And also Civil Action 24-8879. |
| 8 | So everybody, please come down. |
| 9 | **THE COURT:**  It's everybody anyway.  Okay.  Why don't |
| 10 | we have everyone make their appearances.  I don't know who's |
| 11 | sitting where because you're all on both sides of the "v," so |
| 12 | it doesn't really matter. |
| 13 | **MR. SAFI:**  CDK's on this side, Your Honor. |
| 14 | **THE COURT:**  Okay.  We'll have CDK go first. |
| 15 | **MR. BHATIA:**  Thank you, Your Honor.  Vineet -- |
| 16 | **THE COURT:**  Come to the microphone, please. |
| 17 | **MR. BHATIA:**  Yes, your Honor.  Vineet Bhatia with |
| 18 | Sussman Godfrey, and I can introduce my team, or they can come |
| 19 | up one at a time. |
| 20 | **THE COURT:**  Whatever they prefer. |
| 21 | **MR. BHATIA:**  Okay.  I'll have them do it one at a |
| 22 | time. |
| 23 | **THE COURT:**  All right. |
| 24 | **MR. SAFI:**  Good morning, Your Honor.  Robert Safi for |
| 25 | CDK Global. |

```
 1              MS. GREGORY:  Good morning.  Amy Gregory for CDK
 2    Global.
 3              THE COURT:  Good morning.
 4              MS. CUEVAS:  Good morning, Your Honor.  Jesse-Justin
 5    Cuevas for CDK Global.
 6              THE COURT:  Good morning.
 7              MS. JAMES:  Good morning, Your Honor.  Rose James for
 8    CDK Global.
 9              THE COURT:  Good morning, Ms. James.
10              MS. YZURDIAGA:  Good morning, Your Honor.  Madeline
11    Yzurdiaga for CDK Global.
12              THE COURT:  Good morning.
13              MR. RAYMOND:  Shawn Raymond for CDK Global.
14              THE COURT:  Good morning.  Okay.  Let's have Tekion.
15              MR. NEWBY:  Good morning, Your Honor.  Tyler Newby of
16    Fenwick & West on behalf of Tekion, and with me are my
17    colleagues, Adam Gahtan.
18              MR. GAHTAN:  Good morning, Your Honor.
19              MR. NEWBY:  Armen Nercessian.
20              MR. NERCESSIAN:  Good morning.
21              MR. NEWBY:  And Cortnay Cymrot.
22              THE COURT:  All right.  Good morning.
23         And InDesign?
24              MR. HAFENBRACK:  Good morning, Your Honor.  Joshua
25    Hafenbrack on behalf of InDesign, and I'm joined by my
```

 1    colleagues Jade Briana Baker and Sydney Hartman.

 2         **THE COURT:**  All right.  Good morning.

 3         Okay.  Let's start with CDK's motion for preliminary

 4    injunction, and let's first talk about InDesign.  So you can

 5    come forward.  So at least since June of 2019, CDK has known

 6    how InDesign operates.

 7         **MR. SAFI:**  Robert Safi for CDK Global on the

 8    preliminary injunction motion.

 9         CDK was aware of InDesign accessing its system without

10    authorization in 2016.  At that time, it disabled every account

11    that it could associate with InDesign.  InDesign started using

12    fictitious names of individuals, and at the time, there was no

13    way to track by email.  The answer to your question is

14    certainly in the past, CDK was aware that InDesign --

15         **THE COURT:**  June 2019.  They deposed --

16         **MR. SAFI:**  Yes.

17         **THE COURT:**  -- InDesign's CEO.

18         **MR. SAFI:**  And during that deposition, the CEO talked

19    about how effective CDK's blocking efforts had been against

20    InDesign.  And the truth of the matter is after that, CD K was

21    unable to detect, did not actually detect, InDesign accessing

22    its system until last fall when they get the email from the

23    dealer showing that InDesign was working with --

24         **THE COURT:**  So how did you think InDesign was working?

25    Not you, your client.  How did they think that they were in

1    business?  Because that was their whole business model, right?

2    And how their software worked.  He sat there.  The CEO

3    explained the whole thing in June 2019 in the MDL.  And by the

4    way, your client had counterclaims, right, that are very

5    similar to the claims made in this case?

6            **MR. SAFI:**  Correct.  And that's part of the reason

7    that InDesign knew by that point in time certainly that what it

8    was doing was unauthorized.  The answer to your question, Your

9    Honor, is CDK, if it had detected InDesign on the system, would

10   have disabled them all along the way.  Every time it detected

11   them on the system, it did disable them.

12           **THE COURT:**  Well, why did it move for a preliminary

13   injunction?  I mean, right?  We're talking about the

14   preliminary injunction, not the motion to dismiss.  The

15   preliminary injunction.

16           **MR. SAFI:**  Right.

17           **THE COURT:**  Right.  But the timeline shows as soon as

18   Tekion sued, then you moved for the preliminary injunction.  It

19   seems like -- I understand --

20           **MR. SAFI:**  I think --

21           **THE COURT:**  -- the litigation strategy, but it doesn't

22   seem like, especially given the equities, it will put InDesign

23   out of business, and -- for the most part, the large part.  I

24   know that ties in with Tekion's complaint as well.  But you

25   knew.  In June 2019, he specifies exactly how you did it.  You

1    had the MDL pending at that time with the counterclaims.  Never

2    moved for a preliminary injunction.

3         MR. SAFI:  CDK was embroiled in litigation that was

4    not by its choosing at that time, and it did not choose to

5    bring InDesign into that litigation.  It did not perceive

6    InDesign as the type -- the nature and frequency of its access.

7    It couldn't detect the access.  But InDesign didn't have some

8    big footprint on CDK's system.

9         THE COURT:  Okay.  So you just thought they were a

10   little bit, not bigger.  I don't know that that shows the

11   irreparable injury.  You knew exactly what they would do.  What

12   is your best case that would say that waiting six years...

13        MR. SAFI:  So delay.  Okay?  I'd say the best case is

14   the *Arc of California vs. Douglas* case from the Ninth Circuit,

15   2014.  Okay?  And there, the Court says, "Usually delay is but

16   a single factor to consider."

17        THE COURT:  Do you have a case with anything close to

18   this kind of delay?

19        MR. SAFI:  Well, I think -- look.  For me, the clock

20   starts -- I mean, if you look at -- let me just -- on the

21   cases, that's our best case.

22        THE COURT:  Okay.

23        MR. SAFI:  Okay?  But what I'll say is if you look at

24   the time -- the line graph that was in the supplemental record

25   declaration, it shows that in 2022, in 2023, InDesign -- there

1    were maybe one or two user accounts associated with InDesign.

2    That scales up over the course of 2024.

3          **THE COURT:**  So what?  I mean, the point is you can't

4    identify any harm that's occurred.

5          **MR. SAFI:**  Well --

6          **THE COURT:**  All -- we know actually they've been doing

7    it since 2013, and you don't identify a single instance of any

8    leak, of any injury or anything.  So what does it matter if

9    it's only twice or it's more?  You're aware of it.

10          **MR. SAFI:**  From a delay standpoint, what the Arc of

11    California case says is when there's some gradual -- okay? --

12    the irreparable harm is developing gradually, incrementally.

13    Okay?  And at the same time, we're in a situation where CDK

14    needs to investigate, and the law says, "Look.  If you're going

15    to go about this in a deliberate fashion -- okay? -- that's

16    prudent.  And that's what the opinion in Arc of California

17    says.

18          **THE COURT:**  You had counterclaims in the MDL against

19    other data integrators similar.  So to say investigate, you're

20    well aware of this.  There's been a lot of investigation, and

21    you know all about it.

22          **MR. SAFI:**  What I'll say is, again, in that

23    deposition, he testified about how effective CDK's blocking

24    efforts were.  From then on, CDK did not detect them on the

25    system.  They say they were continuously active, but the data

1    that CDK --

2            **THE COURT:**  Did they tell you that they were changing

3    their business model?

4            **MR. SAFI:**  Did they -- no.

5            **THE COURT:**  And did they go out of business?

6            **MR. SAFI:**  But they have changed their business model.

7    Beginning in December of 2024, they started pulling data from

8    CDK's DMS as well as documents.  That's another thing that's

9    changed during this time period.

10           **THE COURT:**  Okay.  Point that out to me.

11           **MR. SAFI:**  Yeah.  In the record or --

12           **THE COURT:**  Correct.

13           **MR. SAFI:**  Yeah.  Let me find that for you.  Both

14   Mr. Livingstone from Tekion and then Mr. Lampert himself

15   testified to this.  Let me find it for you.  Pardon me, Your

16   Honor.  Certainly it's in Mr. Livingstone's depositions and

17   Mr. Lampert's depositions.  I'm going to find it for you right

18   now.

19       And what they testified to was after CDK sent the cease

20   and desist letter in December, at that point, Tekion sent a

21   list of customers that were switching -- yeah.  Okay.  I'm

22   sorry.  This is Exhibit 31, Mr. Lampert's deposition, page 176,

23   and he says, "It was sometime in December," referring to

24   December 2024, "that we started doing these CDK to Tekion

25   conversions for both documents and data."

1         In Exhibit 9, which is one of the emails that fortuitously

2    was forwarded to CDK, and that's the only reason it knew that

3    InDesign was on its system doing its thing at that time.  CDK

4    sends a cease and desist letter to Tekion because it didn't

5    know InDesign was in the picture at that point.  That's

6    evidence right there we didn't know.

7              **THE COURT:**  So why did you depose them in 2019 then?

8              **MR. SAFI:**  So I wasn't counsel for --

9              **THE COURT:**  Not you.

10             **MR. SAFI:**  -- CDK at the time.

11             **THE COURT:**  When I say you, by the way --

12             **MR. SAFI:**  But no.

13             **THE COURT:**  -- I'm referring to CDK.

14             **MR. SAFI:**  Look.  I think in the not too recent --

15   distant past before that deposition, CDK had absolutely

16   perceived InDesign, and they were working.  They wanted to shut

17   InDesign down.  They disabled the accounts.  Okay?  And but

18   they could not develop a signature, a repeatable signature.

19   And CDK has to be careful about who it disables.  It can't do

20   that willy-nilly.  You know, there's a customer relations facet

21   to this.  It needs to have some level of certainty before

22   disabling someone.

23        So I think the answer to your question is InDesign was

24   subpoenaed for a deposition because CDK had perceived it on its

25   system.

1          **THE COURT:**  Okay.  Let me ask you about the document

2     data issue.

3          **MR. HAFENBRACK:**  Yes, Your Honor.  So InDesign has had

4     the exact same business model, the exact same access methods,

5     the exact same software, since 2013.  Nothing material changed

6     in September 2024.  Your Honor, this is something that CDK

7     raised for the first time in its PI reply brief.

8          The idea here is that we only started to convert data in

9     addition to documents for Tekion conversions in particular in

10     December 2024, but that's a thin distinction.  The difference

11     between data and documents is only the format, that it exists

12     on the DMS.  The data is sort of raw data.  The documents are

13     PDFs.

14          **THE COURT:**  So before December 2024, they took the

15     documents and then converted it, and after -- or in December

16     2024, they figured out a way to just grab the data itself?

17          **MR. NEWBY:**  No, Your Honor.  We have done -- data

18     integration is our core business.  It's been our core business

19     since 2013.  We have been extracting data off the CDK DMS since

20     the beginning in 2013.  We started doing that for Tekion in

21     December 2024.  We've been doing it for all of our other

22     customers for 13 years.  No difference.

23          Your Honor, not a shred of evidence in this record that

24     there's any distinction between documents and data in terms of

25     the burden or the security risk that it places on the system.

1    We've been extracting data without incident on the CDK DMS for

2    13 years.  Nothing changed.  And Your Honor, even for Tekion

3    conversions, regardless of whether we're pulling data or we're

4    pulling documents, we use the same software, the one DMS

5    software.  We use the same access credentials to do either.

6    Everything is exactly the same.

7        **THE COURT:**  I see.  So the only thing that changed in

8    December 2024 is you started working with Tekion?

9        **MR. NEWBY:**  Not even that's new, Your Honor.  We

10   started working with Tekion in 2020.  But between 2020 and

11   2024, we were only pulling documents.  In 2024, we started

12   doing both, the documents and data conversions, but as I

13   said --

14       **THE COURT:**  But you were doing that for other clients

15   before then?

16       **MR. NEWBY:**  That's been our business all along.  We're

17   a data integrator.  It's about data.

18       **MR. SAFI:**  Your Honor, if I may on this point, I don't

19   have a printout, but the line graph in the supplemental

20   declaration that was submitted with our reply brief -- okay? --

21   shows how many user accounts were created for InDesign using

22   that email domain.

23       **THE COURT:**  Yes.

24       **MR. SAFI:**  Okay?  Which only became an aspect of the

25   user profiles in the last couple years.  The email domain was

1    not an element of the user profiles before that time, and that

2    was one reason it was hard to positively identify InDesign on

3    the system.  But what this shows --

4         **THE COURT:**  But how did CDK think -- but you knew in

5    June -- you.  I'm saying CDK.  You knew in June 2019 exactly

6    how they did their business using the dealers' credentials or

7    even helping them create credentials.  You could have -- they

8    could have sued them at that point and sought a preliminary

9    injunction.

10        **MR. SAFI:**  I think the testimony that came out in that

11   deposition evidenced that the disablements had been effective,

12   and it wasn't just --

13        **THE COURT:**  That's not how I read that deposition.

14        **MR. SAFI:**  But what I'll say, Your Honor, is there's a

15   significant uptick in the number of accounts that are created

16   for InDesign in the last years --

17        **THE COURT:**  I understand how that hurts CDK

18   monetarily.  I understand that.

19        **MR. SAFI:**  Well --

20        **THE COURT:**  I don't understand it for the purposes of

21   irreparable harm.

22        **MR. SAFI:**  Well, you know, irreparable harm under the

23   Computer Fraud and Abuse Act -- you know, it's a trespass.

24   It's a trespass.  The dealers may have -- some of the data in

25   the system may be theirs, but it's CDK's system, and it's a

1    closed system.  They've established a right to exclude others

2    under the case law, and so right there -- and there's an

3    opinion from you recognizing that under that act, the access

4    itself -- okay?  The violation of the integrity of the closed

5    system --

6        **THE COURT:**  The plaintiff waited six years in that

7    case?

8        **MR. SAFI:**  Your Honor, CDK -- there's not evidence

9    that -- I mean, I guess someone could infer it, but there's no

10   evidence that CDK knowingly allowed this to proceed for the

11   last several years.

12       **THE COURT:**  The deposition of the CEO in June 2019.

13       **MR. SAFI:**  But there's no testimony that he was

14   engaged in that on an ongoing basis.

15       **THE COURT:**  Well, then how was he staying in business?

16   Okay.  I --

17       **MR. SAFI:**  I don't think we knew he was staying in

18   business.  All of CDK's witnesses have said they don't even

19   know who he was until -- InDesign was until they served us here

20   last fall.

21       **THE COURT:**  Of course they knew who he was.  They took

22   his deposition.

23       **MR. SAFI:**  I understand.

24       **THE COURT:**  Okay.  I mean, it's actually remarkable,

25   the insight that they had into InDesign.  What amount of bond

1     would CDK be willing to pay here?  Because their entire

2     existence is at issue if your preliminary injunction is

3     granted.

4          **MR. SAFI:**  Well, they say that about 40 percent of

5     revenue, according to Mr. Lampert, comes from CDK conversions.

6     The law is clear that, you know, that's not really a reason to

7     deny a preliminary injunction.

8          **THE COURT:**  Okay.  So what is the amount that CDK

9     would be willing to put up?  You don't know, right?  I'm just

10    -- you don't have to answer.  It's a rhetorical question

11    because I actually think they want to have their cake and eat

12    it too is what happens, right?  And that's just also balancing

13    the equity here.  I understand.  We'll get to the motion to

14    dismiss.

15       I think that's a different matter.  It's too late.  It's

16    just too late.  It's just -- it seems to me like a

17    litigation -- it's ine -- strategy.  And we'll talk, when we

18    get to the CMC, about this battle that's going on that to me is

19    ludicrous, the amount of money that everyone is spending, and

20    people need to try to figure out how to coexist and see if

21    there's a way to help do that.

22          **MR. SAFI:**  May I take one more shot on that, or are

23    you --

24          **THE COURT:**  You may.

25          **MR. SAFI:**  It's changed over time.  There's a line

1    graph showing just the frequency of their presence on the CDK

2    system went from de minimis to systemic over time.

3         **THE COURT:** I don't know how that matters to

4    irreparable harm. It matters to how CDK is being hurt

5    monetarily. I understand that, that the competition that it's

6    now facing -- it has increased. I understand that, but I don't

7    understand how that matters to irreparable harm.

8         **MR. SAFI:** Because they're trespassing, because

9    they're increasing the attack profile. Okay? For -- the size

10   of the different attack vectors for another cyberattack. I'm

11   sure Your Honor has seen CDK -- okay? It's a target. It's got

12   a target on its back from cyber criminals. We learned that

13   last summer. Ironically, that delay that having -- CDK having

14   to take its systems down to cleanse and deal with that --

15   that's the delay that sparked this whole dispute. Okay?

16        **THE COURT:** Well, you -- now you've really intrigued

17   me about trying to get this dispute resolved. Okay. All

18   right. I understand.

19       Let's move to Tekion then.

20        **MR. SAFI:** Thank you.

21        **THE COURT:** And there, Mr. Newby -- Tekion represents

22   that it will not access CDK's DMS through use of

23   dealer-provided credentials, and I'll add until further order

24   of the Court. Is that correct?

25        **MR. NEWBY:** That's correct, Your Honor. We got

1    another cease and desist letter from CDK in December.  And we

2    said, "Look.  Okay.  At this point, let's get a resolution on

3    this."  And so we filed our antitrust complaint along with a

4    declaratory relief claim to resolve the access issues, and we

5    stopped, and we told them, "We're not going to do what you are

6    saying we're doing is unlawful until we get a resolution from

7    the Court."  And but in the meantime, we still have customers

8    dealerships, who are trying to convert and can't get their

9    data.

10        And so what we did was we told those dealerships, "Look.

11   There are other businesses out there that have a history of

12   being able to help dealerships export their data.  If you are

13   having difficulty getting your data, you can use -- contact one

14   of these businesses, and that's their decision, and we're not

15   involved in that contract."  But that's what we did, and that's

16   why, you know, there is no threat of irreparable injury from us

17   because we have said and we are committed to -- we're not going

18   to do what they accused us of doing.

19            **THE COURT:**  So you don't have a problem with me just

20   saying in an order, so it's enforceable, that CDK -- I mean

21   that Tekion will not access CDK's DMS through the use of

22   dealer-provided credential until further order of the Court?

23            **MR. NEWBY:**  We have said that in our representations.

24   We don't think it should be an injunction because we --

25            **THE COURT:**  No.  I understand that.

1          **MR. NEWBY:**  Yeah.

2          **THE COURT:**  I understand the PR.

3          **MR. NEWBY:**  Yes.

4          **THE COURT:**  Everybody wants to go to the reporter and

5    say we won or we didn't, and I'm trying to avoid that.  I think

6    that CDK gets the relief it wants, right, because they're

7    agreeing "we're standing down.  We're standing down.  We are

8    not going to access your system through the use of

9    dealer-provided credentials until further order of the Court."

10          **MR. SAFI:**  Your Honor, an enforceable order -- okay?

11    -- would be fine.

12          **THE COURT:**  Okay.

13          **MR. SAFI:**  We need an enforceable order.

14          **THE COURT:**  No.  I understand that.

15          **MR. SAFI:**  We've been down this road before with them.

16          **THE COURT:**  I understand that, but and so if I say in

17    an order they agree to do that, then it's in an order.  And

18    then if they do it anyway, which they won't do, but if they did

19    it anyway, then it would be a violation of what they

20    represented to me and an order of the Court, but I'm not

21    technically granting the motion for preliminary injunction.

22          **MR. SAFI:**  It would be an order enforceable by

23    contempt, right?

24          **THE COURT:**  Exactly.

25        You wouldn't disagree with that.

1          **MR. NEWBY:**  And -- I understand that.

2          **THE COURT:**  But I'm not granting the motion nor

3    preliminary injunction.

4          **MR. NEWBY:**  Right.  We just want to make sure -- so

5    our worry here is that -- and look.  If CDK does what they say

6    they will do and they convert -- you know, they provide timely

7    migration of their dealership data to Tekion so that those

8    dealerships can be up and running without a hitch on the

9    switchover date, then that's fine.  That's great.  But that's

10   the whole purpose of our antitrust complaint, is that that

11   wasn't happening.

12        And our dealerships, the dealerships need some way of

13   getting their data.  And so if they're going to use a

14   third-party integrator, that's fine.  We just want to make sure

15   that whatever order Your Honor is going to issue is not going

16   to prohibit those dealerships from using some -- if they need

17   to --

18          **THE COURT:**  All I'm going to say is what I just said.

19          **MR. NEWBY:**  Okay.

20          **THE COURT:**  Right?  That Tekion agrees it will not

21   access CDK's DMS through use of dealer-provided credentials

22   until further order of the court.

23          **MR. NEWBY:**  Yes, Your Honor, provided that if we need

24   further relief, we can seek consideration of that.

25          **THE COURT:**  Everybody --

1          **MR. NEWBY:**  With Your Honor.

2          **THE COURT:**  -- can seek --

3          **MR. NEWBY:**  Yes.

4          **THE COURT:**  -- reconsideration of everything.  Okay.

5    I think that takes care of that.  So I'm not granting it, but

6    because they've agreed -- and you don't have any evidence since

7    December, when they say they stopped, that they haven't

8    stopped?

9          **MR. SAFI:**  The evidence that we have is that the

10   process for securely transferring the data to them works just

11   fine, and everyone is perfectly happy with it, Your Honor.

12         **THE COURT:**  Yay.  Okay.  Great.  All right.  Good.

13      Let's then move on to InDesign's motion to dismiss.  Okay.

14   So here with respect to the CFAA, we do have plausible

15   allegations that at least as of December 2024, InDesign is

16   aware that CDK's clients have agreements that they are not to

17   share their access to the DMS, CDK's DMS, with third parties,

18   including InDesign, right?

19         **MR. HAFENBRACK:**  There was one email from a single

20   dealership in December 2024.  There was never any

21   correspondence by formal cease and desist letter, by email --

22         **THE COURT:**  No.  I understand.

23         **MR. HAFENBRACK:**  -- from CDK.

24         **THE COURT:**  That's kind of to the preliminary

25   injunction.  Now we're at the motion to dismiss.

```
 1            MR. HAFENBRACK:  Yes, Your Honor.

 2            THE COURT:  Is InDesign still in business today?

 3            MR. HAFENBRACK:  Yes, Your Honor.

 4            THE COURT:  And still doing what it's doing?

 5            MR. HAFENBRACK:  Yes, Your Honor, trying to.

 6            THE COURT:  All right.  And you know now that CDK has

 7    -- at least it alleges -- an agreement with its clients that

 8    they can't share their access to CDK's DMS with third parties

 9    such as InDesign?

10            MR. HAFENBRACK:  I would say we have -- all we have is

11    one email from one dealership in December 2024, nothing from

12    CDK --

13            THE COURT:  Well, you have a lawsuit.

14            MR. HAFENBRACK:  That was filed in February.  The

15    cease and desist letter doesn't come until after the lawsuit.

16            THE COURT:  I understand that, but you have a lawsuit

17    in which they allege that.

18            MR. HAFENBRACK:  In February 2025, yes.

19            THE COURT:  But you're still in business today.

20            MR. HAFENBRACK:  Yes.

21            THE COURT:  Still doing the same thing.

22            MR. HAFENBRACK:  Yes.  Yes.

23            THE COURT:  All right.

24            MR. HAFENBRACK:  But you take the allegations in the

25    complaint, within the four corners of the complaint, that
```

1   there's no allegation because there can't be, that there was

2   ever any individualized sort of cease and desist letter that

3   the case law, you know, consistently requires in the Ninth

4   Circuit.

5         THE COURT:  For a CFAA violation to plead it?

6         MR. HAFENBRACK:  Absolutely, Your Honor.  This is a

7   criminal anti-hacking statute, and every case that CDK cites

8   within this circuit is pegged on a very clear and unambiguous

9   cease and desist letter from the CFAA plaintiff to the

10  defendant revoking access.  And Your Honor, we've been --

11        THE COURT:  But that happened now.

12        MR. HAFENBRACK:  It happened after the lawsuit was

13  filed.  So the complaint itself necessarily doesn't include the

14  allegations required to state a CFAA claim.

15        THE COURT:  So you want them to amend it, and then

16  they can, and then it will state a CFAA claim.

17        MR. HAFENBRACK:  They can amend it, and liability can

18  only start after the cease and desist letter was sent.

19        THE COURT:  Okay.  Well, whether we're talking about

20  December or February, right, what's the dif, right?  I mean --

21        MR. HAFENBRACK:  The difference is they haven't filed

22  a complaint with well-pleaded allegations that state a CFAA

23  claim because they didn't send a cease and desist until after.

24  And Your Honor, even the post-February 11th access, we claim

25  still entirely lawful, authorized by the dealers.  The dealers

1    own the data that InDesign is obtaining.  If you look at

2    the WalkMe case, the --

3         **THE COURT:**  So the VPN is meaningless; so I don't

4    think you can square that with Nosal II or even with powers.

5         **MR. HAFENBRACK:**  Your Honor, there's allegations about

6    a VPN tunnel going only to Tekion, not to InDesign.  InDesign

7    used only valid log-in credentials provided by the dealer.

8         **THE COURT:**  Yes.  I understand that, and that's why I

9    think we're focusing on from December 2024, when you became

10   aware that the dealers had a contractual obligation to not

11   allow third parties to access, right?  How is that any

12   different from Nosal II.

13        **MR. HAFENBRACK:**  So in Nosal II, you don't have the

14   division of the system owner and information owner like you

15   have here.  In Nosal II, it's sort of a classic case where you

16   have -- it's an employer/employee relationship, very common

17   CFAA context.  The employer owns both the system and all the

18   information on the system.  So in that circumstance, it makes

19   total sense to say permission can only come from the employer

20   because the employer owns everything.

21        Here, the dealer owns the data that InDesign is accessing,

22   obtaining, extracting, and they've long been recognized in the

23   industry, including by CDK.

24        **THE COURT:**  I understand you might have Laches

25   argument.  You might have a -- this is a motion to dismiss a

1    12(b)(6).  Are you saying that the dealer -- I don't know.

2    They get bribed, so they can give access to Russia?

3             **MR. HAFENBRACK:**  No, Your Honor.

4             **THE COURT:**  Okay.  What's the difference?

5             **MR. HAFENBRACK:**  The difference is they're giving

6    access, long recognized as an authority to give access to

7    independent integrators to access their own data.

8             **THE COURT:**  Under the statute, what's the difference?

9    Under the statute, under the plain language of the statute.

10            **MR. HAFENBRACK:**  The statute does not say that

11   permission can only come from the computer owner, Your Honor.

12   It just says you have to have authorization.  Brekke says

13   authorization means permission from an authority.  The Brnovich

14   case, the Arizona case that we cited --

15            **THE COURT:**  But let me stop you.  How did the dealers

16   have the authority given that their contracts, as alleged,

17   prohibit them from giving you access?

18            **MR. HAFENBRACK:**  This was extensively litigated in the

19   MDL.  We submit that CDK is violating the law.

20            **THE COURT:**  That may be a great argument when we get

21   down to it, but this is on a 12(b)(6).

22            **MR. HAFENBRACK:**  And again, Your Honor, this is all

23   about post February 11th access, which isn't in the complaint.

24            **THE COURT:**  Okay.  So we'll go there.  All right.

25   What about their argument that you have to do a cease and

1    desist letter first.

2              **MS. GREGORY:**  That's not the law in the Ninth Circuit.

3    In Power Ventures, the Court clearly stated that you can

4    violate the CFAA if you lack permission or if it has been

5    revoked.  Here, they are an outsider to the system.  They never

6    had permission in the first place.

7              **THE COURT:**  Well, they did have permission from the

8    dealers.

9              **MS. GREGORY:**  The dealers don't have authority to give

10   them permission.  And the case that they love, Dealer

11   Management, from 2019 in the Northern District of Illinois, the

12   Court, quoting Judge Easterbrook of the Seventh Circuit, said,

13   "The authorization required for lawful access under the CFAA

14   must come from the owner of the computer system, not from

15   anyone who happens to use the system."

16        If anything, that gave them clear notice as well that they

17   lacked permission to access the system, notwithstanding the

18   dealership provided the credentials.

19             **MR. HAFENBRACK:**  That was a comment from Judge

20   Easterbrook, not any sort of legal holding.  That issue wasn't

21   before the Court in that, and that's not correct, Your Honor.

22   The CFAA expressly does not say -- there's no text in the CFAA

23   that says only the computer owner can authorize.

24             **THE COURT:**  Okay.  But we --

25             **MR. HAFENBRACK:**  And Your Honor --

1          **THE COURT:**  But there's an inference to be drawn that

2     as of December 2024, InDesign knew that the -- or again,

3     drawing all reasonable inferences in CDK's favor knew that the

4     contracts the dealers had with CDK prohibited them from giving

5     access to third parties such as InDesign.

6          **MR. HAFENBRACK:**  I respectfully disagree with that,

7     Your Honor.  That was just one dealership.  And the important

8     point that cases over and again say this, is what are the

9     actions that the system owner, the plaintiff, the CFAA

10    plaintiff, took?  Did they expressly and unambiguously revoke

11    access?  Here the answer is no.  InDesign operated since 2013

12    with dealer permission.

13         And I might add, Your Honor, that for most of InDesign's

14    existence, CDK's contracts expressly allowed dealers to

15    authorize their access because they were allowed to have agents

16    access the system.  CDK only started revoking that when they

17    started getting hammered in the antitrust MDL.  And so, you

18    know, to the extent there was any sort of --

19         **THE COURT:**  Okay.  Again -- well, that's all beyond

20    their complaint, right?  So the question is with their

21    complaint and just what they plausibly allege, not where things

22    are going to end up down the line --

23         **MR. HAFENBRACK:**  Yes, Your Honor.

24         **THE COURT:**  -- when everyone continues to pay lawyers

25    in these disputes.

 1          But tell me the case that says they have to actually send

 2     you a cease and desist letter before any CFAA liability can

 3     arise.

 4          **MR. HAFENBRACK:**  So we cite a number of cases on this

 5     front.  So there's the language that the Ninth Circuit has said

 6     that the -- the Ninth Circuit requires affirmative conduct

 7     terminating authorization before someone can be held liable.

 8     That's *Stern v. Weinstein,* quoting Brekke.  I would also cite

 9     to Your Honor the WalkMe and the two AtPac decisions where

10     courts dismissed a CFAA claim where the defendant had relied on

11     credentials provided by a licensee or a customer, just like we

12     had here.

13          And in every case CDK cites, Your Honor -- Power Ventures,

14     Nosal II, Ticketmaster, the Craigslist case they cite -- the

15     entire analysis is pegged to the defendant putting -- I'm sorry

16     -- the CFK plaintiff putting the defendant on clear notice

17     through a formal cease and desist letter.

18          And this is so important, Your Honor.  This is a criminal

19     anti-hacking statute that the Ninth Circuit has repeatedly said

20     should be construed narrowly in light of the rule of lenity,

21     should be applied in very limited circumstances, and this is

22     one of the ways that the Ninth Circuit and courts in this

23     circuit have accomplished that.

24          **THE COURT:**  Okay.  But you're only arguing okay.  So

25     then we got that notice in February.

1        **MR. HAFENBRACK:**  After the complaint.  At minimum,

2   they need to file a well-pleaded complaint and we can deal with

3   it at that time, and there can only be liability after the

4   cease and desist letter.  They're claiming liability for years

5   before.  We never received that letter.

6        **MS. GREGORY:**  A few things to respond to.  First of

7   all, the complaint does allege that CDK has disabled InDesign

8   accounts.  That's in paragraphs 128 to 129.  And as we know

9   from the factual record, that happened 2016, 2017.  So there

10  is, within the four corners of the complaint, affirmative

11  conduct putting InDesign on notice that it lacked

12  authorization.

13       **THE COURT:**  I don't know that I can draw that

14  inference given that during that period, you did nothing.  CDK

15  did nothing.  Didn't send them a letter, a cease and desist,

16  nothing, right?  So I don't -- I mean, I can draw reasonable

17  inferences, but if there's an equal inference the other way --

18  I don't know that that gets you there.

19       **MS. GREGORY:**  Well, it certainly shows that we have to

20  accept that it happened.  They revoked access for them with the

21  account disablement, and to the point Your Honor is making

22  about Laches defenses, well, that's a fact-intensive question

23  that we just can't resolve on a motion to dismiss.

24       **THE COURT:**  No.  That, I understand.  That, I

25  understand.  But I'm trying to get out of his argument that you

1    didn't send the cease and decease letter until February, and

2    therefore -- well, maybe they can state a claim after February,

3    but that hasn't been alleged yet.

4         **MS. GREGORY:**  We can also state a claim from before

5    February.  Two key points I want to make.  One is factual.

6    That single email that my friend on the other side highlights

7    -- that's an email that a concerned dealership happened to send

8    to CDK.  We don't, of course, have discovery on the scope of

9    communications InDesign has with all the dealerships, who may

10   have also said, "We're not giving you a log-in because that

11   would violate the terms of our contract.

12        **THE COURT:**  Okay.  But you're not suggesting that I

13   can hold you state a claim because you haven't had discovery

14   yet, right?

15        **MS. GREGORY:**  No, of course not, but our fact of that

16   we think they knew in December 2024 -- that creates a plausible

17   inference that they also would have known.  It stands to reason

18   they knew before December 2024 that the dealerships were not

19   authorized to give them access.

20        **THE COURT:**  I don't know that I agree with that

21   inference at all.  I mean, the fact that they're in business at

22   all and have done some CDK stuff suggests that the dealers

23   aren't telling them that because the dealers -- if the dealers,

24   number one, are aware of it -- and they may not even be aware

25   of it -- and number two, that they're then just blatantly -- I

1    mean, I don't know that.  But I just want the legal question.

2    Do you agree that CDK has to do some affirmative act to revoke,

3    and you're just pointing to the disablement?

4            **MS. GREGORY:**  Legally CDK does not need to do an

5    affirmative act to revoke because InDesign has always been an

6    outsider.  Now, Mr. Hafenbrack cited --

7            **THE COURT:**  I'm going to stop you.  What case would I

8    read for that?

9            **MS. GREGORY:**  Power Ventures says that when you are an

10   outsider, you lack permission, and Nosal II also supports that,

11   when you're an outsider.  Now, Mr. Hafenbrack, I was going to

12   say, highlighted the Brekke case and they've also made the

13   point in the briefing that Nosal II -- that there was an

14   express revocation, but that's when talking about a former

15   employee who was an insider at one point in time.  So you need

16   to revoke that access.  But if you're an outsider at all points

17   in time, why do I need to go and revoke your access?

18        And I also want to point out the cases they cite that they

19   say supports there needs to be an express revocation.  They

20   said AtPac.  Well, AtPac -- the licensee that was not the

21   plaintiff authorized access to their own computer system.  This

22   is a case where CDK controls the access to their own computer

23   system.

24        They also cite the WalkMe case.  It's a case they brought

25   up for the first time on reply.  There's several very key facts

```
1    that distinguish the allegations in the WalkMe case, including
2    in WalkMe, there were no allegations that the defendant knew
3    customers lacked authorization.  Here, we do have those
4    pleadings.
5            THE COURT:  As of December, at least.
6            MS. GREGORY:  As at least of December, which creates
7    the plausible inference that there would be more.
8            MR. HAFENBRACK:  Your Honor, respectfully, that's not
9    true about WalkMe.  The system owner sent a cease and desist
10   letter, unlike CDK, in WalkMe.  So they were on particularized
11   notice before the complaint.
12       I would note my friend referred to paragraphs 128 and 129
13   referencing blocking.  Your Honor can read those paragraphs
14   yourself, but they do not contain any specific facts that --
15   about blocking of InDesign, and in fact, paragraph 129 only
16   refers to Tekion.  And I think just a couple --
17           THE COURT:  I'm just going to say if I'm denying the
18   motion to dismiss, I'm not saying when liability starts.
19           MR. HAFENBRACK:  Yes, Your Honor.  I understand, Your
20   Honor.
21           THE COURT:  This is just a motion to dismiss.  So I
22   understand.
23           MR. HAFENBRACK:  Yes.  Okay.
24           THE COURT:  Okay.  Let's move on to the next one,
25   the...
```

1              **MR. HAFENBRACK:**  The MCA?

2              **THE COURT:**  The MCA.

3              **MR. HAFENBRACK:**  Yes, Your Honor.

4              **THE COURT:**  So here -- all right.  Do you agree CDK

5      has plausibly alleged that they have a technological measure

6      protecting their DMS?

7              **MR. HAFENBRACK:**  Yes, Your Honor.

8              **THE COURT:**  Okay.

9              **MR. HAFENBRACK:**  The password is a technological

10     measure.

11             **THE COURT:**  Okay.  Well, they have a little bit more

12     than the password, right?  They allege that you have to access

13     their system through an IP address that comes from the

14     dealership.

15             **MR. HAFENBRACK:**  Right.  Absolutely, Your Honor, yes.

16     And InDesign complies with that.

17             **THE COURT:**  So why isn't it -- drawing, again, all

18     inferences in Plaintiff's favor, why isn't sharing that

19     password with someone and allowing them to either sit in your

20     IP address or -- I don't know if this is alleged or not that

21     you could do that.  You can fake IP addresses.  But why isn't

22     that avoiding or bypassing the technological measure?

23             **MR. HAFENBRACK:**  We've never faked any IP address, and

24     there's no allegation in the complaint about circumvention with

25     respect to the IP address.  That's something --

1          **THE COURT:**  Okay.  So put that aside.

2          **MR. HAFENBRACK:**  Yeah.

3          **THE COURT:**  But even just allowing somebody else to

4     use your credentials to access it from your IP address -- why

5     isn't that avoiding the technological measure?

6          **MR. HAFENBRACK:**  Because entering a valid username and

7     password is not avoiding or bypassing the password requirement.

8     It is complying with the password requirement.  The DMCA is

9     about complying with the technological manner of access.  It's

10    not about whether it's authorized or whether you have

11    permission.  And CDK's argument really confuses this point

12    throughout their briefing.

13         What they're upset about, Your Honor, what they complain

14    about, is that InDesign, in their view, lack permission to

15    access the DMS.  It's not that we stole the password, we did

16    phishing to get the password.  We entered a password that was

17    valid and that if a dealership employee used, CDK would have no

18    complaint.  It's the exact same standard log-in credentials

19    that every dealer employee uses.

20         **THE COURT:**  But let me stop you for a second.  What if

21    you tricked the dealer into giving you the password?

22         **MR. HAFENBRACK:**  Then they'd have a claim.  We've

23    never done that.  There's no allegation we've done that.

24         **THE COURT:**  Okay.  So you think -- so it turns then on

25    whether the dealer authorized your use of the password.

1        **MR. HAFENBRACK:**  If there's, you know -- if there's

2    some, like -- for example, there are a couple of cases that

3    discuss this, Your Honor, that if there's some trickery,

4    phishing involved -- I think the WalkMe case might discuss

5    trickery.  If you're somehow duping the plaintiff into

6    providing you with a password, then that --

7        **THE COURT:**  Wait, wait.  Not the plaintiff.

8        **MR. HAFENBRACK:**  Not the plaintiff, right.  The

9    dealer, the licensee, the customer, yes, Your Honor.  Yeah.

10        **THE COURT:**  So --

11        **MR. HAFENBRACK:**  So here, there's no more.  There's

12    only the entry of a valid username and password willingly

13    provided pursuant to contract by the dealer to InDesign.

14        **THE COURT:**  Okay.  So it does turn on authorization?

15        **MR. HAFENBRACK:**  It turns on the password being a

16    genuine password that was validly provided by the system owner.

17    You know, that's -- you just look at the iSpot case, the Adobe

18    case --

19        **THE COURT:**  You're going to have to slow down because

20    the --

21        **MR. HAFENBRACK:**  Sure.

22        **THE COURT:**  -- court reporter's --

23        **MR. HAFENBRACK:**  Sorry about that, Your Honor.

24        **THE COURT:**  -- going to go crazy.

25        **MR. HAFENBRACK:**  You know, the Adobe case, the iSpot

1    case from this circuit.  There's a number of other cases from

2    across the country we cite --

3        **THE COURT:**  There's a dispute, there's a split, isn't

4    there, and it's just among the district courts?  We don't have

5    any circuit authority.

6        **MR. HAFENBRACK:**  All within the district courts.  I

7    agree with that.  I don't think there's much of a split.  I

8    think it's a pretty clear lopsided majority.  There's the

9    Synopsys case from Judge Koh in this district.  But she

10   expressly distinguished cases where all you're doing is

11   entering a valid but unauthorized password as being different.

12   That's what we have here.

13       And then the other cases that CDK relies on -- there's 321

14   Studios and Microsoft.  Those cases are about the distribution

15   rather than the use of a valid password.  I would submit to

16   Your Honor that that implicates a lot of different concerns

17   that that would be like if InDesign was taking the passwords

18   that dealers gave to it and posting it on the internet for

19   anyone to see and anyone to use.  Not what we have here.

20       And I would also argue --

21       **THE COURT:**  But let me stop you again for one second.

22   Here we have an allegation that InDesign knows that they do not

23   have authority, right, or that the access has been revoked and

24   they know -- again, drawing reasonable inference in CDK's favor

25   -- that the dealer is not allowed to give them access.  Does

1    that change the analysis at all?

2          **MR. HAFENBRACK:**  No.  That, again, goes to

3    authorization or permission rather than circumvention.  The

4    DMCA is only about circumvention.  And I would note for Your

5    Honor that the Adobe and Egilman cases have really good,

6    persuasive analysis on exactly this point in explaining why you

7    can't conflate authorization with circumvention when you're

8    looking at the DMCA in the plain text, Your Honor.  I mean, we

9    don't avoid or bypass.  We comply with the password

10   requirement.

11         **THE COURT:**  Well, avoid or bypass a technological

12   measure.

13         **MR. HAFENBRACK:**  And we comply with it.  We enter the

14   password according to the specifications that CDK requires.

15         **THE COURT:**  Okay.

16         **MS. GREGORY:**  In -- let me start with one point that

17   Mr. Hafenbrack made.  In Actuate, the Court clearly held that

18   using --

19         **THE COURT:**  In which one?

20         **MS. GREGORY:**  Actuate, and that's the one with Judge

21   Spero, building on the 321, which is one of the first cases

22   within the Ninth Circuit among district courts addressing this

23   issue that unauthorized use of a password does amount to

24   circumvention under the DMCA.

25         And Mr. Hafenbrack said that case is different because it

1    involved the trafficking prong.  The Court expressly rejected

2    that argument, said there's nothing in the statutory text that

3    we should interpret circumvention under the trafficking prongs

4    a(2) or b(1) separate and apart from circumvention under the

5    direct access prong a(1).  That's the first issue.

6         The second issue is Mr. Hafenbrack saying the credentials

7    are valid because the dealerships created them for InDesign's

8    use, but he also, I think, misspoke where he said validly

9    issued by the system owner.  Well, that's the problem.  They're

10   not validly issued by the system owner.  The system owner is

11   CDK, who gives the dealerships the technological ability to

12   create log-in credentials for dealership employees.

13        And what InDesign is using -- is doing is getting them to

14   create a copy, like a skeleton key to a locked room to allow

15   its access, and they're not valid because they're fictitious.

16   They're associated with fake names.  So under these

17   circumstances, the entire premise that all they're doing is

18   using a valid credential is inaccurate.

19        Also, critically, as Your Honor pointed out, CDK does more

20   than just restrict access with password requirements.  It has a

21   private encrypted network not connected to the internet that

22   CDK controlled both ends of the tunnel, and InDesign is

23   circumventing that control.  All the cases they cite -- iSpot,

24   Egilman, Navistar -- those were websites where they were

25   password-protected websites where the Court found no DMCA

1    violation, but you could access them from any IP address.

2    There was no restriction there.  That is not this case.

3         They say, "Well, we're not bypassing the private network

4    because we're doing it from the dealership's computer

5    workstation."  What they've done is designed a software to be

6    loaded on that system to bypass what that technological control

7    is designed, intended to do, which is keep out third parties

8    like them.

9         So, you know, in the complaint, we allege Tekion used a

10   VPN tunnel to get into that private network.  They use a

11   software to get into that private network.  These are both

12   methods of circumvention, and there's nothing in the case law

13   that says the only way to circumvent a private IP address

14   restriction is through a VPN.

15        **MR. HAFENBRACK:**  Your Honor, to take the last point

16   first on the IP restrictions, again, none of that is alleged in

17   the complaint.  CDK nowhere alleges that we circumvented an IP

18   restriction.  And we haven't.  We haven't.  This is just how

19   our software works.  The dealership downloads our software

20   application like any software application on their computer,

21   just like any -- that's how it's designed to work.  The whole

22   point is that dealers control everything.  It's within their

23   environment.

24        And then from their dealership PC, they can operate our

25   software.  This is all alleged in CDK's complaint.  They can

1    operate their soft -- our software to extract their data from

2    the CDK DMS.  That complies with it.  Does not bypass any IP

3    restriction.  And again, none of that's in the complaint.

4         On the Actuate case from 2010, again, my first argument is

5    it involves distribution.  My second argument, Actuate's

6    wrongly decided.  And there's the Adobe case after that from

7    this district, you know, coming out to the polar opposite

8    holding, that iSpot case, and those cases are much more

9    persuasive.

10         **THE COURT:**  Well, iSpot was a little bit different

11   because the defendant had been given the password and log-in by

12   the authorized entity, and then she used them for an improper

13   purpose.

14         **MR. HAFENBRACK:**  After she --

15         **THE COURT:**  Right?

16         **MR. HAFENBRACK:**  After she left the company.

17         **THE COURT:**  Right, but she had been given them

18   initially, and here, InDesign has not been given access ever,

19   right?

20         **MR. HAFENBRACK:**  It's been given access by dealers,

21   and again, to this point, if it's relevant at all, it goes to

22   permission rather than circumvention, and I'd again refer Your

23   Honor to Adobe and Egilman, which discuss that issue.  The DMCA

24   does not prescribe unauthorized access.  It prescribes

25   circumventing a technological measure.

1          **MS. GREGORY:**  Mr. Hafenbrack said we don't allege an

2     IP address restriction.  That's completely inaccurate.  It is

3     in paragraph 43 of the complaint.  It says, "By design, the CDK

4     network only accept electronic communications from devices,

5     i.e. computer workstations, tied to internet protocol, IP

6     addresses, on the corresponding local dealership network."

7          **THE COURT:**  I don't think he said didn't.  I think he

8     said that you didn't allege that they did something to fake --

9          **MR. HAFENBRACK:**  Correct.

10         **MS. GREGORY:**  To fake the IP address.  Okay.

11         **THE COURT:**  The dealer puts their software on the

12    computer that's from the IP.

13         **MS. GREGORY:**  Yes.  And then in paragraph 73, we

14    describe how InDesign software works in terms of being

15    installed on the system, and then in paragraphs 105 and kind of

16    following that, the data extraction methods that InDesign

17    does -- this is not software that you download on your computer

18    workstation like a Microsoft Word program, and then the

19    dealership user just, you know, has complete control of the

20    functionality.

21         InDesign is controlling it from outside the system.  They

22    can connect and not all of this is fully spelled out in the

23    complaint.  Some of it did come.

24         **THE COURT:**  Yeah.

25         **MS. GREGORY:**  Some did come to light in the limited

1    discovery we were able to conduct in connection with the PI.

2    But the point is we in good faith basis pled enough in these

3    allegations to show that they are designing a software that

4    gives them access, and then the limited discovery we had said

5    that they are controlling it from the outside to extract the

6    data from the dealership.

7        In fact, they market it as, you know, we will do it for

8    you to get your own data and access every part of the DMS.  So

9    they are entering and accessing CDK's copyright-protected

10    software when they install the data, get the dealerships to

11    install it.

12        **THE COURT:**  Can I ask you -- I mean, because the

13    question is we don't have binding authority, and so wouldn't it

14    make the most sense to resolve the question on a record, a

15    factual record?  I mean, I think I would say -- look, if I was

16    going to dismiss the whole complaint against InDesign, then I

17    shouldn't say that, but I do think the CFAA claim -- I think

18    you even have said they can even amend it to allege it, so

19    you're going to be here anyway, right?

20        Doesn't that make the most sense, that if we're going to

21    have an appellate court, which I hope for your client's sake is

22    not in this case -- but if we are going to have an appellate

23    court answer this question, they're going to want to answer it

24    on a factual record.

25        **MR. HAFENBRACK:**  I mean, my view is they haven't

1    included the required allegations to show a DMCA claim, and the

2    Court should dismiss it as a result.  There's no -- you know,

3    as you point out, there's district court cases and no binding

4    appellate court authority.  But you've got the text of the

5    DMCA, which I think, you know, we haven't done any of the -- we

6    haven't avoided, bypassed, removed, deactivated, or repaired

7    any of CDK's technological measures.

8            **THE COURT:**  I guess how do you interpret "avoid a

9    technological measure"?  It's sort of -- what do they mean?  If

10   it's put there to make sure that third parties don't access but

11   then a third party accesses it by the credentials, why isn't

12   that avoiding in a very broad sense of the term?

13           **MR. HAFENBRACK:**  Because, again, that goes to

14   permission rather than whether you're circumventing the actual

15   technological measure.

16           **THE COURT:**  So then you're saying there's an

17   exception?

18           **MR. HAFENBRACK:**  It's not an exception.  It's just not

19   covered by the statute.

20           **THE COURT:**  Well --

21           **MR. HAFENBRACK:**  There's separate laws that deal with

22   authorization.  The DMCA is not one of them.

23           **THE COURT:**  All right.

24           **MR. HAFENBRACK:**  Could I make two more quick points,

25   Your Honor?

1           **THE COURT:**  You may.

2           **MR. HAFENBRACK:**  Okay.  So our log-in credentials have

3    our email domain.  This is at paragraphs 108 and 109 of CDK's

4    complaint.  The idea that we're hiding anything here -- CDK

5    recently has blocked, like, 90 percent of our business on the

6    CDK DMS.  They can easily identify us precisely because we're

7    not doing anything to circumvent.  We're not doing anything to

8    hide.

9          Every one of our credentials is clearly labeled with DMS

10   credentials.  And one other thing I'd note, Your Honor -- the

11   MDL case, so CDK alleged these exact same DMCA counterclaims

12   back in 2018.  The only reason -- the Court there in the

13   Northern District of Illinois held that if all CDK had alleged

14   was that Authenticom had entered a valid username/password, he

15   would have dismissed the DMCA claim.

16         The reason CDK's claims against Authenticom proceeded to

17   discovery -- two reasons.  One, Authenticom had evaded CAPTCHA

18   prompts, using, like, CAPTCHA farm or something in Europe.  And

19   two, Authenticom had used software scripts to re-enable

20   credentials that CDK disabled.  Neither of those are in the

21   complaint.  And so, you know, the MDL decision also counsels in

22   favor of dismissing the DMCA claim.

23           **THE COURT:**  Okay.  I'll have to look at it.

24           **MR. HAFENBRACK:**  Thank you, Your Honor.

25           **THE COURT:**  It's an interesting question.

1          **MS. GREGORY:**  If I may briefly respond to that, it's

2     important to note that nothing in that decision said conduct

3     such as re-enabling accounts after --

4          **THE COURT:**  Such as -- I'm sorry -- what?

5          **MS. GREGORY:**  Re-enabling accounts after disablement,

6     as Authenticom was doing, or evading CAPTCHA are necessary

7     conditions to state a DMCA claim.  Under the district courts in

8     this circuit, the unauthorized use of the password is enough.

9     And here we have --

10          **THE COURT:**  So I'm going to caution you just because I

11     think lawyers do this all the time.  District court is just a

12     district court.  And whether you're in the Ninth Circuit or

13     you're in the Northern District or the Central District or

14     you're in Florida, the decision is only as good as it's

15     reasoning, right?  There's no, like, Ninth Circuit district

16     court law.  So but, you know, certainly, colleagues -- I look

17     at their opinions, and I'm not going to tell you who, but I may

18     look at some closer than others.

19          **MS. GREGORY:**  Well, I would urge you to look carefully

20     at your colleagues' opinions, which I think are very

21     well-reasoned decisions.

22          **THE COURT:**  Okay.  I will.

23       So the SCA claim.

24          **MR. HAFENBRACK:**  Yes, Your Honor.

25          **THE COURT:**  That one seems to expressly permit if it's

1    authorized by a user with respect to communications intended by

2    the user under 2701(c).

3            MR. HAFENBRACK:  Thank you, Your Honor.  If I may,

4    before you --

5            THE COURT:  Go ahead.

6            MR. HAFENBRACK:  Pursuant to Your Honor's standing

7    orders, my talented younger colleagues are going to take some

8    of these other claims.

9            THE COURT:  Excellent.

10           MR. HAFENBRACK:  So I'm going to switch out counsel,

11   if that's okay.

12           THE COURT:  Of course.

13           MS. HARTMAN:  Thank you, Your Honor.  Sydney Hartman

14   for InDesign.

15           THE COURT:  Ms. Hartman, why don't you tell me why the

16   SCA claim, you think, should be dismissed.

17           MS. HARTMAN:  So first, we believe that the SCA claim

18   should be dismissed because the CFAA claim should be dismissed,

19   and both of these statutes are analogous in the sense that they

20   only prohibit intentional, unauthorized access of either an

21   electronic facility or a computer system.  And as Mr.

22   Hafenbrack just explained, we believe that because dealerships

23   provided authorization for InDesign to access these systems.

24   The SCA claim should also fail for that reason.

25           But also, there's a separate exemption under the SCA in

1    which conduct authorized by a user of that service with respect

2    to a communication of or intended for that user is not -- does

3    not lead to SCA liability under section 2701(c).  So CDK does

4    not dispute that dealers are users of the DMS.  This fact is

5    spelled out in their contract, which is attached to their

6    complaint as Exhibit 1, and in the complaint itself.

7         Instead, CDK asserts that this exemption does not apply

8    because InDesign accesses data on the DMS that is not intended

9    for dealerships, specifically the proprietary information.

10   However, it is our argument that this response by CDK does not

11   make sense.  CDK's entire case is premised on the fact that

12   only dealership employees or dealerships are allowed to access

13   the data that's on the DMS.  So if there's data stored on the

14   DMS that is not intended for dealerships, then that data would

15   serve no purpose at all.

16        Further, CDK's complaint in paragraph 47 and through the

17   complaint says that InDesign uses dealership-provided

18   credentials to access the DMS.  And in paragraph 47, they say

19   that typical dealership employees only have access to the parts

20   of the DMS necessary to perform their job and would not have

21   administrative level credentials to access CDK's proprietary

22   information.

23        So it is our argument that because nowhere in CDK's

24   complaint does it allege that InDesign ever had admin-level

25   access or used administrative-level credentials to access the

1    DMS, there no way they were able to access any communications

2    that were not intended for the dealership.

3            THE COURT:  So they just haven't plausibly alleged it?

4            MS. HARTMAN:  Yes.  That is our assertion.

5            THE COURT:  What paragraph would I look at?

6            MS. GREGORY:  We've alleged in paragraph 112 that

7    InDesign's data scraping queries regularly access files

8    containing proprietary information that belongs to neither of

9    them, referring to both defendants nor the dealerships.  I'll

10   give Your Honor a moment to get there.

11           THE COURT:  Paragraph 112?

12           MS. GREGORY:  112.

13           THE COURT:  Docket Number 1 is the complaint.  112?

14           MS. GREGORY:  "In addition" --

15           THE COURT:  Yeah.  Okay.

16           MS. GREGORY:  -- "defendant's data scraping queries

17   regularly access files containing" --

18           THE COURT:  Right.

19           MS. GREGORY:  -- "proprietary information."

20           THE COURT:  That's the conclusion.  There are no facts

21   pled that plausibly support that inference.  So okay.

22           MS. GREGORY:  Respectfully, Your Honor, I don't think

23   that's conclusory.  It's certainly based on the preceding

24   paragraph too, where -- paragraph 110 -- each time Defendants

25   access the DMS through a dealership computer, they access and

```
1    use valuable pieces of CDK's intellectual property.

2          THE COURT:  How?

3          MS. GREGORY:  How?

4          THE COURT:  Yeah.  How did that happen?  Show me the

5    allegations in the complaint that plausibly support that

6    inference, especially given that they're accessing it simply

7    based on the dealer's credentials.  So point out the

8    allegations in the complaint.

9          MS. GREGORY:  I understand what Your Honor is getting

10   at.  There is -- we could spell it out more in some of the

11   information that has come to light in the PI briefing --

12         THE COURT:  That is the perfect answer.  Anyway, so

13   I'm going to dismiss it with leave to amend.

14         MS. GREGORY:  Understood, Your Honor.  Thank you.

15         THE COURT:  You won that one, Ms. Hartman.

16      Okay.  So the trade credits.

17         MS. HARTMAN:  Yes.

18         THE COURT:  Is that you as well?

19         MS. HARTMAN:  That's also me as well.

20         THE COURT:  Okay.

21         MS. HARTMAN:  So our argument about trade credits is

22   that CDK fails to plausibly allege with actual factual

23   allegations and not just conclusory language that InDesign

24   actually misappropriates any of the trade secrets that they

25   allege exist on the DMS.
```

1          First, we do not dispute that CDK has plausibly alleged

2     that there are trade secrets that exist on the DMS.  However,

3     CDK only makes the conclusory statement in paragraph 207 that

4     Defendants misappropriated CDK's trade secrets by conspiring

5     with each other to utilize technology which was specifically

6     designed to access, scrape, and download the trade secrets.

7          Here, there's no factual allegations that actually show

8     how InDesign misappropriated the trade secrets that they

9     allege.  Further, there are countless allegations throughout

10    the complaint that InDesign has accessed the proprietary

11    information or the trade secrets of CDK on the DMS, but

12    alleging mere possession of trade secrets is not enough to

13    state a misappropriation claim.  And that comes from Southern

14    District of California in *Pellerin v. Honeywell.*

15         At most, CDK's allegations state that Defendants access or

16    obtain or learn about CDK's trade secrets, but even taking as

17    true that InDesign accesses CDK's trade secrets, there has to

18    be something more than just access or possession for there to

19    be a plausible misappropriation claim.

20         **THE COURT:**  Okay.

21         **MS. GREGORY:**  A few responses.  So in terms of

22    disclosing the trade secrets to Tekion, we allege in paragraph

23    71 that Tekion and InDesign are working hand in hand together.

24    Paragraph 96, the email to the dealership in December 2024,

25    InDesign states, "We convert dealers to Tekion data and docs

1    showing that InDesign is sharing information with Tekion," and

2    paragraph 208 discusses that their access has allowed them to

3    copy CDK trade secrets to further their business.

4        And I also want to point out that the Rockwell case is

5    squarely on point with why CDK's allegations are sufficient

6    here to state a trade secrets claim.  In that case, large

7    amounts of data were going out the door, 20,000 files.

8        **THE COURT:**  But the data's not trade secrets because

9    the data belongs to the dealers.

10       **MS. GREGORY:**  The data belongs to the dealers, but

11   there are some aspects of the data in terms of CDK's

12   proprietary forms that could be considered the CDK trade

13   secrets, and we should be entitled to discovery to figure out

14   what exactly is going out the door because in paragraph 105, we

15   clearly allege it's vast amounts of data.  We don't have full

16   insight into actually what's going out the door.  And under

17   Rockwell, courts recognize --

18       **THE COURT:**  Well, what -- give me an example of what

19   -- give me an example.  We're in open court.  Give me an

20   example of what you think is being misappropriated.

21       **MS. GREGORY:**  So one example is CDK has proprietary

22   forms that are coded with pricing models in the forms, and if

23   that's going out the door in a particular way and InDesign is

24   sharing that with Tekion, well, Tekion's a competitor, and now

25   it has access.

1              THE COURT:  Okay.

2              MS. GREGORY:  To this form that's coded with data.

3              THE COURT:  So as I understand it then, it's the

4      sharing with Tekion?

5              MS. GREGORY:  Is the primary misappropriation.

6              MS. HARTMAN:  Just to respond, Your Honor, I would

7      that this, again, is speculative information that's not

8      supported by any factual allegations.  They claim that vast

9      amounts of data is leaving the DMS and that there's a chance

10     that could include the trade secrets of CDK.

11         However, we believe that there's no factual allegations to

12     support the fact that the dealer data that InDesign accesses

13     and extracts for dealerships would have this proprietary

14     information, particularly considering the fact that InDesign

15     only uses dealer-provided credentials to access the DMS and

16     CDK's own complaint does not allege that InDesign uses

17     administrative-level credentials, which are the only types of

18     credentials that could access this proprietary information.

19             MS. GREGORY:  I don't think there's a basis to

20     conclude from the four corners of the complaint that the

21     credentials that InDesign is using would not give them access

22     to the CDK trade secrets.  In fact, it expressly contradicts

23     the allegations in the complaint that they are accessing those

24     trade secrets.  And again, under Rockwell --

25             THE COURT:  Okay.  Give me the paragraph.  I mean,

1      some of the paragraphs are kind of general.

2            **MS. GREGORY:**  Well, paragraph 35 defines the trade

3      secrets, which they don't disagree with, which discuss

4      CDK-owned forms, algorithms, structure tables, and data

5      compilations, among other factors.  And then in paragraph 110

6      and 112, which, you know, talks about accessing those files

7      containing proprietary information that does not belong to the

8      dealerships.  InDesign is taking that.  We've said in paragraph

9      35 that includes the forms, and then we know --

10           **THE COURT:**  How would a dealership, separate and apart

11     from InDesign, get those trade secrets?

12           **MS. GREGORY:**  The dealerships have access to the form,

13     let's say, with the pricing algorithms coded in.  But the

14     dealership isn't a competitor.  So they're not going to be

15     reverse engineering, you know, the form to figure out what

16     CDK's trade secrets are in that.

17           **THE COURT:**  So they have access to it.  And do they

18     have to sign a confidentiality agreement or something so

19     that -- right, because you're sharing your trade secret with

20     these third parties?

21           **MS. GREGORY:**  I can't point you to the specific

22     language in the contract, but the MSA does refer to keeping

23     CDK's proprietary information confidential, and it does have

24     some limitation on that.

25           **THE COURT:**  And the dealership can do it only through

1    the administrative credentials?

2         **MS. GREGORY:**  That is not alleged in certainly the

3    four corners of the complaint, what types of use restrictions

4    different credentials have.

5         **THE COURT:**  Okay.  Where is that, Ms. Hartman?

6         **MS. HARTMAN:**  Let's find it.  So in paragraph 47, it

7    says, "Dealership employees who are authorized to access the

8    DMS are required to use password-protected log-in credentials.

9    The typical user only has access to the parts of the DMS

10   necessary to perform their job functions."

11        They would -- and then going further down, depending on

12   their job function, the average dealership employee would have

13   access to the DMS functions for customer service, for example,

14   sales, accounting, but they would not have administrative-level

15   privileges to access all DMS functions including CDK's

16   proprietary forms code and similar confidential information.

17        **THE COURT:**  But you want me to draw the inference that

18   InDesign didn't get those administrator-level access?

19        **MS. HARTMAN:**  Yes, because CDK alleges that Tekion

20   used administrative-level credentials, but it never makes that

21   allegation, only that InDesign uses dealer-provided credentials

22   generally.

23        **MS. GREGORY:**  I don't think there's a paragraph

24   expressly stating that InDesign only has used the dealer

25   credentials of, you know, an accountant or customer sales.  We

1   allege they are using dealership-provided credentials.  You --

2   on a motion to dismiss, all inferences need to be drawn in

3   CDK's favor, and there's nothing in the complaints, you know,

4   foreclosing the factual allegation that they have also used the

5   admin credentials that would provide the additional access.

6           **THE COURT:**  Okay.  Okay.  I think I understand that.

7       Potential interference -- is that you?

8           **MS. HARTMAN:**  Thank you, Your Honor.

9           **MS. GREGORY:**  Your Honor, can I correct one point on

10   the record?

11           **THE COURT:**  Yes.

12           **MS. GREGORY:**  You asked about the confidentiality

13   restrictions.  My colleague pointed out it's section 4 of the

14   MSA has those restrictions.

15           **THE COURT:**  Thank you.  Go ahead.

16           **MS. BAKER:**  Hi, Your Honor.  Jade Briana Baker on

17   behalf of InDesign.

18       For us, the argument on tortious interference really goes

19   to CDK's insufficient pleading as to intentional acts designed

20   to induce breach.  First, CDK's alleged actions on this point

21   primarily go to Tekion.  The limited actions that CDK does

22   attribute to InDesign are no more than the simple operations of

23   their longstanding business.  That has served various dealers,

24   not just CDK's.

25       These acts on their face are not indicative of an intent

1   or desire to interfere with CDK's contract.  They have plain

2   alternative business purposes as they are InDesign's business

3   model.  And additionally, their allegation of disparagement is

4   unsupported by their own document they cite.

5       **THE COURT:**  But if I were -- so in December 2024, a

6   customer tells InDesign that "I cannot give you access to the

7   DMS.  It would violate my contract with CDK."  So I think

8   that's important inference now that InDesign has become aware

9   of this contractual provision, yet if CDK then were to identify

10  a customer for whom InDesign got the credentials after that

11  date, why wouldn't that support an inference of CDK interfering

12  intentionally with that contractual provision?

13      **MS. BAKER:**  So I do think it goes to an inference of

14  knowledge for that contractual provision as to that dealer.

15  InDesign has not seen the MSA, the signed MSAs, confidential

16  and proprietary, as testified by CDK's witnesses.  One dealer

17  telling them that -- over email that this violates their MSA

18  does not credit an inference for all dealers, and it does not

19  create a specific knowledge.  He never received -- Dave Lampert

20  never received the underlying contract.  It was just a one-off

21  comment from a dealer with no follow-up from CDK.

22      **THE COURT:**  But what facts are pled in the complaint

23  that -- I mean, to me, the more plausible inference is that the

24  contracts are the same.  I mean, there's nothing pled in the

25  complaint that would suggest this particular dealer is a

```
1   one-off.  The more plausible inference is that all the

2   contracts are the same.

3          MS. BAKER:  Okay.  I think even if we are accepting

4   that, I still don't think that inference goes to intentional

5   acts to disrupt.  InDesign then left this dealer alone.  It did

6   not work with this dealer at issue.  So I don't think it

7   necessarily goes to intentional acts intended to disrupt the

8   MSA.

9          THE COURT:  Well, I think what you're saying is they

10  haven't identified post-December 2024 any contract that was

11  actually interfered with.

12         MS. BAKER:  They do not.

13         THE COURT:  That's what I went looking for.  Who?

14         MS. GREGORY:  A contract interfered with after?  One

15  thing I would like to respond to briefly, InDesign did not

16  simply go away when this dealership says, "We won't be

17  providing you our log-in credentials."  In fact, they said,

18  "Okay.  Well, if you don't get accounts receivable approval,

19  give us a call."

20      So they actually, even after hearing that providing the

21  log-in credentials would violate the terms of the contract,

22  they had another kind of solicitation to get those credentials.

23         THE COURT:  And so what?

24         MS. GREGORY:  So they knew that by soliciting the

25  credentials --
```

1          **THE COURT:**  But how does that state a claim for

2    intentional interference with respect to that customer?

3          **MS. GREGORY:**  Well, they know that CDK's contracts

4    prohibit sharing log-in credentials.  And I understand and want

5    you to draw the inference that this is one contract, but as

6    Your Honor astutely pointed out, there is nothing indicating

7    that the contracts are not standardized, and in fact CDK--

8          **THE COURT:**  I understand that.  But this particular

9    customer, they didn't.

10          **MS. GREGORY:**  Yes, Your Honor.

11          **THE COURT:**  Right?  So that contract was not

12    interfered with.

13          **MS. GREGORY:**  Correct.  And let me answer your

14    question directly about other instances.  In paragraph 107, CDK

15    alleges that InDesign has conducted tens of thousands of

16    queries and downloads across multiple dealerships.  That's

17    based on the forensic investigation.  Every time CDK sees

18    InDesign's access on its system, that is evidence of a breach.

19    Through discovery, we can prove the knowledge of the particular

20    contracts for each of those dealerships, but certainly, we have

21    pled enough to be entitled to that discovery.

22          **THE COURT:**  Well, I mean, what it sounds like is you

23    could amend.  You could allege an actual contract post-December

24    2024.

25          **MS. GREGORY:**  Yes, we could.

1          **THE COURT:**  Okay.

2          **MS. GREGORY:**  We could allege that.

3          **THE COURT:**  Okay.  I think you have to.  I think you

4     have to, but I think you could.

5          **MS. GREGORY:**  Well, Your Honor, I do want to point out

6     -- I mean, we do have allegations in the complaint around

7     paragraph 51 that CDK does have a contract with each of its

8     dealerships.

9          **THE COURT:**  Yes, but the question is what happened

10    post December 2024.

11         **MS. GREGORY:**  Once InDesign knew the terms.  Okay.

12    Understood, Your Honor.

13         **THE COURT:**  Right.  Yeah.  That's what I think is

14    missing, but it sounds like you could provide it.

15         Okay.  With respect to the UCL claim, again, drawing all

16    inferences in CDK's favor, it doesn't seem like they're really

17    competing with InDesign on data integration services.  They

18    actually don't want to provide data integration services.  They

19    do it reluctantly.  I'm putting words in your client's mouth.

20    But they'd rather not lose the customer.

21         So how are they a competitor?  They're not charging for

22    it.  They're not charging the customer.  I think they charge

23    you.

24         **MS. HARTMAN:**  Yes, Your Honor.  Well, first, I would

25    say that I do agree that I do not think that CDK and InDesign

1    are competitors in the DMS market.  I think they're competitors

2    in the data integration market, which is different from the

3    data conversion market.

4        Data conversion is InDesign's TKO product, which is where

5    they take all the data that's on one DMS like the CDK DMS and

6    provide it to dealerships to be able to use for the Tekion DMS

7    or a different type of DMS.  Data integration is -- and that's

8    the service that CDK claims is free, that they freely transfer

9    that data to new DMS providers.

10        However, InDesign also provides data integration services,

11    which is where InDesign pulls data from a DMS and provides it

12    to the businesses, the dealership's preferred vendors or

13    third-party dealers.  So people who provide services, part

14    integrators, accounting, any sort of third party that uses the

15    data from a dealership, they provide those services.  And those

16    services, we claim, is what CDK and InDesign are competitors

17    on.

18        And I will say that I do disagree with that opposing

19    counsel's assertion that CDK never alleges that they're

20    competitors.

21            THE COURT:  I'm just going to stop you for one second.

22            MS. HARTMAN:  Okay.

23            THE COURT:  Because we're on a motion to dismiss.  Can

24    you point me to the paragraphs of the complaint that support

25    what you just said about the data integration services that

1    InDesign provides?  In other words, you may absolutely be

2    correct, but what I have to look at is what's alleged in the

3    complaint.

4         **MS. HARTMAN:**  So I would point your attention to

5    paragraph 208.  This paragraph in the complaint says that

6    Defendant's wrongful access to the DMS allowed them to access

7    copy and use CDK's trade secrets to further their businesses in

8    direct competition with CDK.  So I think that allegation there

9    is saying that Defendants are in direct competition with CDK is

10   enough to allege that CDK and -- is enough to assert that the

11   complaint shows that CDK and InDesign are competitors.

12        **THE COURT:**  Okay.  Well, that's about their group

13   pleadings that you also disagree with.

14        **MS. HARTMAN:**  Yes.

15        **THE COURT:**  Except here.  Then you agree with -- then

16   you want to use it.

17        All right.  You do allege that there, that you're in

18   direct competition.

19        **MS. GREGORY:**  You're right, Your Honor.  That probably

20   could have been more artful drafting to draw that distinction.

21   I think as Your Honor pointed out, that you know, all the other

22   things that my friend on the other side has pointed out -- none

23   of these descriptions of data integration services are in the

24   complaint.  The complaint clearly tells a story that CDK is in

25   the business of providing software solutions such as the DMS,

1     and to the extent that data conversion services happen when

2     dealerships switch providers -- those services are ancillary to

3     CDK's business.

4          **THE COURT:**  Okay.  But we have this sort of

5     preliminary question of competition, and you do allege at

6     paragraph 208 that InDesign is a direct competitor.

7          **MS. GREGORY:**  Understood.  I don't think even if

8     InDesign is a direct competitor to CDK, that means the UCL

9     claim needs to be dismissed.  There are actually, in fact,

10    allegations about harm to consumers or competition from

11    InDesign's conduct, if that is a requirement such as in

12    paragraph 113 we allege InDesign's queries place strain on the

13    DMS that degrades the DMS system performance.

14         Paragraph 119, "Defendants unauthorized extraction

15    activities slow system performance, hampering dealerships'

16    ability to access the DMS in realtime and negatively impacting

17    their product experience with CDK."  These are harms that CDK's

18    customers are experiencing as a result of InDesign's conduct.

19              **THE COURT:**  What about that?

20         **MS. HARTMAN:**  My response, Your Honor, would be that

21    first, there is another allegation in the complaint, paragraph

22    102, where CDK accuses InDesign of costing CDK millions of

23    dollars in lost customers and deprived revenue, which I think

24    also goes to show that CDK does consider InDesign a competitor,

25    hence why they lost revenue --

1          **THE COURT:**  She has to own it because it's alleged, as

2    you pointed out, in paragraph 112.  So they're owning that

3    they're a competitor.

4          **MS. HARTMAN:**  Yes.

5          **THE COURT:**  But what they're saying is "We've shown a

6    harm to competition to the consumers through the additional

7    traffic on the system."

8          **MS. HARTMAN:**  So my response, Your Honor, would be

9    that the harm to competition alleged is not the type of harm to

10   competition that cases like Cel-Tech and the Google Assistant

11   privacy litigation asserted are the types of harm to

12   competition that the unfair competition law is trying to

13   address.

14        In Cel-Tech, which is the California Supreme Court case

15   from 1999, it said when a plaintiff was claimed to have

16   suffered injury from a direct competitor's unfair actions, the

17   word "unfair" means conduct that threatens an incipient

18   violation of antitrust law or violates the policy for spirit of

19   one of those laws because its effects are comparable to the

20   same as violation of the law.

21        I would also state that in ESS Technology, the Court

22   defines harm to competition as conduct that harms the

23   competitive process and thereby harms consumers through higher

24   prices, lower quality, or reduced output, and it is our

25   assertion that there are not sufficient allegations in the

1    complaint to show that there's actually harm to the competitive

2    process itself.  In fact, by blocking InDesign from accessing

3    the DMS, there is less competition in the marketplace.

4            **THE COURT:**  Does that indicate -- matter if they can

5    plead unlawful prong, like, if the CFAA claim survives?

6            **MS. HARTMAN:**  Yes.  Our assertion is that the unlawful

7    prong has not been properly pled because the CFAA claim fails,

8    but under the unfair conduct prong, which is the last remaining

9    prong that they assert, they admit that they do not assert a

10   fraudulent conduct prong.  So it's our assertion that the harm

11   to competition is required in the kind of passing allegations

12   to harm to competition in the complaint that my opposing

13   counsel just pointed out isn't sufficient to show the type of

14   harm to competition that is required to state an unfair conduct

15   prong of the UCL.

16           **THE COURT:**  Okay.  All right.  We need to give the

17   court reporter a break.  She started at 9:00 this morning.  So

18   let's resume in 20 minutes, and thank you for the argument.  I

19   don't want any more on the motion.

20           **MS. GREGORY:**  Your Honor, can I respond just very

21   briefly too?

22           **THE COURT:**  You may.

23           **MS. GREGORY:**  I'll talk slowly.

24       In terms of a policy violation, there is another harm

25   alleged in the complaint, and that's the harm to data security,

1    securing consumers' information, in around 121, 122, 127, and

2    there is a legislative policy, the Gramm-Leach-Bliley Act is a

3    federal statute that regulates how dealerships keep consumer

4    data secure, and we would posit that InDesign's conduct does,

5    in fact, violate the policy of the Gramm-Leach-Bliley Act.

6         **THE COURT:**  Okay.  I mean, all of this is sort of by

7    the by because under Sonner, if you can prevail on your legal

8    claims anyway, we'll never get to these equitable claims.

9         Okay.  Thank you very much for the argument.  We'll take a

10   20-minute break, and we'll resume with the motion to dismiss

11   Tekion's complaints.

12         **MS. GREGORY:**  Thank you, Your Honor.

13         **MS. HARTMAN:**  Thank you, Your Honor.

14         (Recess taken.)

15         **THE COURT:**  Okay.  On CDK's motion to dismiss Tekion's

16   claim, why don't you go ahead and state your appearances for

17   the court reporter.

18         **MS. CUEVAS:**  Jessie-Justin Cuevas for CDK Global.

19         **MR. GAHTAN:**  Adam Gahtan for Tekion.

20         **THE COURT:**  Okay.  The Ninth Circuit has said 60 to 70

21   percent of the market is enough, so I can't accept your

22   argument that 60 percent just in and of itself is not enough.

23   Agreed?

24         **MS. CUEVAS:**  No.  I disagree, but I don't think that

25   the Court has to decide the motion to dismiss on the question

1    of whether 60 percent is a sufficient number to allege monopoly

2    power, and the reason for that, Your Honor, is that Tekion's

3    allegations of CDK's alleged 60 percent market share by revenue

4    allegations are conclusory and unsupported by sufficient

5    factual enhancement to cross the threshold from possible to

6    plausible in this case.  And I'd like to walk through a couple

7    reasons why.

8        It's Tekion's burden to show monopoly power.  Tekion

9    alleges that CDK has about 50 percent of the alleged DMS

10   franchise market by revenue, but the complaint makes only

11   conclusory allegations on this point.  As I mentioned before, a

12   plaintiff in an antitrust case must allege sufficient facts to

13   support allegations of monopoly power to make them plausible,

14   to suggest that those allegations are plausible.

15       Here, Tekion attempts to substantiate the 60 percent

16   market share by revenue allegation by relying solely on an

17   automotive news article incorporated into its complaint by

18   reference.

19           THE COURT:  But there's cases that say -- I mean, what

20   case are you relying on that says I would actually look at the

21   source that they're relying on for it?  What case says that?

22           MS. CUEVAS:  Well, when a plaintiff cites materials in

23   its complaint, it's incorporating those materials --

24           THE COURT:  No.  I understand you have to consider

25   that, but you're saying they don't have enough factual

1    allegations.  What case -- because there are cases that say you

2    don't really need much of anything.  So what case would you

3    like me to apply?

4        **MS. CUEVAS:**  Well, several cases that say that.  I

5    understand from earlier today, the Court has indicated some

6    reluctance to consider district court cases, but --

7        **THE COURT:**  Oh.  So I want to -- I don't -- no, no,

8    no, no, no.  What I was responding to was courts in this

9    circuit, in the Ninth Circuit, and I guess what I was saying is

10   only -- of course I'll consider district court cases.  As to

11   the reasoning, that's what I find persuasive, not necessarily

12   where they're at.

13       **MS. CUEVAS:**  Certainly.  So Kumho, Korea Kumho

14   Petrochemicals, provides that the plaintiff must support its

15   factual allegations with sufficient factual information to

16   suggest that those assertions are plausible.  In that case, the

17   Court did not say, "Oh, you cite an article.  I'm going to go

18   look at the article," but it does say you have to have

19   sufficient facts, factual allegations to support the assertion,

20   and here we just don't have that.

21       We also cite in our motion multiple cases saying that --

22   about 50 percent and about 60 percent and approximately 60

23   percent or 65 percent market share is insufficient.

24       **THE COURT:**  Well, this doesn't say that.  It says it

25   has...

1          **MS. CUEVAS:**  It says about 60 percent.

2          **THE COURT:**  Paragraph 30?

3          **MS. CUEVAS:**  Paragraph 30 says --

4          **THE COURT:**  Has.  I don't see "about" or

5     "approximate."

6          **MS. CUEVAS:**  Sure.  Pardon me.  The allegations on

7     market share paragraph 29 with about 60 percent of the market.

8     That's at line 12.

9          **THE COURT:**  I see.  So line 14, they say "has."

10         **MS. CUEVAS:**  Correct.  And in paragraph 30, by

11    revenue, CDK has a 60 percent market share.  But the 60 percent

12    figure is coming from paragraph 29 and footnote 10.  That's the

13    automotive news article that does not say that CDK has a 60

14    percent market share by revenue.  In fact, that article does

15    not discuss revenue in the context of market power at all.

16         **THE COURT:**  Can I -- I just want to put something by

17    the side.  Your opposition seemed to focus on other cases that

18    had found what their -- what CDK's market share was.

19         **MS. CUEVAS:**  Yes.  Yes.  So --

20         **THE COURT:**  I found that a little surprising because I

21    wasn't aware of any legal principle that would allow me to

22    accept what was found in those cases on this motion to dismiss.

23         **MS. CUEVAS:**  Your Honor, those cases support the

24    implausibility of CDK's allegations of 60 percent market share

25    here.  CDK's market share has been a subject of litigation in

1    multiple cases, the Seventh circuit and twice in the Northern

2    District of Illinois, finding that CDK does not have a 60

3    percent market share.  In fact --

4         **THE COURT:**  Beginning in 2023?

5         **MS. CUEVAS:**  The Northern District of Illinois found

6    in the In Re Dealer Management second case of summary judgment

7    that it was a 45 percent market share.  That decision was in

8    2023.

9         **THE COURT:**  Based on what period though, was it --

10        **MS. CUEVAS:**  It was an earlier period, Your Honor.

11        **THE COURT:**  Right.  So it's just -- okay.  I'm sort of

12   saying -- I was surprised, right, because Tekion's not bound by

13   any of those decisions.  They're not bound by that record,

14   right?  There's no legal principle.  If I were to grant your

15   motion to dismiss based on that, I would get reversed in a

16   heartbeat, right?  So I'm just going to put those cases aside.

17   I'll think of them more as window dressing as to whatever, but

18   it doesn't have any legal significance, as far as I can tell.

19   But you didn't start there.  I just wanted to put that by bite

20   aside.

21        Okay.  So your argument basically is it's not plausibly

22   alleged that it has 60 percent.  Okay.  I do have a question as

23   I'm not exactly sure what the allegation is to market share.

24        **MR. GAHTAN:**  It's 60 percent by revenue.

25        **THE COURT:**  Of what?  Whose revenue?

1          **MR. GAHTAN:**  Of all DMS market --

2          **THE COURT:**  Okay.  So all the -- 60 percent of the

3    revenue.  Okay.  That's it.  So when, in paragraph 29, you say

4    about 60 percent of the market, that's referring to paragraph

5    30, line 14.  You mean by revenue.

6          **MR. GAHTAN:**  It's franchise DMS revenue, right, market

7    wide.

8          **THE COURT:**  Well, it's DMS revenue derived from

9    franchise, not OEM-owned dealerships.

10          **MR. GAHTAN:**  Well, franchise dealerships are new car

11   dealerships.  So some of them might be OEM-owned.  Franchise is

12   sort of a contrasting to independent one-off.  They might also

13   sell used cars or only used cars.

14          **THE COURT:**  Oh, okay.  All right.  So it would include

15   dealer -- I mean, not dealer.  Manufacturer-owned dealerships

16   as well.

17          **MR. GAHTAN:**  That's correct, Your Honor.

18          **THE COURT:**  Okay.  So that's what confused me because

19   normally I would not think of that as a franchise, but we're

20   using "franchise" as a term of art.  Okay.  We're talking about

21   dealerships that -- oh, so then maybe are owned by -- they own

22   more than one dealership?

23          **MR. GAHTAN:**  Some of them do, right?  Some of the

24   groups.  And CDK claims to provide DMS services to five of the

25   six major publicly owned groups, right, which is why, in fact,

1    if anything, and -I know you put these earlier cases to the

2    side -- 45 percent by rooftop, by dealership, if it includes

3    the largest -- the largest dealerships is very likely

4    supporting a 60 percent by revenue share, not undermining it.

5            **THE COURT:**  So that 45 percent was actually measuring

6    something else, which was actually dealerships.

7            **MR. GAHTAN:**  Rooftops.

8            **THE COURT:**  Okay.

9            **MR. GAHTAN:**  Which is individual stores, and of course

10   not every rooftop is the same, right?  Some are very big and

11   sell lots and lots of cars.  Some are small.

12           **THE COURT:**  I see.  And that's why you say that

13   revenue in this context is an appropriate measure.

14           **MR. GAHTAN:**  That's one reason.  And revenue is, you

15   know, an obviously recognized measure of market share in other

16   cases.  So for purposes of our motion to dismiss, if that's an

17   acknowledged legitimate measure of market share for

18   monopolization cases, then even if somehow it turns out not to

19   be the right measure in this case on a motion to dismiss, you

20   can't dismiss it because we chose revenue rather than units.

21           **THE COURT:**  Okay.  So what do you say what is

22   supporting that 60 percent number?

23           **MR. GAHTAN:**  Sure.  So there is the article, but I

24   think it's not fair to say that we rely on that entirely, and

25   there are other facts.  I'll get to them in a moment.  But I'd

```
 1    like to just start with the general proposition that, as Your

 2    Honor pointed out, we're not really required to show our work,

 3    right?

 4        The Kumho case that CDK relies so heavily on, a single

 5    unreported case, and the issue there was all the plaintiff did

 6    was say something like, "You, defendant, have a dominant

 7    share," right?  Period.  That's it.  It was just reciting the

 8    elements of the claim.  And that's the Twombly issue, and we

 9    don't do that, right?  We start with a defined market.  We give

10    a number.

11        And now -- and, you know, the Newcal case, which is a

12    Ninth Circuit case, says you don't have to plead with

13    specificity, and a series of district court cases from this

14    district that, you know, allow allegations of market share to

15    pass even if they're on information and belief, and some that

16    say we're aware of authority that requires you to show your

17    work, but I can list a bunch of facts and plain allegations in

18    the complaint that do support the 60 percent certainly enough

19    to make that number a plausible inference.  So there is the

20    article.

21        There is -- in the article, we cite in paragraph 17,

22    footnote 3, CD K is quoted in there as saying that it is the

23    DMS provider for Asbury, which, as you know, is one of the big

24    groups, other enterprise clients, and the majority of franchise

25    dealerships, right?  So now we're up to -- even if you want to
```

1      call it 51 percent, a majority.

2           CDK provides DMS to five out of the six large enterprise

3      dealers, and that's at paragraphs 13, 54, and 67, right?  So

4      they've got the majority and a lot of the ones they have are

5      the really big ones, right?  So there's that.  CDK claims that

6      2.6 percent of the entire United States GDP flows through CDK

7      Global LLC, so we're talking about enormous numbers.

8           **THE COURT:**  2.6 percent?

9           **MR. GAHTAN:**  Yes, of U.S. GDP, right?

10          **THE COURT:**  Where is that?

11          **MR. GAHTAN:**  That is in our paragraph 29, and it's a

12     claim they made in an article that we cite in footnote 4 in --

13          **THE COURT:**  CDK is a larger parent company?

14          **MR. GAHTAN:**  They have some other products as well,

15     but again, these are underlying facts that go to the 60

16     percent.  One billion dollars was lost in the industry in just

17     a few weeks of the CDK ransomware attack, which is another way

18     to measure the significance of the business that CDK does.  It

19     affected 15,000 dealers in the United States and Canada.

20     That's complaint 27 and footnote 4.

21          **THE COURT:**  Okay.

22          **MR. GAHTAN:**  And on and on.

23          **THE COURT:**  Why isn't it just from what you cited to

24     me, the Illinois case, that if prior to 2023, they had 45

25     percent of just rooftop franchises -- that suggests to me that

1    a 60 percent of revenue is plausible.  At least it's not

2    implausible.  I mean...

3        **MS. CUEVAS:**  Your Honor, a couple points, and I would

4    like to respond to what my friend on the other side has said,

5    but I'll answer your question first, which is first, in

6    Tekion's opposition, it makes the claim that simply because

7    these Illinois cases, Seventh Circuit cases, happened in 2017

8    through 2023, that they're outdated and that CDK's DMS share of

9    the DMS market must be on the rise.

10        That's not in the complaint.  It doesn't -- the complaint

11    doesn't allege that they're on the rise, and in fact, Tekion's

12    allegations show that its own market share is increasing.  It's

13    taking customers, transitioning customers from CDK.

14        **THE COURT:**  We're, like, so nuanced here that this is

15    not a 12(b)(6) argument, right?  So really just -- I mean, I

16    understand, and we can talk about that with the CMC and summary

17    judgment and all those kinds of things, but this is, like, they

18    say 60 percent.  You were at 45 percent just dealerships.  You

19    have five of the six largest franchisees.  That doesn't seem

20    implausible to me, that 60 percent number.  It's certainly at

21    the bottom, right, of what they would need to allege.  I

22    understand that, but it doesn't seem implausible.

23        **MS. CUEVAS:**  I hear what the Court is saying.  I don't

24    think that the Court has to find that CDK lacks monopoly power

25    to grant the motion to dismiss.

1          I'd like to respond briefly to some of the other points

2     that my friend on the other side made, unless the Court would

3     prefer that I move on.

4          **THE COURT:**  No.  Go ahead.

5          **MS. CUEVAS:**  Okay.  So a few things:  One, another

6     case which was cited in CDK's motion to dismiss on page 13 is

7     the Malheur Forest Fairness Coalition case, and in that case,

8     the Court specifically explained that an allegation -- excuse

9     me -- that -- in that case, to be clear, the defendant there

10    was alleged to have about 95 percent of the market.  But that

11    case discussed the FTC versus Facebook case, where the

12    plaintiff allege market share in excess of 60 percent, and that

13    bare allegation was insufficient.  So that's another case for

14    the Court.

15         Two points on the amounts of money going through the

16    industry.  First, this issue of how much money CDK or what

17    percentage of U.S. GDP CDK may have, as the Court has

18    recognized, as my friend on the other side is recognizing,

19    CDK's business is not simply DMS.  I don't think that we can

20    take from an allegation of the percentage of GDP in the United

21    States that CDK has that it necessarily is obtaining or

22    receiving 60 percent of the revenues from DMS providers alone.

23         The other point here on the 1 billion dollar loss in the

24    industry from a security breach, the industry is not

25    necessarily -- is not the DMS market.  Dealers were affected.

 1    Car dealers were affected.  There was a loss in the industry

 2    writ large.  But more importantly, the revenue allegation in

 3    this case is simply implausible.  Tekion says that customer --

 4    that DMS -- excuse me -- that franchise dealers have one DMS at

 5    a time, that CDK and Tekion's DMS platforms have different

 6    prices, that CDK's DMS is more expensive than Tekion's DMS.

 7         And in this circumstance, where there really is a

 8    one-to-one replacement or substitution ratio, revenue is not

 9    the proper metric.  The Areeda and Hovenkamp treatise that

10    Tekion originally put into play in its opposition explains that

11    units rather than dollars is the appropriate metric.

12         And there we have the Sub-Zero versus General Electric

13    fridge example that the treatise presents, where if a Sub-Zero

14    fridge is $10,000 and a GE fridge is $2,000, people are only

15    going to buy one fridge.  The question is not how many GE

16    fridges you need to get to to equal a Sub-Zero version.  The

17    same is true here.  We're talking about --

18         THE COURT:  I share your concerns about why revenue

19    might not be the appropriate measure in this particular market.

20    I don't know how I could do that on a 12(b)(6).

21         MS. CUEVAS:  I don't think the Court has to decide

22    this case on the monopoly power elements.

23         THE COURT:  Okay.  All right.  Great.  So then let's

24    move on.

25         MS. CUEVAS:  If I'm not convincing you on the

1    implausibility of revenue.

2        I think the real issue here is the antitrust injury, and

3    it's a great place for the Court to focus on because it

4    encapsulates what this case is about as well as disposes of

5    both the monopolization and the attempted monopolization

6    claims.  Antitrust law, if the Court is familiar, distinguishes

7    between competition writ large and -- excuse me -- harm to

8    competition writ large and harm to consumers or competition

9    versus harm to competitors.

10        To constitute an antitrust injury, there has to be harm to

11   the competitive process and thereby harm to consumers.  Harm to

12   a competitor does not suffice alone.  Here, Tekion's

13   well-pleaded allegations concern only the harm to itself.

14        **THE COURT:**  No.  Consumers are harmed, according to

15   their -- taking their allegations as true because they're stuck

16   with an old system that doesn't work as well and costs more.

17   Isn't that what they allege?

18        **MS. CUEVAS:**  Tekion alleges that the auto dealer --

19        **THE COURT:**  Yes.

20        **MS. CUEVAS:**  -- the customer.

21        **THE COURT:**  Yes.

22        **MS. CUEVAS:**  But the consumer is not the customer.

23   The customer is the dealership.

24        **THE COURT:**  Well, is the dealership.  And the

25   dealership is harmed because it is stuck with -- for this, it's

```
 1    the consumer.  Why isn't it the consumer?  I don't understand.

 2            MS. CUEVAS:  It's not the consumer.  It's not the

 3    car-buying public.  It's the dealership.

 4            THE COURT:  Yeah, but the DMS isn't for the car-buying

 5    public.  It's for the franchise.

 6            MS. CUEVAS:  A few things.  I'd like to take some of

 7    the points the Court's making in turn.

 8        So first, Tekion does not allege that there is any --

 9    there are no specific allegations that any franchise dealer has

10    actually been unable to switch.  The concern in this case is

11    that Tekion wants CDK to transfer data faster so that Tekion

12    can speed up the transitions from CDK's DMS to Tekion's DMS.

13    That is not harm to competition.  There's no foreclosed ability

14    for a dealership to switch DMS providers.

15            THE COURT:  Well, there is for that period.

16            MS. CUEVAS:  For seven months at most in an outlier

17    instance.  What we're talking about here is a situation of

18    maybe two to four months at most isolated incidents that are

19    alleged in the complaint with possible delays to postponed

20    go-live dates on Tekion's DMS.  There are no allegations that a

21    specific dealership has been unable to switch.

22        In fact, the Tekion's allegations talk about dealerships

23    switching from CDK to Tekion in droves.  Over 80, nearly 90

24    dealerships alleged --

25            THE COURT:  So let's just stop for a second.  So we're
```

1    past -- so we're looking at injury to the dealerships.  We

2    agree on that.

3            **MS. CUEVAS:**  I don't agree on that.

4            **THE COURT:**  Okay.  Why not?

5            **MS. CUEVAS:**  So injury to the customer, who has agreed

6    to the terms of CDK's and the customer's contracts.  It's not a

7    harm to competition if there is a slight delay in the

8    dealership's ability to get its data to make its transition.

9            **THE COURT:**  Okay.  I'm sorry.  I wasn't clear.  We

10   agree then that -- but what I want to say -- not whether

11   they've been harmed.  I understand that argument.  But we're

12   looking at the harm to the dealerships.

13           **MS. CUEVAS:**  I think that Tekion's primary allegations

14   of harm are to itself in the form of lost revenues from delayed

15   -- postponed go-live dates on Tekion's DMS system.  To a lesser

16   extent, there are allegations of harm to the dealership.

17           **THE COURT:**  And you would say for there to be

18   antitrust injury, it has to be to the dealership.

19           **MS. CUEVAS:**  No.  I would say it would have to be

20   competition writ large, to the ability to -- there's no

21   allegations of decreased output.  There's no allegations of an

22   increase in pricing because of what Tekion alleges CDK is

23   doing.

24           **THE COURT:**  An increase in pricing to consumers?

25           **MS. CUEVAS:**  Correct.

1          **THE COURT:**  So if the dealerships simply absorb the

2     extra cost that they're paying for the DMS from CDK, you say

3     that's not a harm to competition.  The dealers, that they

4     can't -- they have no antitrust injury?

5          **MS. CUEVAS:**  Right.  The dealers have entered into

6     these contracts with CDK.

7          **THE COURT:**  That's a different -- that's a different

8     -- let's put aside the contracts for a moment.  I understand

9     you don't think they've been harmed.  But what I hear you

10    saying is "We don't care if they've been harmed.  It only

11    matters if consumers."  That's what's confusing me, that you

12    can't have a harm to competition if it only involves the market

13    involving the dealers.

14         **MS. CUEVAS:**  I wouldn't go so far as to say dealer

15    that CDK doesn't care, but for purposes of antitrust injury,

16    yes, there's no antitrust injury here because the only -- to a

17    lesser extent, the harm that is alleged to the dealership is a

18    slight delay in its timing of its transition.

19         **THE COURT:**  Okay.  All right.  It's a little it

20    different, but I hear what you're saying.

21         Okay.  So what about that?

22         **MR. GAHTAN:**  So the harm to competition from -- that

23    harm to competition comes -- injury to Tekion -- in the form of

24    increased costs and loss of profits and so forth results from

25    the harm to competition.  And he's how it works, right?  I

1    won't repeat all the data manipulation tactics that we describe

2    in the complaint, but as a result of those tactics, Tekion is

3    foreclosed from the market because it's harder and harder --

4    excuse me, Your Honor -- for dealers having to play a game of

5    chicken, right, just to be able to evaluate a competing DMS

6    provider like Tekion's, right?

7        And not just a matter of when the contract requires CDK to

8    help dealers move their data over during the transition period,

9    but at any time, dealers are supposed to be free to get their

10   data.  They're not, for the reasons we allege.  And we also

11   allege that when the transition period comes, all of a sudden

12   there are what we allege to be pretextual, delays to settling

13   up and accounts receivable.

14       And even when it's acknowledged that those things have

15   been paid, it continues to play games.  That's going to have a

16   chilling effect on dealers who already have reasons to fear

17   switching from one DMS to another because it's so important.

18   It's so fraught.  That diminishes options for -- well, the

19   CoStar case that was just cited in the Ninth Circuit really

20   answers this whole question.

21           **THE COURT:**  I actually read it before you filed your

22   notice of --

23           **MR. GAHTAN:**  Did you?  Okay.

24           **THE COURT:**  -- related case.

25           **MR. GAHTAN:**  So, you know, in that case, it broadly

1    endorses exactly the theory that we're alleging here.  Not that

2    I think we needed it to make an antitrust injury complaint in

3    the first place.

4        Broadly, in that case, technical barriers that CoStar

5    erected to make it difficult, if not impossible, for its broker

6    customers, right -- and you can substitute dealer customers in

7    our case -- to move their data from one platform to another

8    diminished options for brokers to list their properties, and

9    that was good enough, as the Court said.

10       In purpose and effect, Crexi alleges that these barriers

11   inhibit free transfer of information from brokers to companies

12   that compete with CoStar and prevent competition in the

13   marketplace.  This plausibly alleges that the technological

14   barriers are anticompetitive, and that was good enough.  And

15   that's in effect what we're alleging here.

16       They make it harder for dealers to move the dealers' own

17   data, right, to access it in the first place, never mind to

18   move it, right?  Maybe they just want to access it and download

19   it, trial Tekion's DMS or trial someone else's DMS.  They can't

20   do that.  Other dealers are going to see this.  They're going

21   to see the Asbury, right?  You've got to go to court.  You've

22   got to get an injunction.  You've got to try to get another

23   injunction.  It takes a long time.  You know what?  I'm not

24   going to move it.

25       Asbury itself said -- and this is in the complaint or the

1    recent articles that we -- well, it's both in the complaint and

2    the articles that we attach -- that they believe that CDK is

3    playing these games to force them to stay with CDK, and of

4    course that's the game, right?

5        Then they can keep their prices higher, and as Your Honor

6    just understood, then the prices are higher, right?  And that

7    is keeping the prices higher, and you have diminished

8    competition, and you have less innovation because who else is

9    going to want to get into this market, right?

10       451 million dollars raised by Tekion to go into it -- this

11   is in the Guillory article.  In another article we attached, it

12   took Asbury with CDK 13 years.  It then took two years for

13   Tekion, the new entrant, to negotiate just the pilot program

14   with Asbury, and then on top of it, it's fraught and difficult

15   for a dealer to move its central nervous system from one

16   provider to another.  So they're already hesitant.

17       And then on top of it, you've got these data manipulation

18   games?  Who else is going to get in that, right?  Who's going

19   to want to do that?  Nobody, right?  And not a lot of people

20   do.  So you're going to have less innovation, you're going to

21   have less competition, and that's going to keep prices higher.

22   I mean, these are quintessential antitrust injuries, and they

23   go beyond what was sufficient in CoStar, which really sort of

24   encapsulates it nicely.

25           THE COURT:  And CoStar actually didn't look at buyers

1    of the real estate.  They just looked at the real estate

2    marketers, right?  So we can just look at the injuries to the

3    dealerships.

4        **MS. CUEVAS:**  A few points.  First, Tekion is saying

5    that it's foreclosed in the market.  I think the allegations of

6    the complaint, the well-pled allegations, replete with

7    allegations of how innovative Tekion's DMS is, how many

8    customers coming over to it, including from CDK specifically.

9    As I said before, nearly 90, if not 90 customers, are alleged

10    in the complaint to have transitioned.  Tekion is not

11    foreclosed.

12        **THE COURT:**  Well, but they'd rather be doing better.

13        **MS. CUEVAS:**  There is not any -- I mean, there's not

14    any allegation in the complaint that plausibly alleges that

15    they could be doing --

16        **THE COURT:**  Why not?

17        **MS. CUEVAS:**  -- that isn't just speculation?

18        MR. GAHTAN:  That's --

19        **THE COURT:**  Why not everything he just said?  I mean,

20    come on.  Just look at the litigation in Georgia.  If I was a

21    dealer, that would certainly give me pause.  I mean, why isn't

22    just that in and of itself...

23        **MS. CUEVAS:**  Well, on the litigation -- on the point

24    of the Asbury litigation in Georgia, CDK presented to the Court

25    a notice of recent decision of the Georgia court actually

1    denying the modified preliminary injunction, Asbury's modified

2    -- motion to modify the preliminary injunction.  In that

3    modified motion, Asbury wanted to have CDK get its data

4    whenever it wanted from any store in the way -- in the format

5    that Asbury wants to make it its transfer to Tekion, right?

6        And the Georgia court said, "No.  You haven't entered into

7    your transition assistance period.  You don't have -- you don't

8    get the data any time you want in any way" --

9        **THE COURT:**  No, but their allegation is different.

10   It's just that you're not even complying with what your

11   obligations are under your agreement.  You're making -- now,

12   I'm not saying this is true, but you're making up excuses and

13   that you're creating roadblocks.  It's sort of almost like a

14   breach of the duty of good faith and fair dealing, right?

15       And you're putting up these roadblocks to make it harder

16   to dissuade dealerships from even considering an alternative

17   source, and that's a harm to competition.  I mean, that just

18   seems self-evident that that would be a harm to competition.

19       **MS. CUEVAS:**  I'd like to push back a little bit there.

20   We have the complaint in the Asbury Georgia case, the complaint

21   that was originally filed in the Illinois case from CDK to --

22   against Asbury.  These complaints also point out these

23   contractual provisions that show that the allegation in the

24   complaint that Tekion makes, that this is all pretextual, that

25   this isn't what's required by contract.

1          Those documents show, along with the order on the original

2     motion for preliminary injunction, which was attached, I

3     believe as Exhibit F, to Tekion's complaint show that, in fact,

4     CDK's just enforcing its customer contracts.

5          THE COURT:  Okay.  You're asking me to draw inferences

6     in CDK's favor.  I mean, I think it was the other way around

7     with InDesign's motion, but I can't do that.

8          MS. CUEVAS:  The Court can't take -- can't draw

9     inferences against Tekion on its own motion, but what the Court

10    also does not -- should not take as true allegations in the

11    complaint that are inconsistent or that are contradicted by

12    other allegations --

13          THE COURT:  So point to me --

14          MS. CUEVAS:  -- in the complaint.

15          THE COURT:  -- what I cannot -- you're saying --

16    because it's a pretty dramatic statement.  I cannot accept this

17    allegation as true.  Point --

18          MS. CUEVAS:  Because it's contradicted in the

19    complaint elsewhere by all of the allegations --

20          THE COURT:  Okay.  Point it out -- point them out to

21    me.

22          MS. CUEVAS:  The inconsistent allegations?

23          THE COURT:  The ones I cannot accept as true.

24          MS. CUEVAS:  The allegation that CDK is acting

25    pretextually and --

1          **THE COURT:**  Okay.  All right.  So point to me.  I have

2     the complaint.

3          **MS. CUEVAS:**  Absolutely, Your Honor.

4          **THE COURT:**  Let me just tell you.  They give one

5     example in paragraph 43.

6          **MS. CUEVAS:**  Yes.

7          **THE COURT:**  Tell me why I cannot accept that as true.

8          **MS. CUEVAS:**  Universal -- Tekion alleges in this

9     allegation that Universal has, in fact, contracted to

10    transition -- excuse me -- that Universal has, in fact,

11    contracted to transition to Tekion.  These allegations are not

12    telling a story of dealerships that are unable or shying away

13    from transitioning to Tekion.

14        If anything, Tekion is alleging that CDK customers,

15    franchise auto dealerships, are transitioning to Tekion in

16    droves, that nearly 90 -- that nearly 90 dealerships have

17    contracted for Tekion services.  Those allegations, in terms of

18    the numbers of customers -- we have that at paragraph 13, which

19    addresses seven different customers that are going from

20    Tekion --

21          **THE COURT:**  So it has to be complete foreclosure?

22    You're not arguing that.

23          **MS. CUEVAS:**  Well, you have to have harm to

24    competition through foreclosure, through reduced output --

25          **THE COURT:**  Yes.

1          **MS. CUEVAS:**  -- through increased prices, and we just

2     don't have that here.

3          I also want to --

4          **THE COURT:**  So you don't think that a dealer, seeing

5     for example, that Universal, if I accept the allegation as

6     true, had to make a legal demand, had to get lawyers involved,

7     before they could get their data?  That's not going to have any

8     impact on a dealership as to whether they would try to get

9     their data?  No impact?  I have to draw that inference?

10          **MS. CUEVAS:**  I don't think that Tekion's allegations

11     rise to the level of showing an actual reduced output either in

12     transitions or in new entrance into the market.  There's also

13     not an allegation that there's a reduction in quality of the

14     DMS platform.

15          **THE COURT:**  That's not true.  Don't you allege that

16     Tekion is, like, way -- I don't know why.  It's in the cloud or

17     something -- that it's better and that CDK's is --

18          **MR. GAHTAN:**  Well, it's not just that we allege it,

19     but we -- but we quote Asbury, one of the major public dealers,

20     saying --

21          **THE COURT:**  Yeah.

22          **MR. GAHTAN:**  -- this is a game changer, and --

23          **THE COURT:**  Yeah.  So I don't think there's the case.

24     I think they absolutely allege that the dealerships are harmed

25     by having -- I don't know if it's true, but by -- it being

1    harmed.

2         **MS. CUEVAS:**  There's another thing that my friend on

3    the other side said prior to exchange, that dealers should be

4    able to get their data at any time.  Even Tekion alleges that

5    dealers can get their data at any time.  There's a self-help

6    tool dealers can download --

7         **THE COURT:**  But they say it doesn't work.

8         **MS. CUEVAS:**  Well, they say they don't like the format

9    and that it is not in the format that Tekion wants in order to

10   transition over.  There's also --

11        **THE COURT:**  Okay.  All right.  Again, I understand,

12   but you're asking me to draw inferences in -- against them,

13   right?  Against them.  Certainly we've all encountered

14   self-help tools that aren't of self-help.

15        **MS. CUEVAS:**  I understand the Court's concern there.

16   I think there are other points, if I may make them.

17        **THE COURT:**  Okay.  I have another preliminary

18   injunction hearing at --

19        **MS. CUEVAS:**  Understood.

20        **THE COURT:**  -- 1:30, believe it or not.

21        **MS. CUEVAS:**  I think actually with the Qualcomm ruling

22   with respect to the Apple-Qualcomm contract in that case is

23   illustrative.  In Qualcomm -- this is at 969 at --

24        **THE COURT:**  I'm going to stop you for a second.

25        **MS. CUEVAS:**  Sure.

```
 1              THE COURT:  I actually inherited that from Judge Koh,

 2     so I'm very familiar with it.

 3              MS. CUEVAS:  I am aware.

 4              THE COURT:  This seems different.

 5              MS. CUEVAS:  Well, if I may, the Court there, the

 6     Ninth Circuit, credited the district court's conclusion that

 7     the 2013 Qualcomm and Apple contract was an exclusive dealing

 8     arrangement.  And I understand that Tekion has disclaimed an

 9     exclusive dealing claim, but the delays, the alleged forcing of

10     dealers to stay with CDK, are akin to an exclusive dealing

11     arrangement where the party -- where CDK's allegedly forcing

12     customers to stay with CDK.  And if the Court will just indulge

13     me for --

14              THE COURT:  Can I just ask you are you referring to

15     the *FTC vs. Qualcomm*?

16              MS. CUEVAS:  I am referring to the FTC.

17              THE COURT:  After the bench trial?

18              MS. CUEVAS:  Correct.

19              THE COURT:  Okay.  You may be right after a trial

20     here.  And I'm very familiar because Qualcomm then argued that

21     I had to accept that finding of the Ninth Circuit, and I said I

22     can't because the plaintiffs actually weren't actually parties

23     to that FTC action and they had the right to develop their own

24     evidence.  But then they -- I can't remember what happened.

25     They didn't get the evidence, or the problem was the expert
```

1    discovery or something.

2        That doesn't help me because these are allegations, and

3    that was after a bench trial.

4        **MS. CUEVAS:**  Understood, Your Honor.  I think that the

5    findings, the evidentiary findings, that the Court made and

6    credited, map onto Tekion's allegations here.  There, in the

7    Qualcomm, the *FTC vs. Qualcomm* decision, the record suggested

8    that there was only one competitor -- that was Intel, in that

9    instance -- during the term of the contract that was affected,

10   that Qualcomm's customer, Apple, had switched to competitor

11   Intel within a year, a year later, the very next year.  Intel

12   was not a viable competitor before Apple made that switch, and

13   at most, the exclusive dealing arrangement only delayed Apple's

14   transition by a year.

15       And here, what we have are very similar well-pled

16   allegations that, first of all, only harm to Tekion in the form

17   of us reduced revenues or delayed revenues from late

18   transitions.  The complaint --

19       **THE COURT:**  So you want me to apply the chip market

20   writ large to the dealership market for DMS?  Maybe on summary

21   judgment.  Not on motion to dismiss.  Those are two

22   completely -- I mean, the chip market, it's hard to imagine in

23   20 -- whatever year that was -- a larger market for any

24   product, frankly in the world, than chips.  This one, not quite

25   so big.

1          **MS. CUEVAS:**  The Qualcomm -- in a separate ruling in

2     the same case, Your Honor, Qualcomm also on the royalty rate

3     and licensing agreement dispute, where the Ninth Circuit held

4     that even if the challenged royalty rates from Qualcomm

5     amounted to an anticompetitive harm in the anticompetitive

6     sense -- excuse me -- in the antitrust sense, the primary harms

7     were to Qualcomm's customers, who had agreed to Qualcomm's

8     contract terms.  And for that reason, it was outside the area

9     of --

10          **THE COURT:**  Well, Qualcomm's a super complicated case

11     because you have the operation of patent law, right, with the

12     right to exclude that we, at least as far as I know, don't have

13     here.

14          So yeah.  Go ahead.

15          **MR. GAHTAN:**  And it's more than that.  I mean, that

16     was an exclusive dealing case about contracts, and we've heard

17     a lot about the contract here, and we don't have a contract,

18     right?  The contract is not -- the CDK dealer contracts -- we

19     don't make allegations about its provisions.

20          And frankly, the forcing dealers to stay with CDK not to

21     do with certain provisions of exclusivity that may or may not

22     be in CDK's contract.  What happens is as those contracts

23     expire, as we see in the Asbury case, they make it impossible

24     even then for dealers to get their data.  And that's why Asbury

25     says, "I think they're doing this because they want us, Asbury,

1    to stay with them," right?  Not because of what's in the

2    contract, some exclusivity provision, but because of data

3    access manipulation -- data access manipulation.  Sorry.

4          And if I may respond just for a moment to this idea that

5    -- I want to talk about foreclosure for a second.  You're

6    absolutely right.  Total foreclosure is not -- we don't have to

7    be bankrupt before we bring this action, and the idea that, you

8    know, droves of former CDK customers signing up to Tekion --

9    it's, like, 80 or 90 out of 18 -- however many dealers there

10   are.  That's a very small drove, right?  I mean, it's barely --

11   it's --

12         **THE COURT:**  I don't know.  I don't know that it's

13   alleged, the total number of franchisees.

14         **MS. CUEVAS:**  I was going to say that the complaint

15   doesn't allege how many there are, and --

16         **THE COURT:**  But you're the one asking me to draw the

17   inference that 90 is such a sufficient percentage that there's

18   no harm to competition.  I can't, because I don't know what the

19   denominator is.

20         **MR. GAHTAN:**  Well, we know, for example, that when

21   they had their ransomware attack, it affected 15,000 dealers,

22   right?  So it's at least that many, right?  There's a lot.

23         And as to the data tool, it's not the case that Tekion

24   doesn't like it, right?  It's that the dealers don't like it

25   because they can't use it to get their data, and that's also

1    Asbury's complaint, right?  It's the dealer frustration with

2    access to their data that causes all the problems, that causes

3    the harm to competition that then results in, among other

4    injuries, the injury to Tekion.

5        **THE COURT:**  Okay.  I'm going to give you the last word

6    since this is your motion.

7        **MS. CUEVAS:**  I appreciate it.

8      I would point the Court to -- on the issue of total

9    foreclosure versus a delay in transition, I would point the

10   Court to the *Aerotech vs. Honeywell* case.  The district court

11   opinion from the District of Arizona explains very -- in great

12   detail the Ninth Circuit affirms that decision that --

13       **THE COURT:**  Do you want to address CoStar?

14       **MS. CUEVAS:**  Absolutely.  Yes, Your Honor.  CoStar --

15   in our view, CoStar really is, rather than supportive of the

16   allegations in Tekion's complaint -- tells a far more specific,

17   factually supported story.  That complaint was over 100 pages.

18   The monopoly --

19       **THE COURT:**  Oh, I'm not going to -- I don't even want

20   to encourage that.

21       **MS. CUEVAS:**  Many -- very, very detailed allegations,

22   Your Honor.  Two points on that.  One, on monopoly power in

23   that case, the -- Crexi, the counter-claimant, actually alleged

24   direct evidence of super competitive pricing that allowed the

25   Court to draw an inference or make a finding of monopoly power

1    in that case.

2         As I mentioned, we did pull up the complaint in that case.

3    It's hundreds of pages.  There's something like 10 to 14 pages

4    on monopoly power alone.  In the Ninth Circuit's decision, the

5    Ninth Circuit goes on about how many specific examples of

6    direct evidence for monopoly power there were.  The Ninth

7    circuit similarly talks about how robust the allegations of

8    exclusive dealing were.

9         And in that case, the Crexi counterclaim actually alleged

10   an exclusive dealing claim.  And there, you have direct

11   evidence, specific examples, multiple examples, of brokers

12   actually being foreclosed from doing business with Crexi and

13   other CoStar rivals.  That's at the slip opinion on page 26.

14   It's distinct from here, where what we have is a months' long,

15   a few months' long delay in customers' ability to transition to

16   Tekion.  There are no allegations that any dealer customer

17   actually has been unable to do business with Tekion.

18         **THE COURT:**  There are allegations they've been unable

19   to do it without hiring lawyers, right?  In some instances,

20   that would certainly dissuade people.  Also, I don't think

21   dealerships, you know, necessarily have a lot of extra money

22   around, especially these days.

23         **MS. CUEVAS:**  Well, the automotive news article that's

24   incorporated by reference in Tekion's complaint at footnote 10

25   says otherwise.  It actually talks about how highly competitive

1    the DMS sector is and specifically notes that the dealers have

2    so much money and they made so much money that they are having

3    a lot more choice in where they go.

4        **THE COURT:**  Good.  Maybe they can pass it on to

5    consumers.

6        Okay.  All right.  I'll take the motion under submission

7    and think about it.  So I'm just at my limit.  Let's talk about

8    the CMC.

9        **MS. CUEVAS:**  And my colleague, Ms. Yzurdiaga, is going

10   to --

11       **THE COURT:**  Okay.

12       **MS. CUEVAS:**  -- cover the CMC.

13       **THE COURT:**  So I intend to get orders out relatively

14   quickly on everything, a couple of weeks at least.  So it

15   looked like your proposed schedules there were actually very

16   similar.

17       **MS. CUEVAS:**  Yes, Your Honor.

18       **THE COURT:**  Okay.  So I'll just adopt -- I think it's

19   Tekion's.  I don't know if InDesign was in on that as well.

20       **MR. HAFENBRACK:**  We're just following the coattails of

21   Tekion --

22       **THE COURT:**  Okay.  Right.

23       **MR. HAFENBRACK:**  -- Your Honor, for the --

24       **THE COURT:**  So I'll just adopt that schedule.

25       Yes, Mr. Newby?

```
 1              MR. NEWBY:  We have two CMCs.

 2              THE COURT:  Okay.

 3              MR. NEWBY:  One in each case, so they --

 4              THE COURT:  Well, I wanted -- so I'm not consolidating

 5       the cases, right?  Don't worry.  I'm not consolidating them.

 6       Yet.  I mean, we'll see down the line what's left, how things

 7       develop.

 8           But for discovery purposes, we should do it all together.

 9       That makes the most sense.  And InDesign could just skip

10       certain depos or things if it wants, right, if they only have

11       to do with Tekion's case.

12              MR. HAFENBRACK:  We agree.

13              THE COURT:  Okay.  But I think we should do the same

14       deadlines, everything.  Same CMCs just all come together.

15       Okay.

16              MR. HAFENBRACK:  Thank you, Your Honor.

17              THE COURT:  All right.  So I'm doing it all at the

18       same time, Mr. Newby.

19           So let me look at your schedule through trial.  So let's

20       see here.  Our last date here, dispositive motion.  We're

21       looking at a trial date for 2027?

22              MR. HAFENBRACK:  Correct.

23              THE COURT:  Okay.

24              MR. NEWBY:  And just for clarification, Your Honor,

25       are we looking at the joint statement in the CDK v. Tekion or
```

1    the Tekion v. CDK?

2            **THE COURT:**  I thought your proposed dates were the

3    same.

4            **MR. NEWBY:**  They were pretty similar, but discover

5    starts and cutoffs keyed off at different dates.

6            **THE COURT:**  Discovery starts now.

7            **MR. NEWBY:**  Okay.

8            **THE COURT:**  I believe you can serve it.  You'll get a

9    decision before, but you can serve it.  I mean, I don't think

10   this is a secret.  I think both these cases are going forward.

11   That's my view, as I sit here now.  And so let's see.  We would

12   likely hear it probably in February 2027, and then so trial

13   would be maybe in the summer of 2027.  I think we can just set

14   a date now.

15           **MS. YZURDIAGA:**  Your Honor, I think the one thing that

16   we might have some disagreement on or at least potential

17   agreement with caveats is in the antitrust matter.  We proposed

18   this bifurcated schedule where we would deal with --

19           **THE COURT:**  So --

20           **MS. YZURDIAGA:**  -- dispositive issues.

21           **THE COURT:**  Correct.  So the deadline I'm going to

22   give is last day.

23           **MS. YZURDIAGA:**  Okay.

24           **THE COURT:**  And I actually don't have a rule about --

25   you get one summary judgment motion.  And so I know you have an

1    issue as to market power.

2         **MS. YZURDIAGA:**  Correct.

3         **THE COURT:**  And their allegation is at the bottom,

4    right?  So if you want, you can focus your discovery there, and

5    you can bring an early summary judgment motion.  Well, they

6    don't want to be spending their -- if they can't make their

7    burden -- or they can't persuade me that they've made their

8    burden, they'd rather find out sooner than later, right?

9         **MR. NEWBY:**  That's right.  We don't think that it's so

10   easy to bifurcate discovery.

11        **THE COURT:**  I'm not talking about -- right.  I'm not

12   talking about bifurcation, but I'm allowing that you could

13   bring the issue before me.  That's not the date -- that's not

14   your motion filing date.  That's the last date to file.  Okay?

15        Now, that doesn't mean you can bring seriatim.  I would

16   say you should think maybe two at the most summary judgment,

17   but certainly -- and we can talk about that.  We'll have

18   regular CMCs, and we can talk about that before you file.  So

19   otherwise, let's keep the schedule the same.  No bifurcation.

20   Otherwise, we're going to waste our time fighting about what

21   bucket it falls into.

22        **MS. YZURDIAGA:**  All right.  We appreciate the

23   guidance, Your Honor.

24        **THE COURT:**  Okay.  So a trial, Ms. Means, in, like,

25   July?

1          **THE CLERK:**  July of 2027.  July 12th, 2027.

2          **THE COURT:**  Okay.  And then we would do the pretrial,

3     like, the last Thursday in June.

4          **THE CLERK:**  And that would be June 24th.

5          **THE COURT:**  And I'll put a dispositive hearing motion

6     date in February.  I'll have to look at the calendar.  Okay.

7     All right.  I will do that order.

8          So let's talk about ADR.

9          **MS. JAMES:**  Your Honor --

10          **THE COURT:**  Yes.

11          **MS. JAMES:**  -- if I can, I just wanted to clarify in

12     the CDK v. Tekion case whether you were inclined to split the

13     issues on Daubert motions and only have -- so Tekion and

14     InDesign have proposed briefing only Daubert motions during

15     summary judgment for expert testimony that is explicitly cited

16     in the motions for summary judgment.

17          **THE COURT:**  Okay.  This is what I'm going to say:

18     Bring it up later.  That's a long time from now, and let's

19     bring it up later.  But don't forget it.  Don't forget it.  But

20     let's bring it up later.  I don't know.  I have no idea.  Let's

21     see.

22          Because frankly what I want to talk to you about -- I

23     don't know if your clients are here.  Maybe they're watching on

24     Zoom.  This D...

25          **MR. BHATIA:**  MS.

1          **THE COURT:**  -- costs about $75,000 a year per dealer?

2          **MR. BHATIA:**  Something like that.

3          **THE COURT:**  I mean, we're just, like -- this -- all

4     these lawyers here --

5          **MR. SAFI:**  We agree.

6          **THE COURT:**  -- must give them heartburn.

7          **MR. SAFI:**  Your Honor --

8          **THE COURT:**  So what are we --

9          **MR. BHATIA:**  -- we agree.

10          **THE COURT:**  -- going to do?

11          **MR. BHATIA:**  We agree.  We agree.

12          **THE COURT:**  So what's the proposal?

13          **MR. BHATIA:**  Look, I got the complaint -- I'm Vineet

14     Bhatia.  I didn't get to speak because my younger lawyers --

15          **THE COURT:**  Did an outstanding job.

16          **MR. BHATIA:**  They did.  I'm very proud of them.

17          When I got the complaint, I read it.  It looked like there

18     was a problem, they said, in some instances of getting data.  I

19     picked up the phone.  I called Mr. Newby even before we

20     answered and filed the preliminary injunction or anything, and

21     I said, "What's the issue?  It seems like you want to get the

22     data more quickly.  We used to have an agreement in place that

23     did it.  Tell me what the problems are, and we can come up with

24     a new agreement."  That was my call to him.  I never heard

25     back.

1          **THE COURT:** Okay. So what's your proposal? You're

2     open to private mediation?

3          **MR. BHATIA:** I'm open to private mediation. We have

4     an agreement that was in place. There was then a second

5     agreement that was done with the general counsel.

6          **THE COURT:** Okay. All right.

7          **MR. BHATIA:** Yes.

8          **THE COURT:** The parties are always free to work stuff

9     out among themselves --

10          **MR. BHATIA:** Right.

11          **THE COURT:** -- right, but --

12          **MR. BHATIA:** We would be open to private mediation.

13          **THE COURT:** Okay.

14          **MR. NEWBY:** We're open to private mediation. Agreed.

15          **MR. HAFENBRACK:** Your Honor, certainly --

16          **THE COURT:** Maybe Tekion will pay your share.

17          **MR. HAFENBRACK:** The one thing I was going to mention,

18     Your Honor -- I mean, as you noted earlier, InDesign is really

19     under an existential risk here from CDK. We have very serious

20     antitrust claims that we intend to serve either as

21     counterclaims or as --

22          **THE REPORTER:** Can you talk into the microphone.

23          **MR. HAFENBRACK:** Sure. Sorry.

24          **THE REPORTER:** I can't hear you.

25          **THE COURT:** And more slowly.

1          **MR. HAFENBRACK:**  Yes.  We're certainly open to ADR,

2     Your Honor, but as your comments indicated earlier, InDesign is

3     under a very serious existential threat from CDK.  We think

4     we've got strong antitrust claims either as counterclaims or as

5     standalone claims, that we intend to bring, and so, you know, I

6     just wanted to flag that --

7          **THE COURT:**  But those things actually seem

8     inconsistent to me.

9          **MR. HAFENBRACK:**  What's that, Your Honor?

10         **THE COURT:**  Well, because it's going to cost a lot of

11    money to litigate those antitrust claims.  And however they

12    find out that you're going to litigate, well, how long did

13    Qualcomm take, right?  And go up on appeal, and we don't know

14    what's going to happen.  So it actually seems like their best

15    bet to survive would be to try to work out an agreement with

16    CDK.  As you know, you've been operating your client since

17    2013.

18         **MR. HAFENBRACK:**  And it's been tough slugging under

19    the restrictions that CDK has placed on competition --

20         **THE COURT:**  Well, they entered into the market with

21    that understanding.  I mean, you know.  I'm not going to weigh

22    in or not.  You should be able to figure something out, a way

23    to do business without having to get -- I don't know.  Anyway,

24    I don't want to say anything.  But if your client doesn't want

25    to settle, your client doesn't want to settle.  Don't come

1    claiming poverty to me though.  Those two things are

2    inconsistent.

3              **MR. HAFENBRACK:**  Understood, Your Honor.

4              **THE COURT:**  They're absolutely inconsistent.

5              **MR. HAFENBRACK:**  And we're happy to talk to CDK also.

6              **MR. BHATIA:**  And Your Honor, we're not asking that

7    InDesign -- if he's advising his client that he doesn't want to

8    come, he doesn't have to come.  We need to work it out with

9    Tekion.  InDesign is a -- no offense.  It's a very -- I mean,

10   they have, as they said, a million dollars a year of revenue.

11   If they want to use all that money to bring an antitrust case,

12   I know how to defend an antitrust case.

13        But if we want to work it out with Tekion, they're the

14   ones who need to have data for their business, we're ready to

15   work it out with them.

16             **THE COURT:**  All right.  So what I want to do is give

17   you a deadline to give me the name of your mediator and the

18   date of your mediation because -- I mean, I think you should

19   meet sooner rather than later.  It doesn't mean that

20   necessarily -- but, I mean, look at all these lawyers here.  So

21   many.  So much money.  So if I gave you a month, do you think

22   you could come up with something?

23             **MR. NEWBY:**  A month to complete a mediation or --

24             **THE COURT:**  No, no.  Just to tell me who it's going to

25   be with and when it's going to be.

1          **MR. NEWBY:**  I think so.  I've been mediating a lot of

2     cases recently, and it's really hard to get a mediator

3     scheduled in the summer.

4          **THE COURT:**  No, no, no.  Just tell me when.

5          **MR. NEWBY:**  Yeah.

6          **THE COURT:**  Yeah.

7          **MR. NEWBY:**  I think a month.

8          **MR. BHATIA:**  I think we should -- look, I'm not

9     rushing anybody.  I can come up with a name of a mediator in a

10    week or two weeks, and the mediation won't be done in two

11    weeks, of course --

12         **THE COURT:**  No.

13         **MR. BHATIA:**  -- but I don't see why we can't in a

14    couple of weeks come up with the name of a mediator.  If you

15    want to do a month -- there's no reason we can't do it sooner.

16         **MR. NEWBY:**  Why don't we do three weeks.

17         **MR. BHATIA:**  Compromise is my middle name.

18         **THE COURT:**  That's a start.

19         **MR. BHATIA:**  Three weeks is agreed.

20         **THE COURT:**  We have momentum.

21         **MR. BHATIA:**  It's a start.

22         **THE COURT:**  Yeah.  Okay.  So we're at June 26th.  By

23    July 17th, just give me a joint letter that tells me your

24    mediator and the date of the mediation, whenever it is.

25         **MR. BHATIA:**  Understood.

1          **THE COURT:**  I just want to get it on there at the top

2     of your calendar.

3          So why don't we schedule a further CMC right now for --

4     and I will do those by video.  September 10th with an updated

5     statement a week in advance.  So at 2:00 P.M. on September

6     10th.

7          **MR. HAFENBRACK:**  I believe that works for InDesign,

8     Your Honor.

9          **THE COURT:**  Okay.

10          **MR. BHATIA:**  It works for me.

11          **MR. NEWBY:**  The only reason I'm checking is because I

12     may have had something scheduled for the 10th.

13          **THE COURT:**  You have a large team though.

14          **MR. NEWBY:**  Yeah, we do.  We'll be good.

15          **THE COURT:**  A large and very able team.  Okay.  All

16     right.  So but I'll work on these motions, get an order out.

17     I'll get a CMC out with all these dates.  Share them with your

18     clients so they'll see about all the money that would be spent

19     between now and July 2027.  And then in two weeks, you'll let

20     me know who your mediator's going to be.

21          **MR. NEWBY:**  Yes.

22          **MR. BHATIA:**  Three weeks.

23          **THE COURT:**  Thank you.  I was just checking to see if

24     you were paying attention.

25          **MR. BHATIA:**  Your Honor, thank you for the time.

1          **MR. NEWBY:**  Thank you, Your Honor.

2          **MR. BHATIA:**  Thank you for the time.

3          **THE COURT:**  I appreciate it.  It was very helpful

4     arguments.  I appreciate that you let a lot of people argue

5     too.  I found that very helpful.

6          **MR. BHATIA:**  Thank you, Your Honor.

7          **MR. HAFENBRACK:**  Thank you, Your Honor.

8          (The proceedings concluded at 12:50 P.M.)

9                          ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, July 1, 2025

_____

April Wood Brott, CSR No. 13782