UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEKION CORP.,<br><br>    Plaintiff,<br><br>v.<br><br>CDK GLOBAL, LLC,<br><br>    Defendant. | Case No. 24-cv-08879-JSC<br><br>**ORDER RE: CDK'S MOTION TO DISMISS TEKION'S COMPLAINT**<br><br>Dkt. No. 23 |

Tekion Corp. ("Tekion") sues CDK Global, LLC, ("CDK") for alleged antitrust violations. (Dkt. No. 1.)[1] CDK now moves to dismiss Tekion's Sherman Act claims under Federal Rule of Civil Procedure 12(b)(6), and asks the Court not to exercise jurisdiction over Tekion's remaining claims. (Dkt. No. 23.) After careful consideration of the parties' briefing, and having had the benefit of oral argument on June 26, 2025, the Court DENIES CDK's motion.

**BACKGROUND**

**I.    Complaint Allegations**

Auto dealership management systems ("DMS") are software products that enable dealerships to access and maintain critical data, such as "inventory management," "sales and finance," and "service and parts operations." (Dkt. No. 1 ¶ 1, 3.) "Franchise dealers typically spend more on their DMS than on any other software product they use." (*Id.* ¶ 3.) "CDK is the incumbent industry giant in the DMS market for franchise dealers." (Dkt. No. 1 ¶ 2.) It holds a market share of "approximately 60% by revenue, and its share of the submarket for large enterprise franchise dealers in the United States is even greater." (*Id.*) Further, five of the "six

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

largest public dealer groups—Asbury, AutoNation, Group 1, Lithia, and Sonic—use CDK as their primary DMS." (*Id.* ¶ 54.)

There are many barriers to entry into the franchise DMS market, including the complexity of the DMS product, that "a DMS must be integrated with every OEM ["original equipment manufacturer"]," and that dealers are "cautious about switching to a new provider." (*Id.* ¶ 5.) Because CDK's DMS is "antiquated" (*id.* ¶ 6), Tekion "entered the franchise DMS market in 2016" and its DMS now "poses a significant competitive threat to CDK's position in the DMS market for franchise dealers and CDK is well aware of that threat." (*Id.* ¶ 7.)

"CDK's most frequent anticompetitive practice has been to abuse its ability to control access to the data belonging to franchise dealerships." (*Id.* ¶ 10.) Specifically, when dealerships attempt to migrate their data from the CDK DMS to a competing DMS, CDK requires "several months" to do so. (*Id.*) "Historically, DMS providers, including CDK, facilitated dealership access to their own data, including for the purpose of data migrations to different DMS providers." (*Id.* ¶ 11.) But now, CDK has engaged in tactics which "include forcing dealerships to work exclusively through CDK to access and transfer the dealerships' own data[,] restricting dealerships to a rudimentary CDK self-help tool that provides incomplete data in an irregular and unusable format." (*Id.*) Further, CDK has continually "refus[ed] to commit to or honor a reliable data transfer schedule, including by pretextually terminating CDK service with insufficient time and access to the dealerships' data; and threatening and then instituting legal action against those, …, who seek to switch to competitors." (*Id.*) Beginning in early 2023, "CDK began to withhold approvals necessary to facilitate data transfers to Tekion, demanding that dealers seeking to obtain their data to perform a DMS transition first pay any accounts receivable." (*Id.* ¶ 40.) Though this process would typically take 30 days, CDK began withholding approval for much longer. (*Id.*) In one instance, it withheld approval, "the first step in the migration process, for 159 days." (*Id.*) In other instances, CDK would force dealerships to conduct migration from its DMS on timelines that made it impossible for those dealers to transfer their data to a new DMS without serious disruptions to their business. (*Id.* ¶ 41.)

"In January 2024, Tekion announced a partnership with Asbury, which has approximately

1    158 dealerships across 15 states," in which Asbury would use Tekion's DMS in four dealerships.

2    (*Id.* ¶ 8.)  But on "January 25, 2024, contrary to its routine past practice of processing Asbury's

3    data requests, CDK informed Asbury that it would first need to send a 'cancellation request.'" (*Id.*

4    ¶ 45.)  Asbury subsequently sent a cancellation request but "CDK continued to refuse to transfer

5    the data, directing Asbury to obtain the data itself through an inadequate customer self-help tool.

6    The self-help tool did not provide complete and reliable data sets that Asbury needed for the

7    Tekion pilot program with the four dealerships." (*Id.*)  And when Asbury later attempted to access

8    its data on CDK's DMS, "CDK sent Asbury a cease-and-desist letter and subsequently disabled

9    that Asbury account." (*Id.*)  CDK sued Asbury a few months later in Illinois and, in response,

10   Asbury instituted its own action against CDK in Georgia.  (*Id.* ¶¶ 46-47.)  CDK then withdrew its

11   Illinois complaint.  (*Id.* ¶ 48.)  In August 2024, the Georgia court "found against CDK and

12   enjoined it to provide Asbury with the data necessary for Asbury's Tekion pilot program." (*Id.* ¶¶

13   48-51.)

14   CDK has refused to release data for at least "Asbury, Doral, Regal, Lou Bachrodt Auto

15   Mall, and Universal," all dealers who use its DMS.  (*Id.* ¶ 53.)  "Since the start of 2023, at least 62

16   dealerships have been forced to postpone their Tekion Go-Live date, collectively resulting in

17   significant losses to Tekion, increased implementation costs, unpredictability of its

18   implementation calendar, and poor onboarding experiences for its customers." (*Id.*)

19   **II.     Procedural Background**

20   Tekion sues CDK for (1) monopolization under § 2 of the Sherman Antitrust Act, (2)

21   attempted monopolization, (3) tortious interference with contract under state law, (4) tortious

22   interference with prospective economic advantage under state law, (5) unfair business practices

23   under the Unfair Competition Law ("UCL"), and (6) declaratory judgment that its manner of

24   accessing dealer data from CDK's DMS is not unlawful.  (*Id.*)

25   Tekion sued CDK in December 2024.  (*Id.*)  On February 10, 2025, CDK moved to

26   dismiss Tekion's complaint under Federal Rule of Civil Procedure 12(b)(6), and instituted its own

27   action against both Tekion and InDesign, seeking to enjoin their access to dealer data housed in

28   CDK's DMS.  The Court then related the cases.  (Dkt. No. 27.)  Before the parties had fully

3

1  briefed the motion to dismiss in the present matter, CDK moved for a preliminary injunction in the

2  related case. *CDK v. Tekion et al.*, No. 25-cv-01394 (Dkt. No. 45). That motion, and InDesign's

3  motion to dismiss CDK's claims, is addressed in a separate order.

4        Now pending before the Court is CDK's motion to dismiss Tekion's Sherman Act claims

5  under Federal Rule of Civil Procedure 12(b)(6) and for the Court to decline to exercise

6  supplemental jurisdiction over Tekion's state law claims, and deny jurisdiction over Tekion's

7  declaratory relief claim. (*Id.*)

**ANALYSIS**

**I.     Sherman Act Claims (Causes of Action 1 & 2)**

Section 2 of the Sherman Act "makes it unlawful to 'monopolize, or attempt to monopolize, or combine or conspire ... to monopolize' a market." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quoting 15 U.S.C. § 2).. "To establish liability under § 2, a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (cleaned up). (cleaned up).

CDK argues Tekion fails to plausibly allege all three elements of its § 2 claims.

**A.  Monopoly Power**

"To state a monopolization claim, [a plaintiff] must start by plausibly alleging that the defendant has monopoly power in the relevant market." *CoStar Grp. v. Comm. Real Est. Exch*, --- F.4th ---, 2025 WL 1730270, at *4 (9th Cir. 2025) (citing *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996)). Monopoly power is "the substantial ability 'to control prices or exclude competition.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024) (quoting *United States v. Grinnell Corp.*, 384 U.S. 564, 571 (1966)). Monopoly power requires "something greater" than market power. *Id.* (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) ("*Kodak*")). "[M]onopoly power can be shown either directly, through evidence of the exercise of monopoly power, or indirectly, through evidence of a firm's predominant market share." *CoStar*, 2025 WL 1730270, at *6 (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421,

1434 (9th Cir. 1995); *Epic Games*, 67 F.4th at 998).

When pleading market power by circumstantial or indirect evidence, a plaintiff must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Kodak*, 125 F.3d at 1202 (cleaned up). Courts "generally require a 65% market share to establish a prima facie case of market power," *id.* at 1206, but "a market share as low as 45-70% may support a finding of monopoly power, if accompanied by other relevant factors." *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990); *see also CoStar*, 2025 WL 1730270 at ("[M]arket shares on the order of 60 percent to 70 percent have supported findings of monopoly power.") (cleaned up).

Tekion plausibly alleges, through circumstantial evidence, CDK possesses monopoly power in the DMS market for franchise dealerships and in the submarket for large enterprise franchise dealers in the United States. "CDK is the incumbent industry giant in the DMS market for franchise dealers. Its share of this market is approximately 60% by revenue, and its share of the submarket for large enterprise franchise dealers in the United States is even greater." (Dkt. No. 1 ¶¶ 2, 30.) The DMS market is "concentrated" and the CEO of a DMS consulting firm estimated CDK "is the dominant leader, with about 60 percent of the market." (*Id.* ¶ 29.) And "five out of the six largest public dealer groups—Asbury, AutoNation, Group 1, Lithia, and Sonic—use CDK as their primary DMS." (*Id.* ¶ 54.) Further, "[h]igh barriers to entry perpetuate CDK's market power" and "new entrants into the franchise DMS market are rare." (*Id.* ¶¶ 68-70.) Such barriers include that "DMS is a sophisticated and specialized product essential to users in a regulated industry of national importance," and "DMS contracts are often long, and switching to a new DMS system is expensive, time-consuming, and risky." (*Id.* ¶ 68.) These allegations plausibly support an inference that CDK "owns a dominant share" of both defined markets and that "there are significant barriers to entry and [] that existing competitors lack the capacity to increase their output in the short run." *Kodak*, 125 F.3d at 1202 (cleaned up).

CDK's arguments to the contrary are unavailing. First, CDK cites other cases where plaintiffs have alleged CDK commands a smaller market share and where, at summary judgment,

5

1   a court found CDK owned "over 40% of the market." *See Authenticom, Inc. v. CDK Global, LLC*,
2   874 F.3d 1019, 1022 (9th Cir. 2017); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d
3   919, 941 (N.D. Ill. 2023); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 939 (N.D.
4   Ill. 2018). CDK asks the court take judicial notice of these cases to establish its market share is
5   less than 45%. (Dkt. No. 23 at 16 & n.3.) But "when a court takes judicial notice of another
6   court's opinion, it may do so not for the truth of the facts recited therein, but for the existence of
7   the opinion, which is not subject to reasonable dispute over its authenticity." *Lee v. City of Los*
8   *Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (cleaned up). CDK does not explain how the Court
9   can disregard Tekion's well-pleaded allegations about market share in favor of other courts'
10  rulings on different records and in cases where Tekion was not a party. It can't.

Second, CDK argues its alleged 60% market share is legally inadequate as a matter of law. But the Ninth Circuit previously held "a market share as low as 45-70% may support a finding of monopoly power, if accompanied by other relevant factors." *Movie 1 & 2*, 909 F.2d at 1254. And in *CoStar* it reiterated that "[m]arket shares on the order of 60 percent to 70 percent have supported findings of monopoly power." *CoStar*, 2025 WL 1730270, at *7 (quoting *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924-25 (9th Cir. 1980)). Since Tekion alleges CDK had 60% market share and that 5 of the 6 major public dealer groups use CDK, drawing reasonable inferences in Tekion's favor and taking the allegations as true, this is sufficient to plead monopoly power at this stage.

Third, CDK argues the complaint fails to plausibly plead monopoly power because Tekion relies on an unreliable, inaccessible article for its allegation that CDK has 60% market share. But monopoly power within a relevant market need not "be pled with specificity." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (citing *Cost Mgmt. Servs., Inc. v. Washington Nat. Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996)). And "the actual existence of [CDK's] market power within the alleged [market and] submarket is a factual question." *Id.* at 1051. So, at the pleading stage "a rough estimate of the defendant's market share is sufficient" to state a claim. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 777 (N.D. Cal. 2022) (citations omitted). And courts have held plaintiffs properly allege market share even when they "did not

6

1  provide any explanation for how they calculated market share, let alone any specific facts that
2  could support such calculations." *Id.* (collecting cases).   Here, Tekion's allegations of market
3  power are not baseless.  Tekion alleges five of the six largest public dealer groups use CDK as
4  their DMS, (Dkt. No. 1 ¶ 54) and that the 60% market share figure is based on statements from "a
5  DMS consulting firm that helps dealerships with major vendors."  (*Id.* ¶ 29.)  And "over 50% of
6  Honda/Acura dealers were on CDK's DMS" in 2021, (*id.* ¶ 60) and CDK was recently purchased
7  "for roughly $8.7 billion."  (*Id.* ¶ 17.)  Taken together, Tekion plausibly alleges its market share
8  estimate.

9        Finally, CDK urges use of revenue to estimate market share is an invalid measure of
10 market power as a matter of law.  But CDK provides no case law that holds revenue cannot be
11 used as a measure of market share.  To the contrary, courts have accepted revenue to calculate
12 market power.  *See, e.g.*, *Klein*, 580 F. Supp. 3d at 776-77 (using advertising revenue as a measure
13 for market share); *Gamboa v. Apple Inc.*, No. 24-cv-01270-EKL, 2025 WL 1684890, at *2 (N.D.
14 Cal. June 16, 2025) (holding allegation that the defendant had monopoly power based on its share
15 of revenue in the market was sufficient on a motion to dismiss.); *cf Fed. Trade Comm'n v. Meta
16 Platforms Inc.*, No. 22-cv-04325-EJD, 2023 WL 8629125, at *18 (N.D. Cal. Dec. 13, 2023)
17 (holding an expert's calculation of market share using each firm's revenue was sufficient on a
18 preliminary injunction record to make a prima facie showing of market concentration).  At the
19 pleading stage, the Court must draw reasonable inferences in Tekion's favor.  Accordingly, absent
20 case law to the contrary, the Court cannot foreclose Tekion's current method of alleging market
21 share at this stage.

22       So, Tekion plausibly pleads CDK has monopoly power.

### B. Anticompetitive Conduct

24       "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and
25 either does not further competition on the merits or does so in an unnecessarily restrictive way."
26 *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).  "To be condemned as
27 exclusionary, a monopolist's act must have an anticompetitive effect—that is, it must harm the
28 competitive *process* and thereby harm consumers," so merely alleging "harm to one or more

7

*competitors* will not suffice." *Qualcomm Inc.*, 969 F.3d at 990.

Tekion alleges CDK engaged in anticompetitive conduct by "withholding or delaying dealers' access to their own data, thereby preventing, delaying, and foreclosing dealers from switching to a competing franchise DMS, and threatening and initiating legal action against dealers that intend to switch from CDK's DMS." (Dkt. No. 1 ¶ 83.) This conduct harms competition because it chills dealerships from otherwise choosing to migrate to a different DMS provider. So, instead of competing on the merits of their respective products, CDK's conduct forces dealers to stay with CDK's product for longer than desired. Thus, CDK's actions "unfairly tends to destroy competition itself." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)

*CoStar* is instructive. *CoStar*, 2025 WL 1730270, at *11. There, a competitor in the online real estate listing space alleged brokers who used CoStar for their online listings were unable to migrate listings from CoStar to a competitor. *Id.* CoStar had blocked access to these public listings only as to its competitors, so that "there is no practicable way for brokers to do business with" CoStar's competitors. *Id.* The Ninth Circuit held the competitor plausibly alleged CoStar's anticompetitive conduct. Similarly, here, CDK's conduct of preventing, delaying, and foreclosing dealers from switching to other platforms by withholding dealership data on its DMS and initiating legal action against dealers that intend to switch makes it impracticable for dealers to do business with other DMS products. As alleged, and drawing reasonable inferences in Tekion's favor, the conduct "protects [CDK's] monopoly in a manner not attributable to competition on the merits." *Id.* (citing *United States v. Microsoft*, 253 F.3d 34, 76-77 (D.C. Cir. 2001)).

CDK insists its alleged conduct is insufficient to constitute anticompetitive conduct as a matter of law because "there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (quoting *Pac. Bell. Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009). Specifically, "the Sherman Act does not restrict the long[-]recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Qualcomm*, 969 F.3d at 993 (cleaned up). So,

8

1   CDK argues, its alleged refusal to conduct business (namely data migration) under terms favorable
2   to its competitors cannot, as a matter of law, form the basis for a § 2 claim.  But while
3   "'[c]ompetitors are not required to engage in a lovefest,'" *Qualcomm*, 969 F.3d at 993 (quoting
4   *Aerotec Int'l*, 836 F.3d at 1184), Tekion does not allege that CDK should be required to deal under
5   Tekion's preferred terms, but that its conduct toward *dealers* impedes the dealers' ability to
6   migrate to other DMS providers, thus protecting CDK's monopoly  "in a manner not attributable
7   to competition on the merits."  *CoStar*, 2025 WL 1730270, at *11 (citing *United States v.*
8   *Microsoft*, 253 F.3d 34, 76-77 (D.C. Cir. 2001)).

9   *Qualcomm* does not suggest otherwise.  There, Qualcomm held monopoly power in
10  cellphone modem chips and licensed its patents only at the OEM level.  *Qualcomm*, 969 F.3d at
11  983-84.  In other words, Qualcomm made the decision not to license its patents "further upstream"
12  to its rivals, thus ensuring its rivals would not reap the benefits of the license to its patents.  *Id.* at
13  984-85.  "Because rival chip manufacturers practice many of Qualcomm's [patents] by necessity,"
14  Qualcomm offered its rivals agreements whereby it would not assert its patents against them so
15  long as they would not sell chips to unlicensed OEMs.  *Id.*  The court held this conduct on its own
16  was not anticompetitive under the Sherman Act because it constituted harm to competitors, not "to
17  *competition itself*."  *Id.* at 996 (citing *Microsoft*, 253 F.3d at 58.)  Specifically, Qualcomm's
18  agreements with rival chip manufacturers functioned as "de facto licenses" so that the rivals were
19  not deterred from entering the market, and its licensing arrangements were "chip-supplier neutral"
20  because it collected surcharges from all OEMs, not just those that contracted with its rivals.  *Id.*
21  Here, by contrast, the alleged anticompetitive conduct only targets dealerships that seek to migrate
22  from CDK to its rivals, thus harming competition.

23  Finally, CDK argues judicially noticeable material undermines complaint allegations of
24  anticompetitive conduct and intent.  (Dkt. No. 23 at 25-26.)  Specifically, CDK points to a
25  LinkedIn post where one dealer blames CDK's data migration delays on a security breach and
26  Asbury's executives' statements that its pilot program has seen promising results.  (*Id.*)  Because
27  Tekion does not oppose judicial notice of these documents, the Court takes notice of them.  But,
28  and as explained above, the Court cannot accept judicially-noticed documents for the truth of the

9

matter stated. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). So, this material adds nothing to the 12(b)(6) analysis. Finally, even accepting the statements for their truth, they do not undermine Tekion's allegations that CDK engaged in anticompetitive conduct when drawing inferences in Tekion's favor and considering the complaint as a whole. CDK's arguments improperly ask the Court to weigh evidence and draw inferences in its favor. In short, when drawing inferences in Tekion's favor and taking its well-pleaded allegations as true, CDK's evidence does not require dismissal at this early litigation stage.

So, Tekion plausibly alleges CDK's actions constitute anticompetitive conduct.

### C. Antitrust Injury

"[C]ausal antitrust injury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (citations omitted). And "[t]he antitrust laws 'were enacted for the protection of *competition,* not *competitors.*'" *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024 (9th Cir. 2013) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)). Harm to competition includes "reduced output, increased prices, or decreased quality in the relevant market." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (cleaned up).

Tekion has plausibly alleged antitrust injury. The complaint alleges dealerships would prefer to use other DMS products because the CDK DMS is outdated (Dkt. No. 1 ¶ 54), so there is "decreased quality in the relevant market." *PLS.Com*, 32 F.4th at 834. And it alleges CDK's actions have "prevented, delayed, and discouraged dealers from switching DMS providers," (Dkt. No. 1 ¶ 72), thus "depriving [DMS] customers of the benefits of competition." *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 221 (D.D.C. 2022). So, Tekion plausibly alleges antitrust injury.

CDK focuses on Tekion's allegations about harm it sustained from CDK's actions—such as reduced revenue—to argue Tekion does not allege harm to competition. But CDK fails to acknowledge Tekion alleges both harms to itself *and* to competition. That CDK's alleged anticompetitive conduct harms Tekion as well as competition does not mean Tekion cannot state a

10

section 2 claim.

\* \* \*

So, Tekion plausibly pleads CDK has monopoly power in the DMS market for franchise dealerships and in the submarket for large enterprise franchise dealers in the United States, that CDK engaged in anticompetitive conduct, and that its conduct had a deleterious effect on competition, harming consumers. Thus, CDK's motion to dismiss Tekion's § 2 claim of monopolization is DENIED.

### D. Attempted Monopolization

CDK's basis for dismissal of the attempted monopolization claim is that Tekion fails to allege its first claim. Therefore, having held Tekion plausibly alleges its monopolization claim, CDK's motion to dismiss the attempted monopolization claim is also DENIED.

### E. Section 2 Violation Based on Tying

"Tying is defined as an arrangement where a supplier agrees to sell a buyer a product (the tying product), but 'only on the condition that the buyer also purchases a different (or tied) product.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) (quoting *N. Pac. Ry. So. v. United States*, 356 U.S. 1, 5 (1958)). Though Tekion makes some passing allegations about CDK "attempting to tie" one of its products to its DMS (Dkt. No. 1 ¶¶ 56-61), in opposition it represents "Tekion did not make a standalone tying claim." (Dkt. No. 36 at 25.) Since no tying claim is made, there is no tying claim to dismiss.

### F. Declaratory Relief Claim / Supplemental Jurisdiction over State Law Claims

The Court has discretion to exercise jurisdiction over claims under the Declaratory Judgment Act and to exercise supplemental jurisdiction over state law claims asserted with underlying federal law claims when those claims have been dismissed. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (holding federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants."); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir.), *supplemented*, 121 F.3d 714 (9th Cir. 1997), *as amended* (Oct. 1, 1997) (holding a "federal district court with power to hear state law claims has discretion to keep, or decline to keep, them under the conditions set out in § 1367(c)"). CDK asks the Court to dismiss both sets of

claims if the Court dismisses the underlying Sherman Act claims. The Court having determined Tekion plausibly pleads its Sherman Act claims, it likewise exercises jurisdiction over the declaratory relief and state law claims. So, CDK's motion to dismiss these claims is likewise DENIED.

## CONCLUSION

For the reasons stated above, the Court DENIES CDK's motion to dismiss. CDK shall answer the complaint within 30 days of the date of this Order.

This Order disposes of Docket No. 23.

**IT IS SO ORDERED.**

Dated: July 15, 2025

*[signature]*

JACQUELINE SCOTT CORLEY
United States District Judge