TYLER G. NEWBY (CSB No. 205790)
tnewby@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 415.281.1350

ERICA R. SUTTER (CSB No. 309182)
esutter@fenwick.com
ADAM GAHTAN (admitted *pro hac vice)*
agahtan@fenwick.com
NOAH SOLOWIEJCZYK (admitted *pro hac vice*)
nsolowiejczyk@fenwick.com
FENWICK & WEST LLP
902 Broadway, Floor 18
New York, NY 10010-6035
Telephone: 212.430.2600

Attorneys for Plaintiff
TEKION CORP.

FENWICK & WEST LLP
ATTORNEYS AT LAW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

TEKION CORP., a Delaware corporation,

Plaintiff,

v.

CDK GLOBAL, LLC, a Delaware limited liability company,

Defendant-Respondent.

Case No.: 3:24-cv-08879-JSC

**FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE AND DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. Auto dealership management systems ("DMS") are sophisticated, specialized software products that are mission critical for franchise, i.e., new car, dealerships. Nationwide, approximately 18,000 franchise dealerships rely on DMS to conduct all essential operations, and for legal and regulatory compliance. DMS providers are stewards of their customers' (the dealers) essential data—the historical and daily information, on which DMS operate and without which dealers cannot function. Plaintiff Tekion Corp. ("Tekion") brings this action to put a stop to Defendant CDK Global, LLC's ("CDK") unlawful and anticompetitive conduct in the DMS market for franchise dealerships in the United States and the DMS submarkets for multi-store franchise dealership groups and even larger enterprise franchise dealership groups (collectively, "Large Franchise Dealership Groups").

2. CDK is the incumbent industry giant in the DMS market for franchise dealers and even more so in the submarkets for Large Franchise Dealership Groups. At least as of the filing of Tekion's initial Complaint (Dkt. No. 1), CDK's share of the DMS market for franchise dealers in the United States exceeded 50% by revenue, and its share of each of the submarkets for Large Franchise Dealership Groups exceeded 60% of the market by revenues. But CDK's product has fallen behind the capabilities of 21st century technology and franchise dealership needs. Suddenly faced with competition from providers of superior, modern DMS, like Tekion, CDK has attempted to maintain its dominant position in the market through unlawful, anticompetitive practices intended to prevent and discourage franchise dealerships from switching to an alternative DMS provider. This harms competition in the DMS market for franchise dealers and the submarkets for Large Franchise Dealership Groups, and it harms both franchise dealers and the car-buying public.

3. Among many other functions, a DMS enables dealerships to perform all aspects of: inventory management (vehicles, parts, and accessories); sales and finance (initial customer contact, credit checks, insurance, and delivery); customer relationship management (monitoring, maintaining, and personalizing customer information and interactions, improving the customer experience, increasing customer loyalty); service and parts operations (scheduling service appointments, monitoring technician productivity, ensuring parts availability); accounting and

FENWICK & WEST LLP
ATTORNEYS AT LAW

reporting (tracking performance in real time, payroll services, monthly mandatory reporting, trends, and more); legal and regulatory compliance (maintaining accurate records for all manners of compliance, audits, and financial reporting requirements in a highly regulated industry); integration and data access (enabling integration within the dealership and dealership group, and with third parties from suppliers to auto manufacturers). The DMS touches every aspect of the modern franchise auto dealership. Franchise dealers typically spend more on their DMS than on any other software product they use. Upon information and belief, on average, dealers spend over $75,000 per year on their DMS, not counting fees for implementation and ancillary services.

4. A DMS operates on dealership data, both historical and generated during daily operations. The data, which comprises the entire record of a dealership's past and present business, includes vehicle sales and service history, inventory data, financial information, payroll-related information, all manner of customer information, and sales leads. The data also includes records required for mandatory quarterly and annual financial statements, and information that franchise dealerships must submit to original equipment manufacturers ("OEMs", e.g., General Motors, Ford, Toyota, etc.) for, e.g., warranty audits and disputes related to sales or service issues. Although dealer data resides on systems owned and controlled by the DMS provider, the data unambiguously belongs to the dealer. Indeed, some states have passed laws codifying dealer ownership of the data and ensuring dealer control over it. CDK has opposed and challenged such laws, reflecting its strategy to control the franchise DMS market and the submarkets for Large Franchise Dealership Groups through control of dealer data.

5. Within the broader franchise DMS market, the DMS needs of multi-store dealership groups and even larger enterprise dealership groups are distinct from and exceed the needs of smaller franchise dealerships. A large franchise dealership group must coordinate operations, inventory, personnel, and accounting across multiple physical locations, often representing multiple OEM brands with distinct certification, warranty, and data-sharing protocols. Such groups require a DMS capable of features such as consolidated reporting and inventory visibility; multi-brand OEM integration; group-level accounting, payroll, and financial consolidation; and centralized user administration.

FENWICK & WEST LLP
ATTORNEYS AT LAW

6. Enterprise dealer groups (which include at least the six largest publicly traded franchise retailers in the United States: AutoNation, Inc., Lithia Motors, Inc., Penske Automotive Group, Inc., Asbury Automotive Group, Inc., Group 1 Automotive, Inc., and Sonic Automotive, Inc.) operate hundreds of franchise dealerships, employ thousands of people, and generate billions of dollars in annual revenue. They are reported on Automotive News' annual ranking of the Top 150 Dealer Groups and, if publicly traded, are subject to the financial reporting, internal controls, and audit requirements imposed on public companies by the Securities and Exchange Commission, the Sarbanes-Oxley Act of 2002, and the rules of the national securities exchanges on which their shares are listed. A DMS serving enterprise franchise dealership groups must also meet operational and compliance demands that exceed those smaller franchise dealerships. For example, an enterprise DMS must provide: centralized, real-time visibility across large numbers of rooftops operating in multiple states under varying state regulatory regimes; consolidated financial reporting and controls sufficient to satisfy public-company auditing standards; the ability to manage integrations with multiple OEM brands simultaneously, each with distinct certification and data-sharing requirements; and sophisticated workforce management, payroll, and human resources integration across a large geographically dispersed employee base.

7. Barriers to entry into the franchise DMS market and the submarkets for Large Franchise Dealership Groups are high. First, a DMS is a complex, purpose-built platform that must work at scale and across innumerable interrelated functions for businesses operating in a complex, regulated industry that affects the national economy. Second, a DMS must be integrated with every OEM (there are over 40) and with several other third-party providers. Because the market for DMS for franchise dealers and the submarkets for Large Franchise Dealership Groups had become so stagnant, many OEMs do not know how to enable integration with a new DMS. In addition, because dealers rely on their DMS for every daily function, for legal and other compliance purposes, and for integration with the rest of the automotive ecosystem, they are understandably cautious about switching to a new provider, in the rare case that one comes along. CDK has unfairly exploited these inherent barriers to competition in the franchise DMS market the submarkets for

Large Franchise Dealership Groups by introducing additional obstacles that dealers have no choice but to accept, thus raising the costs for new entrants like Tekion.

8. Barriers to entry for DMS serving the submarkets for Large Franchise Dealership Groups are higher still as such DMS must meet operational and compliance demands that exceed those of a one or two rooftop franchise dealership. Developing a DMS capable of serving large dealership groups and enterprise franchise dealership groups requires not only the complex engineering, OEM integrations, and regulatory knowledge needed for any franchise DMS, but also the capacity to operate reliably at large scale across multiple states and stores and—in the case of publicly traded groups—meet public-company auditing and disclosure standards. Large dealership groups cannot risk deploying a DMS that has not been proven to function at that scale. In some instances, large dealership groups require the ability to trial a DMS implementation on a small scale before a broader rollout. This multi-stage evaluation process increases switching costs and extends the transition timeline for large groups, further entrenching the position of the incumbent DMS provider and making competitive entry into these submarkets more difficult.

9. The needs of auto dealerships have changed with the advent of new technology that enables greater automation, integration, data-keeping, and customer service possibilities and expectations. Barry Cohen—the Vice President and Chief Information Officer ("CIO") of Asbury Automotive Group, a Fortune 500 company and one of the largest franchise auto retailers in the United States—recently explained to a Georgia court that today's dealerships rely on DMS for "almost everything," from tracking repair orders, to maintaining vehicle inventory, to interfacing with banks to obtain auto loans, to managing accounting functions. He described CDK's DMS as "antiquated."

10. California-based Tekion entered the franchise DMS market and the submarkets for Large Franchise Dealership Groups in 2016 to address these needs. Because Tekion's DMS was built natively on the cloud, rather than (like CDK's) for individual on-premises or hosted installations, it provides dealerships with several significant advantages, including regular, real-time updates and enhancements that do not require significant downtime or manual installation. Tekion's DMS also offers the power of new technology, like data analytics, machine learning, and

FENWICK & WEST LLP
ATTORNEYS AT LAW

artificial intelligence, that modernize and elevate dealership operations and enhance consumer experiences. At a dealer's discretion, Tekion's DMS enables the integration of retail, service, parts, accounting, customer relationship management, and analytics functionality in an all-in-one seamless and connected platform. Tekion's modern DMS poses a significant competitive threat to CDK's position in the DMS market for franchise dealers and the submarkets for Large Franchise Dealership Groups and CDK is well aware of that threat.

11. In January 2024, Tekion announced a partnership with Asbury, a Large Franchise dDalership Group which has approximately 158 dealerships across 15 states, including two in California. Explaining Asbury's decision to trial Tekion's DMS at four dealerships in a pilot program, Mr. Cohen testified that,

> "Tekion is a very interesting company that was started in 2016. The CIO of Tesla realized that there was a big void in the automotive industry and so he started up this DMS company. So it's very exciting. It's game-changing. It's transformative. Our company's mission statement is to be the most guest-centric automotive company in retail. And so we feel like this aligns very well with our North Star, and we're very passionate about getting onto this platform. It will replace not only CDK, but 15 other vendors that we have. So there's a bunch of bolt-ons, stove pipes that will go away. It'll make us very efficient. It'll make it easy to train new employees. But the guest experience will be truly amazing."

12. Because CDK knows that its legacy product cannot compete with modern entrants, it has been attempting to entrench (and perpetuate) its market power through other, anticompetitive means. For example, in 2018, the FTC challenged CDK's unlawful and anticompetitive acquisition of Auto/Mate, an "innovative, disruptive challenger" in the DMS space that posed an "emerging threat" to CDK's position, for "a price that was far in excess of its original standalone valuation," to rid itself of the competition. A true and correct copy of the FTC's redacted administrative complaint in *In the Matter of CDK Global and Auto/Mate*, File No. 1710156, Docket No. 9382 is attached as **Exhibit A**. As CDK touted, "We are so serious about acquiring new customers that we bought the DMS [Auto/Mate] that has been kicking our butts." Exhibit A at ¶ 54. CDK dropped the acquisition after the FTC's challenge.

13. CDK's most frequent anticompetitive practice has been to abuse its ability to control access to the data belonging to franchise dealerships. Franchise dealerships that decide to move from one DMS provider to another, particularly Large Franchise Dealership Groups, must have meaningful access to their data sufficiently in advance of the move—typically several months—to validate and integrate their data in the new DMS. The actual switch to a new DMS happens in an instant, usually at the stroke of midnight, after which the new DMS becomes the sole system of record for the dealership. Without the validation period, a move could cause massive disruption to daily operations and significant legal and regulatory risk. The negative impacts of such disruptions can be devastating, as a 2024 ransomware attack on CDK demonstrated. This widely publicized attack deprived the thousands of franchise dealerships that used CDK of access to their DMS, and, consequently, to their essential data. Over just four weeks, this disruption is estimated to have cost those dealers over $1 *billion.*

14. Historically, DMS providers, including CDK, facilitated dealership access to their own data, including for the purpose of data migrations to different DMS providers. But faced with a threat to its dominance, CDK began using various anticompetitive and unlawful tactics to prevent dealers in California and elsewhere from gaining timely access to their own data, frustrating dealers' efforts to migrate to a competitor like Tekion. These tactics have included forcing dealerships to work exclusively through CDK to access and transfer the dealerships' own data; restricting dealerships to a rudimentary CDK self-help tool that provides incomplete data in an irregular and unusable format; refusing to commit to or honor a reliable data transfer schedule, including by pretextually terminating CDK service with insufficient time and access to the dealerships' data; and threatening and then instituting legal action against those, like Asbury, who seek to switch to competitors. Thus, acting with knowledge that dealers may be forced to recommit to CDK rather than risk the disruption of a delayed or failed switch to a different, even superior, DMS product, CDK has become captor, rather than steward, of its customers' data. Its conduct excludes others, including Tekion, from the DMS market for franchise dealers and the submarkets for Large Franchise Dealership Groups.

15. As an example of the unfair and unlawful disruption that CDK's tactics represent for franchise dealers and DMS competitors such as Tekion, in 2024, Asbury was forced to seek judicial intervention just to obtain its own data from CDK for purposes of conducting a four-dealership pilot program with Tekion's DMS platform.[1] On August 29, 2024, a Georgia state court issued a preliminary injunction ordering CDK to provide Tekion with the data needed for the four dealerships. A true and correct copy of the August 29, 2024, preliminary injunction order in *Asbury Automotive Group, Inc. v. CDK Global, LLC*, Case No. 24-A-04939-3 (Superior Court of Gwinnett Court, State of Georgia), is attached as **Exhibit B**. Asbury's lawsuit with CDK continues even today, even though Asbury has announced that it plans to roll out Tekion to all of its stores by late Fall 2026.

16. Tekion's pilot program with Asbury in 2024 and 2025 was a critical opportunity for Tekion to demonstrate its superior technology not only to Asbury—a major customer crucial to Tekion's success as a newcomer—but to the entire industry, which is well aware of the program.[2] On information and belief, of the six primary publicly traded franchise dealership groups, five are currently CDK customers. Other franchise dealership groups that used CDK as their DMS provider before 2025, including Doral Automotive Group, Lou Bachrodt Auto Mall, and Action Nissan, Inc. d/b/a Universal Nissan, Universal Hyundai, and Universal Genesis (collectively, "Universal"), also contracted for Tekion's DMS. CDK held these groups' data hostage in one form or another, thwarting competition in the franchise DMS market, and harming the dealers, and, by extension, the car-buying public. CDK's unfair and unlawful conduct deterred additional franchise dealerships from transitioning from CDK to Tekion's DMS.

---

[1] Asbury, CDK in legal fight over dealer data ahead of Tekion pilot | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-cdk-legal-fight-over-dealer-data-ahead-tekion-pilot.

[2] Asbury 4-store Tekion DMS pilot could precede companywide switch by 2026 | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-4-store-tekion-pilot-could-precede-full-dms-switch-2026; *see also* Tekion Selected by Asbury Automotive Group to Elevate Guest Experiences (yahoo.com), *available at* https://finance.yahoo.com/news/tekion-selected-asbury-automotive-group-160000562.html; Asbury to deploy Tekion cloud tool | Auto Remarketing, *available at* https://www.autoremarketing.com/ar/asbury-to-deploy-tekion-cloud-tool/

17. In addition, CDK's unfair and unlawful conduct has interfered with and delayed Tekion's ability to meet contractual obligations, including launch dates for several dealer groups. CDK's tactics cause reputational and competitive harms to Tekion and to franchise dealers looking to switch their DMS, and they have immediate negative financial impacts on Tekion by raising Tekion's costs of competing with CDK. Tekion typically collects the great majority of its implementation fees on the date on which its DMS actually launches at a dealership, and it collects no subscription fees until that launch date. Moreover, because of the substantial lead-time and planning required for a franchise dealership to switch DMS solutions, it is difficult for Tekion to obtain a substitute dealership for a reserved slot, such that the resources that Tekion allocated for the launch go to waste.

18. CDK's conduct constitutes a violation of Section 2 of the Sherman Act, for monopolization or attempted monopolization of the franchise DMS market and the submarkets for Large Franchise Dealership Groups in the United States; tortious interference with Tekion's contractual and prospective economic relations with Asbury and other dealerships; and unfair competition under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* CDK's conduct has harmed and, if its continues, will continue to harm competition, and to injure Tekion, including through Tekion's loss of goodwill, reputation, market share, revenue, and profits. It also harms franchise dealers, Large Franchise Dealership Groups, and the consumers whom they serve. Accordingly, Tekion brings this action to seek damages and injunctive relief to redress and prevent CDK's unlawful, unfair, and anticompetitive conduct.

## THE PARTIES

19. Tekion is a corporation organized and existing under the laws of Delaware, with its principal place of business and headquarters in Pleasanton, California. Tekion is a technology company that provides innovative and cloud-native solutions for the automotive retail industry, including an end-to-end cloud-based DMS product that connects consumers, dealers, and manufacturers in a seamless interface.

20. CDK is a corporation organized and existing under the laws of Delaware, with its principal place of business and headquarters in Austin, Texas (formerly, Hoffman Estates, Illinois).

Until 2022, CDK was a publicly traded company with reported global revenues of over $1.5 billion every year since 2014. In 2022, however, a private equity firm took CDK private for roughly $8.7 billion.[3] CDK is registered to do business in California and has multiple offices throughout California—including offices in San Jose, California; Petaluma, California; and Orange, California.

## JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. § 15, and under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Tekion's asserted state law claims because they are transactionally related to, and factually interdependent with, those arising under federal antitrust law and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

22. The Court has personal jurisdiction over CDK under Cal. Code Civ. Proc. § 410.10 and the Due Process Clause of the United States Constitution. CDK is engaged in continuous and systematic business in the state of California, including because it is registered to do business in California, has multiple offices located in California, and employs many employees in California. Further, upon information and belief, CDK provides DMS for well over a hundred California-based franchise auto dealerships, and its tortious and anticompetitive conduct described herein arises out of and relates to CDK's significant contacts with California. CDK otherwise intentionally avails itself of the markets in California through its business activities, such that the exercise of jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

23. Venue is proper in this district under 28 U.S.C. § 1391 and 15 U.S.C. § 22, because a "substantial part of the events or omissions" on which the claim is based occurred in this district.

24. ***Divisional Assignment.*** Under N.D. Cal. Civil L.R. 3-2(c), (d), because a substantial part of the events or omissions alleged occurred in Alameda County, the case should be assigned to the San Francisco Division or the Oakland Division.

---

[3] CDK completes sale to investment firm Brookfield Business Partners | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/cdk-completes-sale-investment-firm-brookfield-business-partners.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

## CDK'S CONDUCT AND RELATED MARKET IMPACTS

### I. DMS Is Essential To Franchise Dealership Operations.

25. To manage their operations, franchise dealers use specialized software known as DMS, which, among other things, centralizes their own data. "The core of a DMS is a database containing information about a dealer's customers, vehicles, accounting, parts, and services." *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1272 (9th Cir. 2021). The information contained in the DMS database is used by a suite of complementary software tools that integrate and manage all aspects of dealership operations, including customer relationship management ("CRM"), internet connectivity, telephones, website management, inventory, service scheduling, finance and insurance, and accounting. DMS, and the data maintained within it, is an auto dealership's central nervous system.

26. DMS streamlines dealership operations by automating routine operational tasks, improving the accuracy of dealer data, allowing for comprehensive and reliable reporting and analytics, and enhancing the customer experience of dealership clients through faster service, personalized communication, and efficient transaction processing. In addition, dealerships use DMS to maintain important records that they need for legal and compliance purposes.

27. In part to meet contractual obligations for participation in OEM incentive programs, which is an important element of profitability for franchise dealers, dealers use DMS to share information about, e.g., sales, inventory, parts, service, and warranties, with the OEMs.

28. Auto retailers use DMS, in conjunction with complementary software modules, to perform a wide array of functions necessary to the operations of each dealership, including:

a. ***Inventory Management***. Dealerships can use inventory data to track every vehicle or other product in their inventory. This includes tracking cars, parts, and accessories. The inventory system can monitor stock levels, reorder parts automatically, and provide insights into which vehicles are selling well and which are not. This helps in maintaining optimal inventory levels, reducing carrying costs, and improving the financial health of the dealership and turnover rate.

b. ***Sales and Finance***. Sales data within DMS can be used to provide end-to-end management of the sales process, from initial customer contact to finalizing the sale. The sales module can integrate with credit reporting agencies and financial institutions to streamline the financing and insurance processes. This integration ensures that sales teams can quickly provide customers with financing options and accurate quotes, thereby enhancing the consumer experience and expediting the sales cycle.

c. ***Customer Relationship Management (CRM)***. Dealerships also leverage customer data to track and maintain customer relationships, interactions, preferences, and purchase history, enabling personalized communication, customer service, and marketing efforts. This targeted approach can improve customer satisfaction and loyalty, leading to repeat business and referrals.

d. ***Service and Parts Operations***. As service is a key revenue and profit generator for dealerships, dealerships use operational data to schedule service appointments, manage work orders, and ensure that parts are available for repairs, thus reducing wait times and improving customer satisfaction. The services and parts operations system can also monitor the productivity of technicians and thus track the profitability of the service department.

e. ***Accounting and Reporting***. DMS allows for real-time tracking of the dealership's financial performance. Dealerships leverage DMS, together with complementary software products, to handle payroll, accounts payable and receivable, and to submit mandatory monthly and other reporting to their OEMs. The reporting capabilities that DMS facilitates can provide valuable insights into sales trends, financial health, and operational efficiency, enabling data-driven decision-making.

f. ***Legal and Regulatory Compliance***. Automotive dealerships must adhere to various legal and regulatory requirements. DMS helps ensure compliance by maintaining accurate records, providing audit trails, and facilitating the necessary reporting. This reduces the risk of fines and penalties associated with non-compliance.

g. ***Integration and Data Access***. A modern DMS can integrate with other software systems, such as manufacturer systems, third-party vendors, and marketing platforms. This integration allows for the flow of information across the dealership, improving operational efficiency. Additionally, cloud-based DMS solutions like Tekion's provide access to data from anywhere, at any time, which is essential for managers who need to make informed decisions on the go.

29. For modern franchise dealerships, there are no realistic alternatives for a DMS, particularly given the connections that DMS facilitates with other critical participants in the automotive retail system such as OEMs, data providers, lenders, and other third parties.

30. 2024 cyberattacks on CDK showed the importance of a DMS to dealership operations and a risk associated with CDK's dominant position in the industry. As was widely reported in *Automotive News*, *Bloomberg*, and other news outlets, on June 19, 2024, CDK suffered multiple ransomware attacks that encrypted its critical files and disrupted its provision of DMS for thousands of dealerships across North America.[4] Affected dealerships had no access to their CDK DMS services for weeks, which made it challenging for them to sell or service cars, pay employees, track and order car parts, submit OEM-mandated reporting to OEMs as required by their franchise agreements, offer financing, manage inventory, and ensure data security.[5] Anderson Economic

[4] Timeline: CDK Global cyberattacks | Automotive News (autonews.com), *available at* https://www.autonews.com/retail/timeline-cdk-global-cyberattacks; CDK Cyberattack: What Is It, Who Is Responsible and What's the Fallout? - Bloomberg, *available at* https://www.bloomberg.com/news/articles/2024-06-24/cdk-cyberattack-what-is-it-who-is-responsible-and-what-s-the-fallout.

[5] *See also* note 6, *supra*.



FENWICK & WEST LLP ATTORNEYS AT LAW

Group, a premier automotive consulting firm, estimated that the attack and subsequent software outage resulted in 56,200 lost new-vehicle sales and dealership losses collectively totaling $1.02 billion.[6] According to a forecast from J.D. Power and GlobalData, the attack contributed to a year-over-year drop in new-vehicle sales of as much as 7.2 percent, comparing sales in June 2024 with those from June 2023, despite strong demand for new vehicles in June 2024.[7] The outage caused substantial negative impacts on the Q2 earnings of dealer groups that used CDK for their DMS, including Asbury.[8] AutoNation Inc., a large publicly traded dealership group which uses CDK, said its net income plunged 52% to $130.2 million in the second quarter of 2024 partly because of lost revenue and hits to vehicle sales stemming from the June 19 CDK Global cyberattacks. AutoNation reported that the incident reduced earnings per share by an estimated $1.50—totaling a $32.3 million loss due to one-time costs alone.[9]

31. Launching or migrating to a new DMS is a significant, risky undertaking for a dealership. Among other tasks, the franchise dealer must re-engineer its myriad business processes for inventory management, payroll, sales, services, parts, and accounting, to make them compatible with the new infrastructure. It must also develop training materials and set up IT and business controls required for compliance with federal regulations. For publicly traded dealer groups and dealer groups operating many dealerships (enterprise dealerships) this requires trialing the implementation on a small scale, with internal and external auditors testing the process, before a

---

[6] Dealers lost $1.02B from CDK cyberattack, revised AEG study says | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/dealers-lost-102b-cdk-cyberattack-revised-aeg-study-says.

[7] J.D. Power-GlobalData U.S. Automotive Forecast for June 2024 | Business Wire, *available at* https://www.businesswire.com/news/home/20240626332772/en/J.D.-Power-GlobalData-U.S.-Automotive-Forecast-for-June-2024.

[8] CDK Global cyberattacks mar Q2 public dealership group results | Automotive News (autonews.com), *available at* https://www.autonews.com/retail/cdk-global-cyberattacks-mar-q2-public-dealership-group-results. Asbury Q2 earnings: CDK cyberattack fuels 86% drop in profit | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-q2-earnings-cdk-cyberattack-fuels-86-drop-profit.

[9] AutoNation: CDK attack to cut Q2 earnings per share by $1.50 | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/autonation-cdk-attack-cut-q2-earnings-share-150; *see also* note 8, *supra*.

larger rollout. And, because DMS is mission-critical, dealerships cannot operate without it for even short amounts of time.

**II. CDK Dominates The DMS Market For Franchise Dealers and The Submarkets for Large Franchise Dealership Groups.**

32. The franchise DMS industry in the United States is concentrated, with CDK holding the largest market share by rooftop and revenues. CDK's software business started over half a century ago, as the Dealer Services division of Automatic Data Processing (ADP). CDK boasts on its website that "2.6% of the U.S. GDP is transacted through CDK Global."[10]

33. As of the time of Tekion's Complaint (Dkt. No. 1), CDK had more than 50% share of the DMS market for franchise dealerships by revenue. CDK's share of the submarkets for Large Franchise Dealership Groups in the United States is even larger and exceeds 60%.

34. As an example, a 2022 industry report estimates that there were 18,211 franchise dealerships in the United States. The report also estimates that CDK served 7,600 of those dealerships. Additionally, CDK's Monthly North America revenue per site was estimated to be $8,902, while the average monthly spend on DMS services for all dealerships was $6,300. Accordingly, CDK's estimated share of revenue based on these numbers would be 59%.[11] Further, in a ruling in another antitrust litigation brought against CDK and Reynolds and Reynolds Company ("Reynolds") (another DMS provider), a court noted that "CDK and Reynolds each have significant market power in the DMS market. Together, they control approximately 75% of the United States market by number of dealers and approximately 90% when measured by number of vehicles sold." Taken together with the 2022 industry report which estimated that CDK served 7,600 dealers and Reynolds served 3,000, one can extrapolate that CDK had 65% of the franchise DMS market by revenue at that time.[12]

35. As Asbury's CIO described it, CDK's DMS product is "an antiquated system that was created 30 years ago." The user interface is outmoded, unintuitive, and cumbersome. CDK

---

[10] Dealer Management System (DMS) | CDK Global, *available at* https://www.cdkglobal.com/dms.

[11] ($8,902 * 7,600) / ($6,300 * 18,211) = ~59%.

[12] Assuming that CDK and Reynolds each sell to similarly sized customers. 7,600 / (7,600 + 3,000) * .90 = 65% share of revenue for CDK and 25% share of revenue for Reynolds.



FENWICK & WEST LLP ATTORNEYS AT LAW

creates (often arbitrary) obstacles to integration with third-party products and vendor services, which can result in data inconsistencies or gaps. The performance of CDK's DMS can be slow, especially during peak usage times, causing delays and frustration for users. Dealerships have reported to Tekion that CDK's customer support can be unresponsive or slow to resolve issues, leaving users without timely assistance. Because CDK's DMS lacks regular updates and enhancements, its DMS does not evolve to meet new industry demands or technological advancements.

**III. Tekion Is An Innovator In The Franchise DMS Market And The Submarkets For Large Enterprise Dealership Groups.**

36. Tekion was founded in 2016 by Jay Vijayan, a former Chief Information Officer of Tesla, Inc. Tekion's team includes former executives and engineers from Tesla, Oracle, Microsoft, Cisco, JFrog, Amazon, Salesforce, and other leading technology companies.

37. Tekion offers the world's first end-to-end cloud-based DMS platform.[13] Its centralized approach allows for greater scalability, flexibility, and integration, and it allows for continuous updates without the need for significant downtime or manual intervention. Tekion also incorporates artificial intelligence and machine learning processes into its DMS, and it provides predictive analytics, personalized customer experiences, and smarter decision-making tools tailored to the workflows of individual dealerships. With a cloud-native platform and highly configurable application, Tekion can roll out updates and new features more frequently and with less disruption to the end-user, ensuring that the software evolves with the changing needs of its customers and the automative retail marketplace. Unlike CDK's outdated legacy technology, which was designed prior to widespread adoption of the Internet, Tekion's DMS is designed to be fast, scalable, secure, and user-friendly. It connects the entire spectrum of the automotive retail ecosystem through one seamless platform, enabling superior automotive retail experiences that modern day consumers have come to expect.

38. Tekion's DMS is also designed to integrate seamlessly with other tools and services, including third-party applications, that a dealership might use. Tekion provides developer-friendly

---

[13] Tekion |First End-to-End Cloud Native Automotive Platform, *available at* https://tekion.com/.

FENWICK & WEST LLP
ATTORNEYS AT LAW

open APIs to facilitate fast and easy data sharing between dealers and their chosen service providers. Tekion's DMS offering thus gives dealers more choice and control over their own data and operations. Unlike CDK, Tekion allows dealers to own and access their data freely and securely, and to integrate with third-party vendors of their choice.

39. Tekion provides its DMS to dealerships by subscription, with transparent pricing that reflects the value and performance of its platform, and also lower upfront costs compared to traditional DMS solutions like CDK's.

40. Because of its innovative, cloud-based implementation, Tekion's DMS offers significant advantages over CDK's, and enables dealers to streamline and automate their workflows, reduce errors and inefficiencies, lower operating costs, enhance customer satisfaction and loyalty, and increase revenue and profitability.

41. As a new entrant in the DMS industry, Tekion currently serves only a small percentage of the franchise dealerships in the United States. But there has been growing interest in Tekion's innovative technology. On February 16, 2023, Tekion contracted to provide DMS services to three dealerships in the Doral Auto Group. On July 18, 2023, Tekion entered an agreement to provide its DMS to two dealerships operated by Regal Auto Group. In December 2023 and March 2024, Tekion entered into contracts with Lou Bachrodt Auto Mall, which then operated five stores, each for a different car manufacturer. On February 2, 2024, Tekion entered an agreement with Universal to provide its DMS to three dealerships it operates. These agreements included an implementation schedule, with the bulk of Tekion's fees (and the start of the monthly subscription fees) coming due at the "Go-Live" date—the date on which the dealership begins operating with Tekion's DMS.

42. In late 2023, Tekion won a critical opportunity to showcase its advanced technology to franchise dealers, entering into a contract with Asbury, an enterprise franchise dealership and one of the largest dealership groups in the United States. Under the agreement, Asbury would pilot Tekion's DMS at four dealerships by September 2024, and in time for the 2024 holiday season. If the pilot was a success, Asbury would launch Tekion's DMS in all of its dealerships over the course of the next few years. As of December 2023, Asbury operated 158 new-vehicle dealerships,

FENWICK & WEST LLP
ATTORNEYS AT LAW

representing 31 brands; in 2022, it retailed 151,179 new vehicles, ranking fifth on *Automotive News*' list of the Top 150 dealer groups in the United States.[14] The Asbury pilot program was critical to Tekion's future success beyond Asbury, serving as a high-profile proof of concept of Tekion's technology.

**IV. CDK Unlawfully Forecloses Competitors From The Franchise DMS Market And The Submarkets For Large Franchise Dealership Groups.**

43. CDK is well aware of the competitive threat from modern DMS providers. As Asbury's CIO explained to the Court in Georgia, "if an enterprise public company like Asbury can go on [Tekion's] system, anybody can go on [Tekion's] system." Because its legacy DMS cannot compete on its merits, CDK has taken unlawful advantage of its market power, of the control it has over dealer data access, of the time and planning required for a dealer to switch DMS providers, and of the potentially devastating consequences to a dealer of a failed or delayed data migration.

44. As CDK's Chief Transformation Officer admitted under oath, CDK can easily prepare data needed for dealership migrations to new DMS providers and has done so in the past within a matter of days of a dealership request. Starting in early 2023, however, CDK began to withhold approvals necessary to facilitate data transfers to Tekion, demanding that dealers seeking to obtain their data to perform a DMS transition first pay any accounts receivable. At first, the process for obtaining approvals from accounts receivable requests would take about thirty days. But, CDK began withholding accounts receivable approvals for longer and longer periods of time, even for dealerships current on their payments, necessarily delaying the transition. For instance, upon information and belief, Lou Bachrodt Auto Mall submitted its request for approval on February 23, 2024, but CDK withheld that basic approval, i.e. the first step in the migration process, *for 159 days*, until July 31, 2024**.** Meanwhile, as described in greater detail below, in the case of Universal, CDK refused to transfer dealership data needed for a transition to Tekion for almost two-and-a-half months after Universal satisfied any final payment obligations it had to CDK, and long after CDK had provided accounts receivable approvals.

[14] Asbury Automotive will partner with Tekion on DMS pilot | Automotive News (autonews.com), *available at* https://www.autonews.com/dealers/asbury-automotive-will-partner-tekion-dms-pilot.

45. CDK also has manufactured pretexts to force transitions to occur on timelines that risked leaving dealers without continuous DMS support, knowing the pressure that this would exert on the dealerships to remain with CDK. By 2024, CDK began taking the position that it would not transfer the dealer's data to the dealer or its new DMS provider until 30 days before the dealer's contract end date with CDK, which leaves insufficient time for the dealership to test the new DMS with its data and train its workforce. Even CDK's own employees expressed concern that a 30-day implementation period for data coming to CDK would be create implementation challenges.

46. In the case of Doral Automotive Group, CDK refused to facilitate the dealer's access to its own data, including for the purpose of transitioning to another DMS provider, until Doral first terminated its contract with CDK. After being notified that Doral intended to terminate with CDK and transition to Tekion, CDK initially refused to provide Doral with its own data until its contract termination date, forcing Doral to postpone its go-live date with Tekion. At the time, Doral described to Tekion that Doral and Tekion were "being held hostage by CDK" as a result of CDK's refusal to release Doral's data until the contract termination date, and noted that "[i]f CDK stays the course, Doral will not be able to convert and this will have a major impact on future CDK to Tekion conversions." After Doral postponed its go-live date, Doral still did not receive its DMS data from CDK with sufficient time for the dealer and Tekion to ensure a smooth transition, ultimately first receiving its DMS data approximately two weeks before the go-live date.

47. CDK's dealing with Universal similarly illustrates the improper and pretextual nature of CDK's tactics of withholding franchise dealership data. Universal was another CDK DMS customer seeking to convert to Tekion. Upon information and belief, in August 2024, after Universal informed CDK of its intention to switch to Tekion, CDK issued a "Final Obligations Letter" that purported to set forth Universal's remaining payment obligations to CDK. Within two days, Universal had provided payment in full. CDK nevertheless continued to refuse to give Universal its own data for almost two and a half additional months, seeking to delay release of the data until the last day of the term (which would not leave adequate time for Universal to transfer to a new DMS), and despite providing the accounts receivable approvals in late September. As a result, Universal had to delay deployment of Tekion DMS, and Universal had no choice but to

make a legal demand to CDK seeking immediate release of the data. A true and correct copy of Universal's correspondence to CDK, dated November 20, 2024, is attached as **Exhibit C**. "Universal reached out multiple times to everyone at CDK who had been involved in this matter, but not a single person from CDK even responded." Ex. C at 2.

48. As CDK no doubt understands, Asbury is a likely bellwether for change in the franchise DMS market as well as the submarkets for Large Franchise Dealership Groups. In 2024, CDK outright refused to provide data access to Asbury or allow the necessary data transfer. The Tekion-Asbury contract required Asbury to provide Tekion with data for the four dealerships in the pilot program by May 2024, so that Tekion could enable launch of the pilot program in September 2024. Shortly after the public announcement of the pilot, Asbury requested that CDK provide complete and full access to its customer data for the four dealerships, using the standard authorization process that typically took five or fewer days to complete.

49. On January 25, 2024, contrary to its routine past practice of processing Asbury's data requests, CDK informed Asbury that it would first need to send a "cancellation request." Upon information and belief, CDK had not previously required such a cancellation prior to providing data extraction and transfer to Asbury or other dealers, nor does Asbury's agreement with CDK require such a cancellation. CDK's cancellation request was a pretext and a stall tactic. Nevertheless, on February 5, 2024, Asbury sent CDK a cancellation request for the four dealerships, to be effective on December 31, 2024. CDK continued to refuse to transfer the data, directing Asbury to obtain the data itself through an inadequate customer self-help tool. The self-help tool did not provide complete and reliable data sets that Asbury needed for the Tekion pilot program with the four dealerships. When Asbury attempted to access its own data through its CDK account, moreover, counsel for CDK sent Asbury a cease-and-desist letter and subsequently disabled that Asbury account.

50. Not content with frustrating Asbury's efforts to obtain its own data, on May 30, 2024, CDK sued Asbury, in state court in Cook County, Illinois, for its decision to partner with Tekion on the pilot program. A true and correct copy of the complaint in *CDK Global, LLC v. Asbury Automotive Group, Inc.* Case No. 2024CH05116 (Circuit Court of Cook County, Chancery

FENWICK & WEST LLP
ATTORNEYS AT LAW

Division) is attached as **Exhibit D**. CDK's lawsuit was a warning to other dealerships not to partner with CDK's competitors. The potential chilling effect from such lawsuits is particularly acute for individual dealerships or small dealer groups, which are ill-equipped for handling the demands of legal actions and may not want to deal with the hassle, risk, and expense attendant to protracted litigation.

51. Unable to obtain its own data from CDK for the pilot program, Asbury sued CDK in state court in Gwinnett County, Georgia on June 3, 2024, and filed a motion for a preliminary injunction seeking to enjoin CDK from its improper withholding of Asbury's data. A true and correct copy of the complaint in *Asbury Automative Group, Inc. v. CDK Global, LLC*, Case No. 24-A-04939-3 (Superior Court of Gwinnett County, State of Georgia), which alleges claims against CDK for breach of contract, conversion, tortious interference with business relations, and tortious interference with contractual relations, is attached as **Exhibit E**; and a true and correct copy of Asbury's preliminary injunction motion, and supporting declaration of Barry Cohen, is attached as **Exhibit F**. As Asbury explained in its moving papers, by refusing to provide Asbury with its data, CDK sought to coerce Asbury into adopting CDK's own DMS product, CDK Unify. *See, e.g.*, Ex. E at ¶ 37 ("It appears that CDK is attempting to force Asbury into adopting the new CDK Unify program by not allowing Asbury [access to] its Client Data ….").

52. CDK withdrew its Illinois complaint against Asbury on or around June 28, 2024, having asserted similar causes of action against Asbury as counterclaims in Asbury's Georgia suit.

53. On August 28, 2024, the Superior Court of Gwinnett County held an evidentiary hearing on Asbury's preliminary injunction motion against CDK. Asbury presented testimony from Barry Cohen, its CIO, about the plan to potentially transition DMS from CDK to Tekion over the course of four years. The testimony showed that even though Asbury's contract with CDK allowed Asbury to work with a different DMS, CDK refused to enable access to all of Asbury's data and limited Asbury to using the rudimentary CDK self-help tool. Mr. Cohen also testified that the CDK self-help tool did not allow Asbury to obtain the necessary data, including critically important CRM data and historical data.

FENWICK & WEST LLP
ATTORNEYS AT LAW

54. CDK presented testimony from Dan Flynn, its Chief Transformation Officer. Mr. Flynn admitted that CDK could provide the data needed for Asbury's Tekion pilot program using its internal tools with little burden and within five days. Mr. Flynn also testified that CDK did not itself use the self-help tool to which it referred Asbury for migration purposes, that he was unfamiliar with the format, completeness, and reliability of the data output by the self-help tool, that the self-help tool was not in fact covered by CDK's contract with Asbury, and that he was not aware of any dealer that had used the tool to migrate data to a different DMS provider.

55. Following the hearing, the Superior Court of Gwinnett County found against CDK and enjoined it to provide Asbury with the data necessary for Asbury's Tekion pilot program. *See* Ex. B.

56. CDK's refusal to allow Asbury to access its own data thwarted Asbury's pilot program with Tekion, delaying it to October 2024 and threatening to jeopardize the entire contract.

57. CDK's refusals to release data for Asbury, Doral, Lou Bachrodt Auto Mall, and Universal, for purposes of a switch away from CDK, were not isolated incidents. They were part of a broader pattern of anticompetitive and unlawful conduct by CDK to lock dealers in to using its DMS, by holding their data hostage and thus forcing dealerships looking to switch to a competitor DMS to continue to rely on CDK's DMS. In 2023 and 2024, CDK routinely took weeks to provide the preliminary accounts-receivable approvals that it requires to move forward with data transfer. From the start of 2023 through the end of 2024, numerous dealerships were forced to postpone their Tekion Go-Live date, collectively resulting in losses to Tekion, increased implementation costs, unpredictability of its implementation calendar, and poor onboarding experiences for its customers. A resumption of CDKs pattern of interference would threaten to delay the enrollment of new dealerships in the pipeline for transition. Tekion and other potential entrants into the DMS space are thus at risk of incurring economic harm from CDK's efforts to frustrate dealer access to their data and delay data transfers, including due to increased implementation costs because of the CDK-imposed delays.

58. CDK's obstruction of dealer efforts to access their own data has had an anticompetitive effect on the franchise DMS market and the submarkets for Large Franchise

FENWICK & WEST LLP
ATTORNEYS AT LAW

Dealership Groups. Dealers will not move to competitor DMS providers if doing so risks being without a DMS, and without their own data, or if they have to bring or defend lawsuits just for the right to access and use what is indisputably theirs. If dealers are effectively foreclosed from contracting with and trialing new DMS providers, staying with CDK even when superior alternatives are available, then CDK's market position will become even more entrenched. This harm is of particular concern given that five out of the six largest public dealer groups—Asbury, AutoNation, Group 1, Lithia, and Sonic—used CDK as their primary DMS in 2024. Asbury is transitioning to Tekion by the end of 2026 and Lithia has reported that it will transitioning to a DMS which it had previously co-owned through a joint venture by the end of 2028.[15] As Asbury's CIO testified, if Asbury can change DMS providers, any dealer can. But, of course, if others see that CDK could prevent Asbury from switching off of CDK to Tekion or impose enormous costs and delays, then they will be dissuaded from even making the attempt.

59. CDK's conduct also has caused delays in Tekion's implementation of DMS services for its customers, resulting in economic harm to Tekion. Tekion does not begin collecting monthly subscription fees until the date of launch with each customer, and it collects half or more of its implementation fees on that launch date. These fees are critical for Tekion's revenue, financial health, and attractiveness to investors.

**V. CDK Engages in Other Exclusionary Conduct.**

60. Recognizing the importance of data to dealer operations, some states, like Arizona, have enacted legislation intended "to ensure that dealers retain control over their data." *CDK Glob. LLC v. Brnovich*, 16 F.4th 1266, 1272 (9th Cir. 2021) (considering CDK's challenge to Ariz. Rev. Stat. §§ 28-4651 to -4655); *see also, e.g.*, Mont. Code Ann. §§ 30-11-717, 30-11-718, 30-11-719, Or. Rev. Stat. § 650.123, and W. Va. Code § 17A-6A-15a(h)(2)(C). CDK, which understands the power that control over dealer data gives it for entrenching its share of the franchise DMS market and the submarkets for Large Franchise Dealership Groups, tried to block the Arizona "Dealer

[15] CDK cyberattack Day 10: DMS restored for Group 1, more dealerships (autonews.com), *available at* https://www.autonews.com/dealers/cdk-cyberattack-day-10-dms-restored-group-1-more-dealerships/; *see also* https://pinewood.ai/resources/news/pinewood-ai-announces-agreement-to-acquire-lithias-majority-stake-in-north-american-joint-venture/



FENWICK & WEST LLP ATTORNEYS AT LAW

Law," which the legislature passed unanimously. CDK failed, but its conduct, as the Ninth Circuit described it, is illustrative of another branch of CDK's illegal attempts at market dominance through data control.

61. As noted, dealers often use separate software applications that complement their DMS to manage other aspects of their business. Those applications require access to dealer data as stored in the DMS. The Arizona Dealer Law prohibited DMS providers from "tak[ing] any action by contract, technical means or otherwise to prohibit or limit a dealer's ability to protect, store, copy, share or use" data the dealer stored in its DMS, or to impose charges "beyond any direct costs incurred" for database access. *See* Ariz. Rev. Stat. §§ 28-4651(5), 28-4653(A)(3). And as long as a dealer-authorized third-party integrator complies with industry security standards, DMS providers may not prohibit the third party "from integrating into the dealer's data system," nor may they otherwise "plac[e] an unreasonable restriction on integration." *Id.* §§ 28-4651(1), (9), 28-4653(A)(3)(b).

62. As the Court explained, "in the past, CDK allowed dealers to share access to the DMS with third-party data-integration companies that would extract a dealer's data from the DMS and reformat it for use in the dealer's other software applications. But a few years ago, CDK began to prohibit that practice." *Brnovich*, 16 F.4th at 1272. That is because CDK began offering its own data integration services "at significantly higher prices than independent data integrators." *Id*. In addition to charging a premium for these integration services, CDK offered its own versions of the complementary applications for which integration would otherwise be required. The Arizona Dealer Law was a threat to CDK's practices in this regard.

63. Digital retail applications are software platforms that enable OEMs to create online "showrooms" where potential car buyers can browse inventory, customize vehicles, schedule test drives, and complete purchase transactions. These applications complement the DMS for franchise dealerships and provide a seamless and efficient shopping experience for customers, streamlining various aspects of the sales process, including financing and trade-ins, and offering a multi-channel shopping experience that allows customers to buy vehicles online, in-store, or in a hybrid process.

Digital retail applications enable OEMs to enhance customer satisfaction, simplify operations, and stay competitive with vertically integrated automobile manufacturers, such as Tesla.

64. Separate from its DMS, Tekion offers OEMs digital retailing functionality that is technologically capable of integrating seamlessly with whatever DMS is used within an OEM's network of franchise dealers. Tekion built such a platform for General Motors ("GM DRP"). To enhance the customer experience, GM mandated the DRP program for its dealers across the country, many of which were on CDK's DMS. Before 2021, CDK's dealership-level DMS product permitted integrations with the GM DRP that Tekion built. Thus, for example, if a vehicle was sold via the GM DRP (which Tekion designed and deployed) it would be removed automatically from the relevant dealer's inventory, even if that dealer used a CDK DMS, and all transaction details would be pushed to the accounting module of the dealer's CDK DMS to facilitate closure. But in 2021, CDK acquired its own competing digital retail application, Roadster.[16] After the Roadster acquisition, CDK terminated its integration agreements with both Tekion and GM for GM DRP and attempted to tie the use of Roadster to its DMS product.. By refusing to permit integration by any competing digital retail platform with CDK's monopoly franchise DMS platform, CDK attempted to force any OEM, such as GM, that aspired to adopt a digital retail platform to purchase Roadster—CDK's own product. At the same time, Honda/Acura also was launching its own digital retailing experience on Tekion's platform. Because over 50% of Honda/Acura dealers were on CDK's DMS, Honda/Acura asked CDK to enable integration of the DMS with Tekion's digital retailing platform. CDK initially refused.

65. CDK's attempt to tie its Roadster digital retailing product to its DMS threatened both to extend CDK's existing monopoly into the adjacent market for digital retailing products and entrench and perpetuate CDK's existing monopoly in the franchise DMS market and the submarkets for Large Franchise Dealership Groups. Through its conduct, CDK sought to increase the barriers to entry faced by competitors and entrants into all of the relevant product markets.

[16] CDK Global acquires digital retailing provider Roadster for $360M | Automotive News (autonews.com), available at https://www.autonews.com/dealers/cdk-global-acquires-digital-retailing-provider-roadster-360m.

FENWICK & WEST LLP
ATTORNEYS AT LAW

Competitors of CDK's Roadster product, such as Tekion, would be foreclosed from the digital retailing product market due to the incompatibility of their products with the majority of franchise dealers in any OEM's network who are dependent on CDK's monopoly franchise DMS product. Correspondingly, CDK would perpetuate its existing monopoly in the franchise DMS market and the submarkets for Large Franchise Dealership Groups by effectively requiring competitors to simultaneously enter the adjacent digital retailing application market.

## INTERSTATE COMMERCE

66. CDK is engaged in, and its activities substantially affect, interstate trade and commerce. CDK provides DMS to dealers across the nation.

## RELEVANT PRODUCT MARKETS

67. The relevant product markets for the purposes of this complaint are the markets for DMS for franchise dealerships in the United States and submarkets for Large Franchise Dealership Groups. Nationwide, approximately 18,000 franchise dealerships rely on DMS to conduct all essential operations. There are no reasonably interchangeable substitutes for DMS, and franchise dealers—in particular, Large Franchise Dealership Groups with more complex operations—could not switch to another DMS in the face of a small but significant and non-transitory increase in price.

68. Franchise DMS have distinct qualities that other business software products, such as independent (used car) DMS, do not have. For instance, a franchise DMS must have OEM integrations and certifications for each dealer to communicate with OEMs to share new car sales and parts information, and perform warranty services, among other things. Independent dealerships do not need to maintain such OEM integrations or certifications, and thus these requirements are not needed for independent DMS products or general business software that independent dealers use. In addition to OEM certification, franchise dealers generally require software features not required for independent dealers, including complex automobile repair and parts software modules. In addition, independent DMS providers often lack other software modules important to a franchise dealer, such as accounting and payroll modules.

69. DMS for Large Franchise Dealership Groups is further distinguishable from DMS serving smaller franchise dealers. A multi-store franchise dealership group must coordinate

operations, inventory, personnel, and accounting across multiple physical locations, often representing multiple OEM brands with distinct requirements. A DMS serving such groups must provide centralized, real-time visibility across multiple rooftops, sometimes operating across states under varying regulatory regimes; consolidated financial reporting and controls; the ability to manage integrations with multiple OEM brands; and sophisticated payroll and human resources integration across a large, geographically dispersed employee base. Enterprise franchise dealer groups may also be subject to financial reporting and audit requirements imposed by the Securities and Exchange Commission, the Sarbanes-Oxley Act of 2002. These requirements are not features that a DMS designed for a smaller franchise dealership is built to provide, and franchise dealerships serving large groups do not necessarily view a DMS capable of serving a single-rooftop dealership as a reasonable substitute.

70. Franchise dealers do not use independent DMS providers or general business software as a competitive restraint in negotiations with franchise DMS providers. Franchise dealers are also reluctant to switch to a new DMS provider, given the high switching costs, the risks of disruption to their daily operations and compliance obligations, and the need for reliable and secure access to their data. Thus, the markets for DMS for franchise dealerships in the United States and submarkets for Large Franchise Dealership Groups are the relevant product market in which to analyze the anticompetitive effects of CDK's conduct.

**RELEVANT GEOGRAPHIC MARKET**

71. For purposes of this lawsuit, the United States of America is the relevant geographic market. There are few providers in the franchise DMS market in the United States, and fewer still that can support multi-store dealership groups and large enterprise dealership groups. They provide a specialty product for United States-based franchise auto dealers, which operate physically in the United States. For such dealers, the only reasonable substitute for one franchise DMS provider would be another franchise DMS provider operating within the United States and serving United States-based dealers.

## MARKET AND MONOPOLY POWER

72. In addition to CDK and Tekion, only Reynolds & Reynolds, Dealertrack, Auto/Mate, and a small handful of other companies offer DMS services to franchise dealers in the United States. As of the time of Tekion's Complaint (Dkt. No. 1), CDK had more than 50% market share by total DMS revenue for franchise dealers, and more than 60% share of the submarkets for Large Franchise Dealership Groups. CDK provided DMS to five of the six publicly owned enterprise dealership groups at the end of 2024, and provides DMS to four of the six as of January 2026.

73. High barriers to entry perpetuate CDK's market power. A DMS is a sophisticated and specialized product essential to users in a regulated industry of national importance. DMS providers also act as the repositories for dealers' data, often many years' worth, and they must make that data interoperable with DMS. Without reliable access to their data, dealers cannot meet daily operational and business needs or legal and commercial compliance requirements. For these and related reasons, DMS contracts are often long, and switching to a new DMS system is expensive, time-consuming, and risky, involving, among other steps, high-volume data migrations.

74. Dealers cannot risk being without a fully functional DMS, and they cannot be sure that a new DMS functions properly unless they have validated its operation with their own data, well in advance of the switchover date. Before Tekion filed this lawsuit in December 2024 CDK took the position that it would not provide dealerships or their new DMS provider with the dealership's DMS data until 30 days before their CDK contract end date. CDK's conduct described above makes timely validation difficult if not impossible. As described above, even CDK's own employees did not view a 30-day implementation period for incoming data to be sufficient for a smooth transition. It is safer for a dealer to renew with CDK than to exercise its right to contract freely with an alternative DMS provider, even a superior one. Nor can dealers risk the cost and disruption of litigation, or even threatened litigation, just to secure the rights that they already have in their own data (nor should they have to). CDK's practices have delayed and foreclosed dealer adoption of competing franchise DMS, including from Tekion.

75. Not surprisingly, new entrants into the franchise DMS market and the submarkets for Large Franchise Dealership Groups are rare.[17] Tekion, which entered the market in 2016, is among the newest entrants and the first to develop a cloud-native DMS. Given concentration in the franchise DMS market and the submarkets for Large Franchise Dealership Groups, it is highly unlikely that there will be other meaningful expansion into the market for franchise DMS products and services as well as the submarkets for Large Franchise Dealership Groups.

**CAUSAL ANTITRUST INJURY**

76. CDK's anticompetitive conduct has caused substantial and continuing harm to new entrants and existing competitors in the DMS industry. The harm constitutes cognizable antitrust injuries.

77. CDK intended the various anticompetitive practices described above to restrict competition from alternative DMS providers, including newcomer Tekion. By withholding, delaying, and impeding dealers' meaningful access to their own data, CDK prevented, delayed, and discouraged dealers from switching DMS providers to, e.g., Tekion, notwithstanding any competitor's superior offering.

78. Because CDK's outdated legacy product cannot compete with competitors' offerings on merit, CDK has intentionally resorted to anticompetitive conduct to prevent dealers from accessing their data for the purpose of switching DMS providers. CDK's conduct has hampered competition in the franchise DMS market and the submarkets for Large Franchise Dealership Groups, and it has harmed dealers and consumers, as well. Tekion's injuries, which include lost revenues and increased costs, are the result of that conduct.

79. But for CDK's anticompetitive conduct, innovative DMS providers like Tekion would have gained a more rapid and substantial foothold in the franchise DMS market and the

[17] In June 2025, after Tekion filed its Initial Complaint (Dkt. No. 1), Lithia announced the sale of its UK subsidiary's 51% stake in a North American joint venture with Pinewood.AI to Pinewood.AI and and agreement for Lithia's U.S. stores to use the Pinewood.AI DMS in its Norther American stores by the end of 2028. Pinewood has not yet proven to be a true market participant in the Franchise DMS market and the submarkets for Large Franchise Dealership Groups.

FENWICK & WEST LLP
ATTORNEYS AT LAW

submarkets for Large Franchise Dealership Groups. The harm to the competitive process, and to Tekion in particular, will be reasonably ascertainable through proof to be submitted at trial.

**CDK THREATENS TEKION WITH MERITLESS LEGAL ACTION FOR HELPING FRANCHISE DEALERS OBTAIN AUTHORIZED ACCESS TO THEIR OWN DATA**

80. As described above, CDK has delayed, denied, or impeded meaningful dealer access to their own data in order to transfer it to a DMS of their choice.

81. In addition, CDK is actively hostile to dealership efforts to obtain their data from CDK's systems, including through legal threats and abusive legal process. For instance, when Asbury attempted to extract DMS data for its switch to Tekion, CDK brought a lawsuit against it (since withdrawn) accusing Asbury of violating the Illinois Computer Crime Prevention Law, 720 ILCS 5/17-51, among other claims, and seeking to enjoin Asbury from accessing their own data or working with Tekion. Ex. D at 11-13.

82. Some dealerships, including several in California, sought Tekion's assistance with accessing their data that they have stored in CDK's DMS so that they can migrate it to Tekion's DMS. Using the dealership's CDK-issued credentials, Tekion provided the dealers with technical assistance in accessing their own data from CDK's DMS. This assistance included providing the dealer with equipment, automation tools, and know-how. Some of these activities occurred in California and in this district. Tekion's assistance was lawful, reasonable, and necessary for enabling dealerships to exercise their lawful rights of access to their own data and to switch DMS providers. At all times Tekion acted on behalf of and with the consent and authorization of the dealerships, who own the data stored in CDK's DMS data and who have valid credentials for accessing their data on CDK's systems.

83. In furtherance of its anticompetitive scheme to prevent franchise dealers from accessing and migrating their own data to Tekion, on December 6, 2024, CDK sent Tekion a letter styled "Cease and Desist/Notice of Legal Action," a true and correct copy of which is attached as **Exhibit G**. In that letter, CDK mischaracterized the nature of Tekion's assistance, and states that,

> "Based on the evidence gathered to date, CDK has reason to believe that Tekion is engaged in the persistent violation of multiple state and federal laws that prohibit Tekion's illegal

FENWICK & WEST LLP
ATTORNEYS AT LAW

hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract. Violation of these laws exposes Tekion to civil and criminal penalties, including liability for statutory damages, actual damages, attorneys' fees and injunctive relief."

84. In its December 6th letter, CDK directly threatened Tekion with legal action: "Finally, this letter puts Tekion on notice of threatened or impending litigation concerning the allegations contained herein."

**FIRST CAUSE OF ACTION**

**(Monopolization Under 15 U.S.C. § 2)**

85. Tekion incorporates the allegations of the preceding paragraphs by reference.

86. Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

87. The market for DMS products and services for franchise dealership groups and the submarkets for Large Franchise Dealership Groups are well-defined relevant antitrust markets. CDK has substantial market power in these markets, as evidenced by its dominant market share and as otherwise alleged in this First Amended Complaint.

88. CDK has engaged and continues to engage in various forms of anticompetitive conduct to limit and exclude competition in the market for DMS for franchise dealership groups and the submarkets for Large Franchise Dealership Groups from Tekion and others. Such conduct includes withholding or delaying dealers' access to their own data, thereby preventing, delaying, and foreclosing dealers from switching to a competing franchise DMS, and threatening and initiating legal action against dealers that intend to switch from CDK's DMS. There is no legitimate business justification for such conduct, which constitutes monopolization in violation of Section 2 of the Sherman Act.

89. In addition to substantial harm to competition generally, CDK's conduct has caused specific antitrust injuries to Tekion, including loss of revenue, delaying and slowing its growth of market share, and increased costs and expenses.

90. CDK's conduct occurred in and affected interstate commerce.

91. Because Tekion, franchise dealerships, and the car-buying public have all suffered antitrust injuries as a result of CDK's anticompetitive conduct, CDK is liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial and in accordance with 15 U.S.C. § 2.

92. In addition, under 15 U.S.C. § 26, Tekion is entitled to permanent injunctive relief against further losses and damages caused by CDK's anticompetitive conduct.

## SECOND CAUSE OF ACTION

**(Attempted Monopolization Under 15 U.S.C. § 2)**

93. Tekion incorporates the allegations of the preceding paragraphs by reference.

94. Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

95. The market for franchise DMS products and services and the submarkets for Large Franchise Dealership Groups are well-defined relevant antitrust markets. CDK has substantial market power in these markets, as evidenced by its dominant market share and as otherwise alleged in this First Amended Complaint.

96. CDK has engaged and continues to engage in various forms of anticompetitive conduct to limit and exclude competition from Tekion and others. Such conduct includes withholding or delaying dealers' access to their own data, thereby preventing, delaying, and discouraging dealers from switching to a competing franchise DMS, and threatening and initiating legal action against dealers that intend to switch from CDK's DMS. There is no legitimate business justification for such conduct, which constitutes attempted monopolization in violation of Section 2 of the Sherman Act.

FENWICK & WEST LLP
ATTORNEYS AT LAW

97. CDK has engaged in and may resume engaging in the anticompetitive conduct described in this Complaint with the specific intent of excluding competition and obtaining an unlawful monopoly such that it has a dangerous probability of success in monopolizing the relevant market.

98. CDK's conduct has caused substantial harm to competition and specific antitrust injuries to Tekion, including loss of revenue, delaying and slowing its growth of market share, and increased costs and expenses.

99. CDK's conduct occurred in and affected interstate commerce.

100. Because Tekion, dealers, and the car-buying public have all suffered antitrust injury to its business as a result of CDK's anticompetitive conduct, CDK is liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial and in accordance with 15 U.S.C. § 2.

101. In addition, Tekion is entitled under 15 U.S.C. § 26 to permanent injunctive relief against further losses and damages caused by CDK's anticompetitive conduct.

## <u>THIRD CAUSE OF ACTION</u>

### (Tortious Interference With Contract)

102. Tekion incorporates the allegations of the preceding paragraphs by reference.

103. Tekion has valid and enforceable contracts with many dealerships that currently use CDK's DMS and are seeking to switch to Tekion, including but not limited to Asbury, Doral Automative Group, Lou Bachrodt Auto Mall, and Universal, as well as over a dozen California-based dealerships that currently use CDK DMS that are slated to Go-Live in 2025.

104. CDK was asked to comment on Asbury and Tekion's announcement of the Asbury pilot program, and Asbury, Doral, Lou Bachrodt Auto Mall, and Universal also each requested that CDK provide the data necessary for their respective transitions to Tekion's DMS. Accordingly, CDK knew about these contracts and about dealership plans to transition from CDK to Tekion.

105. CDK acted intentionally to induce a disruption or breach of the Tekion contracts with these dealerships by refusing to provide the dealerships with meaningful access to their own data, employing tactics that would potentially leave dealerships without an operational DMS during the transition.

FENWICK & WEST LLP
ATTORNEYS AT LAW

106. CDK's conduct has materially interfered with Tekion's performance of its contracts with dealerships, by delaying the transfer of data needed in advance of a transition, and in many instances has resulted in postponement of contractually agreed "Go-Live" dates. This interference made performance of the contracts more costly and difficult. For instance, in the case of Asbury, the contractual start date for pilot program has been delayed for at least a month, even with Asbury having to resort to judicial intervention to address CDK's conduct.

107. CDK's actions were motivated by its desire to quash Tekion, a newcomer to the DMS industry, and to force dealership groups including but not limited to Asbury, Doral, Lou Bachrodt Auto Mall, and Universal to stay on CDK's platform by holding their data hostage.

108. CDK "is not justified in inducing a breach of contract simply because [it] is in competition with one of the parties to the contract and seeks to further [its] own economic advantage at the expense of the other." *See, e.g.*, *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 36 (1941) (reversing lower court grant of demurrer on tortious interference with contract cause of action against competitor). CDK cannot, "under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor"—here, Tekion. *See id.* at 37.

109. As a direct and proximate result of CDK's conduct, Tekion has suffered economic harm, including loss of revenue, loss of market share, and increased costs and expenses, including by causing delay of dates on which the majority of implementation fees are due, and on which monthly subscription fees begin, under Tekion's contracts with dealerships.

110. Tekion is entitled to recover damages from CDK for CDK's tortious interference with Tekion's contracts, in an amount to be proven at trial.

111. In addition, to stop and prevent continuing irreparable harm to Tekion, Tekion is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the DMS industry.

**<u>FOURTH CAUSE OF ACTION</u>**

**(Tortious Interference With Prospective Economic Advantage)**

112. Tekion incorporates the allegations of the preceding paragraphs by reference.

113. In 2023 and 2024, Tekion had valid and enforceable contracts with many dealerships that used CDK's DMS and were seeking to switch to Tekion, including but not limited to Asbury, Doral Automative Group, Lou Bachrodt Auto Mall, and Universal, as well as California-based dealerships that used CDK DMS that were slated to Go-Live in 2025.

114. CDK was asked to comment on Asbury and Tekion's announcement of the Asbury pilot program, and Asbury, Doral, Lou Bachrodt Auto Mall, and Universal also each requested that CDK provide the data necessary for their respective transitions to Tekion's DMS. Accordingly, CDK knew about these contracts and about dealership plans to transition from CDK to Tekion.

115. Tekion's contracts with dealerships are not only valid agreements in and of themselves, but they also reflect prospective business relationships and future economic expectancies for Tekion. For example, Tekion's contract with Asbury contemplated that Asbury would eventually transition all of its dealerships to Tekion's DMS if the pilot program were successful. Also, given Tekion's monthly subscription model, its contracts with dealerships reflect forward-looking economic relationships.

116. CDK acted intentionally to induce a disruption or material interference with the Tekion contracts with these dealerships by delaying or refusing to provide the dealerships with meaningful access to their own data, employing tactics that would potentially leave dealerships without an operational DMS during the transition. As part of its unlawful scheme, CDK instigated meritless legal action against Asbury, to serve as a warning to other dealerships considering a switch to Tekion. The threat of a lawsuit, together with the uncertainty associated with the schedule for data transfer, has had a chilling effect on dealership conversions from CDK's DMS to Tekion's.

117. CDK's conduct materially disrupted Tekion's relationships with these dealerships, by delaying the transfer of data needed in advance of a transition, and in many instances has resulted in postponement of contractually agreed "Go-Live" dates. For instance, in the case of Asbury, the contractual start date for pilot program has been delayed for at least a month, even with Asbury having to resort to judicial intervention to address CDK's conduct.

118. CDK's conduct was wrongful by some legal measure other than the fact of interference itself, as it violated the policy or spirit of antitrust laws.

119. CDK's actions were motivated by its desire to quash Tekion, a newcomer to the DMS industry, and to force dealership groups including but not limited to Asbury, Doral, Lou Bachrodt Auto Mall, and Universal to stay on CDK's platform by holding their data hostage.

120. CDK "is not justified in inducing a breach of contract simply because [it] is in competition with one of the parties to the contract and seeks to further [its] own economic advantage at the expense of the other." *See, e.g.*, *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 36 (1941) (reversing lower court grant of demurrer on tortious interference with contract cause of action against competitor). CDK cannot, "under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor"—here, Tekion. *See id.* at 37.

121. As a direct and proximate result of CDK's conduct, Tekion has suffered economic harm, including loss of revenue, delaying and slowing its growth of market share, and increased costs and expenses, including by causing delay of dates on which the majority of implementation fees are due, and on which monthly subscription fees begin, under Tekion's contracts with dealerships.

122. Tekion is entitled to recover damages from CDK for CDK's tortious interference with Tekion's business relationships in an amount to be proven at trial.

123. In addition, to stop and prevent continuing irreparable harm to Tekion, Tekion is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the DMS industry.

## FIFTH CAUSE OF ACTION

**(For Violations of California's Unfair Competition Law,**

**Business and Professions Code § 17200, *et seq.*)**

124. Tekion incorporates the allegations of the preceding paragraphs by reference.

125. Tekion has valid and enforceable contracts with many dealerships that currently use CDK's DMS and are seeking to switch to Tekion, including Doral Automative Group, Lou Bachrodt Auto Mall, and Universal, as well as over a dozen California-based dealerships that currently use CDK DMS that are slated to Go-Live in 2025.



FENWICK & WEST LLP ATTORNEYS AT LAW

126. CDK was asked to comment on Asbury and Tekion's announcement of the Asbury pilot program, and Asbury, Doral, Lou Bachrodt Auto Mall, and Universal each requested that CDK provide the data necessary for their respective transitions to Tekion's DMS. Accordingly, CDK knew about these contracts and about dealership plans to transition from CDK to Tekion.

127. CDK acted intentionally to induce a disruption to the Tekion business relationships with these dealerships by withholding, delaying, or impeding dealership access to their own data. CDK also employed tactics, and invented pretexts, that would potentially leave dealerships without any operational DMS during the transition. CDK refused to provide Tekion with the necessary data for the Asbury pilot program, which is an important public proof of concept of the Tekion DMS.

128. CDK has thus engaged in unfair and unlawful course of conduct, which constitutes an unfair business practice within the meaning of California Business and Professions Code § 17200, *et seq.* CDK's conduct threatened an incipient violation of antitrust laws, violated the policy or spirit of antitrust laws, such that its effects are comparable to or the same as a violation of the law, and it otherwise significantly threatens or harms competition within the franchise DMS market and the submarkets for Large Franchise Dealership Groups. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).

129. CDK's actions were motivated by its desire to impede Tekion's growth in the franchise DMS market and the submarkets for Large Franchise Dealership Groups and to entrench its current market position.

130. As a direct and proximate result of CDK's conduct, Tekion has suffered economic harm, including loss of revenue, delaying and slowing its growth of market share, and increased costs and expenses. As an example, CDK's delay in providing customer data for on-boarding dealerships such as Doral Automotive Group, Lou Bachrodt Auto Mall, and Universal has caused Tekion economic harm and threatened Tekion's ability to provide its innovative DMS to other dealerships.

131. Tekion is entitled to permanent injunctive relief to prevent CDK from continuing its unfair conduct and to restore fair competition in the DMS market.

FENWICK & WEST LLP
ATTORNEYS AT LAW

132. Tekion is also entitled to restitution of any money or property that CDK acquired or retained by means of its unfair conduct.

**SIXTH CAUSE OF ACTION**

**For Declaratory Judgment Under 28 U.S.C. § 2201**

133. Tekion incorporates the allegations of the preceding paragraphs by reference.

134. CDK's December 6, 2024, letter styled "Cease and Desist/Notice of Legal Action" established the existence of an actual and justiciable controversy between Tekion and CDK as to CDK's (false) accusations that "Tekion is engaged in the persistent violation of multiple state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract. Violation of these laws exposes Tekion to civil and criminal penalties, including liability for statutory damages, actual damages, attorneys' fees and injunctive relief."

135. Contrary to CDK's false allegations, Tekion's provision of technical assistance to dealers to access and export their own data from their CDK accounts using the dealers' CDK access credentials, all with the express authorization of the dealers, does not violate state or federal laws, and is not "hacking." Franchise dealerships own the data stored in the DMS products that they use, including CDK's DMS, and they have the right to access their data, including through use of authorized, CDK-issued credentials. Franchise dealerships, including in California, also have the right to seek assistance to access their data through use of their authorized credentials. The dealerships' authorization precludes any claim under, e.g., the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, which bars certain access "without authorization or exceeding authorized access."

136. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Tekion seeks a declaration that it has not violated the Federal Computer Fraud and Abuse Act, California's Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, or any other "state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract," as described in CDK's December 6, 2024, letter.

**PRAYER FOR RELIEF**

FENWICK & WEST LLP
ATTORNEYS AT LAW

WHEREFORE, Tekion prays for judgment against CDK as follows:

a. For declaratory relief under 28 U.S.C. § 2201 that Tekion's provision of assistance to dealerships is migrating from CDK's DMS product to Tekion's does not violate the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, California's Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502, the Copyright Act., or any other "state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract."

b. For compensatory damages according to proof at trial, and treble damages under 15 U.S.C. § 15(a).

c. For punitive damages according to proof at trial.

d. For restitution and disgorgement of any ill-gotten gains or profits obtained by CDK as a result of its unfair and unlawful conduct.

e. For an award of attorneys' fees and costs under 15 U.S.C. § 26.

f. For an injunction pursuant to 15 U.S.C. § 26 and Tekion's related state law claims, in the absence of an adequate self-help tool data migration tool for dealerships to obtain a complete and accurate copy of their data in a structured format, (i) requiring CDK to provide to Tekion any dealership data needed for a migration within ten (10) calendar days of a dealership's request for it; and (ii) enjoining CDK from engaging in any conduct that interferes with Tekion's contractual and prospective economic relations with Asbury and other dealerships that use or intend to switch from CDK's DMS to Tekion's DMS.

g. For pre- and post-judgment interest as allowed by law.

h. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Tekion hereby requests a trial by jury.

Dated: May 15, 2026

Respectfully submitted,

By: */s/ Tyler G. Newby*

Tyler G. Newby (CSB No. 205790)
tnewby@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 415.281.1350

Adam Gahtan (*pro hac vice*)
Noah Solowiejczyk (*pro hac vice*)
Erica R. Sutter (CSB No. 309182)
FENWICK & WEST LLP
902 Broadway, Floor 18
New York, NY 10010-6035
Telephone: 212.430.2600
agahtan@fenwick.com
nsolowiejczyk@fenwick.com
esutter@fenwick.com

*Attorneys for Plaintiff*
*TEKION CORP*.

# EXHIBIT A

**1710156**

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:** **Maureen K. Ohlhausen, Acting Chairman**
**Terrell McSweeny**

**In the Matter of**

**CDK Global, Inc.**
**a corporation,**

**CDK Global, LLC**
**a limited liability company,**

**Auto/Mate, Inc.**
**a corporation,**

**Robert Eustace**
**an individual,**

**Elsa Eustace**
**an individual,**

**G. Larry Colson, Jr.**
**an individual,**

**Michael Esposito,**
**an individual,**

**And**

**Glen Eustace**
**a representative.**

**Docket No. 9382**

**REDACTED PUBLIC VERSION**

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents CDK Global, Inc. and CDK Global, LLC (collectively "CDK") and Auto/Mate, Inc. ("Auto/Mate"), Robert Eustace, Elsa Eustace, G. Larry Colson, Jr., Michael Esposito, and Glen Eustace have executed an acquisition agreement in

violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

## I. NATURE OF THE CASE

1. Respondents are providers of dealer management systems ("DMS") for franchise (new car) dealerships. The DMS is mission-critical business software used by dealerships to manage nearly every aspect of their business, including accounting, payroll, parts and vehicle inventory, service repair scheduling, and vehicle financing. Franchise DMS providers must also obtain car manufacturer ("OEM") certifications so that the DMS can share information between the franchise dealerships and OEMs, including information about new car sales, warranty services, parts, financial performance, and labor time.

2. CDK and Reynolds & Reynolds ("Reynolds") are the two largest franchise DMS providers in the United States. They are also the highest priced, and have similar business models, which include long-term contracts and significant initial and monthly fees for third-party applications (app) vendors to integrate with their respective DMS.

3. Auto/Mate is an innovative, disruptive challenger to the two market leaders. It offers franchise dealerships a distinct value proposition, including strong functionality, low pricing, an agnostic platform for third-party applications, extensive OEM certifications, short contracts, free software upgrades and training, and a reputation for high-quality customer service. In recent years, Auto/Mate has grown as a competitive threat in the franchise DMS market, including by specifically targeting CDK customers. Auto/Mate has consistently expanded its customer base and revenues through both aggressive pricing and adapting its differentiated product to match the preferences of many franchise dealers, placing pressure on CDK's pricing and margins. It has also developed features attractive to larger franchise dealerships and as a result, became an increasing threat to take more customers from CDK. CDK identified Auto/Mate as a current and emerging threat and responded aggressively by discounting and offering more flexible and better terms to customers.

4. In the fall of 2016 when Auto/Mate placed itself up for sale, CDK concluded that it could eliminate a strong current competitor, which was threatening to become an even more disruptive rival, by simply purchasing the company. However, CDK's plan to rid itself of a significant and growing competitive threat hit a roadblock: during the bidding process, CDK suspected that other well-financed, credible bidders recognized Auto/Mate's competitive strengths and were seriously interested in buying the company. CDK recognized that if Auto/Mate fell into the hands of a well-financed buyer willing to invest additional resources, Auto/Mate would become an even more aggressive and effective competitor. CDK was so concerned about this possibility that it [redacted]

5. After concluding that it could not allow Auto/Mate to fall into the hands of a larger, well-financed backer, CDK [redacted] CDK ultimately offered a price that was far in excess of its original standalone valuation of Auto/Mate [redacted] Indeed, the most credible explanation for CDK's [redacted]

6. CDK's post-merger plans for Auto/Mate provide substantial additional support for the conclusion that this Acquisition will reduce competition. Post-merger, CDK plans to substantially downgrade [redacted] features and service, raise [redacted] prices, and prevent CDK's larger customers from migrating [redacted].

7. Today, competition from Auto/Mate yields a myriad of substantial benefits to franchise dealers. Auto/Mate's presence in this market means lower prices, greater innovation, more flexible contract terms, and better service. If consummated, the Acquisition would eliminate the considerable and growing competition between CDK and Auto/Mate. It would also eliminate competition between Auto/Mate and other DMS providers, and thereby cause significant and pervasive harm to franchise dealers.

8. The Acquisition would entrench CDK's [redacted] share of the relevant market and would significantly increase market concentration. Post-Acquisition, CDK would control approximately 47% of the franchise DMS market. Reynolds would possess approximately [redacted] of the relevant market. Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-merger market-concentration level above 2500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders a merger presumptively unlawful. Post-Acquisition market concentration would be more than 2500, and the Acquisition would increase HHIs in an already concentrated market by well over 200 points. Thus, the Acquisition is presumptively unlawful.

9. New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. *De novo* entrants face considerable barriers including substantial and lengthy up-front investments in product development and OEM certification, with a high risk of failure. Similarly, existing DMS providers face substantial challenges in order to reposition to replace Auto/Mate's competitive significance, including but not limited to, a poor or non-existent reputation among customers, software with limited functionality, limited or non-existent OEM certifications, poor service levels, constrained capacity, and high prices. In brief, the remaining firms in this market are not likely to replace the unique, substantial, and growing competitive significance of Auto/Mate in a timely way, either collectively or individually.

10. Respondents cannot show cognizable efficiencies that would offset the likely and substantial competitive harm from the Acquisition.

## II. JURISDICTION

11. Respondents are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

12. The Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## III. RESPONDENTS

13. CDK is the largest provider of franchise DMS in the United States. CDK is a publicly traded company, headquartered in Hoffman Estates, Illinois. CDK had 2017 global revenues of over $2 billion. In the United States, CDK has DMS customers with more than [redacted] franchise dealership locations (or "rooftops," the industry's preferred term).

14. Auto/Mate is one of the fastest-growing providers of franchise DMS in the United States. Auto/Mate is a privately held company based in Albany, New York, with 180 employees in the United States. [redacted] Auto/Mate had 2017 revenues of approximately [redacted]. In the United States, Auto/Mate has DMS customers with more than [redacted] franchise dealership rooftops. Since 2012, Auto/Mate has grown rapidly, significantly increasing its customer base year-over-year. Auto/Mate is now the fifth largest franchise DMS provider in the United States with approximately [redacted] market share.

## IV. THE ACQUISITION

15. Pursuant to a Stock Purchase Agreement, dated April 28, 2017, CDK proposes to acquire 100% of the shares of Auto/Mate for approximately [redacted] in cash.

## V. MARKET PARTICIPANTS AND INDUSTRY DYNAMICS

16. The United States franchise DMS market is highly concentrated with CDK and Reynolds controlling approximately 70% of the market. Dealertrack, Auto/Mate, and Autosoft round out the top five franchise DMS providers in the United States. Each of the remaining franchise DMS providers accounts for a much smaller share of the market.

17. CDK and Reynolds have similar business models — both offer a broad set of features and OEM certifications, but both also charge relatively high prices, and both regularly require their customers to sign long-term contracts. In addition to these issues, both companies tend to charge relatively high fees for integrating third party applications, and CDK has a reputation for relatively poor customer service. Despite such business practices that frustrate

some of their customers, the two market leaders have maintained dominant positions in this market.

18. Customers frustrated with CDK's and Reynolds's business practices have faced significant challenges in switching DMS suppliers and, historically, a lack of good alternatives to the two market leaders. In order to change DMS suppliers, franchise dealers need to spend a significant number of hours training their staff, while dealing with losses in productivity that can lead to lower sales during the transition period. Because the DMS touches essentially every aspect of a dealer's business, there is considerable risk associated with switching to a DMS that does not perform adequately. This makes customers understandably wary of DMS suppliers without an established track record of success.

19. Auto/Mate is a low price, innovative company that has posted consistent, double-digit growth in recent years. A significant portion of Auto/Mate's wins in recent years have come at CDK's expense. Auto/Mate's value proposition includes but is not limited to, low prices, an ample and growing set of features, month-to-month contracts, the choice of on-site or cloud server deployment, a full roster of major OEM certifications, a low-cost agnostic platform for third-party applications, a strong reputation, and excellent customer service.

20. Today, no other DMS offers Auto/Mate's combination of low prices, high functionality, and strong customer service. These attributes position Auto/Mate well to effectively challenge the market leadership of CDK and Reynolds. According to its internal business documents, Auto/Mate plans to grow its market share both by continuing to aggressively court and win small franchise dealership customers as well as by continuing to expand on its recent successes in winning larger franchise dealership customers. In 2016, Auto/Mate stated it could grow [redacted]

21. Compared to Auto/Mate, each remaining DMS provider, including Dealertrack and Autosoft, lacks important features or value, including but not limited to, low pricing, important software functionalities, important OEM certifications, month-to-month contracts, or a strong reputation. Many of these DMS providers have failed to show significant growth or have stagnated or contracted in the last several years. Many of the remaining DMS providers have significant limitations on their capacity to add and support new customers.

## VI. RELEVANT MARKET

22. The relevant market is the sale of DMS for franchise dealers in the United States ("Relevant Market" or "U.S. Franchise DMS Market"). A hypothetical monopolist of the sale of all franchise DMS in the United States would find it profit-maximizing to impose at least a small but significant and non-transitory increase in price ("SSNIP").

### A. Relevant Product Market

23. The relevant product market in which to assess the effects of the proposed Acquisition is DMS for franchise dealers.

24. The DMS is a mission-critical business software that serves as the backbone of the dealer's information technology systems. Within a dealership, the DMS is used to manage nearly every aspect of the business, including accounting, payroll, parts and vehicle inventory, service repair scheduling, and vehicle financing. Much of the technology needed to run a dealership, including internet connectivity, telephones, website management, inventory, service scheduling, finance and insurance, and accounting is run or connected through the DMS. The DMS is also necessary for sharing information between the dealerships and OEMs like Ford, Audi, or Honda. This enables the dealer and OEMs to share real-time information on sales, inventory, parts, service, and warranties.

25. There are no reasonably interchangeable substitutes for franchise DMS, and franchise dealerships could not realistically switch to other products in the face of a SSNIP for DMS for franchise dealers.

26. DMS for franchise dealers has distinct qualities that other DMS products, including independent (used car) DMS does not have. A DMS for franchise dealers must have OEM certifications for the dealer to communicate with OEMs to share new car sales and parts information, and perform warranty services. Independent DMS providers and general business software do not have OEM certifications.

27. In addition to OEM certification, franchise dealers generally require software features tailored to franchise car dealership business operations, which are lacking in other DMS. In particular, franchise dealers demand complex automobile repair and parts software modules that independent DMS providers do not offer. In addition, independent DMS providers often lack other software modules important to the franchise dealer, including accounting and payroll modules.

28. Franchise dealers do not use independent DMS providers as a competitive restraint in negotiations with franchise DMS providers. General business software programs are also not a constraint on franchise DMS providers, and franchise dealers do not use general business software as a competitive restraint in negotiations with franchise DMS providers.

29. Thus, DMS for franchise dealers is the relevant product market in which to analyze the Acquisition's likely effects.

### B. Relevant Geographic Market

30. The relevant geographic market is the United States. Auto/Mate does not compete outside of the United States. OEM certifications are frequently limited to specific countries and many OEMs require a United States-specific certification. Because franchise DMS customers demand OEM certifications that work within their country, and those certifications are frequently nation-specific, the relevant geographic market is the United States.

## VII. MARKET STRUCTURE AND THE MERGER'S PRESUMPTIVE ILLEGALITY

31. The U.S. Franchise DMS Market is highly concentrated, with CDK and Reynolds controlling roughly 70% of the market. CDK has approximately [redacted] market share and Auto/Mate has approximately [redacted] market share. Post-Acquisition, the Relevant Market would be even more highly concentrated; CDK would control nearly half the market.

32. The Merger Guidelines and courts often measure concentration using HHIs. HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market. Under the Merger Guidelines, a merger is presumed likely to create or enhance market power and is presumptively illegal when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

33. Post-Acquisition, the Relevant Market would be substantially more highly concentrated than it is today. Post-Acquisition, CDK would control approximately 47% of this Relevant Market. Reynolds, the next largest competitor, would possess approximately [redacted] of the Relevant Market. The Acquisition would result in a post-Acquisition HHI of over 2,500, and would increase concentration by well over 200 points. Therefore, the Acquisition establishes a presumption of competitive harm.

34. In this matter, the HHIs based on current market shares materially understate Auto/Mate's competitive significance in the Relevant Market because they do not take into consideration Auto/Mate's likely growth trajectory. Prior to the merger announcement, Auto/Mate posted significant growth year-over-year, adding new functionalities to its DMS and gaining large dealership customers. Moreover, Auto/Mate's reputation was growing in the industry and it was poised for continuing and significant growth.

35. The Acquisition is, therefore, presumptively unlawful under relevant case law and the Merger Guidelines.

## VIII. ANTICOMPETITIVE EFFECTS: THE ACQUISITION WOULD ELIMINATE VITAL COMPETITION BETWEEN AUTO/MATE AND OTHER DMS PROVIDERS

36. The Acquisition is likely to substantially lessen competition in the Relevant Market. Auto/Mate competes aggressively against CDK today and would compete even more aggressively against CDK in the future but for the Acquisition. The merger would extinguish

this competition, as well as competition between Auto/Mate and other DMS providers. The result would be higher prices, inferior service, and reduced quality and innovation.

### A. Auto/Mate Competes Aggressively Against CDK Today

37. To successfully challenge the large incumbent DMS providers, Auto/Mate deploys aggressive sales and marketing efforts. In attempts to win CDK customers, Auto/Mate has repeatedly emphasized CDK's price increases for both its core DMS and third-party integration, CDK's restrictive contracts, and CDK's business practices in marketing blasts it sent directly to CDK customers:

- "Pressure to increase margins has already caused prices to increase on third-party integration fees. This pressure will also cause increased prices on products for dealers directly if they have not seen it already."
- "CDK is letting go of a substantial amount of account managers in addition to other employees" and "[t]his will surely result in decreased communications between CDK and its dealers."
- "We believe that CDK dealers using an older web platform are being forced to migrate to a newer version and are required to pay for the cost of implementation."
- "[I]f you are currently using an in-house server, you may be alarmed to find out that you will be forced to migrate to a cloud-based solution by January 1st, 2018."
- "We are aware that these changes could drastically impact your bottom line. If you're tired of being locked down in an unsatisfactory contract and forced to pay for unnecessary updates, please feel free to contact me personally."

38. Auto/Mate also focuses on the overall price difference between Auto/Mate and CDK and Reynolds, using its website to assure prospective customers that "dealers often find their Auto/Mate monthly support bills to be 65-75 percent less than what they're paying with Reynolds and Reynolds or CDK." Auto/Mate is successful in its attempts to target CDK and Reynolds customers. Auto/Mate touted that "[o]ver 82% of our customers are converted from CDK Global and Reynolds & Reynolds DMS systems."

39. Auto/Mate also continually improves its product in response to customer demand for feature innovations. [redacted] Auto/Mate almost always provides these enhancements to its entire customer base, and in most cases, does so free of charge.

40. Auto/Mate's aggressive competition drew considerable attention at CDK. In 2016, CDK recognized that Auto/Mate was winning an increasing share of opportunities and that CDK was "losing more clients to Automate (sic) in the [redacted] than we've ever lost before," that Auto/Mate had "shrunken the gap in functionality to our core DMS," that Auto/Mate was "moving up toward Tier 1," and that Auto/Mate was now successfully acquiring large dealership customers. Internally, CDK discussed that Auto/Mate was getting "more and more aggressive with pricing" and that Auto/Mate was "making too much headway" relative to other franchise DMS competitors.

41. To respond to competition from Auto/Mate, CDK regularly offers [redacted] concessions. Reynolds also provides [redacted] and other benefits in response to competition from Auto/Mate.

42. In 2016, CDK implemented a plan specifically designed to reduce the risk that some of its customers would switch to Auto/Mate. [redacted] all of which were beneficial to customers.

43. Competition between CDK and Auto/Mate has substantially lowered prices for customers. The following are examples of this direct price competition:

- In a competition between CDK, Auto/Mate and Dealertrack, a franchise dealer's consultant produced a cost comparison showing that Auto/Mate's total price over 60 months was [redacted] less than Dealertrack and [redacted] less than CDK's DMS. In explaining his decision to leave CDK, the franchise dealer cited the price difference as "significant" and added that the decision to leave "wasn't a very hard call."

- A franchise dealer told CDK it was switching to Auto/Mate because "The price difference between R&R / CDK and a smaller DMS like Auto/Mate is a savings of [redacted] over 60 months. That is substantial and the main reason our owners wish to go this route."

- In competition with Auto/Mate, CDK was forced to provide a roughly [redacted] discount on monthly charges (an equivalent of approximately [redacted] over 60 months).

44. CDK also regularly responds to competition from Auto/Mate on non-price terms, including but not limited to, [redacted] For example, CDK typically offers a 60-month term contract, whereas Auto/Mate's contracts are month-to-month. Before the Acquisition's announcement, in response to Auto/Mate competition, [redacted] In another example, seeing Auto/Mate as the "real risk" to win one of its existing customers who expressed frustration with CDK's service, [redacted]

### B. Auto/Mate Is Positioned to Compete Even More Aggressively in the Future Against CDK, Especially for Larger Dealership Customers

45. This Acquisition would lead to a real and significant loss of current competition. However, Auto/Mate's effect on the market is more significant than its current market share suggests, in part because of its compelling value proposition and history of continuous software innovations. These issues strongly indicate that, prior to the Acquisition, Auto/Mate was poised to become an even more aggressive and effective competitor in the Relevant Market.

46. For the past five years, Auto/Mate has been experiencing significant year-over-year rooftop growth. To drive this growth, Auto/Mate recently introduced several important functionality upgrades, including centralized accounting, which is a feature that dealerships with multiple rooftops value, and often strongly prefer. By adding centralized accounting to an already solid feature set at aggressive prices, Auto/Mate has attracted the attention of multi-rooftop dealers with very sophisticated DMS needs. Auto/Mate's introduction of centralized accounting was a [redacted] and amplified its competitive threat to CDK.

47. Prior to the Acquisition's announcement, Auto/Mate was on a clear growth path and believed it was well positioned to win larger DMS franchise customers. In 2016, Auto/Mate's Chairman made its growth plans clear: "We expect that as we continue to take larger groups from CDK/R&R, that we will eventually wake the sleeping giants. Right now, we're an annoyance, and they truly think that we are not a serious competitor at dealerships of a certain size. However, they are not really aware of some of the recent changes we have made to the software, and in the coming months we will begin installing a pilot store at a very large dealer group[] that, assuming we are successful, ought to shake up the industry, at least those who are paying attention."

48. As predicted, Auto/Mate had its best year yet in 2016, the last full year prior to the Acquisition's announcement, when it won several larger dealerships and successfully started [redacted] Auto/Mate believed its momentum would lead to further success: "Our success with these Groups is already generating interest from other large groups…. The large groups we installed in 2015 and 2016 are singing our praises."

49. In 2016, Auto/Mate won [redacted] customers with [redacted] rooftops from CDK in competitive situations. Auto/Mate also had significant success against Reynolds in 2016, winning [redacted] customers with [redacted] rooftops in competitive situations. Auto/Mate also won [redacted] customers with [redacted] rooftops from other DMS providers in competitive situations.

50. Auto/Mate knew its aggressive competition and strong reputation were working: "It seems that our reputation as tops in customer service, our successes at multi-store group installations, our more recent larger customer wins and some help from our competitors jacking up 3rd party integration fees has combined to create one of those 'perfect storm' moments, and we're perfectly positioned to take advantage of it."

51. At the end of 2016, Mike Esposito, the President and CEO of Auto/Mate highlighted to his team "We have worked very hard to get to the 'top of the hill'…we are almost on the other side. Our efforts are paying off! People don't ask anymore 'Who are you guys?' They now know who Auto/Mate is!" Mr. Esposito expected 2017 to "be the best year we have ever had."

52. As Auto/Mate won more and more customers, CDK executives knew they needed to respond to this competition, acknowledging that [redacted] and that CDK needed a [redacted] CDK determined that [redacted]

### C. The Acquisition Will Eliminate the Consumer Benefits of Head-to-Head Competition Between Auto/Mate and other DMS providers

53. The Acquisition would eliminate the intense head-to-head price and quality competition between CDK and Auto/Mate occurring today. Consequently, CDK would not need to compete as aggressively on price to win franchise dealer customers, and would have the incentive and ability to raise prices and lower service quality. The Acquisition would also eliminate the competition between Auto/Mate and other DMS providers, reducing the need for those providers to compete as aggressively on price, service, and innovation.

54. After the Acquisition, CDK and other DMS providers would face less competition to retain and gain new customers and would have less incentive to offer shorter contracts, faster software enhancements, more third-party and less expensive app integration, additional training, and better customer service. CDK was aware that it would face less competition after acquiring Auto/Mate, internally touting: "We are so serious about acquiring new customers that we bought the DMS [Auto/Mate] that has been kicking our butts."

55. Indeed, CDK was willing to pay top dollar to keep Auto/Mate out of the hands of an acquirer that would increase Auto/Mate's already impressive growth trajectory. CDK predicted that, in the hands of a motivated and well-capitalized buyer, Auto/Mate would [redacted] To prevent this, CDK [redacted] over the next highest bidder to acquire Auto/Mate, and [redacted] CDK's original valuation of Auto/Mate. The gap between CDK's winning bid and its initial valuation substantially represents the defensive value to CDK of removing Auto/Mate as a competitor and preventing a well-financed alternative buyer from accelerating Auto/Mate's growth further.

56. Post-Acquisition, CDK plans to severely handicap the [redacted] DMS platform and remove it as a competitive alternative to CDK's other DMS products for large swaths of customers. [redacted] These are two Auto/Mate features its customers highly value. [redacted]

[redacted] Prior to the Acquisition announcement, Auto/Mate was successfully adding customers with three or more rooftops, often at the expense of CDK. [redacted] customers therefore would face degraded functionality and higher prices following the Acquisition, and [redacted] strong competitive attributes would be significantly dampened or withdrawn from the market. To the extent that Auto/Mate customers seek another franchise DMS provider, that provider would not be a close substitute to the unique value proposition they chose with Auto/Mate. Moreover, such alternatives may not be available given the significant installation and support capacity limitations of many other DMS providers.

## IX. LACK OF COUNTERVAILING FACTORS

### A. Barriers to Entry and Expansion

57. Respondents cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition.

58. New entry or repositioning by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. *De novo* entrants into this market would face considerable barriers in replicating the competition that will be eliminated by the Acquisition. Effective entry into this market would require substantial, costly up-front investments in product development and OEM certification, and the risk of failure would be high given the substantial product development and reputational barriers to commercial success in this market. Collectively, these challenges would take many years to overcome. Auto/Mate's current success has taken many years of slow, careful growth to achieve, and new entrants would face a similarly protracted, high-risk path to success.

59. Similarly, existing DMS providers are unlikely to replace the competition that will be lost as a result of the Acquisition, because all of them lack important offerings Auto/Mate provides and that they are unlikely to develop in a timely manner if Auto/Mate is absorbed by CDK. While each firm's shortcomings are distinct, each faces real and significant challenges in becoming the next Auto/Mate. These challenges include, but are not limited to, a poor or non-existent reputation among customers, software with limited functionality, limited or non-existent OEM certifications, poor service levels, and constrained capacity. Moreover, other DMS providers are significantly higher priced than Auto/Mate and would not sufficiently replace Auto/Mate's aggressive pricing. The remaining firms in this market are not likely to replace the unique, substantial, and growing competitive significance of Auto/Mate in a timely way, either collectively or individually.

### B. Efficiencies

60. Respondents have not identified and cannot demonstrate cognizable efficiencies that would be sufficient to rebut the strong presumption and evidence that Acquisition likely would substantially lessen completion in the relevant market.

## X. VIOLATION

### Count I – Illegal Agreement

61. The allegations of Paragraphs 1 through 60 above are incorporated by reference as though fully set forth herein.

62. The Acquisition Agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

### Count II—Illegal Acquisition

63. The allegations of Paragraphs 1 through 60 above are incorporated by reference as though fully set forth herein.

64. The Acquisition, if consummated, may substantially lessen competition in the relevant market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and is an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## NOTICE

Notice is hereby given to the Respondents that the twenty-first day of August, 2018, at 10 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you. An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect. Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true. Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding. In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers. Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580. Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers). Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

**Notice of Contemplated Relief**

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Merger challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, viable and independent businesses in the relevant market, with the ability to offer such products and services as CDK and Auto/Mate were offering and planning to offer prior to the Acquisition.

2. A prohibition against any transaction between CDK and Auto/Mate that combines their businesses in the relevant market, except as may be approved by the Commission.

3. A requirement that, for a period of time, CDK and Auto/Mate provide prior notice to the Commission of acquisitions, mergers, consolidations, or any other combinations of their businesses in the relevant market with any other company operating in the relevant markets.

4. A requirement to file periodic compliance reports with the Commission.

5. Any other relief appropriate to correct or remedy the anticompetitive effects of the transaction or to restore Auto/Mate as a viable, independent competitor in the relevant market.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this nineteenth day of March, 2018.

By the Commission.

Donald S. Clark
Secretary

SEAL:

# EXHIBIT B

E-FILED IN OFFICE - NL
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
24-A-04939-3
8/29/2024 3:50 PM
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**

**STATE OF GEORGIA**

| | | |
|---|---|---|
| ASBURY AUTOMOTIVE GROUP, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 24-A-04939-3 |
| CDK GLOBAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER FOR PRELIMINARY INJUNCTION**

This matter comes before the Court on August 28, 2024, on a Motion for Preliminary Injunction (the "Motion") filed by Plaintiff Asbury Automotive Group ("Asbury") in the above-styled case. The Plaintiff appeared with Counsel and Defendant appeared with Counsel. The Court, having reviewed the documents filed in support of and in opposition to this Motion, and also having heard the arguments of counsel for both parties, along with testimony from witnesses, and for good cause appearing therefore:

**IT IS HEREBY ORDERED** that Asbury's Motion is **GRANTED in the following particulars:** In regard to Asbury's Nalley Toyota Roswell, Nalley Lexus Roswell, Nalley Lexus Smyrna/Galleria, and Nalley Honda Union City dealerships (the "Four Dealerships"), Defendant CDK Global ("CDK") is directed to fully cooperate and work in good faith with Asbury to transfer Asbury's Client Data for the Four Dealerships to Tekion Corp. ("Tekion"). CDK shall provide Asbury's Client Data for the Four Dealerships to Tekion as follows: (i) CDK shall provide a first pull/transfer of Client Data for the Four Dealerships within seven (7) days following Asbury's submission to CDK of an updated CDK FTP Request Form (the "Form"), which Asbury shall provide to CDK within three (3) days of the date of this Order; and (ii) CDK shall provide a second

pull/transfer of Client Data for the Four Dealerships as indicated by Asbury on the Form, as soon as possible, but no later than September 20, 2024.

SO ORDERED this 29th day of August 2024.

Judge Robert D. Walker, Jr.
Superior Court of Gwinnett County
By Designation

**Copies to All Parties and their Attorneys of Record**

# EXHIBIT C

SEMANIE LAW

**Orlando Office**
1800 Pembrook Drive
Suite 300
Orlando, FL 32810
321-341-9565

**New York Office**
5 Penn Plaza
23rd Floor
New York, NY 100001
212-835-1500

**New Jersey Office**
33 Wood Avenue South
Suite 600
Iselin, New Jersey 08830
732-549-8000

*Sender's Email Address:*
*MSemanie@SemanieLaw.com*

November 20, 2024

CDK Global
Attn: Legal Department
1950 Hassell Road
Hoffman Estates, IL 60169

**Re: Action Nissan, Inc. v. CDK Global, LLC**

Sir or Madam:

This law firm has the pleasure of representing Action Nissan, Inc. d/b/a Universal Nissan, Universal Hyundai, and Universal Genesis (collectively, "**Universal**") in regard to the above referenced matter. As such, please direct any and all future communications in regard to this matter to the undersigned.

Universal operates franchised motor vehicle dealerships in Orlando, Florida. As you know, Universal has been a CDK DMS and CRM customer for many years. Recently, Universal elected to convert from CDK to Tekion. In furtherance of that conversion, CDK provided Universal with a "Final Obligations Letter" on August 28, 2024, in which CDK described all purported remaining contractual obligations that Universal owed to CDK, along with current and future accounts receivable. One such obligation was payment through the end of the term, which was received by CDK on August 30, 2024.

On September 3, 2024, Universal reached out to CDK's representative, Sandy Smart, asking her to confirm receipt of the payment. Ms. Smart ignored that communication. Universal reached out again on September 4, 2024, and Ms. Smart responded on September 5, 2024, to confirm CDK's receipt of payment from Universal. Despite the foregoing, CDK refused to release Universal's data as requested by Universal. Instead, on September 24, 2024, Ms. Smart advised Universal that despite payment having already been made in full, CDK refused to release Universal's data to Universal. The purported reason for commandeering Universal's data was because the official termination date with CDK was November 30, 2024, and CDK would not

release the data until 30 days prior to the termination date, regardless of payment already being made in full.

Setting aside for a moment the myriad issues related to this refusal, Universal pushed back its conversion to Tekion as a result of CDK's actions. Universal then converted to Tekion on November 12, 2024. However, CDK still refused to provide Universal with its own CRM (eLead) data. More specifically, now that CDK had Universal's payment, CDK has refused to respond to Universal's requests for its data.

On October 22, 2024, CDK Executive Vice President Scott Herbers signed two statements of work ("SOW's") confirming that CDK would extract and send Universal its data stored in CDK's eLead CRM "ASAP." Again, all payments for such extraction were promptly made by Universal to CDK. On October 30, 2024, Universal created a ticket with CDK (as advised by CDK) for the extraction of Universal's CRM data.

As CDK has not extracted Universal's CRM data by November 15, 2024, Universal reached out to CDK to request an update. CDK representative, Christian Gonzalez, responded that "We are searching for an answer for you. Will get back to you before end [sic] of day." When Universal followed up later that day, Mr. Gonzalez only responded that "Unfortunately, I am still awaiting a response from the data extraction team regarding your request. As soon as I receive an update, I will get back to you with the latest information." This second delay in converting to Tekion due to CDK's actions caused Universal significant damages.

On November 18, 2024, Mr. Gonzalez responded to another request for a status update, only to advise that "Unfortunately, I have been unable to find a specific answer to your request regarding the data extraction process." By November 20, 2024, Universal had been waiting three weeks for CDK to honor its commitment to provide Universal with its own data. Universal reached out multiple times to everyone at CDK who had been involved in this matter, but not a single person from CDK even responded.

At this point, Universal has no choice but to seek legal remedies. Indeed, in light of the recent developments in Asbury's case against CDK for refusing to provide data, and in other cases that this office has handled with very similar facts, it is clear that this is not an isolated incident, and that CDK's actions are being undertaken for a wholly improper purpose.

Based on the foregoing, demand is hereby made upon CDK to immediately cease and desist its unlawful withholding of Universal's data, and immediately provide such extracted CRM data as agreed. While Universal has no independent desire to file suit against CDK, it can no longer continue to suffer significant damages as a result of CDK's misconduct. Accordingly, in order to avoid litigation, please provide Universal with its extracted CRM data by no later than the end of business on **November 21, 2024**.

Demand is further made upon CDK and its affiliates and subsidiaries, pursuant to § 627.4137, Florida Statutes, to disclose to the undersigned the name and coverage of each known insurer who does or may provide liability insurance coverage to pay all, or a portion of all claims

related to the above matter. Moreover, demand is hereby made pursuant to the same authority to forward this request to all such insurers who shall, within 30 days of receipt of this request, provide a statement under oath of a corporate officer or the insurer's claims manager or superintendent setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance:

(a) The name of the insurer.
(b) The name of each insured.
(c) The limits of the liability coverage.
(d) A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement.
(e) A copy of the policy.

Please also be advised that, based upon the foregoing, CDK now has a duty to preserve, and not destroy, conceal, or alter, any and all documents, tangible things and electronically stored information potentially relevant to the issues in this case (collectively, the "**Evidence**"). This duty not only applies to CDK, but also extends to any agents, representatives, affiliated companies, predecessors, successors, subsidiaries, or divisions, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions (collectively, the "**Obligated Parties**"). The above lists of Obligated Parties and Evidence are not intended to be exhaustive, but are merely intended to serve as an illustration of the scope of your preservation obligations now that litigation is reasonably foreseeable.

Consistent with this duty to preserve Evidence, the Obligated Parties may not destroy, conceal, or alter any paper or electronic files or any other electronically generated or stored information on computers or storage media that the obligated parties may have in their possession, custody, or control that may be related to this matter. This includes any and all information stored on mobile devices, social media websites or applications, web hosting servers, and other third party computer, information technology, and software providers.

The Obligated Parties' failure or refusal to comply with their duty to preserve Evidence may constitute a "spoliation of evidence," which may subject CDK to sanctions by the court. In the event of a dispute arising out of the Obligated Parties' failure or refusal to preserve Evidence, we may rely on this letter in court as evidence of our request and notice of CDK's preservation obligations.

This letter is not intended as a full recitation of the facts, nor a complete review of applicable law. The matters described herein are intended for settlement purposes only, and are therefore deemed confidential. Nothing contained in or omitted from this letter is or shall be construed to be a limitation, restriction, or waiver of any of Universal's rights and remedies, either at law or in equity, in connection with any of the matters raised herein, all of which are expressly reserved.

I anticipate and appreciate your prompt attention to this matter. If you have any questions about the foregoing, or if there is anything that you would like to discuss, please feel free to contact me at your convenience. If we do not hear from you by November 21, 2024, we will presume that you are not interested in attempting to amicably resolve this matter without judicial intervention and we will proceed accordingly.

Sincerely,

/s/ Michael A. Semanie
Michael A. Semanie

cc: Christian Gonzalez (christian.gonzalez@cdk.com)
Hobie Harris (Hobie.Harris@cdk.com)
Jim Verity (Jim.Verity@cdk.com)
Harrison Steel (Harrison.Steel@cdk.com)
Sandy Smart (Sandy.Smart@cdk.com)
Scott Herbers (Scott.Herbers@cdk.com)
Cameron Williams (Cam.Williams@cdk.com)

# EXHIBIT D

FILED
5/30/2024 7:19 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH05116
Calendar, 4
27913269

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| CDK GLOBAL, LLC<br><br>Plaintiff,<br><br>vs.<br><br>ASBURY AUTOMOTIVE GROUP, INC,<br><br>Defendants. | Case No. 2024CH05116 |

**COMPLAINT**

Plaintiff, CDK Global, LLC ("CDK"), by its attorneys, Mayer Brown LLP, files this Complaint against Defendant, Asbury Automotive Group, Inc. ("Asbury"), and alleges as follows:

**INTRODUCTION**

1. Plaintiff CDK is a global provider of integrated information technology and digital marketing solutions to the automotive retail industry. Defendant Asbury has a longstanding business relationship with CDK, under which CDK provides proprietary software and hardware solutions to Asbury's franchised automobile dealerships across the United States pursuant to multiyear agreements called Master Services Agreements ("MSAs"). CDK's product offerings include what is known in the automotive retail industry as a dealer management system, or "DMS," which is a set of proprietary software tools and database elements that automobile dealers use to manage core aspects of their business. CDK has been Asbury's primary DMS supplier since 2010.

2. The Parties entered into their current MSA in April 2019. Under the terms of the MSA, Asbury receives favorable pricing terms for DMS and other products and services compared to what CDK charges other customers, in recognition of the fact that Asbury has committed to purchase these services from CDK across its national footprint of dealerships.

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

3. Asbury recently elected to extend the Parties' MSA through April 2025. In the letter notifying CDK of its decision to extend the MSA, Asbury wrote that "[w]e look forward to continue to work with CDK as a preferred vendor under the Agreement." In reliance on Asbury's decision to extend the MSA, CDK invested in making improvements to Asbury's DMS and related services that CDK provides to Asbury under the Parties' agreement.

4. However, unbeknownst to CDK, Asbury was negotiating in secret with another DMS provider, Tekion Corp. According to recent public statements, Asbury has been in talks with Tekion for more than two years—long before Asbury elected to renew the MSA. In February 2024, Asbury announced that it was switching to Tekion Corp's DMS pursuant to a "pilot program" beginning later this year, with a company-wide rollout to follow in January 2025.

5. Asbury has issued written notices to CDK purporting to cancel services at certain dealerships that are being transitioned to Tekion Corp. However, Asbury does not have the right to cancel these services unilaterally until the MSA—which was recently extended at Asbury's election—expires in April 2025. Asbury's conduct is therefore in breach of the MSA.

6. [redacted]

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

[redacted] Asbury's conduct also constitutes unlawful tampering with a computer system in violation of 720 ILCS 5/17-51.

7. CDK now brings this action against Asbury for breach of the MSA, for violations of 720 ILCS 5/17-51, and for a declaratory judgment to protect CDK's rights under the MSA throughout the remaining term of the agreement.

**PARTIES**

8. CDK is a Delaware limited liability company. Until 2023, CDK's corporate headquarters was located at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK continues to maintain its largest corporate office in Hoffman Estates, Illinois.

9. Asbury Automotive Group, Inc. is Delaware corporation with its principal place of business located at 2905 Premiere Parkway, Suite 300, Duluth Georgia, 30097. Asbury owns and operates over 150 automobile dealerships and collision centers across the United States.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over Asbury because this lawsuit arises out of and relates to Asbury's contacts with the State of Illinois. Specifically, Asbury engaged CDK, an Illinois company, to provide the services that are subject to this lawsuit. The Parties' MSA was negotiated and executed from within the State of Illinois. CDK's performance of the Parties' MSA occurred within the State of Illinois. Further, as detailed below, Asbury's wrongful conduct includes the use of third party software to access CDK's proprietary DMS systems and network, which are maintained in the State of Illinois. These acts provide sufficient minimum contacts to submit Asbury to the exercise of jurisdiction by Illinois courts.

11. Venue in this Court is proper pursuant to Section 5/2-101 of the Illinois Code of Civil Procedure because (a) parts of the transaction out of which this cause of action arises took

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

place in Cook County, Illinois, including negotiations related to the MSA, which is central to this action; and (b) all defendants in this action are nonresidents of the state.

## FACTUAL ALLEGATIONS

### A. The Parties' Master Services Agreement

12. The Parties entered into their most recent MSA in 2019. The MSA was executed on behalf of CDK by Dan Flynn, then the President of CDK North America. When he executed the MSA, Mr. Flynn was part of CDK's executive team in Hoffman Estates, Illinois.

13. Under the terms of the MSA, CDK licenses certain proprietary software to numerous Asbury dealerships, [redacted]

14. The MSA is a valid and enforceable contract between the Parties, and CDK has performed and continues to perform all of its obligations under the MSA.

15. [redacted]

16. Asbury's DMS is cloud-based, meaning that the software and database elements used to the provide the DMS are maintained by CDK on host servers at data centers located in Chicago, Illinois and Las Vegas, Nevada.

17. [redacted]

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

[redacted]

18. The initial term of the MSA was five years: April 22, 2019 to April 22, 2024. [redacted] By electing to extend the MSA, Asbury obtained an additional year of rights and benefits arising under the Parties' agreement. In reliance on Asbury's decision to extend the MSA for at least another year, CDK has made and continues to make certain investments to improve the Products and Services, which CDK provides to Asbury Clients at no additional cost. As one example, CDK is in the process of upgrading all Client locations to CDK Unify, a single cloud-based entry point for all CDK Products and Services.

19. [redacted]

20. [redacted]

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

[redacted]

21. [redacted]

**B. Asbury's Wrongful Conduct**

22. Notwithstanding its decision to extend the MSA for another one-year term, on February 4, 2024, Asbury provided written notice to CDK purporting to "cancel all services" at four Asbury Clients—Nalley Honda Union City, Nalley Lexus Galleria, Nalley Lexus Roswell, and Nalley Toyota Roswell (the "Nalley Dealerships")—effective December 31, 2024.

23. CDK has since learned that Asbury intends to transition the Nalley Dealerships to Tekion Corp, another DMS provider. Asbury's CEO, David Hult, stated publicly during a February 8, 2024 earnings call that Asbury intends to use the Nalley Dealerships to establish a "pilot" program with Tekion Corp, with a company-wide conversion to Tekion Corp planned to begin in January 2025 (Mr. Hult: "We anticipate [in] January rolling out all our stores").

24. The MSA does not give Asbury the right to cancel certain Products and Services, including Core Applications and Services, during the remaining term of the MSA, which Asbury in its sole discretion recently elected to extend. [redacted]

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

[redacted]

25. [redacted] Mr. Hult stated publicly during Asbury's February 8, 2024 earnings call that Asbury has been in discussions with Tekion Corp "for over [two] years" and "working together to overcome obstacles and what both of us would need to do on our end to create the relationship." [redacted] Despite this, Asbury elected to extend the MSA in order to continue reaping the substantial benefits it obtains under the MSA for another year. Asbury even stated in its notice to CDK regarding the contract extension that "[w]e look forward to continuing to work with CDK as a preferred vendor under the Agreement." However, Asbury has failed to honor its end of the bargain and has repudiated its obligations arising under the MSA by purporting to cancel all CDK services at certain Clients so that those Clients can be transitioned to another DMS provider. Asbury's conduct is in breach of the MSA.

26. When CDK objected to Asbury's conduct, Asbury's Chief Information Officer Barry Cohen claimed that the MSA was nothing more than "a general (enterprise-wide) license granted by CDK to Asbury and its dealerships," under which Asbury was free "to discontinue (or add or change) use of the CDK products at any Asbury location." Asbury's position is contradicted

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

by the express terms of the MSA regarding each Party's rights to cancel Products and Services during the remaining term of the MSA.

27. Asbury has never retracted its position or withdrawn its purported cancellation of all CDK services at the Nalley Dealerships. Asbury has unequivocally repudiated its obligations arising under the MSA as to these Clients and, based upon the public statements of its CEO, Asbury intends to breach its obligations arising under the MSA with respect to other Clients.

28. Asbury has demanded that CDK transfer all operational data stored in the DMS pertaining to the Nalley Dealerships to Tekion Corp. In the ordinary course of business, when a dealership customer reaches the end of its contract term, CDK will typically facilitate one transfer of data that resides in the DMS to the dealer or its new DMS vendor, provided that the dealer is in compliance with its contractual obligations, is current on all of its accounts, and has satisfied its financial obligations through the end of its contract term. CDK is under no duty to provide this service for any Asbury Client prior to the expiration of the MSA or while Asbury is in breach of its duties and commitments arising under the MSA.

29. [redacted]

30. [redacted]

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

[redacted]

31. [redacted]

32. [redacted]

33. [redacted]

34. [redacted]

**COUNT I – BREACH OF CONTRACT**

35. CDK incorporates all preceding paragraphs as if fully set forth herein.

36. The Parties' MSA includes a New York choice-of-law provision.

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

37. Under New York law, the elements of a cause of action for breach of contract are: (1) the existence of a valid contract between the parties; (2) the non-breaching party's performance of its obligations arising under the contract; (3) the breaching party's failure to perform its obligations arising under the contract; and (4) damages. The elements of a cause of action for breach of contract under Illinois law are materially similar.

38. The MSA is a valid and enforceable contract between the Parties, and CDK has fully performed all of its obligations arising under the MSA.

39. Asbury breached the MSA by using third party software to access the DMS through the conduct described above.

40. Asbury breached the MSA by purporting to cancel Products and Services at certain Asbury Clients when the MSA does not permit cancellation at Asbury's unilateral discretion.

41. CDK has suffered damages from Asbury's breaches of the MSA in the form of lost revenue and profits, harm to CDK's system and degraded system performance, as well as the cost of detecting, monitoring, and remediating Asbury's improper access to the DMS through the use of third party software, in an amount to be proven at trial.

**COUNT II – BREACH OF CONTRACT (ANTICIPATORY BREACH)**

42. CDK incorporates all preceding paragraphs as if fully set forth herein.

43. Under New York law, if a party repudiates its obligations arising under a contract, it commits an anticipatory breach of contract that is immediately actionable. The elements of a cause of action for anticipatory breach of contract under Illinois law are materially similar.

44. Asbury's written notice to CDK purporting to "cancel all services" at the Nalley Dealerships prior to the expiration of the MSA as well as the public statements of Asbury's CEO that Asbury plans to transition "all our stores" to Tekion Corp beginning in January 2025 are clear

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

and unequivocal pronouncements that Asbury intends to forego performance of its obligations arising under the MSA related to the purchase of Products and Services.

45. In subsequent interactions with CDK, including in correspondence from Asbury's Chief Information Officer dated February 20, 2024, Asbury has refused to retract its statements and actions repudiating its obligations arising under the MSA.

46. CDK is and will continue to be damaged by Asbury's repudiation of the MSA through lost revenue and profits, in an amount to be proven at trial.

## COUNT III – VIOLATION OF 720 ILCS 5/17-51

47. CDK incorporates all preceding paragraphs as if fully set forth herein.

48. The Illinois Computer Crime Prevention Law ("CCPL") prohibits "computer tampering," which includes knowingly and without authorization accessing, or causing to be accessed, a "computer" or a "computer network" and obtaining data or services. 720 ILCS 5/17-51. A "computer" includes any "device that accepts, processes, stores, retrieves, or outputs data and includes, but is not limited to, auxiliary storage, including cloud-based networks of remote services hosted on the Internet, and telecommunications devices connected to computers." 720 ILCS 5/17-0.5. CDK's DMS is a computer for purposes of the CCPL.

49. The CCPL authorizes a private right of action for violations of 720 ILCS 5/17-51(a)(4), which provides that "[a] person commits computer tampering when he or she knowingly and without the authorization of a computer's owner or in excess of the authority granted to him or her . . . [i]nserts or attempts to insert a program into a computer or computer program knowing or having reason to know that such program contains information or commands that will or may: (A) damage or destroy that computer, or any other computer subsequently accessing or being accessed by that computer; (B) alter, delete, or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

accessed by that computer; or (C) cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such program[.]" 720 ILCS 5/17-51(c).

50. The CCPL defines a "computer program" or "program" as "a series of coded instructions or statements in a form acceptable to a computer which causes the computer to process data and supply the results of the data processing." 720 ILCS 5/17-0.5.

51. Through the conduct described above, Asbury knowingly inserted a computer program into a computer system maintained by CDK [redacted]

52. [redacted]

53. Asbury's conduct was without CDK's authority and, to the contrary, was expressly prohibited under the terms of the Parties' MSA.

54. CDK has incurred losses in the form of harm to CDK's computer system and degraded system performance, as well as the costs of investigating, detecting, monitoring, and remediating Asbury's improper access to the DMS through the use of third party software.

55. CDK is therefore entitled to appropriate relief, including its reasonable attorney's fees and costs of suit as the prevailing party.

**COUNT IV – DECLARATORY JUDGMENT**

56. CDK incorporates all preceding paragraphs as if fully set forth herein.

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

57. Pursuant to 735 ILCS 5/2-701, Illinois courts may, in cases of actual controversy, make binding declarations of rights, having the force of final judgments, whether or not any consequential relief is or could be claimed, including the determination, at the instance of anyone interested in the controversy, of the construction of any statute, municipal ordinance, or other governmental regulation, or of any deed, will, contract or other written instrument, and a declaration of the rights of the parties interested.

58. An actual controversy has arisen between CDK and Asbury concerning their rights and obligations arising under the MSA, including with respect to [redacted] Further, a controversy has arisen between the Parties [redacted]

59. CDK has a tangible legal interest in the resolution of these issues in its favor, while Asbury has an adverse interest in their resolution.

60. A judicial declaration regarding the contractual rights and obligations contained in the MSA will aid in the termination of the Parties' controversy.

**PRAYER FOR RELIEF**

WHEREFORE, CDK requests that this Court enter judgment in its favor and against Defendant Asbury Automotive Group, Inc. for:

a. Compensatory damages in an amount in excess of $50,000;

b. Injunctive and equitable relief prohibiting Defendant from continuing to violate the Parties' MSA and engage in unauthorized access to CDK's computer systems and network through the use of third party software;

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

c. A declaratory judgment of the Parties' rights and obligations under the MSA;

d. An award of CDK's costs of suit and reasonable attorney's fees; and

e. Any and all additional relief as the Court may determine in its discretion to be just and proper.

**JURY DEMAND**

CDK hereby demands a trial by jury on all issues so triable.

Dated: May 30, 2024

Respectfully submitted,

By: /b/Britt Miller

Britt M. Miller
bmiller@mayerbrown.com
Matthew D. Provance
mprovance@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Firm No. 43948
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*Attorneys for Plaintiff CDK Global, LLC*

FILED DATE: 5/30/2024 7:19 PM 2024CH05116

# EXHIBIT A
# (FILED UNDER SEAL)

# EXHIBIT E

E-FILED IN OFFICE - JM
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
24-A-04939-3
6/3/2024 8:38 PM
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **ASBURY AUTOMOTIVE GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | 24-A-04939-3 |
| **v.** | ) | |
| | ) | **Civil Action No. _______** |
| **CDK GLOBAL, LLC,** | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| **Defendant.** | ) | |

**VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Asbury Automotive Group, Inc. ("Plaintiff" or "Asbury"), by and through undersigned counsel, hereby files this Complaint for Damages and Injunctive Relief against Defendant CDK Global, LLC ("Defendant" or "CDK") and shows the following:

**INTRODUCTION**

1. This action requests specific performance, declaratory and immediate injunctive relief as a result of Defendant CDK's improper refusal to give Asbury complete and full access to Asbury's own proprietary client data. Pursuant to a relationship that spanned over a decade, CDK provides Asbury data management technology and software that enables Asbury to run all aspects of its automotive business with dealerships in Georgia and multiple states across the country. Indeed, the data stored by CDK is necessary and critical to the daily operation of Asbury's business.

2. Asbury and CDK entered into a new contract in 2019 under which CDK continued to provide technology support services for Asbury's dealerships. The contract had an initial exclusivity term with some exceptions, including a contracted-for exclusion for 3 dealership

locations. This exclusion was specifically negotiated by Asbury to permit it flexibility to explore a partnership with another technology provider.

3. Consistent with its contractual right to do so, Asbury identified a new market participant in the dealership data management space and competitor of CDK, Tekion Corporation ("Tekion") that offers cutting edge and improved data management strategies that will significantly improve Asbury's data management and its business. Asbury announced that it entered into a contract with Tekion to conduct a pilot program following the end of the agreed upon exclusivity period. Provided that the pilot program is successful, Asbury will move its dealerships to Tekion in 2025 and 2026.

4. After Asbury announced the pilot program with Tekion, CDK refused to transfer Asbury's client data from the four selected dealerships ("Four Dealerships") in an unveiled attempt to impede Asbury from proceeding with the Tekion pilot program. CDK intent has become quite clear, that it intends to quash its competitor, Tekion, and force Asbury to stay on CDK's platform by holding its data hostage in direct violation of the parties' agreement.

## THE PARTIES, JURISDICTION AND VENUE

5. Asbury is one of the largest franchised automotive retailers in the United States, which owns and operates numerous car dealerships across the nation, including approximately 157 new vehicle dealerships across 15 states, including Georgia.

6. Asbury is a corporation organized under the laws of Delaware, with its headquarters and principal place of business located in Duluth, Georgia.

7. CDK offers various information technology services to retail automotive groups, including Asbury.

8. CDK is a corporation organized under the laws of Delaware, with its headquarters and principal place of business located in Hoffman Estates, Illinois. CDK is registered to do business in Georgia and may be served with process via its Registered Agent: CT Corporation System, 289 S Culver St, Lawrenceville, GA, 30046-4805.

9. This Court has personal jurisdiction over CDK because CDK is registered to do business in the State of Georgia and this lawsuit arises out of CDK's business transactions and tortious acts committed in Georgia. *See* O.C.G.A. § 9-10-91.

10. Venue is proper in this Court because a substantial part of the events, omissions, and damages giving rise to the claims occurred in this district. *See* O.C.G.A. § 9-10-93.

## FACTS

*Asbury and CDK's Relationship and Prior Course of Performance*

11. Asbury and CDK (the "Parties") have been business partners for more than thirteen years. Throughout this relationship, CDK has provided Asbury with proprietary software application programs and computer hardware designed to automate Asbury's business functions. For example, CDK provides Asbury with a Document Storage and Document Archiving System ("DSDA") that stores all of Asbury's historical documents. CDK also provides Asbury with a Client Relationship Manager ("CRM") platform, which allows Asbury to efficiently and accurately store and access its customer lead data.

12. In order to be able to use CDK's products and services, Asbury provides CDK with its proprietary and confidential business information, including customer data, vehicle and parts inventories, sales history, and financial records. In return, CDK has agreed to protect Asbury's ownership and right to possess its data. The data stored by CDK is essential to Asbury's business and is what allows it to conduct day-to-day operations.

13. Throughout the course of the Parties' relationship, CDK's services to Asbury have also, necessarily, included transferring Asbury's data to other designated dealer management system ("DMS") providers at Asbury's request and direction. Until recently, Asbury has never had prior issues requesting and/or having its own data transferred to another DMS provider.

*The Parties' Contract*

14. On April 22, 2019, Asbury and CDK entered into the Master Services Agreement ("MSA"). A true and correct copy of the MSA is attached to this Complaint as Exhibit **1**. The MSA is governed by New York law. *Id.* § 19(J).

15. When negotiating the terms of the MSA, Asbury intentionally structured the contract to allow it to eventually move to a different DMS provider if it wanted to.

16. The Parties agreed the "Initial Term" of the MSA would run through April 22, 2024, and provide Asbury the option to renew the Agreement for up to two (2) successive periods of one (1) year each (the "Renewal Period"). *Id.* § 3(A). On or about April 22, 2024, the Parties renewed the MSA for another year—until April 22, 2025. Thus, the Renewal Period runs from April 22, 2024 through April 22, 2025.

17. Section 4(B) of the MSA, titled "Qualified Exclusivity," provides "that all retail motor vehicle dealer locations owned by Asbury . . . now or in the future, will license, and pay for, the Core Applications and Services at all times during the *Initial Term* of this Agreement." *Id.* § 4(B) (emphasis added). That said, there are several carve outs to the Qualified Exclusivity during the Initial Term, including "up to three (3) retail motor vehicle dealer locations owned by Asbury or one of its affiliates."

18. Section 2 of the MSA identifies the services CDK agreed to provide "in accordance with the terms and conditions of this Agreement." *Id.* § 2(A). Section 2 does not require Asbury to *exclusively* use CDK's services at all of its dealership locations.

19. Neither Section 4 nor any other section of the MSA requires Asbury to exclusively license and pay for CDK's core products and services at all Asbury locations during the *Renewal Period.*

20. The MSA defines "Client Data" as: "any [Asbury] file or other information provided by [Asbury] to CDK (including information of [Asbury's] customers) and any extract, database, output, reports, or derivative works created by [Asbury], and any [Asbury] business or transaction information produced by or for [Asbury] using the Products and Services or Software[.]" *Id.* § 8(A).

21. The MSA makes clear the Client Data is Asbury's proprietary data. It states that Asbury's Client Data "shall be and remain[s] the exclusive and confidential property" of Asbury. *Id.* § 8(A). The MSA also states, "CDK does not claim ownership over any Client Data . . . ." *Id.* § 7(A). Under the MSA, Asbury is "free to extract, aggregate, use, store, modify, compile, retransmit, and distribute" its own Client Data. *Id.* § 8(A).

22. Throughout the Parties' thirteen-year business relationship, Asbury would often request CDK provide DMS providers with certain data extractions related to Asbury's Client Data. For each request, CDK would promptly and cooperatively assist in providing the DMS provider access to Asbury's Client Data

*Asbury and Tekion Reach an Agreement for a Pilot Program and Asbury Requests its Client Data*

23. On December 8, 2023, Asbury and technology provider Tekion Corporation ("Tekion") reached an agreement for a trial program under which Asbury would start using

Tekion's dealership management technology—instead of CDK's—for four dealerships (the "Four Dealerships"), effective September 2024, following the termination of the exclusivity period in the Initial Term of the MSA. Asbury also contracted with Tekion to move additional dealerships beginning in 2025 and 2026 so that it can be fully moved to Tekion's services by 2027. Upon information and belief, in early 2024, CDK became aware through various news outlets of Asbury's new partnership with Tekion.[1]

24. As part of its deal, and prior to the required launch with Tekion in fall 2024, Asbury needs to provide its Client Data for the Four Dealerships to Tekion, so Tekion can begin loading the data into its products and software (just like CDK did at the start of the CDK-Asbury relationship) and timely launch the pilot program.

25. The agreement between Asbury and Tekion requires Asbury's Client Data pertaining to the Four Dealerships be transferred to Tekion by May 2024 so that Tekion can timely launch and complete the pilot program in order to install the Four Dealerships. Despite Asbury's best efforts to complete the transfer of its own Client Data, the Client Data was not received by that time because CDK is wrongly holding the Client Data hostage. As a result, Asbury has been working with Tekion in good faith to agree upon an alternative installation date for the Four Dealerships because CDK's improper conduct has obstructed the pilot program and contracted-for installation of the Four Dealerships by September 2024. The pilot program cannot be further delayed because such a delay impacts the completion of the pilot program, which impacts when the Four Dealerships can be installed, which, in turn, impacts Asbury's contractual obligations to

[1] *See, e.g.*, Mark Hollmer, *Asbury Automotive will test Tekion's DMS platform*, Automotive News (Jan. 10, 2024), a true and correct copy of this article is attached to this Complaint as **Exhibit 2**; Business Wire, *Tekion Selected by Asbury Automotive Group to Elevate Guest Experiences*, Yahoo! Finance (Jan. 9, 2024), https://finance.yahoo.com/news/tekion-selected-asbury-automotive-group-160000562.html.

Tekion to begin moving dealerships in 2025 as well as jeopardizing Asbury's plan for dealership data management on a global basis, which is the linchpin of its business.

26. Rolling out a new DMS is one of the most difficult and risky projects a dealer group can undertake because Client Data is the linchpin of the business. Asbury commissioned Tekion to conduct a pilot program on the Four Dealerships because Tekion is a new market participant offering a competitive and improved DMS product that will significantly support and enhance Asbury's business. During the pilot program, Asbury must re-engineer many business processes including inventory management, payroll, sales, services, parts, and accounting. In addition to perfecting these processes, Asbury also has to develop training materials and set up IT and business controls required to be compliant with federal regulations. This must be done on a small scale and verified by internal and external auditors before a large, full-scale rollout can be contemplated. It is for this reason that Asbury exercised the contracted-for Extension Period under the MSA, so that it continues to receive the CDK contracted-for services under the MSA during the pilot program and prior to an enterprise rollout with Tekion. It is estimated that the pilot program will take six to eight months; and if successful, an enterprise rollout will take between two to three years.

27. On January 16, 2024, Asbury promptly requested—through CDK's "FTP Request Form"—that CDK provide Tekion complete and full access to its Client Data related to the Four Dealerships Asbury identified as part of its pilot program with Tekion. A true and correct copy of this request is attached as **Exhibit 3**.

28. In response to this request, on January 25, 2024, CDK told Asbury that Asbury would first need to send a "cancellation request" for the subject dealerships. A true and correct copy of this email correspondence is attached as **Exhibit 4**.

29. CDK's cancellation request is a red herring and stall tactic. Nothing in the MSA requires a cancellation in order for Asbury to obtain its own Client Data, and CDK has never previously required such a cancellation prior to providing extractions of Asbury's Client Data. Nonetheless, in an effort to obtain the necessary data as quickly as possible, and per CDK's instruction, on February 5, 2024, Asbury sent CDK a cancellation request for the Four Dealerships, to be effective on December 31, 2024 (*i.e.*, during the Renewal Period). *See id.*

30. Even after Asbury submitted a cancellation request—as per CDK's instruction—CDK *still* would not release the Client Data. CDK's meritless excuses continued. On February 7, 2024, CDK refused Asbury's request for access to its Client Data because, CDK stated, "a CDK facilitated data transfer . . . is only available upon the termination of a location during the transition assistance period or the termination or expiration of our agreement." Instead, CDK pointed Asbury to its own "data warehouse" and the CDK "Data—Your Way" tool, neither of which provide the full and complete data sets that Asbury requested. *See id.*

31. Additionally, CDK stated (incorrectly) that Asbury's request to terminate "all CDK Services" for the Four Dealerships as of December 31, 2024 was not permitted because the MSA "does not permit termination of core products and services prior to the transition assistance period." *Id.*

32. Contrary to CDK's assertion, the MSA only requires Asbury to "license, and pay for, the Core Application and Services at all times during the *Initial Term* of this Agreement," not the Renewal Period (or any other period). **Exhibit 1** § 4(B) (emphasis added). And, even then, the MSA directly provides for at least 3 locations owned by Asbury or an Asbury Affiliate to be "Excluded Locations" that are not subject to the exclusivity requirement. MSA § 4(B). In other words, the MSA directly contemplates that Asbury would be free to have up to three locations

explore other data management solutions even during the exclusivity period, which no longer applies. Therefore, Asbury's request to cancel CDK's services during the Renewal Period at the Four Dealerships (out of approximately 157 dealership locations), although not required, was well within Asbury's rights under the MSA.

33. Ultimately, Asbury cannot fully and accurately extract its Client Data without CDK's cooperation. For example, the tools offered by CDK do not allow Asbury to extract *any* data from the DSDA system in bulk, which holds Asbury's own Client Data. As another example, Asbury only has access to *replicated* CRM data but does not have access to the actual SQL databases needed to verify the completeness and accuracy of the Client Data.

34. Asbury has attempted to extract its Client Data on its own, to no avail. In fact, on May 23, 2024, counsel for CDK sent a cease and desist letter regarding Asbury's attempts to access its Client Data. As a result, the Asbury account was disabled. In light of this letter, Asbury employees discontinued efforts to obtain Asbury's Client Data—and Asbury's account was disabled.

35. By contrast, CDK is able to easily, efficiently, and accurately extract the requested Client Data, as it has done many times before at Asbury's request.

36. CDK has no justification for refusing to extract and transfer the requested Client Data. Upon information and belief, CDK refuses to provide the requested Client Data simply because CDK does not want Asbury to use Tekion's services at the Four Dealerships.

37. Asbury has recently learned that CDK released its own new dealership management product called CDK Unify. It appears that CDK is attempting to force Asbury into adopting the new CDK Unify program by not allowing Asbury to take its Client Data to a CDK competitor. CDK is keenly aware of the substantial harm it is causing Asbury's business by withholding

Asbury's Client Data, the linchpin of its business. Wrongly withholding Asbury's Client Data rather than complying with the agreed upon contractual terms that provide a clear termination of the exclusivity period following the Initial Term and permit Asbury to freely contract with competitors and explore other data management products is substantially injurious to Asbury's business.

38. Indeed, restricting customers' access to their own data and engaging in other anticompetitive behavior is not new to CDK, which is currently embroiled in numerous antitrust lawsuits that have been consolidated into an MDL. *See In Re: Dealer Management Systems Antitrust Litigation*, MDL 2817 (N.D. Ill.).

39. Without its Client Data, Asbury is unable to implement its pilot program at the Four Dealerships and will be unable to launch with the Four Dealerships in fall 2024 as required. As such, the Four Dealerships that are contractually obligated to switch to Tekion's services will be unable to operate.

40. Obtaining the Client Data for Asbury's Four Dealerships is also necessary for Asbury to fulfill its agreement with Tekion to implement its pilot program, pursuant to the confidential contract between the parties. Asbury was obligated to provide Tekion its Client Data pertaining to the Four Dealerships by May 2024 in order to ensure a timely launch in September 2024. Because CDK is refusing to transfer the Client Data, Asbury is working with Tekion to arrange an alternative date for launch in October 2024. Nonetheless, there is grave concern about postponing the Four Dealerships' launch data beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sale volume months so the launch cannot happen during that time. Therefore, every day that CDK refuses to transfer Asbury's Client Data is another day that Tekion is not able to complete the pilot program and

another day closer to not being able to install the Four Dealerships, as required by contract. Every day delayed also further jeopardizes Asbury's plan to move dealerships beginning in 2025. As such, CDK's actions are causing significant and irreparable harm to Asbury.

41. On April 2, 2024, CDK contacted Tekion without Asbury's permission with respect to the Asbury-Tekion pilot program. CDK threatened "that any remote or in-person access by Tekion to screen displays generated by CDK Products and Services, or to such Products and Services directly, including through software and/or the use of CDK login credentials, would constitute a material breach of the MSA." A true and accurate copy of this correspondence is attached as **Exhibit 5**. CDK also threatened that Tekion's actions could be considered to be inducing Asbury's non-compliance with the MSA and thus "actionable as tortious interference." *Id.*

42. CDK's statements to Tekion in the April 2, 2024 letter are untrue as the MSA permits Asbury to reduce the number of dealerships using CDK's core services now that the Parties are in the Renewal Period.

43. By May 2024, months after Asbury's original request, CDK still has refused to provide Asbury with its Client Data. On May 9, 2024, Asbury sent CDK a formal demand letter requesting that CDK immediately provide the requested Client Data. To date, CDK still has not done so. CDK has never articulated that it neither could transfer the data nor that doing so would be burdensome.

44. Because CDK continues to refuse to extract the Client Data to which Asbury is entitled, Asbury now has no choice but to file this lawsuit and seek assistance from the Court.

**COUNT I**
**Breach of Contract**

45. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

46. The MSA is a valid and enforceable contract between CDK and Asbury.

47. Asbury has complied with all provisions of the MSA.

48. The MSA entitles Asbury to its own Client Data.

49. By holding the Client Data hostage, despite repeated requests by Asbury, CDK has breached the terms of the MSA including, but not limited to, Sections 7(A) and 8(A) of the MSA.

50. New York law implies in every contract a covenant of good faith and fair dealing. *See New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318, 662 N.E.2d 763, 769 (N.Y. 1995). CDK has breached the implied covenant of good faith and fair dealing by, *inter alia*, (i) failing to use reasonable efforts to provide and/or (ii) arbitrarily or irrationally refusing to provide Asbury the requested Client Data that it is plainly entitled to under the MSA.

51. Because of CDK's improper conduct, Asbury does not have its requested Client Data. Until and unless CDK provides that Client Data to Asbury, Asbury cannot implement its pilot program with Tekion at the Four Dealerships and cannot timely launch with the Four Dealerships.

52. As a direct and proximate result of CDK's breach, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

53. Further, as a direct and proximate result of CDK's breach, Asbury has suffered damages in an amount to be determined at trial.

**COUNT II**
**Conversion**

54. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

55. Asbury has title to and a right to possess the Client Data.

56. CDK has actual possession of the Client Data.

57. Asbury has demanded CDK to provide the Client Data.

58. CDK has continually refused to provide access to the Client Data.

59. The Client Data is valuable.

60. As a consequence of CDK's refusal, Asbury does not have its requested Client Data. Until and unless CDK provides that Client Data to Asbury, Asbury cannot implement its pilot program with Tekion at the Four Dealerships and cannot timely launch with the Four Dealerships.

61. As a direct and proximate result of CDK's conduct, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

62. Further, as a direct and proximate result of CDK's conduct, Asbury has suffered damages in an amount to be determined at trial.

**COUNT III**
**Tortious Interference with Contractual Relations**

63. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

64. Asbury and Tekion have entered into a valid, enforceable contract.

65. CDK has acted improperly and without privilege in holding hostage the requested Client Data and in contacting Tekion directly, without Asbury's consent, and misrepresenting the terms of the MSA.

66. In withholding the Client Data and contacting Tekion directly, CDK has acted purposefully and/or maliciously with intent to injure Asbury's contractual relationship with Tekion.

67. As a result of CDK's misconduct, including improperly withholding the Client Data, it has halted and impaired Asbury and Tekion's contractual relationship because their pilot program cannot go forward.

68. CDK's withholding of Client Data has proximately resulted in Asbury's inability to implement its contracted-for services with Tekion, including executing its pilot program with Tekion at the Four Dealerships.

69. As a direct and proximate result of CDK's conduct, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

70. Further, as a direct and proximate result of CDK's conduct, Asbury has suffered damages in an amount to be determined at trial.

## COUNT IV
## Tortious Interference with Business Relations

71. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

72. CDK has acted improperly and without privilege in holding hostage the requested Client Data and in contacting Tekion directly, without Asbury's consent, and misrepresenting the terms of the MSA.

73. In withholding the Client Data and contacting Tekion directly, CDK has acted purposefully and/or maliciously with intent to injure Asbury's business relationship with Tekion.

74. As a result of CDK's conduct, including improperly withholding the Client Data, it has halted and impaired Asbury and Tekion's business relationship because their pilot program cannot go forward.

75. CDK's withholding of Client Data has proximately resulted in Asbury's inability to implement its pilot program with Tekion at the Four Dealerships.

76. As a direct and proximate result of CDK's conduct, Asbury has suffered substantial and irreparable harm for which there is no adequate remedy at law to compensate Asbury.

77. Further, as a direct and proximate result of CDK's conduct, Asbury has suffered damages in an amount to be determined at trial.

**COUNT V**
**Declaratory Judgment**

78. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

79. The Declaratory Judgments Act gives courts the power "to declare rights and other legal relations of any interested party. . . in any civil case in which it appears to the court that the ends of justice require that the declaration should be made." O.C.G.A. § 9-4-2.

80. An actual controversy exists between Asbury and CDK with respect to: (a) whether the MSA requires Asbury to use CDK as its exclusive provider of CDK's core products and services during the Renewal Period; and (b) whether the MSA requires CDK to complete the transfer of Asbury's Client Data to Asbury when requested as consistent with the Parties' course of performance.

81. Based on the foregoing, Asbury respectfully requests the Court declare that: (a) Asbury has no obligation under the MSA to use CDK as its exclusive provider of core products and services during the Renewal Period; and (b) the MSA requires CDK to complete the transfer of Asbury's Client Data to a DMS provider like Tekion when requested consistent with the Parties' MSA and course of performance.

82. Declaratory relief will resolve the dispute between Asbury and CDK regarding their rights and obligations under the MSA.

## COUNT VI
## Attorney's Fees Pursuant to O.C.G.A. § 13-6-11

83. Asbury incorporates by reference all paragraphs of this Complaint as though fully stated herein.

84. CDK has acted in bad faith, has been stubbornly and maliciously litigious, and has caused Asbury unnecessary trouble and expense.

85. More specifically, CDK has acted in bad faith by concocting and stringing together numerous meritless excuses for refusing to provide Asbury's Client Data.

86. In addition, CDK has acted in bad faith by improperly contacting Tekion with the intention of threatening and interfering with Asbury's business and contract with Tekion.

87. CDK is therefore liable to Asbury for all of Asbury's costs and expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

88. Accordingly, Asbury seeks to recover its statutory attorneys' fees, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays for judgment in favor of Asbury and against Defendant CDK on all counts in this Complaint, and that the Court grant the following relief:

a. Specific performance requiring Defendant CDK to provide the requested Client Data to Tekion immediately;

b. Injunctive relief, enjoining Defendant CDK from refusing to provide Asbury access to its Client Data, which was first requested on January 16, 2024;

c. Actual damages, to include injury to Asbury's loss of present and prospective business;

d. For a declaration that the MSA does not require Asbury to use CDK as its exclusive provider of CDK's Core Products and Services during the Renewal Period;

e. For a declaration that the MSA requires CDK to complete transfer of Asbury's Client Data upon request by Asbury, as consistent with the Parties' prior course of performance;

f. Attorneys' fees and costs;

g. Pre- and post- judgment interest as allowed by law; and

h. Any and all such other and further legal and equitable relief as the Court deems necessary, just, and proper.

**REQUEST FOR TRIAL BY JURY**

Asbury respectfully requests trial by jury for all issues so triable.

Respectfully submitted this 3rd day of June, 2024.

**McGuireWoods LLP**

/s/ M. Laughlin Allen
M. Laughlin Allen
Georgia Bar No. 901999
McGuireWoods LLP
1075 Peachtree Street, N.E., 35th Floor
Atlanta, GA 30309
Tel: (404) 443-5738
Fax: (404) 443-5773

Email: mlallen@mcguirewoods.com

Benjamin L. Hatch
Virginia Bar No. 70116 (to be admitted *pro hac vice*)
McGuireWoods LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Tel: (202) 857-1700
Fax: (202) 857-1737
Email: bhatch@mcguirewoods.com

Jodie H. Lawson
NC Bar No. 42900 (to be admitted *pro hac vice*)
McGuireWoods LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2000
Fax: (704) 343-2300
Email: jlawson@mcguirewoods.com

*Attorneys for Plaintiff Asbury Automotive Group, Inc.*

24-A-04939-3

VERIFICATION OF BARRY COHEN

I, Barry Cohen, being duly sworn under oath, hereby state that the following is true and correct to the best of my knowledge, information, and belief, which is based on my personal knowledge:

1. I am over 18 years old and believe in the obligations of an oath.

2. I am the Vice President and Chief Information Officer of Asbury Automotive Group, Inc. ("Asbury"). I have served in this role for over 10 years and haves worked at the company for more than 13 years.

3. I have read the allegations in all Paragraphs of Asbury's Verified Complaint for Damages and Declaratory and Injunctive Relief regarding Defendant CDK Global, LLC's breach of contract, conversion, tortious interference with contractual relations, and tortious interference with business relations as well as Asbury's request for a declaratory judgment and attorney's fees.

4. All such allegations are true and correct to the best of my knowledge, information and belief.

Barry Cohen

Barry Cohen

Sworn to and subscribed before me
This 3 day of June, 2024.

Notary Public
My Commission Expires: 10.30.27

J K WALKER
MY COMMISSION EXPIRES 10/30/2027
NOTARY PUBLIC GWINNETT COUNTY, GEORGIA

# EXHIBIT F

E-FILED IN OFFICE - JM
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
24-A-04939-3
6/3/2024 8:38 PM
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA**

| | | |
|---|---|---|
| **ASBURY AUTOMOTIVE GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No.** 24-A-04939-3 |
| **CDK GLOBAL, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION & EXPEDITED CONSIDERATION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Plaintiff Asbury Automotive Group, Inc. ("Asbury"), pursuant to O.C.G.A. §§ 9-5-1 and 9-11-65, moves the court for a preliminary injunction against Defendant CDK Global, LLC ("CDK") and requests that the Court expedite the consideration of this Motion.

## I. INTRODUCTION

Asbury is an automotive retailer with dealerships in multiple states across the country, including Georgia. CDK provides information technology services to the automotive retail industry and is one of two dominant service providers in a field that has long been characterized by the presence of two large providers. Asbury has utilized CDK's technology services for over a decade to manage Asbury's data. Asbury relies on the data maintained by CDK's software to run all aspects of its business; indeed, the data stored by CDK is necessary and critical to the daily operation of Asbury's business. Asbury and CDK entered into a Master Services Agreement ("MSA") in 2019 under which CDK provided technology support services for some 89 dealerships of Asbury. This contract had an initial exclusivity term—a period in which, with some exceptions, Asbury was generally required to keep these dealerships supported by CDK.

That initial exclusivity period ended in April of this year. Asbury elected to extend its contract at that time for a year, but critically, the extension period of the contract does not require exclusivity. Knowing that it would be freed from the exclusivity requirement as of April 2024, Asbury considered whether a competitor of CDK could offer it better service or prices, or both. Asbury identified Tekion Corporation ("Tekion"). A relatively new market participant in the dealership data management space and competitor of CDK, Tekion offers cutting edge and improved data management strategies that stand to significantly improve management of Asbury's data. Asbury announced in January 2024, that it would conduct a pilot program with Tekion. Under this pilot program, Asbury would have data from only four of its stores transferred from CDK to Tekion for the pilot program. If the pilot program is successful, Asbury could then transfer more of its stores to Tekion in 2025 and 2026, all of which is consistent with the non-exclusivity period of Asbury's contract with CDK.

CDK has fought Asbury's request to transfer the data from the four selected dealerships (the "Four Dealerships") to Tekion at every turn by CDK. Indeed, CDK has in bad faith refused to transfer the Four Dealerships' data even though this is a function CDK has historically routinely performed with ease and at no charge.[1] Rather, CDK told Asbury it could come get its own data, which Asbury attempted. The tools CDK provides to access customer data directly proved wholly inadequate, however, and then, in a bizarre turn, CDK accused Asbury of wrongfully attempting to access *its own data*. Asbury's every effort to get just the Four Dealerships transferred has been rejected by CDK, even when Asbury offered to pay for the transfer—an offer Asbury was not required to make under its agreement with CDK but which Asbury ultimately advanced to try and

[1] CDK has transferred Asbury's data at Asbury's request to other dealer management systems ("DMS") at no charge on numerous occasions, including as recently as May 2024.

resolve the impasse. It is thus apparent at this point that CDK intends to quash any competition by Tekion, and that CDK intends to attempt to retain Asbury's business by brute force refusal to yield up *Asbury's own data*. Asbury has been left with no choice but to seek the Court's intervention to direct CDK to yield up Asbury's data to Tekion.

The significance of this issue goes well beyond the Four Dealerships' data that CDK is refusing to transfer. As a direct consequence of CDK's bad faith, Asbury is unable to proceed with its pilot program and planned move to Tekion. Asbury will lose out on financial commitments it has made to Tekion if Asbury cannot have its data transferred in a timely fashion. And, even more significantly, if Asbury cannot run the pilot program with Tekion, its ability to shift its stores to Tekion in 2025 and 2026 will be severely impaired, resulting in massive disruption to Asbury's business. CDK's conduct has thus caused and will continue to cause significant and irreparable harm to Asbury.

Accordingly, Asbury respectfully requests that the Court issue an order (i) granting Asbury's motion for a preliminary injunction on an expedited basis to prevent CDK's gamesmanship, anti-competitive conduct, and bad faith, and (ii) requiring CDK to immediately yield up Asbury's data, in the form and manner requested on January 16, 2024, just as CDK has done in the past and as CDK is obligated to do under the plain letter of the parties' contract. As demonstrated below, all four factors considered in connection with Asbury's request weigh heavily in favor of granting a preliminary injunction. *See City of Waycross v. Pierce Cty. Bd. of Comms.*, 300 Ga. 109, 111 (2016) (articulating factors to consider for granting preliminary injunction).

*Irreparable Harm.* First, CDK's conduct, if not enjoined, will make it impossible for Asbury to move forward with its pilot program with Tekion, which was scheduled to commence in May 2024, and prevent the contracted-for launch of the Four Dealerships with Tekion in

September 2024. Thereafter, Asbury has contracted with Tekion to move additional dealerships beginning in 2025 and 2026 so that it can be fully moved over to Tekion's services by 2027. The negative impact to Asbury's business caused by CDK's refusal to provide access to Asbury's data cannot be overstated—Asbury cannot proceed with the Tekion pilot program without its data, which means that Asbury will not be able to complete the pilot program. Consequently, Asbury will not be able to meet the contractually required launch of the Four Dealerships by September 2024 and therefore will be unable to proceed with its contractually agreed move of additional stores through 2025 and 2026.

Quite literally, Asbury will suffer irreparable harm unless the Court intervenes. Data management is the lifeblood of Asbury's business and CDK's bad faith and unlawful conduct have prevented it from implementing its data management plan with Tekion now and into the future. Further, Asbury and CDK *agreed* that this type of irreparable injury and damage would entitle Asbury to injunctive relief pursuant to their contract. *See* Master Services Agreement § 19(H), attached as Ex. 1 to Verified Compl. Every day that goes by without the Four Dealerships' data further delays the time that Asbury will be able to implement the pilot program with Tekion and jeopardizes Asbury's ability to comply with the Tekion agreement to launch Four Dealerships by September 2024, and further jeopardizes Asbury's plan to move dealerships beginning in 2025. Thus, Asbury will suffer immediate irreparable harm unless the Court intervenes to enforce Asbury's contractual rights under the MSA. *See*, *e.g.*, *MasterMind Involvement Mktg., Inc. v. Art Inst. of Atl., LLC*, 389 F. Supp. 3d 1291, 1295 (N.D. Ga. 2019) (granting preliminary injunction under nearly identical circumstances).

*Balancing of Harm.* In contrast to the irreparable harm Asbury will suffer, the burden on CDK is, for all practical purposes, non-existent. CDK has quickly and efficiently completed data

transfers for Asbury with minimal effort in the past. Because Asbury cannot proceed with its pilot program or the contracted-for launch with Tekion without the requested data, the irreparable harm to Asbury greatly outweighs any burden to CDK.

*Likelihood to Succeed on the Merits.* CDK's conduct in withholding Asbury's data is in violation of the parties' contract; amounts to conversion; and constitutes tortious interference with the contract and business relationship between Asbury and Tekion. As demonstrated below, there is substantial likelihood that Asbury will prevail on the merits of its claims at trial.

*Public Interest.* Lastly, granting this Motion will support Georgia's bedrock public policy of freedom of contract and promoting competition. CDK's conduct in withholding Asbury's data contravenes the terms of their contract *and* inhibits Asbury's ability to contract with other vendors, and is designed and intended to thwart competition in the marketplace by making it impossible for retail concerns similar to Asbury to seek other data management solutions.

## II. RELEVANT FACTUAL BACKGROUND

### A. Asbury and CDK's Prior Course of Performance and Master Services Agreement

Asbury and CDK (the "Parties") have been business partners for more than thirteen years. *See* Affidavit of Barry Cohen ("Aff.") ¶ 5, attached hereto as **Exhibit 1**. Throughout this relationship, CDK has provided Asbury with software application programs and computer hardware designed to automate Asbury's automotive dealerships. *Id*. For example, CDK provides Asbury with a Document Storage and Document Archiving System ("DSDA") that stores all of Asbury's historical documents. *Id*. CDK also provides Asbury with a Client Relationship Manager ("CRM") platform, which allows Asbury to store and access its customer data. *Id*. To be able to use CDK's products and services, Asbury provides CDK with its proprietary and confidential business information, including customer data, inventory information, sales history, and financial

records. *Id*. at ¶ 6. In return, CDK has agreed to protect Asbury's ownership and right to possess its data. *Id*. The data stored by CDK is essential to Asbury's business and is what allows it to conduct day-to-day operations. *Id*.

On April 22, 2019, the Parties entered into the MSA, which is the contract at issue in this case. *Id*. at ¶ 8. The MSA makes clear the Client Data is Asbury's proprietary data. *Id.* at ¶ 11. "Client Data" means: "any [Asbury] file or other information provided by [Asbury] to CDK (including information of [Asbury's] customers) and any extract, database, output, reports, or derivative works created by [Asbury], and any [Asbury] business or transaction information produced by or for [Asbury] using the Products and Services or Software[.]" MSA § 8(A). Under the MSA, Asbury's Client Data "shall be and remain[s] the exclusive and confidential property" of Asbury; "CDK does not claim ownership over any Client Data . . . ."; and Asbury is "free to extract, aggregate, use, store, modify, compile, retransmit, and distribute" its own Client Data. *Id.* §§ 7(A), 8(A). Throughout the course of the Parties' relationship, CDK's services to Asbury have also, necessarily, included transferring Asbury's data at Asbury's request and direction. Aff. ¶ 7. Until recently, Asbury has never had issues requesting and/or having its own data transferred to another DMS provider from CDK. *Id.*

The Parties agreed the "Initial Term" of the MSA would run through April 22, 2024, and provide Asbury the option to renew the Agreement for up to two (2) successive periods of one (1) year each (the "Extension Period"). *See* MSA § 3(A). On or about April 22, 2024, the Parties renewed the MSA for another year—until April 22, 2025. Thus, the Extension Period runs from April 22, 2024 through April 22, 2025. Aff. ¶ 10.

While the MSA contains an exclusivity clause, it applies only to the Initial Term (and, even then, does not apply to the "Excluded Locations"). Section 4(B) of the MSA, titled "Qualified

Exclusivity," provides "that all retail motor vehicle dealer locations owned by Asbury . . . now or in the future, will license, and pay for, the Core Applications and Services at all times during the *Initial Term* of this Agreement." MSA § 4(B) (emphasis added). Thus, after April 22, 2024, Asbury was free to use other vendors to supply the "Core Applications and Services" CDK provided at some of Asbury's dealership locations. Further, "Excluded Locations" is an exception to the exclusivity requirement during the Initial Term for up to three dealer locations. MSA § 4(B). Asbury specifically and intentionally negotiated this provision to allow it to explore a relationship with other vendors and move to a different DMS provider if it wanted to. Aff. ¶ 9. Thus, even during the Initial Term (which is now concluded), Asbury had the contractual right to have at least three dealer locations managed by a different vendor, such as Tekion.

**B. Asbury and Tekion Reach an Agreement for a Pilot Program and Asbury Requests its Client Data**

On December 8, 2023, Asbury and Tekion reached an agreement for a trial pilot program under which Asbury would start using the dealership management technology provided by Tekion—instead of CDK—for the Four Dealerships, effective September 2024, following the termination of the exclusivity period in the Initial Term of the MSA. Aff. ¶ 12. Asbury also contracted with Tekion to move additional dealerships to Tekion dealership management technology beginning in 2025 and 2026 so that Asbury can be fully moved to Tekion services by 2027. *Id*. Soon after, various news outlets publicized Asbury's new partnership with Tekion. *Id*. at ¶ 13.

Rolling out a new DMS is one of the most difficult and risky projects a dealer group can undertake because managing Client Data is the linchpin of the business. *Id.* ¶ 14. Asbury commissioned Tekion to conduct a pilot program at the Four Dealerships because Tekion is a new market participant offering a competitive and improved DMS product that will significantly

support and enhance Asbury's business. During the pilot program, Asbury must re-engineer many business processes including inventory management, payroll, sales, services, parts, and accounting. *Id.* In addition to perfecting these processes, Asbury also has to develop training materials and set up IT and business controls required to be compliant with federal regulations. *Id.* This must be done on a small scale and verified by internal and external auditors before a large, full-scale rollout can be contemplated. *Id.* It is for this reason that Asbury exercised the contracted-for Extension Period under the MSA, so that Asbury continues to receive the contracted-for services under the MSA during the pilot program and prior to an enterprise rollout with Tekion. It is estimated that the pilot program will take six to eight months; and if successful, an enterprise rollout will take between two to three years. *Id.*

As part of its deal, and prior to launching with Tekion in September 2024, Asbury needs to provide its Client Data related to the Four Dealerships to Tekion so Tekion can begin loading the data into its products and software (just like CDK did at the start of the CDK-Asbury relationship) to initiate and complete the pilot program. Aff. ¶ 15. Accordingly, on January 16, 2024, Asbury promptly requested—through CDK's "FTP Request Form"—that CDK provide complete and full access to its Client Data related to the Four Dealerships that are part of its pilot program with Tekion. *Id*. at ¶ 17. In response to this request, on January 25, 2024, CDK told Asbury that Asbury would first need to send a "cancellation request" for the subject dealerships. *Id.* at ¶ 18. Despite there being no such requirement in the MSA, on February 5, 2024, Asbury sent CDK a cancellation request for the Four Dealerships to be effective on December 31, 2024—within the Extension Period. *Id*. at ¶ 19.

Notwithstanding the fact that Asbury has done everything that CDK has asked it to do, CDK has still refused to release the Client Data. *Id*. at ¶ 20. On February 7, 2024, CDK refused

Asbury's request for access to its Client Data because, CDK stated, "a CDK facilitated data transfer . . . is only available upon the termination of a location during the transition assistance period or the termination or expiration of our agreement." *Id*. at ¶ 21. Instead, CDK pointed Asbury to its "data warehouse" and "Data—Your Way" tool, neither of which provide the full and complete data sets that Asbury requested. *Id*. Additionally, CDK stated (incorrectly) that Asbury's request to terminate "all CDK Services" for the Four Dealerships as of December 31, 2024 was not permitted because the MSA "does not permit termination of core products and services prior to the transition assistance period." *Id*. at ¶ 22.

Asbury cannot fully and accurately access its Client Data without CDK's cooperation—it is impossible as a practical matter. *Id*. at ¶ 23. For example, the tools offered by CDK do not allow Asbury to extract <u>any</u> data from the DSDA system, which holds Asbury's own Client Data. *Id*. As another example, Asbury only has access to <u>replicated</u> CRM data but does not have access to the actual SQL databases needed to verify the completeness and accuracy of the Client Data. *Id*. By contrast, CDK is able to easily, efficiently, and accurately extract the requested Client Data, as it has done many times before at Asbury's request. *Id*. at ¶ 24. Asbury has tried to access its Client Data, to no avail. Even more egregious, after telling Asbury to "come and get its own data," on May 23, 2024, counsel for CDK sent Asbury's counsel a cease and desist letter regarding Asbury's attempts to access its Client Data—and Asbury's account was disabled. *Id.* at ¶ 23.

Obtaining the Client Data for Asbury's Four Dealerships is <u>necessary</u> for Asbury to fulfill its agreement with Tekion to implement its pilot program, which is required for Asbury to operate its automotive business pursuant to the confidential contract between the parties. *Id.* at ¶ 27. Asbury was obligated to provide Tekion its Client Data pertaining to the Four Dealerships by may 2024 in order to ensure a timely launch in September 2024. *Id*. Because CDK is refusing to

transfer the data, Asbury is working with Tekion to arrange an alternative date for launch in October 2024. *Id.* Nonetheless, there is grave concern about postponing the Four Dealership launch date beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sales volume months so the launch cannot happen during that time. *Id.* Thus, every day that CDK refuses to transfer Asbury's Client Data is another day that Tekion is not able to complete the pilot program and another day closer to not being able to install the Four Dealerships, as required by contract. Every day also further jeopardizes Asbury's plan to move dealerships beginning in 2025. *Id*. CDK is keenly aware of the substantial harm to Asbury's business caused by not having access to its Client Data. *Id*. at ¶ 26.

On April 2, 2024, CDK contacted Tekion without Asbury's permission with respect to the Asbury-Tekion pilot program. *Id*. at ¶ 28. CDK threatened "that any remote or in-person access by Tekion to screen displays generated by CDK Products and Services, or to such Products and Services directly, including through software and/or the use of CDK login credentials, would constitute a material breach of the MSA." *Id*. CDK also threatened that Tekion's actions could be considered to be inducing Asbury's non-compliance with the MSA and thus "actionable as tortious interference." *Id.* These statements are untrue as the MSA exclusivity provision has concluded and the MSA permits Asbury to reduce the number of dealerships using CDK's core services now that the Parties are in the Extension Period.[2]

The agreement between Asbury and Tekion required Asbury to begin transferring its Client Data pertaining to the Four Dealerships by May 2024, so that Tekion can timely launch the pilot

[2] Even if the Parties were still in the Initial Term (which they are not), the Exclusivity Provision would have still permitted Asbury to exclude up to three (3) of its dealership locations from the requirement of using CDK's Core Products and Services. *See* MSA § 4(B). Thus, the MSA specifically contemplated that Asbury—whether in the Initial Term or Renewal Period—could contract with another vendor.

program. *Id*. at ¶ 15. Despite Asbury's best efforts to obtain its own Client Data, the Client Data has not been transferred because CDK is wrongly holding the Client Data hostage. *Id.* As a result, Tekion cannot timely launch the pilot program and Asbury's plan to launch with the Four Dealerships in September 2024 pursuant to the contract with Tekion has been obstructed by CDK's improper conduct. *Id*. at ¶ 16. On May 9, 2024, Asbury sent CDK a formal demand letter requesting that CDK immediately provide Tekion with Asbury's Client Data. *Id*. at ¶ 29. To date, CDK still has not done so and has instead manufactured excuses for further delay. *Id*. To ensure that Tekion is able to perform the contracted-for services as soon as possible, and to ensure that Asbury can comply with its contractual obligations to Tekion for a planned launch of the Four Dealerships in accordance with their confidential contract as well as Asbury's contracted-for dealership data management with Tekion that is needed to run its business, Asbury needs to obtain its Client Data immediately. *Id*. at ¶¶ 15, 27.

### C. Asbury Undertakes Good Faith Efforts to Obtain the Contractually-Agreed Transfer of its Client Data

Having been refused at every turn by CDK to transfer its Client Data for the Four Dealerships in order meet its contracted-for pilot program with Tekion, Asbury engaged counsel and sent a demand letter to CDK on May 9, 2024. *See* **Exhibit 2**. The letter outlined the contracted-for provisions in the MSA that CDK was overlooking and sought immediate transfer of Asbury's Client Data. *See id*. Further, Asbury explained the irreparable harm being imposed upon Asbury by having its Client Data being held hostage by CDK such that it is not able to complete the pilot program with Tekion, proceed with the planned move to Tekion, or adequately plan for or carry out Asbury's data management that is the linchpin of its business. *See id*. CDK responded on May 22 and 23, 2024. *See* **Exhibit 3**. On May 31, 2024, Asbury's counsel responded to explain that Asbury was not terminating the MSA by exercising its contractual right to remove

the Four Dealerships from the MSA, that even though Asbury did not read the MSA to require payment to obtain transfer of its Client Data, Asbury would be willing to pay the hourly time and costs to transfer the Four Dealerships in order to obtain the necessary Client Data to meet its contractual obligations with Tekion, and again requesting immediate transfer of its Client Data. *See* **Exhibit 4**. Unfortunately, despite multiple good faith efforts to obtain its Client Data as required by the MSA, CDK continued to refuse to comply with Asbury's requests, thereby necessitating immediate relief from the Court.

## III. LEGAL ARGUMENT & CITATION TO AUTHORITY

Plaintiff is entitled to a preliminary injunction to ensure Plaintiff has access to its own Client Data under Georgia and New York law, as well as under the terms of the MSA.

As an initial matter, the MSA at issue contains a choice of law provision that designates New York law. *See* MSA § 19(J). Plaintiffs have also asserted conversion claims and tortious interference claims arising under Georgia law and can similarly show a likelihood of success on the merits of those claims, warranting injunctive relief.[3]

### A. Preliminary Injunction Standard

Georgia courts have broad discretion in granting an interlocutory injunction. *SRB Inv. Servs., LLLP v. Branch Banking & Tr. Co.*, 289 Ga. 1, 5 (2011). Injunctive relief is particularly

[3]The choice of law provision does not apply to Asbury's tort claims. Georgia courts draw a distinction between applying choice of law provisions that govern the "agreement" compared to "any and all claims arising out of the relationship." *See Baxter v. Fairfield Financial Services,* Inc., 307 Ga. App. 286 (2010); *Young v. W.S. Badcock Corp*., 222 Ga. App. 218 (1996). Under Georgia conflict-of-law rules, the substantive law of the place where the tort was allegedly committed is the law by which liability is determined. *Baxter*, 307 Ga. App. at 292. ("Because the provision in Young limited itself to the terms of the agreement, Georgia law applied to the fraudulent representation claim because the representations allegedly occurred in Georgia. . . .").

appropriate where, as here, the withholding of injunctive relief would leave Asbury without an adequate remedy. *See Rash v. Toccoa Clinic Med. Assocs.*, 253 Ga. 322, 327 (1984).

In evaluating Asbury's request for an injunction, the Court must balance the equities which includes consideration of whether: "(1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest." *City of Waycross v. Pierce Cnty. Bd. of Comms.*, 300 Ga. 109, 111 (2016). As this is a balancing test, Asbury need not prove all four factors to obtain the interlocutory injunction. *Id.* Further, the Court need only find that Asbury has a substantial likelihood of succeeding on one of its claims—not all. *Atlanta Sch. of Kayaking, Inc. v. Douglasville-Douglas Cnty. Water & Sewer Auth.*, 981 F. Supp. 1469, 1472 (N.D. Ga. 1997).

Here, a balancing of the equities weighs strongly in favor of requiring CDK to complete the transfer of Asbury's Client Data to Tekion. Accordingly, Plaintiff is entitled to the injunctive relief it seeks.

**B. Asbury will suffer irreparable harm unless interim injunctive relief is granted pending a final decision on the merits.**

The most important factor in the Court's analysis is whether there is a substantial threat of irreparable injury to the moving party. *See City of Waycross*, 300 Ga. at 111. When the moving party alleges its vendor is withholding its electronic information thereby negatively impacting its ability to run its business, such constitutes irreparable harm. *See MasterMind Involvement Mktg., Inc. v. Art Inst. of Atl., LLC*, 389 F. Supp. 3d 1291, 1295 (N.D. Ga. 2019). For example, in *MasterMind,* the defendants, a group of art institutes, filed a counterclaim and moved for a preliminary injunction

requesting that the court order the plaintiff, a marketing company, to transfer control of the defendants' social media accounts and login information—which the marketing company was holding hostage pending further payment from the defendants—back to the defendants. *Id.* at 1293. The court found that because the defendants "rely heavily on their ability to market and advertise through social media" and "their inability to do so has had a negative impact on their reputation and business," they would suffer irreparable harm absent a preliminary injunction. *Id.* at 1295.

The circumstances here are even more critical. Asbury relies on its Client Data to run its dealerships. Aff. ¶ 6. As part of the agreement with Tekion, Asbury has contractually agreed to complete a pilot program with Four Dealerships and to launch the Four Dealership with Tekion services by September 2024. *Id*. at ¶ 27. To do so, Asbury needs to send its Client Data for those Four Dealerships to Tekion by May 2024. *Id.* Because CDK has refused to transfer the data, Asbury has been working with Tekion to arrange an alternative date for launch in October 2024. *Id.* Nonetheless, there is grave concern over postponing the Four Dealership launch date beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sales volume months so the launch cannot happen during that time. *Id.* Most importantly, every day that goes by without its Client Data jeopardizes Asbury's plan to move dealerships to Tekion beginning in 2025. *Id.* Without the benefit of the Tekion pilot program at the Four Dealerships, Asbury will be unable to assess how the full conversion of its other stores to Tekion might work in practice. CDK's refusal to provide the Client Data thus risks putting Asbury's entire business model in jeopardy. *See id.* at ¶ 14.

In fact, the parties agreed that any breach of Sections 7 or 8 of the MSA—which deals with CDK and Asbury's use of the Client Data and is the source of Asbury's breach of contract claim—constituted "irreparable injury and damage," entitling the injured party to injunctive relief. *See* MSA,

§ 19(H) (titled "Remedies"). Thus, just as the *MasterMind* court found the defendants suffered irreparable harm without their ability to market and advertise through their social media accounts, so should this Court find Asbury suffers irreparable harm without its Client Data which not only enables the Four Dealerships to function pursuant to contract, but also to stay on course for the eventual full conversion of Asbury's stores to Tekion, which Asbury has contractually agreed to and put significant time and resources in. *See* 389 F. Supp. 3d at 1295; *see also River Servs. Co. v. Peer*, No. 17-2691, 2017 WL 1407894, at *3 (E.D. La. Apr. 20, 2017) (granting preliminary injunction and ordering defendants to transfer control of plaintiffs' website domains and passwords because "[i]f Defendants are allowed to continue to hold [plaintiffs'] websites hostage and refuse to transfer control, Plaintiffs will suffer a disruption of business and customer relations")); *Ardis Health, LLC v. Nankivell*, No. 11 Civ. 5013, 2011 WL 4965172, at *2-3 (S.D.N.Y. Oct. 19, 2011) (granting preliminary injunction and ordering defendants to provide access information for plaintiffs' website, email accounts, and social media accounts because plaintiffs' inability to so access negatively impacted plaintiffs' "reputation and ability to remain competitive").

Asbury was required to provide its Client Data pertaining to the Four Dealerships to Tekion by May 2024 to allow Tekion time to upload the data and launch the pilot program. *Id*. at ¶¶ 15-16. Every day that goes by in which CDK improperly withholds Asbury's Client Data is another day that Asbury cannot complete the pilot program and another day closer to not being able to install the Four Dealerships, as required by the confidential contract. *Id*. at ¶¶ 16, 27. Wrongly withholding Asbury's Client Data—in an effort to strongarm Asbury into staying with CDK—rather than complying with the agreed upon contractual terms that provide a clear termination of the exclusivity period following the Initial Term and permit Asbury to freely contract with competitors and explore other data management products is substantially injurious to Asbury's business. *Id*. at ¶ 26. CDK knows this.

*Id*. But, restricting customers' access to their own data and engaging in other anticompetitive behavior is not new to CDK, which is currently embroiled in numerous antitrust lawsuits that have been consolidated into an MDL. *Id.*; *see also In Re: Dealer Management Systems Antitrust Litigation*, MDL 2817 (N.D. Ill.). CDK's improper withholding of Asbury's Client Data means that Asbury has not been able to provide Tekion with the data it needs to launch the pilot program which, in turn, means that Asbury's operations cannot timely commence.

**C. The balance of hardships weighs in favor of granting interim injunctive relief pending a final decision on the merits.**

The impact on CDK in requiring it to transfer Asbury's Client Data to Asbury is practically non-existent. In their prior course of performance, when Asbury has requested its Client Data, CDK has done so quickly and easily—indeed as recently as May 2024. Aff. ¶¶ 7, 24. This request is no different. Yet CDK is withholding the Client Data not because transferring it would be burdensome—but because (i) CDK dislikes Asbury's new partnership with Tekion, CDK's competitor, and (ii) CDK is attempting to force Asbury into testing CDK Unify, CDK's new product, against Asbury's wishes. *Id.* at ¶ 26. In fact, in refusing to transfer Asbury's data, CDK has not stated it *could not* transfer the data or even that it would be burdensome to do so. *Id.* at ¶ 29. Meanwhile, the harm that would accrue to Asbury if the Court does *not* grant this motion, as described in *supra* § III(B), is irreparable as it completely prohibits the Asbury-Tekion pilot program from moving forward, thereby preventing Asbury from conducting its business at the Four Dealerships and threatening the planned move to Tekion in 2025 altogether.

Moreover, in the MSA, CDK expressly agreed that injunctive relief could be granted for a breach related to Sections 7 or 8, as Asbury has alleged here. *See* MSA § 19(H).

Therefore, the immediate and irreparable harm Asbury will continue to suffer absent injunctive relief far outweighs the negligible harm, if any, that CDK would experience from a

preliminary injunction. Thus, the injunction should be issued because a balancing of the risk of harm weighs heavily if not exclusively in favor of Asbury.

### D. Asbury is likely to succeed on the merits of its claims against CDK.

#### 1. Asbury is likely to prevail on its breach of contract claim against CDK.

To prevail on a breach of contract claim under New York law, Asbury must show "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (internal citations omitted). As discussed above, Asbury and CDK entered into the MSA, a valid contract. And Asbury has performed in accordance with the MSA, which requires Asbury to use CDK as the exclusive provider of core products and services only during the Initial Term, not the Extension Period. Asbury complied with the MSA and used CDK as its exclusive provider of core products and services during the Initial Term. Asbury's pilot program with Tekion was not set to begin until the Extension Period, ensuring Asbury complied with the MSA. Although not required, Asbury also complied with CDK's demand that Asbury first "cancel" its services for the Four Dealerships participating in the Tekion pilot program, prior to transferring Asbury's data.

Meanwhile, CDK is refusing to complete a transfer of Asbury's Client Data notwithstanding its lengthy prior course of performance where CDK regularly provided Asbury with its Client Data, upon request, and its contractual promise that it "does not claim ownership over any Client Data." MSA § 7(A); *see also id.* § 8(A) (promising that Asbury's Client Data "shall be and remain the exclusive and confidential property of" Asbury). Thus, CDK is in breach of its promise under the MSA that the Client Data would remain *only* the exclusive and confidential property of Asbury.

Further, "[i]mplicit in all contracts is a covenant of good faith and fair dealing." *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289 (N.Y. 1995). This encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* Here, Asbury has reasonably understood that it is entitled to its Client Data pursuant to the parties MSA, since the data is, undisputedly, Asbury's. CDK's position that Asbury can have its data it just has to "come and get the data itself" is nonsensical, impractical, and inconsistent with the parties' prior course of performance, where Asbury would request its data (as it has here) and CDK would transfer it to the DMS provider. Put simply: Asbury cannot "aggregate, use, store, modify, compile, retransmit, [or] distribute" its Client Data, *see* MSA, § 8(A), if it does not have the ability to access its Client Data. This is particularly true when CDK disables Asbury's access to the system. *See* Aff. ¶ 23. It is indisputable that CDK has the ability to provide access to the requested data, CDK is simply choosing not to because (i) it wants to retain Asbury's business and force Asbury into testing CDK Unify, and (ii) CDK wants to maintain its market dominance and avoid the implication that other solutions to data management exist. Thus, in exercising its discretion in refusing to transfer the Client Data, CDK has acted arbitrarily, in bad faith, and its own self-interest, all to the detriment of Asbury.

Finally, CDK's refusal to honor the MSA and allow Asbury access to its Client Data has delayed the implementation of its pilot program with Tekion, which means that Asbury cannot conduct business operations at its Four Dealerships pursuant to contract. Furthermore, if Asbury is unable to proceed with the pilot program, it will be unable to assess how the Tekion services work in practice on a larger scale.

**2. Asbury is likely to prevail on its conversion claim against Defendant CDK.**

To make a claim for conversion, Asbury must show: "(1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." *Bo Philips Co. v. R.L. King Props., LLC*, 336 Ga. App. 705, 707 (2016).

In *MasterMind*, the court found the defendants were likely to succeed on a conversion claim under nearly identical facts. 389 F. Supp. 3d at 1294. It found "[the defendants] ha[d] valid legal title to the social media accounts and login information; that MasterMind currently has actual possession of the social media accounts and login information; that the AI Defendants [] demanded return of the accounts and login information, and that MasterMind has refused to transfer back the accounts and login information to [them]." *Id.* Just as in *MasterMind*, Asbury has valid legal title to its Client Data (indeed, the parties so agreed in the MSA); CDK has actual possession of the Client Data; Asbury demanded return of the Client Data; and CDK has refused to comply. As such, Asbury is likely to prevail on its conversion claim.

**3. Asbury is likely to prevail on its tortious interference claims against CDK.**

To sustain a cause of action for tortious interference with contractual or business relations, Asbury must show that CDK: (1) acted improperly and without privilege (i.e., as a stranger to the business relationship); (2) acted purposefully and with malice with the intent to injure; (3) induced a breach of contractual obligations or caused Tekion to discontinue or fail to enter into an anticipated business relationship with Asbury; and (4) CDK's tortious conduct proximately caused damage to Asbury. *Metro Atl. Task Force for the Homeless, Inc. v. Ichthus Community Tr.*, 298 Ga. 221, 230 (2015). The cause of action for tortious interference with contractual relations also

requires proof of an existing contract with a third party. *See Tap Room, Inc. v. Peachtree-Tsg Assocs., LLC*, 270 Ga. App. 90, 92 (2004).

CDK is a stranger to Asbury and Tekion's business relationship and contract. While Tekion and CDK offer similar services, Asbury's engagement with Tekion—at this time—is limited to the Four Dealerships; the rest of Asbury's approximately 90 dealerships are still using CDK products and services. By reaching out to Tekion and accusing it of wrongdoing and by withholding the Client Data from Asbury, CDK has acted improperly and without privilege.

CDK took these improper actions after news reports came out about the Asbury-Tekion contract. And, CDK went so far as to send a letter to Tekion warning that its business with Asbury could result in "tortious interference"—a meritless accusation. CDK's letter evidences its intent to injure the Asbury-Tekion relationship and contract. The letter, coupled with the withholding of Client Data in the face of an established and contrary course of performance, demonstrates that CDK's actions have been made purposefully and with malice to injure Asbury's contract and business relationship with Tekion.

And thus far, CDK's actions have thwarted the pilot program. Unless and until Asbury has its Client Data, the pilot program cannot go on. Aff. ¶ 26-27. Furthermore, CDK is attempting to force Asbury into adopting the new CDK Unify program, to the exclusion of Tekion. *Id*. at ¶ 26. Thus, CDK's conduct is a proximate cause of Asbury's inability to complete its pilot program with its business and contractual partner Tekion; to meet the contractually required launch of the Four Dealerships by September 2024, and to proceed with its contractually agreed move for additional

stores through 2025 and 2026.[4] This is not mere coincidence but rather the entire point of CDK's bad faith approach.

**E. Granting a preliminary injunction will not disserve the public interest.**

Granting the preliminary injunction would only foster Georgia's "bedrock public policy of freedom of contract." *Nat'l Cas. Co. v. Ga. Sch. Bds. Assoc.-Risk Mgmt. Fund*, 304 Ga. 224, 232 (2018); *see also Beckman v. Cox Broadcasting Corp.*, 250 Ga. 127, 130 (1982) (noting the "public's interest in promoting competition and the freedom of individuals to contract"); *HI Tech. Corp. v. Quality Inv. Props. Suwanee, LLC*, 369 Ga. App. 859, 867 (2023) ("[I]t is paramount public policy of this state that courts will not lightly interfere with the freedom of parties to contract.").

CDK's withholding of Asbury's Client Data runs counter to the MSA and impedes Asbury's ability to freely contract with a competitor of CDK. Nothing in the MSA prohibits Asbury from acting as it has during the Extension Period, and there is no question that Asbury is entitled to its own Client Data. Indeed, CDK's prior course of performance supports that. CDK would ask this Court to interpret the MSA in a manner that inhibits competition and the freedom of entities like Asbury from contracting with others on the open market, all as part of CDK's effort to maintain its market dominance. CDK is trying to strongarm Asbury to use CDK Unify by holding Asbury's data hostage so that it cannot proceed with the Tekion pilot program, and so that Asbury will be unable to move forward with Asbury's planned move to Tekion. Thus, granting this Motion and ordering CDK to complete the transfer of the Client Data to Asbury only serves

[4] Asbury is also likely to prevail on its claim for attorneys' fees and expenses under O.C.G.A. § 13-6-11 because CDK has knowingly and willfully withheld Asbury's Client Data—for the sole purpose of impairing Asbury's relationship with Tekion—and it has continued to do so despite Asbury's demands to return it prior to instituting this litigation.

the "public's interest in promoting competition and the freedom of individuals to contract." *Beckman*, 250 Ga. at 130 (explaining how covenants not to compete are disfavored because they inhibit competition and freedom of contract).

## IV. CONCLUSION

Asbury asks this Court to grant injunctive relief pending a decision on the merits of its claims. CDK's improper withholding of Asbury's Client Data makes CDK liable for breach of contract, conversion, tortious interference with business relations, and tortious interference with contractual relations. Thus, for the reasons stated above and set forth in Asbury's Verified Complaint, Asbury respectfully requests the Court enter an order requiring CDK to complete the transfer of the Client Data as per Asbury's January 16 request. Due to the time sensitivity of this matter, Asbury respectfully requests that a hearing on this Motion be held as soon as possible.

Respectfully submitted this 3rd day of June, 2024.

/s/ M. Laughlin Allen
M. Laughlin Allen
Georgia Bar No. 901999
MCGUIREWOODS LLP
1075 Peachtree Street, N.E.
35th Floor
Atlanta, GA 30309
Tel: (404) 443-5738
Fax: (404) 443-5773
Email: mlallen@mcguirewoods.com

Benjamin L. Hatch
Virginia Bar No. 70116 (to be admitted *pro hac vice*)
MCGUIREWOODS LLP
888 16th Street N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
Tel: (202) 857-1700

Fax: (202) 857-1737
Email: bhatch@mcguirewoods.com

Jodie H. Lawson
NC Bar No. 42900 (to be admitted *pro hac vice*)
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
Tel: (704) 343-2000
Fax: (704) 343-2300
Email: jlawson@mcguirewoods.com

*Attorney for Plaintiff Asbury Automotive Group, Inc.*

**CERTIFICATION OF SERVICE & EFFORTS TO NOTIFY DEFENDANT**

Pursuant to O.C.G.A. § 9-11-65, I hereby certify that, immediately upon filing this Motion, I notified CDK Global, LLC by providing a copy to counsel at:

Matthew Provance
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
*Counsel for CDK Global LLC*

*/s/ M. Laughlin Allen*
M. Laughlin Allen
Georgia Bar No. 901999

189784867_21

# Exhibit 1

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **ASBURY AUTOMOTIVE GROUP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. _______** |
| **CDK GLOBAL, LLC,** | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| **Defendant.** | ) | |

**AFFIDAVIT OF BARRY COHEN**

I, Barry Cohen, being duly sworn under oath, deposes and states:

1. I am over 18 years old and believe in the obligations of an oath.

2. I have personal knowledge of the matters set out in this Affidavit. All of the facts stated herein are based on my personal knowledge and all are true and correct.

3. I offer this affidavit in support of Plaintiff Asbury Automotive Group, Inc.'s ("Asbury") Verified Complaint for Damages and Declaratory and Injunctive Relief and Motion for Preliminary Injunction and Expedited Consideration.

4. I am the Vice President and Chief Information Officer of Asbury. I have served in this role for over 10 years and have worked at the company for more than 13 years.

5. Asbury and CDK Global, LLC ("CDK," and together with Asbury, the "Parties") have been business partners for more than thirteen years. Throughout this relationship, CDK has provided Asbury with proprietary software application programs and computer hardware designed to automate Asbury's business functions. For example, CDK provides Asbury with a Document Storage and Document Archiving System ("DSDA") that stores all of Asbury's historical

documents. CDK also provides Asbury with a Client Relationship Manager ("CRM") platform, which allows Asbury to store and access its customer lead data.

6. In order to be able to use CDK's products and services, Asbury provides CDK with its proprietary and confidential business information, including customer data, vehicle and parts inventories, sales history, and financial records. In return, CDK has agreed to protect Asbury's ownership and right to possess its data. The data stored by CDK is essential to Asbury's business and is what allows it to conduct day-to-day operations.

7. Throughout the course of the Parties' thirteen-year business relationship, CDK's services to Asbury have also included transferring Asbury's data to other designated dealer management system ("DMS") providers at Asbury's request and direction, and at no charge. For each request, CDK would promptly and cooperatively assist in providing the DMS provider access to Asbury's Client Data. CDK's most recent transfer of Asbury's Client Data to another DMS provider was in May 2024. Until now, Asbury has never had prior issues requesting and/or having its own data transferred to another DMS provider.

8. On April 22, 2019, Asbury and CDK entered into the Master Services Agreement ("MSA"). A true and correct copy of the MSA was attached to the Verified Complaint as **Exhibit 1.**

9. The MSA's "Initial Term" ran from April 22, 2019 through April 22, 2024. On or about April 22, 2024, the Parties extended the MSA for another year, from April 22, 2024 until April 22, 2025 (the "Extension Period").

10. When negotiating the terms of the MSA, Asbury intentionally structured the MSA with a carve out to the Initial Term (MSA § 4(B)) to allow Asbury to explore moving to a different DMS provider. Asbury also negotiated the MSA such that after the Initial Period and during the

Extension Period, Asbury is free to transfer its Client Data if it wanted to because there is no exclusivity requirement during the Extension Period.

11. The MSA makes clear the Client Data—as defined in the MSA—is Asbury's proprietary data.

12. On December 8, 2023, Asbury and technology provider Tekion Corporation ("Tekion") reached an agreement memorialized in a confidential contract for a trial program under which Asbury would start using Tekion's dealership management technology—instead of CDK's—for four dealerships (the "Four Dealerships"), effective September 2024, following the termination of the exclusivity period in the Initial Term of the MSA. Asbury also contracted with Tekion to move additional dealerships beginning in 2025 and 2026 so that it can be fully moved to Tekion's services by 2027.

13. Soon after, various news outlets publicized Asbury's new partnership with Tekion.[1]

14. Rolling out a new DMS is one of the most difficult and risky projects a dealer group can undertake because Client Data is the linchpin of the business. Asbury commissioned Tekion to conduct a pilot program on the Four Dealerships because Tekion is a new market participant offering a competitive and improved DMS product that will significantly support and enhance Asbury's business. During the pilot program, Asbury must re-engineer many business processes including inventory management, payroll, sales, services, parts, and accounting. In addition to perfecting these processes, Asbury also has to develop training materials and set up IT and business controls required to be compliant with federal regulations. This must be done on a small scale and

[1] *See, e.g.*, Mark Hollmer, *Asbury Automotive will test Tekion's DMS platform*, Automotive News (Jan. 10, 2024), attached to the Verified Complaint as **Exhibit 2**; Business Wire, *Tekion Selected by Asbury Automotive Group to Elevate Guest Experiences*, Yahoo! Finance (Jan. 9, 2024), https://finance.yahoo.com/news/tekion-selected-asbury-automotive-group-160000562.html.

verified by internal and external auditors before a large, full-scale launch can be contemplated. It is for this reason that Asbury exercised the contracted-for Extension Period under the MSA, so that it continues to receive the CDK contracted-for services under the MSA during the pilot program and prior to an enterprise rollout with Tekion. It is estimated that the pilot program will take six to eight months; and if successful, an enterprise rollout will take between two to three years.

15. As part of its deal, and prior to the contractually required launch with Tekion in September 2024, Asbury needs CDK to provide Asbury's Client Data related to the Four Dealerships to Tekion, so Tekion can begin loading the data into its products and software (just like CDK did at the start of the CDK-Asbury relationship) to complete the pilot program.

16. The agreement between Asbury and Tekion required Asbury to transfer its Client Data pertaining to the Four Dealerships to Tekion by May 2024 so that Tekion can timely launch and complete the pilot program in order to install the Four Dealerships by September 2024. Despite Asbury's best efforts to obtain its own Client Data, the Client Data was not transferred by that date because CDK is—and has been—wrongly holding the Client Data hostage. As a result, Asbury has been working with Tekion in good faith to agree upon an alternate installation date for the Four Dealerships because CDK's improper conduct has obstructed the pilot program and contracted-for installation of the Four Dealerships by September 2024. The pilot program cannot be further delayed because such a delay impacts the completion of the pilot program, which impacts when the Four Dealerships can be installed, which, in turn, impacts Asbury's contractual obligations to Tekion to begin moving dealerships in 2025 as well as jeopardizing Asbury's plan for dealership data management on a global basis which is the linchpin of its business.

17. On January 16, 2024, Asbury promptly requested—through CDK's "FTP Request Form"—that CDK provide complete and full access to its Client Data related to the Four Dealerships Asbury identified as part of its pilot program with Tekion.

18. In response to this request, on January 25, 2024, CDK told Asbury that Asbury would first need to send a "cancellation request" for the subject dealerships.

19. Nothing in the MSA requires a cancellation in order for Asbury to obtain its own Client Data, and CDK has never previously required such a cancellation prior to providing extractions of Asbury's Client Data. Nonetheless, in an effort to obtain the necessary data as quickly as possible, and per CDK's instruction, on February 5, 2024, Asbury sent CDK a cancellation request for the Four Dealerships, to be effective on December 31, 2024.

20. Even after Asbury submitted a cancellation request—as per CDK's instruction—CDK *still* would not release the Client Data.

21. On February 7, 2024, CDK refused Asbury's request for access to its Client Data because, CDK stated, "a CDK facilitated data transfer . . . is only available upon the termination of a location during the transition assistance period or the termination or expiration of our agreement." Instead, CDK pointed Asbury to its own "data warehouse" and the CDK "Data—Your Way" tool, neither of which provide the full and complete data transfer that Asbury requested and needs in order to proceed with its contract with Tekion.

22. Additionally, CDK stated that Asbury's request to terminate "all CDK Services" for the Four Dealership locations as of December 31, 2024 was not permitted because the MSA "does not permit termination of core products and services prior to the transition assistance period." CDK's position is inconsistent with the deal that I was involved in negotiating between Asbury and CDK and that is memorialized in the MSA because Asbury specifically negotiated

that it would be permitted a narrow exception to exclusivity during the Initial Term and that there was no exclusivity during the Extension Period.

23. Asbury cannot fully and accurately access its Client Data without CDK's cooperation. For example, the tools offered by CDK do not allow Asbury to extract *any* data from the DSDA system, which holds Asbury's own Client Data. As another example, Asbury only has access to *replicated* CRM data but does not have access to the actual SQL databases needed to verify the completeness and accuracy of the Client Data. In fact, an Asbury employee had been trying to access Asbury's own Client Data after CDK refused Asbury's request made on January 16, 2024 and began taking Asbury on the proverbial run around regarding its request for its Client Data. On May 23, 2024, CDK's counsel, Matthew Provance, sent a cease and desist letter to Asbury's counsel, Benjamin Hatch, regarding Asbury's attempts to access its Client Data. In light of this letter, an Asbury employee discontinued efforts to obtain Asbury's Client Data—and Asbury's account was disabled.

24. By contrast, CDK is able to easily, efficiently, and accurately extract the requested Client Data, as it has done many times before at Asbury's request.

25. CDK has no justification for refusing to extract and transfer the requested Client Data.

26. CDK has recently released a new dealership management product called "CDK Unify." It appears that CDK is attempting to force Asbury into adopting the new CDK Unify program by not allowing Asbury access to its Client Data. CDK is keenly aware of the substantial harm to Asbury's business caused by not having access to its Client Data, the linchpin of its business. Wrongly withholding Asbury's Client Data rather than complying with the agreed upon contractual terms that provide a clear termination of the exclusivity period following the Initial

Term and permit Asbury to freely contract with competitors and explore other data management products is substantially injurious to Asbury's business. Indeed, restricting customers' access to their own data and engaging in other anticompetitive behavior is not new to CDK, which is currently embroiled in numerous antitrust lawsuits that have been consolidated into an MDL. *See In Re: Dealer Management Systems Antitrust Litigation*, MDL 2817 (N.D. Ill.).

27. Obtaining the Client Data for the Four Dealerships is necessary for Asbury to fulfill its agreement with Tekion to implement its pilot program, pursuant to the confidential contract between the parties. Asbury was obligated to provide Tekion its Client Data pertaining to the Four Dealerships by May 2024 in order to ensure a timely launch in September 2024. Because CDK is refusing to transfer the data, Asbury is working with Tekion to arrange an alternative date for launch in October 2024. Nonetheless, there is grave concern about postponing the Four Dealership launch date beyond September 2024 as required by the contract to October 2024 or beyond because November and December are the highest sales volume months so the launch cannot happen during that time. Thus, every day that CDK refuses to transfer Asbury's Client Data is another day that Tekion is not able to complete the pilot program and another day closer to not being able to install the Four Dealerships, as required by contract. Every day also further jeopardizes Asbury's plan to move dealerships beginning in 2025. As such, CDK's actions are causing significant and irreparable harm to Asbury.

28. On April 2, 2024, CDK contacted Tekion without Asbury's permission with respect to the Asbury-Tekion pilot program. CDK threatened "that any remote or in-person access by Tekion to screen displays generated by CDK Products and Services, or to such Products and Services directly, including through software and/or the use of CDK login credentials, would constitute a material breach of the MSA." CDK also threatened that Tekion's actions could be

considered to be inducing Asbury's non-compliance with the MSA and thus "actionable as tortious interference."

29. By May 2024, months after Asbury's original request, CDK still has refused to transfer Asbury's Client Data. On May 9, 2024, Asbury sent CDK a formal demand letter requesting that CDK immediately provide Tekion with the requested Client Data. To date, CDK still has not done so. CDK has never articulated that it neither could transfer the data nor that doing so would be burdensome. Further, even though it is not required by the MSA, Asbury has offered to pay for any costs of the transfer.

30. Further affiant sayeth not.

Barry Cohen

Sworn to and subscribed before me
This 3 day of June, 2024.

Notary Public
My Commission Expires: 10-30-27

J K WALKER
MY COMMISSION EXPIRES 10/30/2027
NOTARY PUBLIC, GWINNETT COUNTY, GEORGIA

# EXHIBITS 2-4 INTENTIONALLY OMITTED

# EXHIBIT G

BLANKROME
444 West Lake Street | Suite 1650 |Chicago, IL 60606

*Phone:* *(312) 776-2518*
*Fax:* *(312) 276-2601*
*Email:* *rachel.schaller@blankrome.com*

December 6, 2024

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS DELIVERY**

Tekion Corporation
Attn: Aysswarya Murthi
Deputy General Counsel
12647 Alcosta Blvd., Suite 230
San Ramon, CA 94583
aysswarya@tekion.com

Fenwick & West LLP
Attn: Armen Nercessian
555 California Street, #12
San Francisco, CA 94104
anercessian@fenwick.com

**Re: Cease and Desist/Notice of Legal Action**

Dear Ms. Murthi and Mr. Nercessian,

This firm represents CDK Global, LLC ("CDK"). We are writing to demand that Tekion Corporation ("Tekion") immediately cease and desist from engaging in activities that violate CDK's rights and various state and federal laws, as previously outlined in CDK's letters. We further demand that Tekion identify to CDK all customers for which Tekion has accessed and/or downloaded information from CDK's computer systems, including CDK's DMS, within seven (7) days of receiving this letter. CDK reserves all rights.

**Unauthorized Access to and Use of CDK's Dealer Management System (DMS)**

CDK has obtained ample evidence that Tekion is accessing, utilizing, and extracting data from CDK's DMS without authorization. This unauthorized access includes the use of software scripts and establishing secret VPNs, which violates multiple state and federal laws.

In April 2021, CDK and Tekion entered into a Conversion Support Agreement (the "CSA") to create a reciprocal process by which CDK and Tekion could transfer customer data, standardizing dealership conversions from one DMS provider to the other. While the term of the CSA expired, CDK continued to provide reasonable assistance to Tekion during the conversion process, including by creating custom code for dealers converting their DMS from CDK to Tekion, and on certain occasions, accommodating Tekion's requests to modify the code to better assist it in the conversion process.

Tekion has chosen to circumvent the CDK-facilitated conversion process, gain unauthorized, administrative access to CDK's DMS, and run software scripts to extract large

volumes of data. CDK has detected several new user accounts bearing variations of the name "tekion," which are run through the same two virtual desktops. We have discovered that Tekion is inducing CDK dealership customers to create and provide Tekion login credentials with administrative access to the DMS, without CDK's permission and in clear violation of dealers' agreements with CDK. We understand that prior communications between Tekion and CDK have already put Tekion on notice that this conduct is strictly prohibited. Our investigation has uncovered that Tekion has ignored our prior notice and used covert means to create new accounts after CDK disabled prior ones.

Further, we have reason to believe that, once on CDK's DMS, Tekion has created reports to extract dealership data – sometimes using scripts to create hundreds or thousands of reports at a time. The use of third-party software scripts to access and utilize CDK's DMS in this manner is both a violation of dealers' agreements with CDK and creates significant security risks for CDK and degrades system performance. With administrative access, Tekion would also have the ability to damage CDK's DMS by deleting customer data or accounts, and otherwise accessing dealership financial and sensitive data and exposing it to corruption and security risk.

Tekion steadfastly has adapted its practices to evade detection of its repeated access to CDK's DMS from virtual desktops. Most recently, CDK has become aware that Tekion sought to establish a VPN at CDK's dealer's location to establish a secret network connection onto which it can create reports and extract data from CDK's DMS.

**Violations of State and Federal Laws**

Based on the evidence gathered to date, CDK has reason to believe that Tekion is engaged in the persistent violation of multiple state and federal laws that prohibit Tekion's illegal hacking and computer fraud, privacy, copyright infringement, misappropriation, unfair and deceptive trade practices, and tortious interference with contract. Violation of these laws exposes Tekion to civil and criminal penalties, including liability for statutory damages, actual damages, attorneys' fees and injunctive relief.

Specifically, CDK has agreements with various dealership clients that detail the steps the dealership must take before their data may be exported for conversion to a new DMS provider. These agreements impose certain obligations on the dealerships to maintain the confidentiality of CDK's products and services, and prohibits them from granting third-party access to CDK's products or systems, using software or other automated means to extract data, and recompiling data in order to reverse engineer any CDK product. Further, under these agreements, the dealerships are required to fulfill the term of the agreement or make certain payments to CDK before CDK is obligated to assist with the conversion of dealership data to a new DMS provider.

Tekion's actions, including its remote or in-person access to CDK's products and services, inducement of dealerships to provide Tekion direct access to CDK's DMS, use of automated scripts to extract data from CDK's DMS, and surreptitious creation of VPN "tunnels" to the DMS tortiously interferes with CDK's contractual rights with its dealerships and violates numerous state and federal statutes. CDK has been significantly harmed by these

activities. This harm includes certain dealerships' decision not to perform conditions precedent to data conversion, avoiding significant payment obligations which remain due and owing to CDK. These payments may be recovered from Tekion as damages due to its tortious interference with dealers' contractual obligations to CDK and under state and federal computer fraud, privacy, anti-hacking and deceptive trade practices laws.

**Demand for Immediate Cessation, Certification and Document Preservation**

CDK demands that Tekion (i) immediately cease and desist all unauthorized access to CDK's DMS, (ii) within seven (7) days, (a) identify each account it has created on CDK's DMS and each dealership whose CDK DMS it has accessed, and (b) certify in writing that it has disabled all accounts to CDK's DMS that it has created or otherwise has access to, and (iii) refrain from creating any new accounts or using dealership credentials to gain direct access to a CDK DMS or other CDK computer system unless it receives prior written authorization from CDK's general counsel.

Finally, this letter puts Tekion on notice of threatened or impending litigation concerning the allegations contained herein. Tekion must preserve all relevant evidence, suspend any routine data deletion policies, retention schedules or automated systems that might overwrite relevant information, and otherwise ensure that no data within these categories is altered, deleted, or destroyed:

1. **Access to CDK DMS**: Any actions taken to access, download, use, receive, modify, transmit, or otherwise process information from the CDK DMS.

2. **Communications Regarding CDK DMS:** All communications, including but not limited to emails, instant messages, text messages, phone logs, or other records, that discuss or relate to the CDK DMS.

3. **Dealership Data**: Any actions involving the use, receipt, modification, processing, or transmission of data related to CDK's customers, including all dealership management data derived from or connected to CDK systems.

4. **Communications with Client Dealerships**: Any and all communications (including emails, text messages, social media messages, call logs, and meeting notes) with dealerships regarding the transfer of services, data, or accounts related to the CDK DMS or dealership management data.

This preservation requirement includes, but is not limited to, the following categories of data:

1. **Electronic Devices:** Any computer, laptop, tablet, mobile device, server, or other electronic device used for any of the above purposes.

2. **Cloud and Virtual Systems:** Any cloud accounts, virtual machines, or cloud-based storage systems where relevant data may be stored.

3. **Electronic Communications:** Emails, text messages, instant messages, and other digital communications.

4. **Files and Documents:** Any digital or physical files, documents, spreadsheets, or logs.

5. **Scripts and Automation:** Any scripts, automation tools, or software used to access, process, or manipulate data from CDK systems.

6. **Backups and Snapshots:** Any backups, images, or snapshots of devices or accounts that may contain relevant data.

CDK reserves all rights concerning Tekion's ongoing and prior unlawful conduct.

Very truly yours,

Rachel L. Schaller

cc: Cameron Williams, EVP, General Counsel and Secretary
Daniel R. Saeedi, Attorney