TYLER G. NEWBY (CSB No. 205790)
tnewby@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA  94111
Telephone:    415.875.2300
Facsimile:    415.281.1350

ERICA R. SUTTER (CSB No. 309182)
esutter@fenwick.com
ADAM GAHTAN (*pro hac vice*)
agahtan@fenwick.com
NOAH SOLOWIEJCZYK (*pro hac vice*)
nsolowiejczyk@fenwick.com
FENWICK & WEST LLP
902 Broadway, Floor 18
New York, NY  10010-6035
Telephone:    212.430.2600

*Attorneys for Plaintiff Tekion Corp.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TEKION CORP., <br><br> Plaintiff, <br><br> v. <br><br> CDK GLOBAL, LLC, <br><br> Defendant. | Case No.: 3:24-cv-08879-JSC <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT CDK GLOBAL, INC.'S EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT [FILED UNDER SEAL]** <br><br> Date:  June 25, 2026 <br> Time:  10:00 a.m. <br> Court:  8, 19th Floor <br> Judge:  Honorable Jacqueline Scott Corley |

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ii

I.      Issues To Be Decided........................................................................................ 1

II.     Introduction........................................................................................................ 1

III.    CDK has withheld discovery directly relevant to the issues on which moves for summary judgement ........................................................................................... 2

IV.     Statement of Facts ............................................................................................. 4

        A.      Market Share. ......................................................................................... 4

        B.      The Franchise DMS Market.................................................................... 5

        C.      Barriers to Entry and DMS "Churn". ..................................................... 8

V.      Argument ......................................................................................................... 10

        A.      The Court Should Deny CDK's Motion Under Rule 56(d) Because CDK Relies on a Gap in the Evidence That It Created. ................................. 10

        B.      Genuine Disputes of Material Fact Preclude Summary Judgment That CDK Does Not Have Monopoly Power in Relevant Antitrust Markets......................... 12

                1.      Market Share. .............................................................................. 13

        C.      Barriers to Entry..................................................................................... 16

        D.      The Court Should Deny CDK's Motion as Premature in the Absence of Expert Economic Analysis....................................................................... 23

        E.      Even on an Incomplete Record, Genuine Disputes of Material Fact Preclude Summary Judgment on Attempted Monopolization. ........................ 25

FENWICK & WEST LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
    562 F. Supp. 2d 1080 (N.D. Cal. 2008), *rev'd on other grounds*, *John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009) ........................................................................ 24

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip Corp.*,
    No. C 04-02266 JW, 2020 WL 11478992 (N.D. Cal. July 21, 2010)..................................... 24

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) ....................................................................................................... 12, 14

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
    No. 16-cv-00923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018) ................................ 20

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2020) ................................................................................ 24

*Broadway Delivery Corp. v. United Parcel Serv. of Am.*,
    651 F.2d 122 (2d Cir. 1981) .................................................................................................. 13

*Burlington N. Santa Fe R.R. Co. v. The Assiniboine*,
    323 F.3d 767 (9th Cir. 2003)................................................................................................. 10

*Calnetics Corp. v. Volkswagen of Am., Inc.*,
    532 F.2d 674 (9th Cir. 1976).................................................................................................. 12

*Celotex Corp. v. Cartrett*,
    477 U.S. 317 (1986).............................................................................................................. 12

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
    150 F.4th 1056 (9th Cir. 2025) .............................................................................................. 16

*Cyntegra, Inc. v. Idexx Lab'ys, Inc.*,
    520 F. Supp. 2d 1199 (C.D. Cal. 2007) ................................................................................ 20

*DeSoto Cab Co., Inc. v. Uber Techs., Inc.*,
    No. 16-cv-06385-JSW, 2018 WL 10247483 (N.D. Cal. Sept. 24, 2018) ............................. 18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)............................................................................................................... 16

*Freeman v. ABC Legal Servs. Inc.*,
    827 F. Supp. 2d 1065 (N.D. Cal. 2011) ................................................................................ 10

*FTC v. D-Link Sys., Inc.*,
    2018 WL 6040192 (N.D. Cal. Nov. 5, 2018)......................................................................... 12

*FTC v. Meta Platforms, Inc.*,
   811 F. Supp. 3d 67 (D.D.C. 2025) ................................................................. 15

*FTC v. Wilh. Wilhelmsen Holding ASA*,
   341 F. Supp. 3d 27 (D.D.C. 2018) ................................................................. 13

*Greyhound Comput. Corp. v. Int'l Bus. Machs. Corp.*,
   559 F.2d 488 (9th Cir. 1977) ......................................................................... 23

*Guifu Li v. A Perfect Day Franchise, Inc.*,
   281 F.R.D. 373 (N.D. Cal. 2012) ................................................................... 10

*In re IBM Peripheral EDP Devices Antitrust Litig.*,
   481 F. Supp. 965 (N.D. Cal. 1979) ........................................................... 16, 20

*Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*,
   No. 12-cv-3012-WJM-NYW, 2015 WL 5081608 (D. Colo. Aug. 28, 2015) ......................... 24

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................................................ 13

*L.A. Land Co. v. Brunswick Corp.*,
   6 F.3d 1422 (9th Cir. 1993) ...................................................................... 16, 19

*Lenox MaClaren Surgical Corp. v. Medtronic, Inc.*,
   762 F.3d 1114 (10th Cir. 2014) ..................................................................... 24

*Malheur Forest Fairness Coal. v. Iron Triangle, LLC*,
   164 F.4th 710, 726 (9th Cir. 2026) ................................................................ 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................. 14

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) ...................................................................... 20

*Metabolife Int'l, Inc. v. Wornick*,
   264 F.3d 832 (9th Cir. 2001) ........................................................................ 10

*Movie 1 & 2 v. United Artists Commc'ns, Inc.*,
   909 F.2d 1245 (9th Cir. 1990) ....................................................... 13, 14, 16, 25

*Natchitoches Parish Hosp. Svc. Dist. v. Tyco Int'l, Ltd.*,
   262 F.R.D. 58 (D. Mass. 2008) ...................................................................... 13

*Nissan Fire & Marine Ins. Co., Ltd. v. Friz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ...................................................................... 10

*Oahu Gas Serv. v. Pac. Res., Inc.*,
   838 F.2d 360 (9th Cir. 1988) ............................................................ 19, 20, 23

FENWICK & WEST LLP
ATTORNEYS AT LAW

*Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*,
  526 F.2d 1196 (9th Cir. 1975) ............................................................................................... 13

*Pac. Steel Grp. v. Com. Metals Co.*,
  No. 20-cv-07683-HSG, 2024 WL 3236705 (N.D. Cal. June 28, 2024) ................................... 23

*Prime Healthcare Servs., Inc. v. Servs Emps. Int'l Union*,
  642 F. App'x 665 (9th Cir. 2016) ........................................................................................... 24

*Reazin v. Blue Cross & Blue Shield of Kan, Inc.*,
  899 F.2d 951 (10th Cir. 1990) ................................................................................................ 16

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................................................ 19, 25

*Safeway, Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ............................................................................... 20, 23

*Sonobond Corp. v. Uthe Tech., Inc.*,
  314 F. Supp. 878 (N.D. Cal. 1970) ......................................................................................... 24

*Stevens v. CoreLogic, Inc.*,
  899 F.3d 666 (9th Cir. 2018) .................................................................................................. 11

*In re Super Premium Ice Cream Distribution Antitrust Litig.*,
  691 F. Supp. 1262 (N.D. Cal. 1988) ................................................................................... 20, 21

*Tevra Brands LLC v. Bayer HealthCare LLC*,
  No. 19-cv-04312-BLF, 2024 WL 1909156 (N.D. Cal. May 1, 2024) ..................................... 23

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
  709 F. Supp. 985, 991 (W.D. Wash. 1987) .............................................................................. 20

*Trendsettah USA, Inc. v. Swisher Int'l, Inc.*,
  No. SACV14-01664 JVS, 2016 WL 6822191 (C.D. Cal. Jan. 21, 2016) ............................... 19

*Twin City Sportservice v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ................................................................................................ 23

*United States v. Anthem, Inc.*,
  No. 16-cv-1493 (ABJ), 2016 WL 11755527 (D.D.C. Sept. 30, 2016) ................................... 23

*United States v. Denstply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ................................................................................................... 13

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2004) ...................................................................................... 18, 19

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.D.C. 2001) ..................................................................................................... 16

FENWICK & WEST LLP
ATTORNEYS AT LAW

TEKION'S OPPOSITION TO CDK'S
EARLY PMSJ                                iv                    Case No.: 3:24-cv-08879-JSC

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990).......................................................................................... 15, 16

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
  190 F.3d 974 (9th Cir. 1999).............................................................................................. 15

*W. Parcel Express v. UPS of Am.*,
  65 F. Supp. 2d 1052 (N.D. Cal. 1998) ............................................................................... 24

**Statutes**

Sherman Act § 2 ..................................................................................................................... 11, 16

**Court Rules**

Fed. R. Civ. P. 56(a)...................................................................................................................... 12

Fed. R. Civ. P. 56(d) ............................................................................................................ 1, 10, 12

Fed. R. Evid. 106 ........................................................................................................................... 11

Fed. R. Evid. 802 ........................................................................................................................... 14

Fed. R. Evid. 901 ........................................................................................................................... 19

Fed. R. Evid. 901(a) ...................................................................................................................... 14

FENWICK & WEST LLP
ATTORNEYS AT LAW

## I.    ISSUES TO BE DECIDED

1.    Whether the Court should deny summary judgment in CDK's favor on Tekion's monopolization claims because genuine disputes of material fact exist as to CDK's possession of monopoly power.

2.    Whether the Court should deny summary judgment in CDK's favor on Tekion's attempted monopolization claims because genuine disputes of material fact exist as to CDK's possession of monopoly power.

3.    In the alternative, whether, under Rule 56(d) of the Federal Rules of Civil Procedure, the Court should deny CDK's motion for summary judgment on all issues, or defer ruling on it.

## II.    INTRODUCTION

CDK moves for summary judgment on Tekion's monopolization and attempted monopolization counts, arguing that "undisputed evidence shows" that Tekion cannot prove two elements of monopoly power, adequate market share and barriers to entry. Mot. 12. The Court should deny CDK's motion for the following reasons. First, CDK's motion is premature. Two months remained in fact discovery when CDK filed its motion, and, as of Tekion's opposition, CDK has not produced revenue data that bears directly on the issues it now raises, and it has at least tacitly discouraged third-party DMS providers from producing *their* revenue data in response to Tekion subpoenas.[1] The data that Tekion seeks is necessary for determining with greater precision CDK's share in the relevant antitrust markets. Tekion has pursued discovery of the data diligently, including by filing timely motions to compel. CDK is responsible for the gap in evidence on which it relies for summary judgment. The Court should therefore deny CDK's motion under Rule 56(d), notwithstanding CDK's assurance that the missing data would, if produced, support judgement in its favor anyway. Second, there is more than sufficient evidence already in the record to demonstrate genuine disputes of material fact as to both market share and barriers to entry. Third, expert discovery, which is often critical for determinations about monopoly power, has not yet

---

[1] In communications with third parties, CDK disclosed its intention to seek Rule 11 sanctions against Tekion in this connection, on grounds of a supposed lack of evidence for Tekion's market share allegations. It made these disclosures *during the Rule 11 safe harbor period*. Tekion will of course oppose CDK's Rule 11 motion, which is abusive and filed in violation of Ninth Circuit law, and it will seek its fees.

FENWICK & WEST LLP
ATTORNEYS AT LAW

begun, and here both the factual record and provisional expert analysis reveal disputes about how to define the market and calculate share that cannot be resolved on summary judgment, let alone on an incomplete record.

### III.   CDK HAS WITHHELD DISCOVERY DIRECTLY RELEVANT TO THE ISSUES ON WHICH MOVES FOR SUMMARY JUDGEMENT

Since as early as August 4, 2025, Tekion has sought discovery of certain granular revenue data from CDK, and by Rule 45 subpoenas, from non-party DMS providers.  The revenue data is necessary for precise calculations of CDK's market share in the broad franchise DMS market and in potential submarkets.  Ex. 35 ("Smith") ¶ 63.[2]  CDK filed its motion for summary judgment on April 24, 2026.  Dkt. 90.  At that time, there were two months remaining in fact discovery.  Dkt. 87.  To date, neither CDK nor the subpoenaed third parties have produced the relevant evidence.

The contemporaneously filed Declaration of Erica R. Sutter recites the relevant discovery chronology in detail.  A summary follows.  On August 4, 2025, Tekion served an Interrogatory seeking detailed customer information from CDK.  Sutter Declaration ¶ 4.[3]  CDK objected.  The parties met and conferred without resolution.  *Id.*  At the end of January 2026, five months after Tekion served its interrogatory, CDK informed Tekion that it was investigating information that CDK tracks in order to respond.  *Id.* ¶ 5.  On March 18, 2026, still without a response, Tekion served requests for production, including RFP No. 203, seeking a targeted subset of the outstanding information.  Specifically, Tekion sought customer- or rooftop-level data reflecting CDK's revenues by product SKU.  *Id.* ¶ 6.  CDK refused to produce responsive documents, including after a series of emails and meet-and-confers, producing instead its *aggregate* self-reported DMS revenue figures.  *Id.* ¶¶ 7, 9.  Tekion has raised CDK's intransigence with the Court, *id.* ¶ 13, and the Parties will file a joint discovery dispute letter by May 27.  Dkt. 97.  Aware of its untenable position, CDK has suddenly signaled vague willingness to produce at least some additional documents, Sutter Decl. ¶¶ 18–19, but, as of this date, it has not in fact produced the additional

---

[2] Unless otherwise stated, exhibit citations numbered 1–34 refer to the exhibits attached to the Declaration of Eve Levin, Dkt. 90-1.  Exhibit citations numbered 35 through 67 refer to exhibits to the Declaration of Noah Solowiejcyzk, filed contemporaneously herewith.

[3] Citations to the "Sutter Declaration" refer to the contemporaneously filed declaration of Erica R. Sutter.

FENWICK & WEST LLP
ATTORNEYS AT LAW

information and, based on Tekion's understanding, is unlikely to satisfy Tekion's discovery requests.

On November 21, 2025, Tekion served a subpoena for documents under Rule 45 on Reynolds and Reynolds Company, the second largest DMS provider in the franchise DMS market after CDK. Tekion sought, among other items, customer data, revenue and pricing information, and switching and win-loss data. Sutter Decl. ¶ 21. Over the course of the next 5 months, Tekion conferred with counsel for Reynolds repeatedly, with counsel for CDK present, in attempts to minimize the burden on a third party while also securing the information it needs. *Id.* ¶¶ 22–23. Reynolds refused to produce any data at all until April 30, 2026, when it produced seven documents containing partial customer lists, switching, and win/loss data, but not customer- and product-level revenue data, DMS pricing information, or profit-and-loss information. *Id.* ¶¶ 24–25. On May 11, 2026, counsel for CDK informed counsel for Reynolds that CDK would not be providing its own revenue data to Tekion, and indeed that it would be seeking Rule 11 sanctions against Tekion for the supposed lack of evidence in support of Tekion's market share allegations.[4] *Id.* ¶ 26. Tekion served similar subpoenas on other DMS providers, including Dealertrack, Inc. and Dealerbuilt on November 14, 2025. *Id.* ¶¶ 28, 33. Despite negotiations, including joint conferences with CDK counsel, they too have refused to produce documents responsive to Tekion's subpoenas, in part relying on CDK's own non-production. *Id.* ¶¶ 29–32, 34–37. CDK has since cited third-party refusal to produce revenue data as justification for its own continued refusal. *Id.* ¶ 13.

CDK's pre-motion discovery was deficient in other respects directly relevant to the counts on which it now seeks favorable judgement. Three weeks after filing its motion, CDK produced a slide presentation that it had prepared for lenders in connection with its 2023 debt offering ("Lender Presentation"). The Lender Presentation contains key admissions on barriers to entry, CDK's market position in a submarket of large dealer groups, and its plans to retain and grow market share. The context in which CDK belatedly produced the Lender Presentation raises additional questions about the timing of CDK's present motion. On May 14, 2026, Tekion's and CDK's

---

[4] Counsel for CDK made similar remarks during an April 24, 2026, call with counsel for DealerBuilt, Inc., another DMS provider that Tekion had subpoenaed.

FENWICK & WEST LLP
ATTORNEYS AT LAW

counsel met and conferred about Tekion's planned motion for leave to amend its complaint and discovery disputes. During that meeting Tekion's counsel told CDK's counsel that its amended complaint would cite a bulletin in which the lead investment bank for the debt offering had described CDK's share of the North American DMS market as ███████████ On a call shortly after that call, CDK's counsel expressed familiarity with the statement and stated that additional documents from the debt offering (which turned out to be the Lender Presentation) would put that statement into context. CDK had not produced those documents or the bulletin. Newby Decl ¶ 4.[5] Tekion sent CDK's counsel a draft of its proposed amended complaint on May 15th, after which CDK's counsel finally sent the Lender Presentation by e-mail. *Id.* ¶ 5. According to CDK's counsel, the Lender Presentation had been caught up in privilege review. *Id.* It is manifestly not privileged.

## IV.    STATEMENT OF FACTS

### A.    Market Share.

The accompanying Reply Report of Loren K. Smith, Ph.D., sets out why revenue is the correct measure of market share in the relevant antitrust markets for DMSs for franchise dealers. Ex. 35 ("Smith"). In the absence of data that CDK has thus far withheld, rooftop count and revenue estimates from separate ███████████████, together with additional material, provide bases for calculations of market share by revenue. Smith ¶ 54–65. A 2022 analysis prepared by

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ Smith ¶ 40; Ex. 30 at -700.[6] A separate ████████████████

████████████████████████████████████████

████████████████████████. Smith ¶ 55; Ex. 36. Applying

[5] Citations to the "Newby Declaration" refer to the contemporaneously filed declaration of Tyler G. Newby.
[6] Brookfield apparently submitted this analysis to ██████████████████████████ ████████████████████████ Ex. 46.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

estimated rooftop revenue derived from these analyses yields revenue share of ████████ in the market of all United States franchise dealers. Smith ¶ 55–57. Using the same revenue-per-rooftop analysis, CDK's market share of large dealer groups, by revenue, is ████████████ Smith ¶ 58–60. ████████████████████████████████████████████████████████

████████████████████████████████████ Smith ¶ 43.

In a ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 37. CDK itself repeats this assertion in the Lender Presentation, Ex. 38 at -656, though the Lender Presentation also suggests that the ████████████████████████ The Lender Presentation and other documents leave no question about CDK's position in the large dealership group market, for which CDK describes itself as ████████████████████. *Id.* at -651. According to CDK, ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *Id.* at -664. ████████████████████

████████████████████████████████████████████████████████████████

████████████████. *Id.* CDK described itself as ████████████████████

████████████████████████████████ *Id.* CDK further claims in the Lender Presentation that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Ex. 38 at -658. As of May 22, 2026, CDK repeats ████████████ on its homepage. Ex. 39.[7]

## B.  The Franchise DMS Market.

Tekion pleaded CDK's monopolization and attempted monopolization of the market of all franchise dealer groups, and, alternatively, of an enterprise submarket. Dkt. 1, ¶¶ 2, 30, 67, 80, 88.

---

[7] As the Lender Presentation shows, CDK has been making that same claim since 2023, during which time United States GDP increased cumulatively by 5%. U.S. Dep't of Commerce, Bureau of Economic Analysis, *Table 1.1.1 Percent Change from Preceding Period in Real Gross Domestic Product*. As of the latest official figures, United States nominal GDP stood at $ 31.86 *trillion*. *Id.*, *Table 1.1.5 Gross Domestic Product* (April 30, 2026).

Discovery to date supports the existence of at least one and possibly more relevant antitrust submarkets, and Tekion has moved to amend its complaint in part to identify two: multi-store franchise dealership groups and enterprise franchise dealership groups (collectively, "Large Franchise Dealership Groups"). In the Lender Presentation, ███████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 38 at -664. Analyses of the market for DMSs as of ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Smith ¶ 40–41. Testimony from CDK and others is to the same effect. Ex. 40 (Noser Rough Dep. Tr.) at 211:4–22; Ex. 41 (Dutton Dep. Tr.) at 115:10–14; Ex. 42 (Zappin Dep. Tr.) at 20:2-15.

CDK consistently ████████████████████████████████████. *See*, Section IV.A, above; Smith ¶ 33; Exs. 43 at Slides 16, 20; Ex. 44; Ex. 45; Ex. 46. A key distinction for CDK ██ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████ Ex. 38 at -651, -660, -664; Smith ¶ 14. ████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 38 at -664. █████████████████████████ ██████████████████████████████████████████████████████████████████████████ █████████████████ *Id.* at -661. ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ █████████████████████████████████ Smith ¶ 33; Ex. 45. ██████████████████ ██████████████████████████████████. Smith ¶ 31; Ex. 46 at -356. ████████ ████████████████████████████████████████████ Smith ¶ 55; Ex. 46 at -356. CDK's business was already ████████████████████████████████████ Ex. 38 at -664, and CDK had ████████████████████████████████████████████████████ Smith ¶ 41.

████████████████████████████████████████████████████████████████████████████

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

. Ex. 38 at -664; Smith ¶ 28–30; Ex. 40 (Noser Rough Dep. Tr.) at 210:4-8, 210:17-24; Ex. 42 (Zappin Dep. Tr.) at 174:7-177:11.

. Ex. 46 at -355; Ex. 47 at -775; Ex. 36 at -911; Ex. 48 (Doral Dep. Tr.) at 28:14–29:2. (This causes the largest dealerships to be "very locked in" to their current DMS provider. Smith ¶ 70; Ex.46 at -365.)

Ex. 43 at p. 18, 20; Ex. 42 (Zappin Dep. Tr.) at 15:2–9; Ex. 40 (Noser Rough Dep. Tr.) at 212:6–213:15.

CDK describes the DMS market as full of equals, identifying ten different providers as being in "intensifying" competition. Mot. 4–5. The evidence to date, internal documents from CDK and its owner tell a different story. Most of the ten DMS providers that CDK identifies as competing in the market . Smith ¶ 12; Ex. 38 at -660; Ex. 46 at -356; Ex. 49 at 3–4, 6; Ex. 50; Ex. 51 at -532; Ex. 52; Ex. 53 (Bachrodt Dep. Tr.) at 16:9–17:1. CDK itself , Ex. 49, as , Ex. 50, , Ex. 49; *see also* Smith ¶ 12–13. In the Lender Presentation, CDK identifies Ex. 38 at -660. Indeed, according to CDK's declarant Rowland, Ex. 3 (CDK's Rowland Decl.) at ¶ 5. *Id.* At his deposition, Ex. 54 (Rowland Dep. Tr.) at 119:9–120:6, 211:2–15. As of Smith ¶ 41; Ex. 63 at

-085; Ex. 30 at -700.

**C.      Barriers to Entry and DMS "Churn".**

According to CDK, there are few barriers to entry into the DMS industry, and dealerships switch freely among DMS providers. Mot. 5, 17–23. Again, documents produced by CDK and its owner Brookfield tell a different story, ██████████████████████████████████ ████ For example, ████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 36 at -925 (emphasis added); Smith ¶ 68. ███████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ Ex. 46 at -360–61. The ██████████████████████████████████████████████████████ ████████████████████████ Smith ¶ 69; Ex. 46 at -363 (████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████). Feedback gathered from dealers notes ████████ ██████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 46. Another consulting firm,████ ██████████████████████████████████████████████████████████ ████ Ex. 47 at -788; *see also id.* at -803. Yet another document ████████ ██████████████████████████████████████████████████████████ ██████████████████████████████ Ex. 55 at -6071–72. Testimony from █ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████. Exs. 53 at 35:19–38:18, 149:9–150:6; Ex. 48 (Doral Dep. Tr.) at 30:5–31:23; Ex. 56 (Scott. Dep. Tr.) at 48:23–23, 72:15–74:17; Ex. 57 (Eberhardt Dep. Tr.) at 22:4–23:8, 47:4–48:5; *see also, e.g.,* Ex. 58 (Garcia Dep. Tr.) at 26:14–27:12. Switching costs are ██████████████████████

FENWICK & WEST LLP
ATTORNEYS AT LAW

Smith ¶ 70.

Indeed, the rate at which dealerships switch DMS providers suggests friction, not the ease that CDK describes (Mot. 2–3), especially for larger dealer groups.  In the Lender Presentation, CDK repeatedly touts ███████████████████████ Ex. 38 at -656, -661, and -663.  Using CDK's ███████████████████████████████

███████ Smith ¶ 71.  Asbury could not even *start* the process of switching from CDK to Tekion until Asbury sued CDK and won a preliminary injunction requiring CDK to make Asbury's own data available for transfer for a pilot trial.  Dkt. 1–2.  Other dealer groups have testified that ██████████████████████████████ Ex. 48 (Doral Dep. Tr.) at 36:1–38:11, 41:1–11, 56:1-57:4; 61:22-63:17 ("Because, you know, as I said, it's difficult to convert without getting the data timely and far enough in advance to be successful. So as other dealers hear of this, you know, they're going to realize it's going to be difficult for them to convert to a different system.  It's almost prohibiting you from being able to convert to a different system"); 92:7–23; 105:17–106:9; 108:13–109:1; 109:19–112:5; 112:6–113:25; 115:9–25; Ex. 59; Ex. 53 (Bachrodt Dep. Tr.) at 28:1–34:1, 44:1–47:2, 111:7–13 (CDK withheld data for nearly six months after initial requests; "ghosted" Bachrodt); Ex. 57 (Eberhardt Dep. Tr.) at 156:13–160:4 (██████ ████████████████████████████████████████████████████ ████████████████████████████████████; Ex. 56 (Scott Dep. Tr.) 36:7–25, 41:21–43:6, 177:14–178:12 (████████████████████ ██████████████████████████████████ In the Lender Presentation, CDK asserts that ██████████████████████. Ex. 38 at -656.

There are also barriers in the form of access to needed inputs, specifically OEM certifications, mission-critical resources that require substantial capital investment to obtain.  In its 2021 Annual Report, CDK explained: "when an OEM has endorsed or certified a provider of products or services to its associated franchised automotive retailers and if our solutions lack such certification or endorsement, adoption or retention of our products and services among the franchised dealers of such OEM could be materially impaired".  Ex. 60 at 7–8.  As Pinewood Technologies PLC (d/b/a Pinewood.AI), a *prospective* entrant to the United States DMS market

FENWICK & WEST LLP
ATTORNEYS AT LAW

notes, "OEM relationships and market 'know-how' are required to sell to dealerships" and "certification with each manufacturer can cost vendors up to $1m per brand, deterring new entrants." Ex. 61 at -607; *see also* Ex. 62 (Declaration of Gurusankar Sankararaman ("Sankararaman Decl.")) ¶¶ 6–9. In addition, as CDK has explained, "[t]he automotive industry is highly regulated . . . Our customers must ensure their compliance with their regulatory requirements, and, in turn, we must ensure that our solutions effectively address their regulatory compliance needs." Ex. 60 at 3.

## V.   ARGUMENT

### A.   The Court Should Deny CDK's Motion Under Rule 56(d) Because CDK Relies on a Gap in the Evidence That It Created.

Important fact discovery into CDK and other DMS providers' DMS revenues on a per store basis remains outstanding. Tekion has pursued and is continuing to pursue discovery of this revenue data, which is crucial to its economist experts' ability to calculate market share by revenue. The data also is required to define the contours of the relevant markets.

"A moving party [without the ultimate burden of proof at trial] may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins. Co., Ltd. v. Friz Cos., Inc.*, 210 F.3d 1099, 1105 (9th Cir. 2000). A nonmoving party "must have had sufficient time and opportunity for discovery before a moving party will be permitted to carry its initial burden of production by showing that the nonmoving party has insufficient evidence." *Id.* at 1105-06. Where a party has "withheld key evidence necessary for its opponent to establish its case," granting summary judgment would be "absurd." *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 403 n.29 (N.D. Cal. 2012). If the nonmoving party shows "it cannot present facts essential to justify its opposition," the court has discretion to deny or defer judgment on that motion. Fed. R. Civ. P. 56(d); *Burlington N. Santa Fe R.R. Co. v. The Assiniboine*, 323 F.3d 767, 773–74 (9th Cir. 2003). "[T]he Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001). Thus,

"[c]ourts are reluctant to deny Rule 56(d) requests." *Freeman v. ABC Legal Servs. Inc.*, 827 F. Supp. 2d 1065, 1071 (N.D. Cal. 2011). A Rule 56(d) movant must show that "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought after facts are essential to oppose summary judgment." *Stevens v. CoreLogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (citation omitted).

Tekion's experts cannot calculate precise market share by revenue, in the broad market or in narrower relevant antitrust markets, without the data that CDK and third parties have withheld. Smith ¶ 61–65.[8] Among other facts, that data will show which specific dealerships generate revenue, how revenue varies by dealer size and structure, and how revenue changes over time due to acquisitions, expansions or churn. Smith ¶ 61–63. As summarized above in Section II and detailed in the Declaration of Erica R. Sutter, Tekion has been diligent in seeking this information from CDK, in interrogatories and requests for production, and from third parties through subpoenas and protracted negotiations. Sutter Decl. ¶¶ 4, 6, 20, 21, 28. CDK has resisted, and it has at least tacitly discouraged third parties from complying with subpoenas. *Id.* ¶¶ 5, 7–14, 26. Having reached impasses with CDK and the third parties, Tekion timely filed motions to compel the discovery. *Id.* ¶¶ 13, 27, 32, 37.

CDK all but acknowledges that the data is available. And the data requested—in effect CDK's revenue by product and customer—is undoubtedly information that it tracks.[9] Tekion has not failed to develop the record in support of its allegations as CDK argues. Mot. 16. Rather, CDK interfered with Tekion's ability to make a record and then jumped the gun by moving for summary with two months remaining in fact discovery. CDK argues that the Court should pay this no mind because, even if Tekion had developed the record, the data "would have confirmed what the rooftop data reflects – that CDK's share by any metric is well below 50%." *Id.* But there is no reason for

---

[8] CDK cites incomplete parts of Tekion's responses to CDK interrogatories and requests for admission to create the misimpression that Tekion admitted that no evidence exists of DMS market share by revenue. *See* Mot. at 4:22–24, citing six lines from nearly four pages of interrogatory responses and Mot. at 9:19–20. The Court should consider the complete interrogatory responses found at pages 3:8–4:26 and 5:11–7:3 in Exhibit 7 and pages 4:26–5:10 in Exhibit 8 to the declaration of Eve Levin. Fed. R. Evid. 106. In its complete responses, Tekion pointed out that the topic was for expert analysis and that fact discovery was ongoing.

[9] CDK's annual report securities filing from 2021 reflects the significance of customer and site-specific information as part of "Key Performance Measures". Ex. 60 at 24.

FENWICK & WEST LLP
ATTORNEYS AT LAW

the Court or Tekion to take CDK at its word about what revenue data *would* show. After all, testing such claims is the whole point of discovery, and Tekion "lacks" the data only because CDK refuses to produce it. CDK continues: "Tekion therefore cannot credibly attempt to delay summary judgment by claiming its experts will perform alchemy to turn competitors' revenue data, which it lacks, into a triable issue of fact.". *Id.* Once they have the data, Tekion's experts will perform *analysis*, not "alchemy"—precisely the kind of analysis that courts often rely on in making monopoly power determinations. *See*, Section V.D, below.

Contrary to CDK's argument, Tekion *can* "credibly" move the Court to delay ruling on CDK's motion. That is the purpose of Rule 56(d). The Court may even *deny* CDK's motion under Rule 56(d), as it should, given that CDK is responsible for the gap in evidence on which it relies.

### B.    Genuine Disputes of Material Fact Preclude Summary Judgment That CDK Does Not Have Monopoly Power in Relevant Antitrust Markets.

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). In making that assessment, "[t]he evidence of the non-movant is to be believed" and "all-justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). "Credibility determinations, [and] the weighing of the evidence" are not appropriate at this stage. *Id.* "These general standards for [] granting of summary judgment become even more strict in the antitrust context." *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 683 (9th Cir. 1976) (citing *Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962)). After all, "trials are the best way to resolve legal disputes." *FTC v. D-Link Sys., Inc.*, 2018 WL 6040192, at *1 (N.D. Cal. Nov. 5, 2018).

CDK argues that no dispute of material fact exists as to monopoly power because "[b]y any measure supported by the record, CDK's market share falls well below 50%—indeed, below 40%." Mot. 14. First, documents produced by CDK and others are sufficient to provide the basis for calculations that CDK has more than 60% share by revenue in the market of large dealer groups and more than 50% revenue share in the broader market of all franchise dealers, conclusions which ███████████████████████████████████████████████. Smith ¶ 54–60. Especially

FENWICK & WEST LLP
ATTORNEYS AT LAW

given CDK's intransigence in producing per-store and product revenue data, the Court must view the available evidence, discussed below, in the light most favorable to Tekion. Documents and testimony also show a genuine dispute of material facts as to barriers to entry, even without viewing the evidence in the light most favorable to Tekion. And even if the factual record was complete and expert analyses had been disclosed and tested, the "[t]he trend of guidance from the Supreme Court and the practice of most courts endeavoring to follow that guidance has been to give only weight and not conclusiveness to market share evidence." *Broadway Delivery Corp. v. United Parcel Serv. of Am.*, 651 F.2d 122, 128 (2d Cir. 1981). Consideration of market share in isolation—that is, without attention to market dynamics and the evidence of structural barriers that Tekion has adduced (Section V.C, *below*)—would be improper. Even so, Ninth Circuit caselaw gives some general guidance, suggesting that "a market share as low as 45–70% may support a finding of monopoly power, if accompanied by other relevant factors." *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990); *see also Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1204 (9th Cir. 1975).

### 1.      Market Share.

Revenue is a recognized measure of market share, entitled to consideration on a full record. *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 776–77 (N.D. Cal. 2022); *United States v. Denstply Int'l, Inc.*, 399 F.3d 181, 188 (3d Cir. 2005); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 59–61 (D.D.C. 2018); *Natchitoches Parish Hosp. Svc. Dist. v. Tyco Int'l, Ltd.*, 262 F.R.D. 58, 65 (D. Mass. 2008). To be meaningful, market share calculations must reflect the competitive significance within the relevant market. Smith ¶ 21–22. As the United States merger guidelines, have explained over time, revenue is an appropriate measure of market share, and, indeed, it is preferred to unit quantity measures, when assessing market power in markets with differentiated products. Smith ¶ 23–24. CDK's expert Dr. Snail ██████████████████████

████████████████████████████████████████████████

████ Ex. 1 ("Snail Rpt.") ¶ 42. Revenue is the correct measure here. Smith ¶¶ 22–23, 45.

Combining documentary evidence about rooftop shares and revenue per rooftop assembled to date, Tekion's expert calculates that CDK's revenue share of the broad franchise DMS market

██████████████████████████████████████████ Smith ¶ 55–57.  The documents relied on include multiple third-party analyses unconnected to this litigation, and CDK documents like the Lender Presentation.  *Id.* ¶ 55-56, 63.  When Dr. Smith ███████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ *Id.* ¶ 60.  Thus, and contrary to CDK's assertions otherwise (Mot. 16), the record evidence to date construed in the light most favorable to Tekion ████████████████████████████ ██████████████████████.  *Cf. Movie 1 & 2*, 909 F.2d at 1254.

CDK cites a report commissioned from a third-party market research firm, GIS, to argue that CDK had ██████ of U.S. franchise automotive DMS by revenue in 2025.  Mot. 16.  The report is inadmissible hearsay, and neither CDK nor Dr. Snail explain how GIS obtained its data, performed its calculations, or ultimately arrived at its shares.  Smith ¶ 47–48.  The Court should therefore not consider the GIS report when ruling on CDK's motion.  Fed. R. Evid. 802, 901(a).  CDK also tries to undermine the credibility of various pieces of documentary evidence.  For example, ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████ Mot. 17.  CDK claims that two documents cited by Tekion ██████████████ ████████████████████████████████████████████ *Id.*  But, as explained above, ████████████████████████████████████████████████████████████████████████ ██████ *See* Smith ¶ 26–27.  And in making these arguments, CDK asks this Court to do what it cannot—*weigh* the evidence presented and *draw inferences in favor of the moving party*.  *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Anderson*, 477 U.S. at 261 n.2 (1986).  Drawing them in favor of Tekion, as the Court must, there is certainly sufficient evidence to create a genuine dispute of material fact as to market share by revenue, especially given CDK's refusal to produce relevant revenue data.

CDK argues that it cannot have monopoly power, because its "market share by rooftops has decreased in recent years."  Mot. 15–16.  But there is factual tension here, too.  As recently ██████ ███████████████████████████████████████████████████████████ Ex. 38

FENWICK & WEST LLP
ATTORNEYS AT LAW

at -651 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████, *id.* at -664 ██████ ██████████████████████████████████████████████ (emphasis in original)).  And the Lender Presentation shows a rooftop percentage of ████████████ which is ██████████████████████████████████████████ Mot. 10.  Even if CDK's market share had declined, that alone would not be dispositive of market share.  In the cases that CDK cites, plaintiff failed to adduce evidence of barriers to entry.  *See, e.g.*, *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) ("[plaintiff] failed to present evidence that there were barriers to expansion in the relevant market."); *United States v. Syufy Enters.*, 903 F.2d 659, 666–67 (9th Cir. 1990) (no substantial barriers to entry); *FTC v. Meta Platforms, Inc.*, 811 F. Supp. 3d 67, 122–23 (D.D.C. 2025) (decision after trial on the merits; no finding on barriers).  As shown in Section IV.C below, there is more than sufficient evidence to show a genuine dispute of material fact concerning barriers to entry.

In any event, rooftops are the wrong measure of market power.  Smith ¶ 20–26.  Contrary to CDK's argument, Mot. 14–15, rooftops are not a "standard unit".  CDK's own documents recognize that a rooftop belonging to a single point dealership is materially different from a rooftop that is one of a group of many stores.  ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████ Ex. 38 at -664, ████████████████████████████████ ████████████████████████████████████, *id.* at -660, -664; Ex. 46 at -364–66, -371.  Counting rooftops and dividing by the total would distort the monopoly power analysis by equating low-price, high-volume products with high-price, low-volume products in a market in which price and function vary.  Smith ¶ 27.  Measuring market share by *revenue* in such a market, on the other hand, has the benefit of according more weight to dealers that demand more sophisticated DMS services and less weight to smaller dealers and those that demand less sophisticated DMS services, capturing the true competitive significance of each contract.  Smith ¶

FENWICK & WEST LLP
ATTORNEYS AT LAW

45.

**C.     Barriers to Entry.**

Disputes of material fact as to barriers to entry into the franchise DMS market also require denial of CDK's motion.  The Ninth Circuit has recognized that "a market share as low as 45–70% may support a finding of monopoly power, if accompanied by other relevant factors," including entry barriers and barriers to expansion.  *Movie 1 & 2*, 909 F.2d at 1254 (citing *Pac. Coast Agric. Export Ass'n v. Sunkist Growers, Inc.* 526 F.2d 1196, 1204 (9th Cir. 1975) (affirming jury verdict of Sherman Act Section 2 monopolization)).  Entry barriers are either "[1] additional long run costs that were not incurred by incumbent firms but must be incurred by new entrants or [2] factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir. 1993) (quotations omitted).  These include, but are not limited to,[10] switching costs imposed on customers, *see, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 476–77 (1992); network effects, *e.g.*, *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1071 (9th Cir. 2025); *United States v. Microsoft Corp.*, 253 F.3d 34, 55–56 (D.D.C. 2001); access to needed inputs, including licenses and relationships with necessary third parties, *e.g.*, *Reazin v. Blue Cross & Blue Shield of Kan, Inc.*, 899 F.2d 951, 970 (10th Cir. 1990); and high initial investment, *e.g.*, *Syufy*, 903 F.2d at 667.

As shown in Section IV.C, above, ████████████████████ and for the company that bought it in 2022 for $ 8.3 billion, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. Smith ¶ 69; Ex. 46 at -363. ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. *Id.* ████████████████████████ ████████████████████ Ex. 36 at -925, ████████████████████ ████████████████████. Ex. 53 (Bachrodt Dep. Tr.) at 149:9–22; Ex. 48 (Doral

_____

[10] "Anything that tends to inhibit firms from readily and easily entering the marketplace can be analyzed as an entry barrier." *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 976 (N.D. Cal. 1979).

FENWICK & WEST LLP
ATTORNEYS AT LAW

Dep. Tr.) at 30:5–15; Ex. 57 (Eberhardt Dep. Tr.) at 31:17–32:2. Asbury, one of the country's largest dealership groups, had to sue CDK and obtain preliminary injunctions to be able to regain custody of its own data, let alone switch away from CDK's DMS. Given CDK's ███████ ████████████████████████████████████████████████████████████ ██████████████ Ex. 38 at -656, -665. Smith ¶ 71 & n.97.

There are also barriers to entry and expansion in the form of access to needed inputs, specifically OEM certifications. As Pinewood.AI, a prospective entrant to the United States DMS market notes, "OEM relationships and market 'know-how' are required to sell to dealerships" and "certification with each manufacturer can cost vendors up to $1m per brand, deterring new entrants." Ex. 61 at -607. Moreover, ██████████████████████████████████ ████████████████████████████████████████████████████. Ex. 63 at -089 (noting that ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ █████████████████████████████████████████████ This is especially true in the case of larger dealers. ████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 46 at -356. As CDK told prospective lenders in the Lender Presentation, ███████████████████████████████████████████ ██████████████████████████████████████████████████████ Ex. 38 at -664. Sankararaman ¶¶ 6–9.

CDK contests that OEM certifications are significant barriers to entry, arguing that Tekion "has successfully obtained certification from virtually every major OEM," ████████████ █████████████████████ Mot. 20. This goes to evidentiary *weight*, if anything, an improper consideration at the summary judgment stage. ████████████████████████ ████████████████████████████████████ . Sankararaman Decl. ¶ 9. If that constitutes historical speed, it is a further argument for OEM integration as a barrier to entry. CDK also argues that OEM certifications are not barriers to entry because they are not in the nature of regulatory approvals or licenses. Mot. 20. OEM integration certainly is a barrier to entry, and

FENWICK & WEST LLP
ATTORNEYS AT LAW

the auto industry is highly regulated in ways relevant to that analysis. As the Lender Presentation explains, ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ Ex. 38 at -665. ████████████████████████████████████████████ ███████████████. *Id.*; Sankararaman Decl. ¶¶ 6–9.

Competition in the market is simply not what CDK represents it to be, especially in the submarket of large dealership groups. CDK argues that there are ten competitors in the DMS market. Mot. 5. But the Lender Presentation ████████████████████████████████ ██████████████████████████████████████████████████████████████████. Ex. 38 at -662. ████████████████████████████████████████████ ████████████████, Ex. 49 at 4, █████████████████████████████████████████, Ex. 50. *See* Smith ¶ 12 (collecting other examples). Even CDK's own declarant states that ████ ██████████████████████████████████████████████████████████████████ ████████████████████████. Ex. 3 (CDK's Rowland Decl.). At his deposition ███████████ ██████████████████████████████████████████████ Ex. 54 (Rowland Dep. Tr.) at 211:2–15, ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ration, *id.* at 119:9–120:6.

Just getting into the DMS market is a massively expensive proposition. Tekion has raised more than ████████████████████████ to enter the DMS market. Sankararaman Decl. ¶ 10. CDK argues that significant capital costs are not evidence of a barrier to entry (Mot. 20–21), but the extraordinary upfront capital investments required to enter the DMS market deter competition from all but the hardiest and most financially secure investors. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 119 (D.D.C. 2004). The cases that CDK cites are inapposite. Unlike in *DeSoto Cab Co., Inc. v. Uber Techs., Inc.*, a motion to dismiss case in which the plaintiff alleged that Uber's "$15 billion venture capital war chest" was a barrier but failed to plead facts showing that this level of capital backing was a prerequisite for others entering the ride-hail market, the facts here are more than sufficient for the court "to infer that competitors are precluded from entering the market unless

FENWICK & WEST LLP
ATTORNEYS AT LAW

they obtain [prohibitively large amounts of] capital backing." No. 16-cv-06385-JSW, 2018 WL 10247483, at *8–9 (N.D. Cal. Sept. 24, 2018). In contrast to the facts of *L.A. Land Co.*, Tekion has not made allegations about *accessing* credit. 6 F.3d at 1427–28. *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, a case involving (in the portion CDK cites) allegations of market power arising from procurement of a government contract, is also distinguishable. 164 F.4th 710, 726 (9th Cir. 2026). In *Malheur*, the plaintiff failed to allege at the pleading stage that the "cost of specialized machinery and professional knowledge" were barriers incurred only by new entrants or barriers that deterred entry while permitting defendant to earn monopoly returns. *Malheur,* 164 F.4th at 727. Here, on the other hand, evidence suggests that onerous initial investments to build the DMS platform and complete OEM integrations deter new entrants while allowing CDK to flourish. (Ex. 61 at -607; Sankararaman Decl. ¶ 10), *cf. Google*, 747 F. Supp. 3d at 120. As discussed below, Tekion is the only legitimate new entrant that CDK identifies. And the Court should not draw inferences in CDK's favor on the strength of its argument that, in the future, "[a]dvances in artificial intelligence promise to lower development costs." Mot. 20.[11]

CDK argues that Tekion's entrance into the market and "rapid rise" mean that "no cognizable barriers to [] entry exist". Mot. 18–22. The entrant of a rival into the relevant market is not dispositive of whether entry barriers are significant; total foreclosure from the market is not required. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995); *accord Oahu Gas Serv. v. Pac. Res., Inc.*, 838 F.2d 360, 367 (9th Cir. 1988)(on appeal of motion for JNOV, holding that entry of two rivals did not preclude jury finding of monopoly power); *Pac. Coast Agric. Exp. Ass'n*, 526 F.2d at 1204 (defendant had monopoly power in relevant market where its competitors "were relatively small, with no single competitor controlling over . . . 12% of the market after [] Sunkist's entry."). *See also Trendsettah USA, Inc. v. Swisher Int'l, Inc.*, No. SACV14-01664 JVS, 2016 WL 6822191, at *7 (C.D. Cal. Jan. 21, 2016) (finding dispute of material fact on barriers of entry in market with 30 competitors; "the number of new competitors alone does not necessarily

---

[11] CDK appears to base this argument on a single bullet point in a Tekion slide deck  about the use of AI tools to conduct particular code components without any context on the impact of that tool on reducing barriers to entry. Mot. at 20–21 citing Levin Decl. Ex. 22 at -00020209. Tekion objects pursuant to Fed. R. Evid. 901.

FENWICK & WEST LLP
ATTORNEYS AT LAW

indicate whether these barriers are significant"). Nor would Tekion's entry preclude a finding of monopoly power even if it were true, as CDK asserts, that Tekion had ███████████████████████ ████████████████████████. *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) (new entrant capturing 10 percent market share in two years did not foreclose finding of monopoly power where high market share, barrier to entry existed, and monopolist held power over price); *accord Oahu Gas*, 838 F.2d at 366 ("declining market share . . . does not foreclose a finding of [market] power"). A court will deny summary judgement of no monopoly power where evidence of (allegedly) declining market share is presented alongside evidence of barriers to entry. *See, e.g.*, *Safeway, Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 890 (N.D. Cal. 2011) ("this is for a jury to decide"); *Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-cv-00923-BLF, 2018 WL 11230167, at *17 (N.D. Cal. May 21, 2018).

The cases that CDK cites for the proposition that Tekion's entry into the market is alone enough to resolve a dispute over CDK's monopoly power are inapposite. In *Cyntegra, Inc. v. Idexx Lab'ys, Inc.*, there was no dispute as to the market share prong of the monopoly power analysis (defendant's main competitor in the market was achieving twice the revenue of defendant), and defendant introduced evidence of at least *three* competitors entering the relevant market (both in-clinic diagnostic tests and reference lab services). 520 F. Supp. 2d 1199, 1209–10 (C.D. Cal. 2007). In *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, the court found that the defendant was the "second largest competitor among those defined by plaintiff to be participants in the market" and did not consider evidence of barriers to entry identified by Tekion (e.g., switching costs, OEM certification requirements). 709 F. Supp. 985, 991 (W.D. Wash. 1987). In *IBM*, the court found no monopoly power in view of IBM's inability to control prices, as to which CDK offers no argument,[12] IBM's declining market share, and the emergence of multiple, new, successful entrants in a massive market embracing both full systems and "less inclusive offerings." 481 F. Supp. at 981–82. And in *In re Super Premium Ice Cream Distribution Antitrust Litig.*, the court rested its

---

[12] As evidence of supposed "vigorous price competition," CDK cites a single Tekion document that refers to CDK's predatory practices, such as offering "1 year free of all cost but for a longer-term contract" and offering buy outs of Tekion's new dealership customers. Mot. at 7; Ex. 21 at -947. A temporary willingness to accept lower profit margins as a means of stifling competition is entirely consistent with possession of durable market power.

TEKION'S OPPOSITION TO CDK'S
EARLY PMSJ                          20                        Case No.: 3:24-cv-08879-JSC

decision on both "the success with which Two Count, Double Rainbow, and [at least three] other manufacturers of alleged super premium ice creams have had in obtaining market shares" *and* Haagen-Dazs's extremely low market share of approximately 4–5% in the San Francisco area market.  691 F. Supp. 1262, 1268–69 (N.D. Cal. 1988).

Given CDK's claim that ███████████████████████████████████████ one would expect many entrants, especially given how easy it is, according to CDK, to "leverage" new technology (Mot. 21).  (There is no reason for the Court to draw any technology-based inference in CDK's favor.)  But CDK identifies only Tekion and Pinewood.AI as recent entrants.  Tekion entered the franchise DMS market in 2020, after enormous investment and years of pre-launch work.  Sankararaman Decl. ¶¶ 3, 10.  CDK identifies no recent entrant before Tekion.  Pinewood.AI, CDK's other supposed new entrant, is not on CDK's list of competitors in its 2023 Lender Presentation, which is unexpected given CDK's claim that Pinewood.AI "has also successfully entered the market in recent years".  Mot. 18.  In ████████████████████ ██████████████████████████████████████████████████ █████████████████████████  Ex. 64.[13]  Until recently, Lithia was Pinewood's joint venture partner for the North American DMS offering, and from the documents that CDK and its expert cite about Pinewood.AI., Lithia appears to be Pinewood's only prospective future customer.  Exs. 65, 66.  According to Pinewood's own annual report for 2025, its "success" in the United States was limited to a pilot program in a single Lithia dealership.  Smith ¶ 15. ██████████████████ ████████████████████████████████  Sankararaman Decl¶ 11.

The facts concerning the nature, timing, and extent of Tekion's supposed success are contested, moreover.  According to CDK, most of Tekion's success has come in 2025 (Mot. 6, 7), which is *after* Tekion sued CDK.  Likewise, CDK's declarant Rowland testified that, ████ ██████████████████████████████████████████████████ █████████████████████  Ex. 54 (Rowland Dep. Tr.) at  253:5-254:3 ████████ ████████████████████████).  Tekion filed suit in December 2024, creating a strong

---

[13] An excerpt from Ex. 64 is annexed to the Solowiejczyk Declaration.  The entirety of the file is too voluminous to include.  Tekion will provide a complete, native file copy of the Exhibit at the Court's request.

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

inference that litigation was necessary to lower this artificial barrier.  And although it is true, as CDK points out, that Asbury "is transitioning" to Tekion from CDK (Mot. 4), that became possible only after Asbury took CDK to court and obtained a preliminary injunction in October 2024, just so that Asbury could pilot Tekion's DMS.  According to CDK, Tekion cofounder Guru Sankararaman █████████████████████████████████████████████████████████████████████ ████████████ Mot. 7 (emphasis added).  In support, ████████████████████████████ █████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 24.  First, Mr. Sankararaman does not ████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████ *Cf.* Mot. 7–8.  CDK is putting those words into Mr. Sankararaman's mouth, so that the Court draws a misleading inference.  Second, CDK fails to inform the Court that the e-mail is dated five *days* after CDK's shocking data breach that all but shut down DMS access for all CDK dealers, at an estimated ultimate total cost to the U.S. economy of $ 1.02 billion.  Ex. 67.  The inference to draw is that the "████████ that Sankararaman identified was from dealers potentially fleeing CDK because they would otherwise have no DMS *at all*, not one about the comparative effects of CDK's monopolistic practices and other factors in Tekion's growth.

CDK argues that Tekion's "rapid rise"—█████████████████—is evidence that CDK cannot have monopoly power. Mot. 18.  Even at face value, the claim adds a dispute of fact.  CDK has described a market in which there are no barriers to entry, Mot. 17, all rooftops are the same, Mot. 14, dealers switch DMSs frequently and with ease, Mot. 21, and, with at ████████████████████ █████████████████████████████████████████, it describes a lucrative market.  In sworn testimony, Asbury's CIO has described Tekion's DMS as "game-changing" and "transformative", Ex. 68 at 32, ████████████████████████████████████████████████ Ex. 48 at 32:25–33:17.  In contrast, CDK's DMS is "antiquated", Ex. 68 at 37, 38, and ████████████████████████ █████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████████

██████████████    Smith ¶ 68 (citing Ex. 46 at -357). CDK, describes its competitors for large group dealers as not up to the task. Ex. 38 at -661. And yet, after nearly six years, Tekion has only █████ share even by *CDK's* (factually, methodologically disputed) measure. To CDK, this is runaway success, but there is a different interpretation: given Tekion's superior product, CDK's frustrating business practices, approximately 18,000 freely switching rooftops, and a market free of barriers to entry and expansion—Tekion's share would be higher but for CDK's monopolistic conduct (and there would have been other genuine entrants).

At the very least, for all the reasons given in this opposition, there are disputes of fact about the nature of the market that preclude summary judgment, especially with all evidence viewed in Tekion's favor, as it must be. The question of monopoly power is thus "for a jury to decide." *Safeway*, 761 F. Supp. 2d at 890.

**D.    The Court Should Deny CDK's Motion as Premature in the Absence of Expert Economic Analysis.**

The existence of monopoly power, including factors such as market definition, market share, and barriers to entry, is a quintessential fact question, reserved for determination by the jury. *E.g.*, *Oahu Gas*, 838 F.2d at 363; *Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982); *Greyhound Comput. Corp. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 496–97 (9th Cir. 1977). Issues of fact like "[m]arket shares are not themselves 'facts' in the traditional sense of the word, but instead a legal and economic interpretation of other underlying facts" typically performed by experts. *United States v. Anthem, Inc.*, No. 16-cv-1493 (ABJ), 2016 WL 11755527, at *5 (D.D.C. Sept. 30, 2016), *report and recommendation adopted*, 2016 WL 1175535 (D.D.C. Oct. 14, 2016). Thus, even where underlying economic data are not disputed, and here they are, disputes as to their meaning can preclude summary judgment. *See, e.g.*, *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-cv-04312-BLF, 2024 WL 1909156 at *10 (N.D. Cal. May 1, 2024) ("dueling expert testimony" on market control "preclude[d] summary judgment"); *Pac. Steel Grp. v. Com. Metals Co.*, No. 20-cv-07683-HSG, 2024 WL 3236705, at *6–8 (N.D. Cal. June 28, 2024) (expert dispute on market definition precluded summary judgment on antitrust claim).

FENWICK & WEST LLP
ATTORNEYS AT LAW

FENWICK & WEST LLP
ATTORNEYS AT LAW

Though not required in the Ninth Circuit, "[i]n practice, economists [are often used] to explain the relevant market and to measure the impact of the allegedly illegal conduct." *W. Parcel Express v. UPS of Am.*, 65 F. Supp. 2d 1052, 1058 (N.D. Cal. 1998) (citing *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir. 1993)). Even in the cases CDK relies on to show summary judgment may be granted where plaintiffs fail to show market share above 50%, Mot. 14, the parties had completed expert discovery before the court ruled. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1333 (S.D. Cal. 2020) (granting summary judgment *after* plaintiff's expert submitted report acknowledging damages not wholly attributable to monopolization); *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip Corp.*, No. C 04-02266 JW, 2020 WL 11478992, at *5–6 (N.D. Cal. July 21, 2010) (granting summary judgment after plaintiff's expert offered opinions on market share that were excluded by court).[14] "The necessity of expert testimony to translate and interpret material, technical facts is a justifiable ground for denying summary judgment." *Sonobond Corp. v. Uthe Tech., Inc.*, 314 F. Supp. 878, 881 (N.D. Cal. 1970). Here, CDK has withheld data that Tekion's experts require to calculate market share. Smith ¶¶ 61–62. The expert discovery cutoff is December 23, 2026. Dkt. 87. CDK has jumped the gun not only on fact discovery—again, there were two months to go when it filed its motion—but on proper expert discovery as well.

A disagreement of experts about the appropriate methodology for calculating market share can itself be a basis for denial of summary judgment. *See In re Abbott Labs. Norvir Anti-Trust Litig.*, 562 F. Supp. 2d 1080, 1086 (N.D. Cal. 2008) ("triable issues of fact with respect to which party's method of calculating market share is appropriate" precluded summary judgment), *rev'd on other grounds*, *John Doe 1 v. Abbott Labs.*, 571 F.3d 930 (9th Cir. 2009); *see also Lenox MaClaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1124 (10th Cir. 2014) (market share "neither 'undisputed' nor inconsistent with finding of monopoly power" where different methods yielded different market share estimates); *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, 2015

---

[14] CDK also cites *Prime Healthcare Servs., Inc. v. Servs Emps. Int'l Union*, 642 F. App'x 665 (9th Cir. 2016) in support of this proposition. However, here the Ninth Circuit affirmed a motion to dismiss and, contrary to CDK's assertions, noted that the allegations showing twelve percent market share "*by themselves*" were not sufficient to demonstrate monopoly power. *Id.* at 667 (emphasis added).

WL 5081608, at *6 (D. Colo. Aug. 28, 2015) (denying summary judgment; "competing expert reports establish a disputed question of material fact as to the relevant market share at issue here"). There is exactly such a disagreement here. CDK insists that counting rooftops is the only appropriate method for calculating market share. Mot. 1–2, 4, 6, 10–12; 14–15. Tekion's theory, however, has always been that *revenue* is the right measure. Dkt. 1 ¶¶ 2, 30, 54, 67.

### E.    Even on an Incomplete Record, Genuine Disputes of Material Fact Preclude Summary Judgment on Attempted Monopolization.

Whereas monopolization requires a showing of monopoly power, a claim of attempted monopolization requires that Tekion show "a dangerous probability" that CDK will succeed in achieving monopoly power. *Movie 1 & 2*, 909 F.2d at 1254. To demonstrate dangerous probability, a plaintiff must (1) define a relevant market, (2) show evidence of a significant market share, and (3) show evidence of barriers to entry. *Rebel Oil*, 51 F.3d at 1434. CDK argues that it is entitled to summary judgment on attempted monopolization, recycling the same contested evidence cited in support of its motion for summary judgment on monopolization. Mot. 21–23. For the reasons Tekion has already articulated above, the Court should deny CDK's Motion.

*First*, as CDK acknowledges, the "minimum showing of market share required in an attempt case is a lower quantum" than that required for actual monopolization. *Rebel Oil*, 51 F.3d at 1438; Mot. at 21. Nevertheless, CDK points to Dr. Snail's disputed calculation of 36.4% market share *by rooftops*, claiming it falls below the specific threshold in *Rebel Oil*. Mot. 23. But not only do CDK's own documents assert a higher rooftop share—at least 46% as of the Lender Presentation in 2023 and predicted to grow—Tekion's market share theory is *revenue*. *Second*, the evidence establishes a genuine dispute of material fact as to the presence of barriers to entry in the relevant DMS market. CDK's contention—that Tekion's growth and Pinewood.AI's mere overtures to entering the market conclusively establish the absence of "cognizable barriers to entry or expansion" (Mot. 23)—fares no better in the attempted monopolization context.

Though incomplete, the evidentiary record in this case establishes a dispute as to both market share and barriers to entry. These are factual issues for jury determination. CDK's motion for summary judgment should therefore be denied.

TEKION'S OPPOSITION TO CDK'S
EARLY PMSJ                                    25                          Case No.: 3:24-cv-08879-JSC

Dated:   May 22, 2026

FENWICK & WEST LLP

By:   /s/ Adam Gahtan
Tyler G. Newby (CSB No. 205790)
**FENWICK & WEST LLP**
One Front Street, Floors 31-33
San Francisco, CA  94111
Telephone: 415.875.2300
Facsimile:  415.281.1350
tnewby@fenwick.com

Adam Gahtan (*pro hac vice*)
Noah Solowiejczyk (*pro hac vice*)
Erica R. Sutter (CSB No. 309182)
Cortnay-Beth Cymrot (*pro hac vice*)
**FENWICK & WEST LLP**
902 Broadway, Floor 18
New York, NY  10010-6035
Telephone:  212.430.2600
agahtan@fenwick.com
nsolowiejczyk@fenwick.com
esutter@fenwick.com
ccymrot@fenwick.com

Janie Yoo-Scott (CSB No. 312715)
Brittney Dimond (*pro hac vice*)
**FENWICK & WEST LLP**
1155 F St NW, 12th Floor
Washington, DC  20004
Telephone:  202.970.3000
jyooscott@fenwick.com
bdimond@fenwick.com

*Attorneys for Plaintiff Tekion Corp.*

## CERTIFICATE OF SERVICE

I, Adam Gahtan, hereby certify that on May 22, 2026, I caused the foregoing to be served electronically on the following parties:

VINEET BHATIA (*pro hac vice*)
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*pro hac vice*)
sraymond@susmangodfrey.com
ROBERT SAFI (*pro hac vice*)
rsafi@susmangodfrey.com
KATHERINE ROSE JAMES (*pro hac vice*)
rjames@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street , Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

JESSE-JUSTIN CUEVAS (SBN: 307611)
jcuevas@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

AMY B. GREGORY (*pro hac vice*)
agregory@susmangodfrey.com
EVE LEVIN (*pro hac vice*)
elevin@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

RACHEL L. SCHALLER (*pro hac vice*)
rachel.schaller@blankrome.com
DANIEL R. SAEEDI (*pro hac vice*)
daniel.saeedi@blankrome.com
**BLANK ROME LLP**
444 West Lake Street, Suite 1650
Chicago, IL  60606
Telephone: (312) 776-2600
Facsimile: (312) 776-2601

Attorneys for *CDK Global, LLC*

Joshua Hafenbrack (*pro hac vice*)
jhafenbrack@winston.com
Benjamin Rudofsky (*pro hac vice*)
brudofsky@winston.com
Jade Briana Baker (*pro hac vice*)
jbbaker@winston.com
Sydney Hartman (*pro hac vice*)
shartman@winston.com
Molly Rose Gibson (*pro hac vice*)
mrgibson@winston.com
**WINSTON & STRAWN LLP**
1901 L Street NW
Washington, DC  20036-3506
Telephone: (202) 282-5017

Jeanifer E. Parsigian (SBN: 289001)
jparsigian@winston.com
**WINSTON & STRAWN LLP**
101 California Street, 21st Floor
San Francisco, CA  94111
Telephone:    (415) 591-1000
Facsimile:    (415) 591-1400

*Attorneys for INDESIGN DATA, LLC*

Dated:    May 22, 2026

*/s/ Adam Gahtan*
Adam Gahtan

FENWICK & WEST LLP
ATTORNEYS AT LAW

TEKION'S OPPOSITION TO CDK'S
EARLY PMSJ                                      27                          Case No.: 3:24-cv-08879-JSC