**UNITED STATES OF AMERICA**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **TEKION CORP., a Delaware corporation,**<br>Plaintiff,<br><br>and<br><br>**CDK GLOBAL, LLC,**<br>Defendant. | **Case No. 3:24-cv-08879** |

**Declaration of Loren K. Smith, Ph.D.**
**August 4, 2026**

# Table of Contents

I. CDK Has Not Produced Data That Would Allow Me to Calculate an Economically Meaningful Estimate of Unbundled DMS Revenues or Address CDK's Criticisms of My Preliminary Revenue Share Calculations. ....................... 5

II. To Date Reynolds and DealerTrack Have Not Produced Adequate Data for Calculating Market Shares Based on DMS Revenues. .......................................... 10

III. Relevant Depositions Have Not Been Completed. ............................................... 10

I, Loren K. Smith, declare as follows:

1. I have been a Founding Partner and Head of U.S. Antitrust & Competition at Econic Partners since February 2025. A detailed description of my background and qualifications was provided in my original declaration filed on May 22, 2026.[1]

2. I have been retained by Fenwick & West LLP, counsel to Plaintiff Tekion Corporation, ("Tekion"), to provide testimony as an economic expert in this litigation. I submit this declaration pursuant to Federal Rule of Civil Procedure 56(d) in support of Tekion's opposition to CDK Global, LLC's ("CDK") early motion for partial summary judgment on the issue of market share. As explained below, CDK and two non-party DMS providers have not produced sufficient revenue data that would allow me to measure DMS revenues on an unbundled basis and thereby refine and increase the precision of my revenue-based market share calculations. Using currently available data, I have preliminarily estimated CDK's DMS revenue share and expect to offer opinions on relevant market size and market shares; the additional data that Tekion has requested but not yet received would materially improve the precision of my analysis and allow me to respond more directly to CDK's current criticisms.

3. I understand that Plaintiff Tekion has asserted that CDK has engaged and continues to engage in various forms of anticompetitive conduct to limit and exclude competition in the franchise DMS market from Tekion and others.[2] Among other things, I understand that I will be asked to analyze and opine on Plaintiff's claims. This work will require evaluation of CDK's market power, which can be established through direct and/or indirect evidence. Indirect

---

[1] Expert Report of Loren K. Smith, Ph.D., Case No. 3:24–cv–08879 (filed May 22, 2026) ("Smith Initial Report") ¶¶ 1-7, Appendix A.

[2] Complaint for Damages and for Injunctive and Declaratory Relief, Demand for Jury Trial, *Tekion Corp. v. CDK Global, LLC,* Case No. 3:24–cv–08879 (filed Dec. 9, 2024) ("Complaint") ¶ 83.

Tekion has alleged that "CDK has engaged and continues to engage in various forms of anticompetitive conduct to limit and exclude competition in the franchise DMS market from Tekion and others. Such conduct includes withholding or delaying dealers' access to their own data, thereby preventing, delaying, and foreclosing dealers from switching to a competing franchise DMS, and threatening and initiating legal action against dealers that intend to switch from CDK's DMS."

evidence requires, among other things, properly defining relevant antitrust markets and calculating shares within these markets.

4. I understand that I will be asked to provide an initial expert report for this matter, containing disclosure of my expert opinions on the above-described topics, as well as other topics on which I may be asked to provide an opinion.

5. I previously submitted a declaration on May 22, 2026, responding to an April 27, 2026 declaration that Dr. Snail submitted in support of CDK's early partial summary judgement motion. In my May declaration, I explained that revenue-based shares—rather than rooftop-based shares—more accurately reflect CDK's competitive significance in a DMS market and also reflect rivals' abilities to constrain CDK from engaging in alleged behavior. I also estimated CDK's DMS revenue share using currently available information.

6. CDK has challenged the reliability of my revenue share calculations on two principal grounds: (a) that the DMS revenue estimates I relied on include revenue from layered applications sold to DMS customers, which CDK contends biases the estimates because larger providers likely sell more layered applications; and (b) that my calculations do not use rooftop data from CDK, Tekion, and Reynolds & Reynolds ("Reynolds").

7. Even if the revenue estimates used in my initial report included layered application revenue along with DMS revenue, CDK provided no evidence that this materially biases my revenue share estimates. Moreover, the data needed to address CDK's first criticism directly—by measuring DMS revenue after reliably unbundling the cost a customer incurs when using a particular provider's DMS—is data that I understand that CDK and non-party providers Reynolds and Dealertrack have not produced.

8. Regarding CDK's suggestion that I should have supplemented my revenue share analysis with rooftop data produced by three of the DMS providers (CDK, Tekion, and Reynolds), such mixing of data sources likely would have introduced biases into the analysis. That is, counting dealership rooftops is not straightforward. Various sources define a "rooftop" differently: for example, Dr. Snail considers rooftop counts from three different industry organizations – *NADA, Urban Science, and Automotive News* – and gets three different estimates

of U.S. Franchise Dealership counts.[3] Dr. Snail likewise recognizes that NADA, Urban Science, and Automotive News count rooftops differently.[4] By contrast, all of the rooftop shares in my analysis come from a single Bain study, so they are likely measured consistently across providers; that Dr. Snail obtains different share estimates when he substitutes CDK, Tekion, and Reynolds data for the Bain data confirms that mixing and matching data sources would introduce inconsistency. Regardless, CDK's criticism is another example of why there is a need for additional data that Tekion has sought.

9. The data and documents produced to date by CDK and several competing DMS providers are not sufficient to fully address CDK's criticisms of my revenue share calculations and thus limit the precision of my opinions on relevant market size and market shares.

## I. CDK Has Not Produced Data That Would Allow Me to Calculate an Economically Meaningful Estimate of Unbundled DMS Revenues or Address CDK's Criticisms of My Preliminary Revenue Share Calculations.

10. To date, CDK has produced revenue data based only on its own definition of what constitutes a DMS product or service. Because CDK has limited its production of revenue data to its preferred definition of DMS revenue, I am not able to determine, based on that data, the true price CDK's franchise dealers pay to use its DMS, which likely exceeds the true DMS revenue CDK earns. As discussed below, an economically meaningful ("unbundled") price for CDK's DMS product (and layered applications) should be determined by evaluating how the total revenue paid to CDK varies, on average, as the composition of CDK products consumed by a dealership varies. This analysis requires information on the total revenues (inclusive of DMS, layered apps, and add-ons) that CDK earns from dealerships combined with information on how those revenues vary as the attributes of the bundle and customer-type varies.

11. CDK's self-reported DMS revenues understate the true prices franchise dealers pay to utilize CDK's DMS for at least two reasons:

---

[3] *See* Expert Report of Timothy S. Snail, Ph.D., Case No. 3:24–cv–08879 (filed Apr. 24, 2026) ("Snail Initial Report") at Exhibit 3.

[4] Expert Reply Report of Timothy S. Snail, Ph.D., Case No. 3:24–cv–08879 (filed Jun. 11, 2026) ("Snail Reply Report") at n.134.

- First, [redacted] Fundamental economics teaches that prices for individual components are obscured when products are consumed as part of a bundle.
- Second, [redacted].[6]

12. To demonstrate the challenge with valuing the components of a bundle, consider a familiar example of the value of rooms of a house. Assume a house has only three rooms, a bedroom, a living room, and a kitchen. The house is valued at $600,000. A realtor can claim the bedroom, living room, and kitchen are each worth $200,000, or she can claim the kitchen is worth $600,000 and she will throw the bedroom and living room in for free. These claims carry no information regarding the value of the kitchen (or the other rooms) – because all that matters is that the value of the individual rooms add up to the selling price for the home. Moreover, it is

---

[5] For example, according to [redacted] *See*, CDK_00939819.

[6] *See*, for example, Expert Reply Report of Loren K. Smith, Ph.D., Case No. 3:24–cv–08879 (filed May 22, 2026) ("Smith Reply Report") at n.83. "[redacted]." *See* CDK_01011382–398 ([redacted]") at 383.

*See also,* Deposition of James Verity (conducted on July 8, 2026) ("Verity Dep.") at 299.

[redacted]

clear that a buyer will recognize that a higher claimed value for the kitchen implies a lower value for the rest of the house.

13. Beyond the difficulties with pricing DMS products whose prices are negotiated as part of a bundle that includes layered applications, CDK's self-reported DMS revenues are also unreliable because they exclude non-layered application add-ons that are consumed in conjunction with CDK's proposed DMS products. Continuing with the real estate example, accepting CDK's definition of DMS is like purchasing the house with a gourmet kitchen only to discover that the kitchen's appliances were not included. That is the case here.

14. As I noted in my initial reply, CDK [redacted]. James Verity, CDK director of sales for Florida and the Caribbean who has been in sales roles at CDK and its predecessor division of ADP since 2003, testified that [redacted][7] These costs are not trivial. In the case of printing, the data I have reviewed indicates that the average DMS customer rooftop pays CDK [redacted] for printing services needed for the DMS to function. These printing costs are just one example of an add-on not included in CDK's reported DMS revenue estimates. Mr. Verity also testified that [redacted].[8]

15. Economists recognize the difficulties in estimating the value of products that are consumed as part of a bundle.[9] In instances where one needs to estimate the value of an individual component of a bundle, economists will often employ an econometric analysis that decomposes the total price of the differentiated product bundle – like a house – into the implicit

---

7 Verity Dep. at pp. 24, 34, 48-51, 299.

8 Verity Dep. at pp. 48, 110, 298-299.

9 *See*, for example, Adams, W.J. and Yellen, J.L., "Commodity Bundling and the Burden of Monopoly," *Quarterly Journal of Economics* 90(3) (1976): 475-498, at Note 24 – noting that "[w]henever bundling occurs, the shadow price an individual faces for one commodity depends on his reservation price for the other commodity." That is, consumers' willingness to pay for DMS is tied to the bundle.

(or "shadow") prices of its components.[10] Instead of treating a house, car, or software bundle as a homogeneous product, such models assume buyers value the underlying attributes—gourmet kitchens, square footage, number of bedrooms, CRM, etc.—and that the observed market price is the sum (or some function) of those component values. For example, rather than valuing a gourmet kitchen according to the realtor's speculative claims, the economist will value a gourmet kitchen according to incremental value that regression analysis determines a gourmet kitchen adds to an otherwise similar house.

16. Implementation of such an econometric analysis requires the price for the bundle (i.e., the total revenue charged per franchise site) and the relevant characteristics for that site (e.g., whether DMS is included, which layered apps are included, how large is the dealer group customer, etc.). However, I understand that to date CDK has only produced revenues associated with what it has deemed to be DMS revenue. This is not sufficient.

17. The analysis of CDK's DMS revenues described above requires the following information for each franchise dealer location:

- [redacted];[11]
- [redacted];[12]

---

[10] *See*, Jeffrey M. Wooldridge, "Introductory Econometrics: A Modern Approach," *5th Ed.*, (2013) at p. 677: "For example, property tax assessors use models (called *hedonic price models*) to estimate housing values for homes that have not been sold recently. This involves a regression model relating the price of a house to its characteristics (size, number of bedrooms, number of bathrooms, and so on)." *See also*, Jeffrey M. Wooldridge, "Econometric Analysis of Cross Section and Panel Data," *The MIT Press*, (2001) at pp. 431-32.

[11] [redacted] is needed in order to be able to consistently match dealerships to the dealer group operating the dealership.

[12] [redacted]. Information on [redacted] is needed in order to consistently match dealerships with the list of franchise dealerships identified in other datasets – including the data relied on in Dr. Snail's analysis.

- [redacted];[13]
- City and state;[14]
- OEM brand;[15]
- CDK's total monthly recurring revenue (MRR);[16]
- The name of the DMS used (Foundations Suite, Fundamentals Suite, Drive, etc.);[17]
- List of layered applications (e.g., Roadster, eLead, etc.) or layered application suites (Modern Retail Suite, Fixed Operations Suite, Vehicle Inventory Suite, Intelligence Suite) purchased by the dealership location;[18] and
- List of non-layered application add-ons (printer services, network services, etc.) purchased by the dealership location.[19]

18. I understand that Tekion has already served formal discovery on CDK seeking precisely this information. On August 4, 2025, Tekion served Interrogatory No. 12 seeking customer- and rooftop-level revenue data, and on March 18, 2026, Tekion served RFP No. 203

---

13 [redacted] is simply the name of the franchise dealership location. [redacted] is required to match CDK's data against available information on the dealership site available through non-CDK sources.

14 Information about the location of each CDK dealership location is needed to analyze if location has a material effect on DMS pricing.

15 Information about the dealership's OEM affiliation is needed to analyze if CDK's DMS pricing varies by dealership OEM affiliation.

16 Total CDK monthly recurring revenue by franchise rooftop (including DMS product revenue, layered application revenue, and all other add-on revenue) is the primary data element of this request. Data on total MRR, along with information on the dealerships' bundle of DMS, layered application, and other add-on attributes is needed to evaluate the effective unbundled DMS prices as described in this declaration.

17 Information on the DMS product used by the dealership could be used to evaluate whether, all else being equal, the price dealerships pay for CDK's DMS varies by DMS installation (e.g., the legacy drive system versus the Foundations Suite implementation).

18 Information on layered applications purchased by dealerships could be used to evaluate whether these applications have an effect on DMS pricing, as described in this declaration.

19 Defined at CDK's internal "[redacted]" level of detail.

(part of its Fifth Set of Requests for Production), seeking, for each CDK franchise DMS customer location, the dealer-group and dealership identifiers, OEM brand, contract dates and duration, the DMS products licensed, MRR attributable to core DMS products, MRR attributable to add-on products, revenue charged to third-party developers, and total revenue per location. I further understand that CDK's own productions show that CDK maintains the customer- and product-level revenue data needed for my analysis.

19. I understand that CDK has refused to produce this customer-level revenue data, producing instead only aggregate monthly DMS revenue and a list of SKUs that cannot be tied back to individual customers or prices. The data CDK has produced to date permits only a limited approximation of unbundled DMS revenue, rather than the more precise unbundling analysis described above.

## II. To Date Reynolds and DealerTrack Have Not Produced Adequate Data for Calculating Market Shares Based on DMS Revenues.

20. Because a reliable market-share analysis requires comparable revenue data for at least a large portion of the DMS market, I would also want to conduct a similar econometric analysis for Reynolds and Dealertrack.

21. I understand that Tekion served Rule 45 subpoenas on Reynolds and Dealertrack seeking this information. I understand that Tekion has moved to compel both Reynolds and Dealertrack to produce the withheld data, among other information, and that those motions are fully briefed and remain pending.

22. After receiving, reviewing, and analyzing the foregoing data and documents as well as the transcripts of depositions being taken in this case, I will prepare my expert report and intend to complete my report in accordance with any schedule issued by the Court.

## III. Relevant Depositions Have Not Been Completed.

23. I also understand that, at the hearing on Tekion's motion to compel, the Court indicated that Tekion should support its market-definition and market-share arguments with deposition testimony, and that certain of those depositions remain outstanding. That testimony is relevant to the opinions I will offer and to Tekion's opposition to summary judgment—for example, testimony concerning how CDK bundles and prices its DMS and layered applications,

the mandatory add-on products CDK excludes from reported DMS revenue, and how CDK tracks customer- and product-level revenue in the ordinary course. I expect to review and analyze the transcripts of the depositions being taken in this case in forming my final opinions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 4th day of August 2026.



Loren K. Smith

Econic Partners