**PUBLICLY FILED REDACTED COPY**

VINEET BHATIA (*Admitted Pro Hac Vice*)
vbhatia@susmangodfrey.com
SHAWN RAYMOND (*Admitted Pro Hac Vice*)
sraymond@susmangodfrey.com
Daniel Wilson *(Admitted Pro Hac Vice)*
dwilson@susmangodfrey.com
Meredith R. Harrison *(Admitted Pro Hac Vice)*
mharrison@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

STEPHEN E. MORRISSEY
*(Admitted Pro Hac Vice)*
smorrissey@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

JESSE-JUSTIN CUEVAS (SBN 307611)
jcuevas@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

EVE LEVIN (*Admitted Pro Hac Vice*)
elevin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for Defendant CDK Global, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

TEKION CORP., a Delaware corporation

*Plaintiff,*

vs.

CDK GLOBAL, LLC, a Delaware limited liability company

*Defendant.*

Case No. 3:24-cv-08879-JSC

DEFENDANT CDK GLOBAL, LLC'S OPPOSITION TO TEKION'S SUPPLEMENTAL RULE 56(d) DECLARATION [REDACTED]

Date: October 1, 2026
Time: 9:00 a.m.
Court: 8, 19th Floor
Judge: Honorable Jacqueline Scott Corley
Trial Date: July 12, 2027

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1
BACKGROUND ........................................................................................................ 2
A. CDK's Summary Judgment and Sanctions Motions and Tekion's Motion to Amend ........................................................................................................ 3
B. Tekion's Initial 56(d) Opposition........................................................................ 4
C. The June 17 Discovery Hearing ........................................................................ 4
D. CDK's Production and Tekion's Continued Delays ........................................ 5
E. Tekion's Reliance On Third Party Reports Is Debunked, Yet Again ................ 6
LEGAL STANDARD ................................................................................................ 7
ARGUMENT ............................................................................................................ 8
I. Tekion Is Not Entitled to More Time to Conduct Third-Party Discovery Before Summary Judgment........................................................................................ 8
A. Tekion Fails to Show The Discovery From Reynolds and Dealertrack Is Usable, Let Alone Necessary, In Proving Market Share. ...................................... 8
B. Tekion Was Not Diligent In Seeking Third-Party Discovery. ............................ 10
II. Tekion Is Not Entitled to More Time to Conduct Party Discovery Before Summary Judgment. .................................................................................................. 12
A. The Court Has Already Rejected Tekion's Argument That It Is Entitled to Non-DMS Revenue Data. ...................................................................................... 12
B. CDK Has Produced Everything Tekion Needs and More. ................................ 14
C. Tekion Was Not Diligent in Seeking the Information It Now Claims to Need. ........................................................................................................ 16
D. Tekion's Belated Request for Deposition Testimony Is Equally Unavailing. ....... 17
CONCLUSION ........................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brae Transp., Inc. v. Coopers & Lybrand*,
790 F.2d 1439 (9th Cir. 1986)........................................................................................ 11

*Doctor's Best, Inc. v. Nature's Way Prods., LLC*,
143 F.4th 1101 (9th Cir. 2025)..................................................................................... 7, 10

*Landmark Dev. Corp. v. Chambers Corp.*,
752 F.2d 369 (9th Cir. 1985)...................................................................................... 10, 11

*Qualls ex rel. Qualls v. Blue Cross of Cal. Inc.*,
22 F.3d 839 (9th Cir. 1994)............................................................................................... 8

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995).............................................................................................. 1

*San Francisco Police Comm'n v. Police Comm'n of City & Cnty. of San Francisco*,
1996 WL 251940 (N.D. Cal. May 9, 1996) ..................................................................... 17

*Tatum v. City & Cnty. of San Francisco*,
441 F.3d 1090 (9th Cir. 2006)............................................................................................ 8

*Tekion Corp. v. CDK Global, LLC*,
No. 1:26-mi-00095-MLB-JEM (N.D. Ga. June 8, 2026), Dkt. No. 15-3 ............................... 8

*Tekion Corp. v. CDK Global, LLC*,
No. 1:26-mi-0095-MLB-JEM (N.D. Ga. June 8, 2026), Dkt. No. 15........................ 10, 11, 12

*Tekion Corp. v. CDK Global, LLC*,
No. 3:26-mc-00006 (S.D. Ohio June 1, 2026), Dkt. No. 11 ................................. 8, 10, 11, 12

*Whitmire v. Wal-Mart Stores Inc.*,
359 F. Supp. 3d 761 (D. Ariz. 2019).......................................................................... 10, 11

*Zamora v. City of Oakland*,
2013 WL 4103109 (N.D. Cal. Aug. 12, 2013)................................................................. 11

**Rules**

Fed. R. Civ. P. 11 ................................................................................................................ 3

Fed. R. Civ. P. 16(b) ............................................................................................................ 3

Fed. R. Civ. P. 56(d) ...................................................................................................*passim*

**INTRODUCTION**

This case began with the false premise that CDK holds 60% of the U.S. franchise DMS market by revenue. Discovery confirmed—as CDK insisted from the outset and as Tekion knew—that CDK's market share by any measure falls well below the 50% threshold the Ninth Circuit has called "presumptively insufficient" to establish monopoly power. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). Confronted with this record and a resultant sanctions motion, Tekion sought leave to amend its complaint to abandon the 60% allegation. The Court granted that request. Yet Tekion has refused to file an amended complaint because it simultaneously sought to substitute new market-share theories that discovery in this case has likewise dismantled, and that request was denied. Tekion now finds itself at summary judgment with no viable theory of monopoly power, no competent evidence to support one, and an operative complaint chockful of allegations it has tacitly admitted are sanctionable but has refused to amend (after receiving leave to do so).

Tekion nonetheless insists the Court should defer reaching the merits of CDK's summary judgment motion *again*. Tekion's supplemental Rule 56(d) declaration is a transparent attempt to delay the inevitable. It should be denied for three independent reasons.

*First*, CDK has already produced the data Tekion claims to need. CDK produced comprehensive revenue data CDK keeps in the ordinary course of business—including every Monthly Operating Review ("MOR") from August 2022 to June 2026, and more than seventy Weekly Executive Leadership Team Scorecards ("ELTs")—as well as additional revenue data (the "Foundation Suite Roll-Up" and the rooftop-level snapshot data this Court ordered at the June 17 hearing) generated for this litigation in response to Tekion's demands. Tekion and its expert have never meaningfully engaged with any of it. They have not marked a single MOR, ELT, or the Foundation Suite Roll-Up as a deposition exhibit. They have not asked a single witness a single question about these documents. And when CDK offered to make witnesses available for deposition before Tekion's summary judgment opposition was due so that it could do so, Tekion declined. The additional data Tekion claims it needs addresses products outside the pleaded market, is redundant

with information CDK has already produced in the documents Tekion has ignored, and in any event the request was already considered—and rejected—by this Court the last time Tekion raised a 56(d) argument.

*Second*, Tekion was not diligent in seeking the discovery it now claims is essential. Knowing full well that market share was the central issue in this case, knowing that it lacked that data in its own files and required third-party discovery, and knowing since at least January 2026 that CDK intended to file an early summary judgment motion on that issue, Tekion nonetheless waited until March 2026, nine months into discovery and weeks before the then-operative close of fact discovery, to serve the RFP it now claims sought essential information. It likewise waited months (from June to November) to first serve third party subpoenas on other DMS providers, and then let those subpoenas languish for months without follow-up. And it made a strategic choice not to even attempt to enforce those subpoenas against the majority of other DMS providers in the market.

*Third*, even if Tekion received every byte of data it now demands, it could not establish a triable issue of fact on monopoly power. Dr. Smith's revenue-share methodology is fundamentally flawed: it uses revenue as the metric in a differentiated product market where rooftops are the appropriate measure, and it would still leave him without data for a non-trivial share of market participants.

The reason Tekion cannot substantiate any market share sufficient to continue its case is not that CDK and third parties have failed to produce enough data. It is that the facts are the facts—and the facts do not support Tekion's monopoly theory. This case should end now. The Court should deny Tekion's supplemental 56(d) declaration and grant summary judgment in CDK's favor.

## BACKGROUND

CDK's prior filings detail the lengthy history of Tekion's spurious market-share allegations and the motion practice they have spawned. CDK summarizes that history only briefly here, focusing on developments since the Court's June 17 hearing.

### A. CDK's Summary Judgment and Sanctions Motions and Tekion's Motion to Amend

On April 24, 2026, CDK moved for partial summary judgment on Tekion's monopolization claims. Those claims rested on a market-share allegation that discovery had by then exposed as baseless. Dkt. 90. On April 27, 2026, after Tekion refused to withdraw the offending allegation notwithstanding its source's disavowal under oath, CDK served its sanctions motion on Tekion. On May 15, 2026, the last business day before the Rule 11 safe harbor expired, Tekion moved for leave to amend its complaint. Dkt. 98.

Tekion's proposed amendment, however, did far more than excise the discredited market share allegation. Recognizing that its monopolization claims could not survive without inflated market-share figures, Tekion sought to add entirely new allegations, including new submarket theories, that it possessed the factual basis for before filing its original complaint. *See* Dkt. 98.

CDK therefore proceeded with filing its sanctions motion on May 18, 2026, which detailed, among other things, both Tekion's original failure to conduct a reasonable pre-filing inquiry and its continuing violations of Rule 11 in refusing to withdraw a baseless allegation after learning it lacked evidentiary support. Dkt. 102. Tekion's opposition to CDK's motion not only opposed the sanctions on the merits, but in fact contended that CDK's sanctions motion was itself sanctionable because Tekion had supposedly agreed to remove the offending allegations. Dkt. 122.

The Court heard oral argument on the motion for leave to amend on July 31, 2026, and granted leave to amend only to the extent Tekion sought to remove the discredited 60% allegations, which CDK did not oppose. But the Court denied leave to add any new allegations, finding that Tekion had not shown good cause under Rule 16(b) and that permitting the amendments would prejudice CDK. Dkt. 197.

Remarkably—despite previously arguing that its motion for leave to amend so obviously mooted the sanctions dispute such that the sanctions motion itself was sanctionable—Tekion has still not filed an amended complaint. It claims uncertainty about the Court's order and asserts a need for further guidance, yet it has taken no steps to seek that guidance. *See* Bhatia Decl. Ex. 3.

### B. Tekion's Initial 56(d) Opposition

Meanwhile, consistent with its litigate-another-day-by-any-means approach, Tekion opposed CDK's summary judgment motion under Rule 56(d), contending that it could not respond on the merits without additional discovery from CDK and third parties. Dkt. 112.

First, Tekion claimed it lacked customer-level revenue data from CDK: granular, rooftop-by-rooftop figures it asserted were necessary to calculate market share.

Second, Tekion claimed it lacked comparable revenue data from third-party DMS providers Reynolds and Dealertrack, which it had subpoenaed but had not obtained.

As CDK explained in its reply, this discovery was unnecessary to oppose summary judgment. And to the extent Tekion lacked it, that was a problem entirely of Tekion's own making. Dkt. 134.

### C. The June 17 Discovery Hearing

The Court held a discovery hearing on June 17, 2026, to address Tekion's claim that it required additional data. In the interest of clearing the path to the merits, the Court convened an in-person conference to facilitate resolution.

At that conference, the Court directed the parties to meet and confer on CDK's offer to produce additional data. The objective was to reach a resolution that would permit the parties to proceed to the merits. As the Court put it: "I really want you to work hard and think about the minimum you need and the maximum you can give sort of thing, so that we can go forward and adjudicate your motion on the merits there." Dkt. 156 ("Hrg. Tr.") at 4:20–23.

In the meet and confer that followed, CDK offered to produce monthly DMS revenue for all products at issue in Tekion's complaint or interrogatory answers, for all franchise DMS rooftops, going back to 2021. Bhatia Decl. ¶11. But Tekion did not want that information. Instead, Tekion preferred a one-time "snapshot" of revenue data for all products, including those that were not in the DMS market, like CDK's CRM and revenue from the sale or lease of printers and printer consumables (paper and toner). Bhatia Decl. ¶ 12. CDK responded that it would not produce data for out-of-scope products, including printer revenue, because there was no way to determine what

non-CDK dealers were paying for printers purchased from other sources, so any revenue calculation would not be reliable and would overstate CDK's revenue share. *Id.* ¶ 13.

The Court reconvened the hearing following the meet-and-confer. At the hearing, CDK's lead counsel made CDK's offer explicit: "We have offered to give them, at the rooftop level, which is what they want, for the snapshot in time that they asked for, which is April 2026, all DMS revenue on a rooftop-by-rooftop basis. We told them that for purposes of DMS revenue, we will include every product that you identified in your complaint that you refer to as DMS.... We also served an interrogatory in this case.... We will give them, on a rooftop basis, all revenue from every product that they have identified as DMS, period." Hrg. Tr. 11:13–12:1.

But CDK also placed clear limitations on the record. The production would include document management—a non-DMS line of business—but not the sale of printers, routers, or other hardware. Hrg. Tr. 15:12–22 ("That will include document management. It does not include, for example, the sale of printers or routers to dealers."). As CDK's counsel explained, including printer revenue would require subpoenas to Cisco, HP, and other hardware providers to obtain comparable data. That was an absurd and unworkable result. Hrg. Tr. 15:23–16:3.

The Court accepted CDK's offer and ordered CDK to produce "what they represented they would produce." Hrg. Tr. 16:15–17. The Court entered an order confirming that CDK would produce the documents it had offered at the hearing. See Dkt. 146.

The Court also permitted supplemental briefing—anticipating, presumably, that Tekion might choose to supplement its substantive opposition to summary judgment once it had received and analyzed the additional data. As the Court explained: "[Y]ou're going to have to be able, after you get this data, to supplement your opposition." Hrg. Tr. at 16:20–16:22.

The understanding was clear: CDK would produce and the parties would proceed to the merits.

**D. CDK's Production and Tekion's Continued Delays**

CDK produced the ordered "snapshot" on July 2, 2026, in full compliance with the Court's directive. Bhatia Decl. ¶ 15. On July 20, *eighteen days* after CDK's production, Tekion sent

questions about the data. Bhatia Decl. ¶ 16. CDK responded with complete answers within twenty-four hours. Bhatia Decl. ¶ 17. Once again, Tekion went silent for weeks. Then, the day *after* filing this supplemental 56(d) submission, Tekion responded with yet more questions and ginned up critiques of the produced data. Bhatia Decl. ¶ 18. Tekion's correspondence did not request a meet and confer.

Nor did Tekion give CDK any indication, before filing its present 56(d) supplemental declaration, that it would argue again under 56(d) that the data was insufficient. Though Tekion's counsel twice indicated its supplemental filing would be pursuant to 56(d), when asked directly, Tekion was unable to articulate the basis for any such filing. Bhatia Decl. ¶ 19.

Fact discovery has been open for more than a year. It closes in two weeks. There are no pending motions to compel party discovery. Tekion has not requested to meet and confer on any live discovery dispute. And yet Tekion now contends that it cannot respond to CDK's summary judgment motion without still more discovery, on issues the Court has already resolved.

### E. Tekion's Reliance On Third Party Reports Is Debunked, Yet Again

Meanwhile, throughout this litigation, Tekion has refused to engage with the actual data CDK and third parties have produced. Instead, desperate to survive another day—and therefore needing to turn a blind eye to the actual data, which does not create a material dispute of fact on CDK's market power—Tekion has relied on an ever-shifting rotation of cherry-picked third-party analyst reports. Twice before, CDK has deposed the analysts behind these reports and exposed the unreliability of Tekion's interpretations. The same pattern has now played out a third time.

First was Gillrie. Tekion based its original complaint on Gillrie's 60% market-share estimate. When Gillrie was deposed, he disavowed Tekion's claim. CDK detailed this at length in its sanctions motion and summary judgment briefing. Dkt. 90, 102. Tekion tacitly conceded the point by moving for leave to remove the 60% allegation and its reliance on Gillrie from its complaint.

Next was Stefan Dreschel, publishing under the trade name DealertechNerd. Tekion cited his analysis as the basis for the revised market-share allegations in its proposed amended complaint.

When he was deposed, he too repudiated Tekion's characterization of his work. CDK detailed this at length in its opposition to Tekion's motion for leave to amend. Dkt. 126.

The newest entry in Tekion's misuse of third-party consultants is [redacted]

In opposing summary judgment, Tekion's expert, Dr. Smith—instead of engaging with any of the data produced in this litigation—speculated that additional discovery might reveal that CDK had a market share that might exceed 50%. That speculation rested on a [redacted] report that he did not prepare and cannot vouch for methodologically. Bhatia Decl. Ex. 1 ("Snail 56(d) Decl.") ¶ 9, n.17.

CDK explained in its summary judgment reply and Daubert briefing why Dr. Smith's reliance on [redacted] was misplaced. Dkt. 134, 140. On August 14, 2026, [redacted], was deposed, and he confirmed those defects. [redacted]

In short, the [redacted] report—like Gillrie and DealertechNerd before it—cannot bear the weight Tekion places on it. And it stands as yet another example of Tekion's strategy in this case: ignore the primary data actually produced by CDK, claim to need more and other data, and rely on cherry-picked, baseless third-party estimates in the meantime.

**LEGAL STANDARD**

"Rule 56(d) is 'a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence.'" *Doctor's Best, Inc. v. Nature's Way Prods., LLC*,

143 F.4th 1101, 1112 (9th Cir. 2025) (quoting *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018)). Under the Rule, a movant is entitled to relief only upon a showing by affidavit that it "diligently pursued its previous discovery opportunities," and that "allowing additional discovery would . . . preclude[] summary judgment." *Qualls ex rel. Qualls v. Blue Cross of Cal. Inc.*, 22 F.3d 839, 844 (9th Cir. 1994) (emphasis in original); *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006).

## ARGUMENT

Tekion's renewed 56(d) arguments are a transparent attempt to avoid reaching the merits, yet again. The Court should deny it and grant CDK's motion for summary judgment.

### I. Tekion Is Not Entitled to More Time to Conduct Third-Party Discovery Before Summary Judgment.

#### A. Tekion Fails to Show The Discovery From Reynolds and Dealertrack Is Usable, Let Alone Necessary, In Proving Market Share.

In its supplemental declaration, Tekion's economist Loren Smith asserts that Tekion requires additional discovery to collect "sufficient revenue data" from "two non-party DMS providers" in order to allow him to "measure DMS revenues" for the purpose of determining CDK's market share. Smith Decl. ¶ 2. Tekion claims that obtaining "comparable revenue data" for Reynolds and Dealertrack will allow its expert to conduct "a reliable market-share analysis." *Id.* ¶ 20. But Tekion has not and cannot show that the information it seeks from third parties is sufficient to preclude summary judgment. A party seeking relief under Rule 56(d) must set out "the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum*, 441 F.3d at 1100–01.

As Tekion has itself admitted, "it would need to obtain similar data from all the other relevant players in the marketplace to attempt to reliably calculate [market] shares." Decl. of Jennifer L. Giordano in Supp. of Dealertrack, Inc.'s Opp. to Tekion Corp.'s Mot. to Compel Compliance with Non-Party Subpoena ¶ 9, *Tekion Corp. v. CDK Global, LLC*, No. 1:26-mi-00095-MLB-JEM (N.D. Ga. June 8, 2026), Dkt. No. 15-3 ("Giordano Decl.") ; *see also* The Reynolds & Reynolds Company's Resp. in Opp. to Mot. to Compel at 11, *Tekion Corp. v. CDK Global, LLC*,

No. 3:26-mc-00006 (S.D. Ohio June 1, 2026), Dkt. No. 11 ("Reynolds Opp.") ("[A]s Tekion's counsel candidly admitted during the meet-and-confer process, Reynolds's Revenue Data is worthless to Tekion until and unless it also obtains comparable information from every other DMS provider in the alleged market.").

In other words, Tekion needs data comparable to that which CDK has produced not only from Dealertrack and Reynolds, but also from every other DMS provider in the U.S. franchise market, to render *any* of the data it seeks from Dealertrack and Reynolds usable. Tekion has not even attempted to pursue data sufficient to clear this hurdle. It has declined to pursue any discovery at all from most of the participants in the market. Snail 56(d) Decl. ¶¶ 24-25. And while two non-party DMS providers have given Tekion *some* revenue data, even those have not produced the "customer- and product-level" data Tekion claims to require to conduct its economic analysis. *Id.* ¶ 21; Smith Decl. ¶ 19. Yet Tekion is not pursuing further data from those entities.

What's more, Tekion is not pursuing—from Dealertrack, Reynolds, nor any other third-party provider—the data regarding *non-DMS* revenues (such as printers and CRM) that Tekion claims it needs to accurately allocate *CDK's* DMS revenue. Dr. Smith insists that CDK's revenues for any other products that its DMS customers *also* buy must be included in any DMS revenue calculation. Smith Decl. ¶¶ 14–16. But if Dr. Smith determines that CDK revenue from its CRM, printers, or other non-DMS products should be included in its DMS revenue, he would need data on non-DMS spending for customers of other DMSs, which Tekion has not pursued from other DMS providers and other non-DMS provider vendors. Snail 56(d) Decl. ¶ 25. Thus, even under Tekion's own theory of what data is necessary, the data it seeks cannot produce a reliable revenue-share analysis. Any effort to allocate, for example, CRM and printer revenue in accounting for CDK's DMS while failing to do the same for other providers would necessarily result in an apples-to-oranges comparison. Taking Tekion at its word that it requires comparable data from all other relevant players in the market in order to calculate a revenue-based market share, the data that Tekion seeks from Reynolds and Dealertrack cannot preclude summary judgment.

Moreover, CDK has raised this same issue—that Tekion has not pursued data *at all* from most participants in the market—multiple times. Tekion has *never* directly explained how obtaining apples-to-oranges data from such an incomplete subset of the market will possibly yield usable evidence of CDK's market share.

Finally, Tekion's pursuit of additional revenue data is a dead end as a matter of economic methodology. Even if Dr. Smith could conduct his proposed hedonic regression to estimate "unbundled" DMS prices, Smith Decl. ¶¶ 10, 15 & n.10, that analysis cannot overcome the fundamental problems with using revenue shares as a measure of market power in a market characterized by differentiated products that are substituted on a one-to-one basis. Snail 56(d) Decl. ¶ 21. DMS platforms vary in features, functionality, and value to customers. And because CDK's DMS offering is more comprehensive and provides greater value to customers than many competing offerings, revenue shares will systematically overstate CDK's competitive significance. *Id.* No additional discovery can cure this methodological flaw.

**B. Tekion Was Not Diligent In Seeking Third-Party Discovery.**

Tekion's argument independently fails because it was not diligent in pursuing Reynolds's and Dealertrack's data. Rule 56(d) does not rescue parties who sit on their rights. Courts routinely deny relief when a movant exhibits unreasonable delay, even where it has engaged in preliminary discovery efforts. *See Landmark Dev. Corp. v. Chambers Corp.*, 752 F.2d 369, 372 (9th Cir. 1985). This is especially so where the delay results in last-minute discovery requests that would require extending deadlines. *See Whitmire v. Wal-Mart Stores Inc.*, 359 F. Supp. 3d 761 (D. Ariz. 2019). Tekion belatedly issued the subpoenas and then let them languish for months at a time without communication or action.

Tekion did not serve third-party subpoenas until November 2025, five months after discovery commenced. *See Tekion Corp. v. CDK Global, LLC*, No. 1:26-mi-0095-MLB-JEM (N.D. Ga. June 8, 2026), Dkt. No. 15 ("Dealertrack Opp.") at 6; Reynolds Opp. at 4. The Ninth Circuit has held that this kind of delay alone is enough to preclude Rule 56(d) relief. *See Doctor's Best*, 143 F.4th at 1113 (holding that plaintiff failed to show diligence where it had not pursued

discovery as to the issues presented in defendant's motion for summary judgment despite having five months to do so).

After serving those subpoenas, Tekion failed to follow up. With Dealertrack, for example, Tekion met and conferred for the first time on January 8, 2026, but could not articulate what specific revenue data it wanted or explain how the data would be relevant to its claims. Dealertrack Opp. at 7–8. Dealertrack asked Tekion to keep it informed about its efforts with other providers. Tekion agreed but then went silent for nearly *three months*. *Id.* at 9.

When Tekion finally resurfaced on March 30, 2026, Dealertrack again asked basic questions: What data does Tekion want? Has Tekion obtained comparable data from other providers? Tekion refused to answer. *Id.* at 9-10. Then, after another month of silence, Tekion declared an "impasse" and filed a motion to compel on less than 24 hours' notice—mere hours before filing its summary judgment opposition. *Id.* at 12-14. The same pattern played out with Reynolds, who Tekion went "completely silent on" for months before CDK's summary judgment motion "evidently threw Tekion into panic mode." Reynolds Opp. at 4–6.

Tekion "cannot [now] complain [because] it fail[ed] to pursue discovery diligently before summary judgment." *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986). That Tekion now lacks evidence to support its claims is a result of its own delay. *See Landmark Dev. Corp.*, 752 F.2d at 372.

Serving subpoenas five months into discovery does not establish diligence when a party then takes no meaningful action to enforce them. Tekion went months without following up, manufactured last-minute "impasses," and now points to those self-created disputes as a reason to defer summary judgment. *See* Reynolds Opp. at 4; Dealertrack Opp. at 11-13. A late-stage flurry of motions to compel cannot cure months of inattention. *See Brae Transp.*, 790 F.2d at 1443; *Zamora v. City of Oakland,* 2013 WL 4103109, at *4 (N.D. Cal. Aug. 12, 2013).

Nor can Tekion hide behind the fact that deposition discovery remains open. Courts disfavor exactly this kind of "eleventh hour" discovery. *See Whitmire*, 359 F. Supp. 3d at 783. Even if the Court were to defer ruling, Tekion would not have the data it claims to need at soonest for months.

Reynolds, for example, has estimated that based on prior recent experience in litigation, gathering the customer-level revenue data Tekion seeks would take months of nightly data transfers. Reynolds Opp. at 5–7. And even this assumes Tekion will prevail on its pending motions to compel. It may not. Reynolds and Dealertrack have opposed Tekion's subpoenas, and each has explained that it does not maintain the customer-level revenue data Tekion seeks in the ordinary course of business. Reynolds Opp. at 5-7; Dealertrack Opp. at 18-21. The Court should not extend case deadlines to accommodate a problem of Tekion's own making and productions that may never come to fruition.

## II. Tekion Is Not Entitled to More Time to Conduct Party Discovery Before Summary Judgment.

### A. The Court Has Already Rejected Tekion's Argument That It Is Entitled to Non-DMS Revenue Data.

Remarkably, the bulk of Tekion's supplemental declaration in essence asks this Court to revisit the very issues it resolved at the June 17, 2026, hearing. There, the Court addressed the parties' dispute over RFP 203,[1] which sought rooftop-level revenue data for products beyond the Core DMS market. Tekion initially sought product-by-product, rooftop-level revenue data for all of CDK's franchise DMS customers, irrespective of whether the revenue derived from a DMS product and notwithstanding the fact that CDK does not keep that data in the ordinary course of business. After hearing initial argument, the Court sent the parties to meet and confer. Hrg. Tr. 5:2-17.

When the parties returned to the courtroom, they remained at an impasse. CDK's lead counsel Vineet Bhatia placed CDK's offer squarely on the record: "We have offered to give them, at the rooftop level, which is what they want, for the snapshot in time that they asked for … all DMS revenue on a rooftop-by-rooftop basis. We told them that for purposes of DMS revenue, we will include every product that you identified in your complaint that you refer to as DMS." Hrg. Tr. 11:13-19. CDK also offered to include "every product that they have identified as DMS" in

[1] Tekion's declaration identifies Interrogatory 12 as an additional basis for its request for non-DMS data. But Interrogatory 12, which is not attached to Tekion's declaration, sought only *DMS*-related revenue metrics—not data for *non-DMS* products.

response to CDK's interrogatory seeking identification of products within Tekion's claimed product market. *Id.* at 11:24-25. CDK's offer thus encompassed every product Tekion had ever claimed fell within the DMS market—both in its pleading and in its discovery responses.

CDK also made explicit what the offer did *not* include. Mr. Bhatia stated: "That will include document management. It does not include, for example, the sale of printers or routers to dealers." Hrg. Tr. 15:20-22. He explained that including printer revenue would be unreliable because it would require comparable data from third-party hardware vendors: "[I]f we're going to start putting printers that we sell and routers that we sell into the denominator, we will need to take a subpoena to Cisco and HP and the other printer providers." *Id.* at 15:23–16:2.

This limitation was not sprung on Tekion at the hearing. It had been the subject of the in-person meet and confer that immediately preceded the parties' return to the courtroom. During that meet and confer, Tekion's counsel specifically asked whether CDK would produce revenue for printers and printer consumables. Bhatia Decl. ¶ 12. Mr. Bhatia told Tekion's counsel that CDK would not produce revenue for products not identified as DMS in Tekion's interrogatory answers or complaint, and explained that there was no way to determine what non-CDK dealers were paying for printers or printer paper and toner purchased from other sources, so any revenue calculation would not be reliable and would overstate CDK's revenue share. *Id.*

Earlier in the meet and confer, CDK had offered Tekion an even broader production: monthly billing revenue for all CDK DMS products, going back to 2021. Bhatia Decl. ¶ 12. Tekion rejected that offer. *Id.* ¶ 11. Tekion did not want that monthly revenue data. Instead, it insisted on the one-time "snapshot" of product-by-product revenue at the rooftop level—and further insisted that the snapshot include products outside the DMS market, including CRM and printer revenue. *Id.* CDK was willing to provide snapshot data for DMS products but refused to include non-DMS products. *Id.*

With the parties' respective positions on the record, the Court ruled. "I think I'm going to order them to produce what they represented they would produce," the Court stated. Hrg. Tr. 16:15–17. The Court did not order CDK to produce printer revenue, CRM revenue, or any of the other

non-DMS data Tekion sought. The Court's minute entry confirmed the ruling: "The Court ordered CDK to produce the documents it offered to produce at the hearing." Dkt. 146.

CDK produced the ordered snapshot data on July 2, 2026. Bhatia Decl. ¶ 14. The production included revenue from the Foundations Suite, Fundamentals Suite, and CDK Drive and Drive Flex—all products identified in Tekion's complaint or interrogatory answers as being DMS products. *Id.* It further included revenue from CDK's document management business. *Id.* at ¶ 15.

Yet Tekion's supplemental declaration revives its demand for printer revenue and other non-DMS data—without identifying any new arguments or evidence that would justify revisiting the Court's prior ruling. The Court has already considered and rejected Tekion's request for broader discovery under RFP 203. That should be the end of the matter.

### B. CDK Has Produced Everything Tekion Needs and More.

The premise of Tekion's renewed request for data is that "CDK has produced revenue data based only on its own definition of what constitutes a DMS product or service," Smith Decl. ¶ 10, and that "CDK has only produced revenues associated with what it has deemed to be DMS revenue." Smith Decl. ¶ 16. That is wrong. CDK has produced extensive market share data covering all of CDK's lines of business—including the hardware revenue and non-DMS software revenue Tekion now claims are essential to calculating market share—as it is kept in the ordinary course of business. Yet Tekion has entirely ignored that data in favor of demanding ever more discovery to forestall summary judgment.

CDK has produced detailed rooftop data that would permit Tekion to calculate CDK's rooftop share in the putative U.S. franchise DMS market. Dr. Smith claims he cannot use this data because "mixing" it with other sources would introduce bias, Smith 56(d) Decl. ¶ 8, but that explanation is nonsensical. [redacted] Snail 56(d) Decl. ¶ 9. Dr. Smith offers no coherent reason why CDK's rooftop data—produced in this litigation—is somehow less reliable than industry reports that contradict Tekion's own pleadings (admitted by CDK).

CDK has also produced extensive revenue data, including but not limited to the snapshot data produced in response to the Court's prior order.

For example, CDK produced a "Foundations Suite Roll-Up," which contains CDK's DMS billings and revenue on a monthly basis for the period July 2020 to January 2026. Bhatia Decl. ¶ 3. This document was produced by the time CDK filed its motion for summary judgment. *Id.* ¶ 5. When Tekion's counsel asked whether the Foundations Suite Roll-Up contained revenue data for CDK's legacy DMS products, like Drive, CDK confirmed that it did. *Id.* ¶ 9.

[redacted]

Despite having all of this data in hand well before filing its initial opposition to summary judgment, and indeed before the vast majority of depositions in this case, Tekion has conducted no meaningful discovery on CDK's revenue reporting. Tekion has never marked an MOR, ELT Scorecard, or Foundations Suite Roll-Up as an exhibit at any deposition. Bhatia Decl. ¶ 7. Tekion has never asked a witness any questions about the financial information and DMS revenue

contained in the MORs, ELTs, or Foundations Suite Roll-Up. *Id.* ¶ 8. And Tekion has not raised informal questions with CDK's counsel about these documents, except for the question about whether legacy DMS product revenue are included in the Foundations Suite Roll-Up. *Id.* ¶ 9.

CDK even offered Tekion the opportunity to depose the witnesses who could explain this data. In the week after CDK filed its motion for summary judgment, CDK offered to make CDK's expert, Dr. Timothy Snail, and the CDK employees who submitted declarations—including Mr. Wellington, whose declaration discussed the revenue data—available for deposition before Tekion's opposition was due. *Id.* ¶ 10. Tekion declined. *Id.* Having ignored the revenue data CDK produced, declined the opportunity to question CDK's witnesses about that data, and rejected CDK's offer of more targeted monthly revenue data, Tekion cannot now claim it lacks the information needed to oppose summary judgment.

**C. Tekion Was Not Diligent in Seeking the Information It Now Claims to Need.**

Tekion's lack of diligence as to party discovery is independently fatal to its Rule 56(d) request. If Tekion believed that this information was necessary to oppose summary judgment, it was obligated to promptly seek it. It waited until March 18, 2026—nine months into discovery and mere weeks before the then-operative fact discovery deadline—to serve RFP 203 requesting the rooftop-level data that now forms the basis of its 56(d) opposition.

This dilatory conduct cannot be squared with the urgency Tekion now claims. Tekion has known from the day it filed this case that it did not have comprehensive revenue data from other DMS providers and knew since at least January 2026 of CDK's intention to pursue an early summary judgment motion on market share. It should have been on notice far earlier, given the Court's statements at the June 26, 2025, motion hearing on the market-share issue. Yet Tekion did not serve RFP 203 until March 18, 2026—more than a year after filing suit and just weeks before the then-operative close of fact discovery. A party that waits nine months to request purportedly "essential" discovery, despite knowing summary judgment is imminent, has forfeited any claim to relief under Rule 56(d).

The pattern of inattention is even more damning considering what Tekion has and has not done with the data CDK actually produced. CDK produced comprehensive DMS revenue data well before summary judgment: the MORs and Foundation Suite Roll-Up were produced by April 2026; approximately sixty ELT Scorecards were produced by February 2026; and the snapshot data ordered by this Court was produced on July 2, 2026. Bhatia Decl. ¶¶ 3–6, 15. These documents contain comprehensive commercial and financial information about the performance of CDK's business that Tekion claims it needs. Wellington Second Decl. ¶¶ 4–14. Yet Tekion has never engaged with any of it.

Tekion's conduct after CDK produced the Court-ordered snapshot data is especially revealing. CDK produced the ordered "snapshot" on July 2, 2026, in full compliance with the Court's directive. Bhatia Decl. ¶ 15. On July 20—*eighteen days* after CDK's production—Tekion sent questions about the data. Bhatia Decl. ¶¶ 16. CDK responded with complete answers within twenty-four hours. Bhatia Decl. ¶ 17. Once again, Tekion went silent for weeks. Then, the day *after* filing its supplemental 56(d) submission, Tekion responded with yet more questions and ginned-up critiques of the produced data. Bhatia Decl. ¶ 18. CDK met and conferred with Tekion at least twice during this period. Bhatia Decl. ¶ 19. In both conversations, Tekion indicated it intended to file a 56(d) supplement. Bhatia Decl. ¶ 19. But when asked directly, Tekion was unable to articulate the basis for any such filing. Bhatia Decl. ¶ 19. Tekion's utter failure to pursue these issues diligently independently dooms its claim.

**D. Tekion's Belated Request for Deposition Testimony Is Equally Unavailing.**

Tekion's belated demand for deposition testimony fares no better. This is the first time that Tekion has suggested it needs additional deposition testimony to oppose CDK's motion for summary judgment. But Rule 56(d) requires a party seeking a continuance to identify "the *specific* facts to be discovered and sufficient facts to demonstrate that the evidence sought does in fact exist." *San Francisco Police Comm'n v. Police Comm'n of City & Cnty. of San Francisco*, 1996 WL 251940, at *8 n.12 (N.D. Cal. May 9, 1996) (emphasis added). Dr. Smith's vague and

conclusory assertions fall far short of that standard. He identifies no specific witness, no specific topic, and no specific fact that additional depositions would uncover. Rule 56(d) demands more.

But even if Tekion's request were properly supported—and it is not—Tekion's own conduct forecloses any claim to additional deposition discovery. Immediately after CDK filed its motion for summary judgment, CDK offered to make witnesses available for deposition before Tekion's opposition was due. Bhatia Decl. ¶ 10. Tekion declined. *Id.* A party that spurns an opportunity for discovery cannot later invoke Rule 56(d) to complain that it lacks the very evidence it chose not to obtain.

**CONCLUSION**

For the foregoing reasons, CDK respectfully requests that the Court deny Tekion's supplemental Rule 56(d) declaration and grant summary judgment in CDK's favor.

Dated: August 18, 2026

**SUSMAN GODFREY L.L.P.**

By: */s/ Vineet Bhatia*

VINEET BHATIA (*Admitted Pro Hac Vice*)
SHAWN RAYMOND (*Admitted Pro Hac Vice*)
DANIEL WILSON *(Admitted Pro Hac Vice)*
MEREDITH R. HARRISON *(Admitted Pro Hac Vice)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
vbhatia@susmangodfrey.com
sraymond@susmangodfrey.com
dwilson@susmangodfrey.com
mharrison@susmangodfrey.com

JESSE-JUSTIN CUEVAS (SBN 307611)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
jcuevas@susmangodfrey.com

STEPHEN MORRISSEY
*(Admitted Pro Hac Vice)*
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101-3000
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
smorrissey@susmangodfrey.com

EVE LEVIN (*Admitted Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
elevin@susmangodfrey.com

*Attorneys for Defendant CDK Global, LLC*

## CERTIFICATE OF SERVICE

I certify that on August 18, 2026, a true and correct redacted copy of the foregoing document has been served on the counsel of record via CM/ECF, and a true and correct unredacted copy of the foregoing document has been served on the following counsel of record by electronic mail.

*/s/ Eve Levin*
Eve Levin