UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TEKION CORP.,

Plaintiff,

v.

CDK GLOBAL, LLC,

Defendant.

Case No. 3:24-cv-08879-JSC

**ORDER RE: CDK'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 90, 130, 140, 192

Tekion Corp. ("Tekion") sues CDK Global, LLC ("CDK") for alleged antitrust violations and tortious interference. (Dkt. No. 1.)[1] CDK moves for summary judgment on Tekion's monopolization and attempted monopolization claims, (Dkt. No. 90), to strike Erica R. Sutter's Rule 56(d) declaration, (Dkt. No. 130), and to exclude Tekion's expert Loren K. Smith, (Dkt. No. 140). Tekion seeks to delay summary judgment under Federal Rule of Civil Procedure 56(d), but insists, regardless, genuine disputes of material fact exist. (Dkt. Nos. 112, 192.)

Having carefully considered the parties' submissions, and with the benefit of oral argument on October 22, 2026, the Court GRANTS summary judgment in favor of CDK on the monopolization and attempted monopolization claims. The available evidence does not support a finding that CDK possessed monopoly power during the relevant time period or was dangerously close to obtaining such power. The Court DENIES Tekion's 56(d) request to delay summary judgment as lacking a good faith basis for pursuing further discovery and for Tekion's failure to

[1] Record citations are to material in the Electronic Case File ("ECF") for Case No. 24-cv-08879-JSC, unless otherwise noted; pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

diligently pursue such discovery to date. The Court also GRANTS IN PART and DENIES IN PART both the motion to exclude Dr. Smith's opinions and the motion to strike Ms. Sutter's declaration.

## BACKGROUND

### I. UNDISPUTED BACKGROUND FACTS

CDK and Tekion are both providers of a software called a "Dealer Management System" ("DMS"), which is targeted to automotive dealerships. (Dkt. No. 88-3 ¶¶ 11-12.) A DMS provides a technological platform for automotive dealerships to manage their businesses, including managing sales, service, parts, inventory, and accounting. (Dkt. No. 112-28 ¶ 5.) DMS providers can obtain certifications from original equipment manufacturers ("OEMs") to allow for compatibility between the DMS and the OEM's system. (Dkt. No. 88-3 ¶ 14.) DMSs can be either installed on-premises or hosted on the cloud. (Dkt. No. 88-3 ¶¶ 15-16.)

Both CDK and Tekion sell DMSs to "franchise" automotive dealerships, which are dealerships who sell cars and light trucks under agreements with OEMs, and "independent" automotive dealerships, which do not have agreements with OEMs and typically only sell used vehicles. (Dkt. No. 88-3 ¶¶ 11-12.) Since 2019, other participants in the franchise DMS market have included Reynolds & Reynolds, Dealertrack, Auto/Mate, Autosoft, Dominion DMS, Dealerbuilt, Quorum, and PBS Systems. (Dkt. 139-2 at 5.) Tekion was founded in 2016 and launched its DMS product to franchise auto dealers in early 2020. (Dkt. No. 112-28 ¶¶ 2-3.)

### II. PROCEDURAL HISTORY

On December 9, 2024, Tekion sued CDK for (1) monopolization, 15 U.S.C. § 2; (2) attempted monopolization, 15 U.S.C. § 2; (3) tortious interference with contract; (4) tortious interference with prospective economic advantage; (5) violating California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200; and (6) declaratory judgment, 28 U.S.C. § 2201. (Dkt. No. 1.) CDK moved to dismiss Tekion's monopolization claims under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 23.) The Court denied CDK's motion because, among other things, Tekion had alleged, "[a]ccording to estimates from" Matt Gillrie, the owner of a "DMS consulting firm that helps dealerships with major vendors," CDK held "approximately 60% by revenue" of

the U.S. DMS market for franchise dealers. (Dkt. No. 49 at 5-7 (citing Dkt. No. 1 ¶¶ 2, 29).) The Court also related Case No. 25-cv-1394-JSC, in which CDK sues Tekion and InDesign Data, LLC ("InDesign") for illicitly entering its DMS to extract CDK's proprietary data. (Dkt. No. 27; Case No. 25-cv-01394-JSC, Dkt. No. 93.)

On May 15, 2026, after CDK moved for summary judgment on Tekion's monopolization and attempted monopolization claims, Tekion moved for leave to amend its complaint to (1) amend its overall allegations of CDK's market share, (2) add submarket allegations, and (3) include new allegations regarding CDK's anticompetitive behavior and interactions with dealership groups. (Dkt. No. 98.) The Court denied the motion, but did allow Tekion to eliminate its allegation CDK possessed a 60% market share by revenue because its allegation had completely relied on an estimate from Mr. Gillrie, which he had subsequently refuted in a deposition. (Dkt. No. 184 at 2, 4.)

Still pending before the Court is CDK's motion for summary judgment. (Dkt. No. 90.) Tekion opposes CDK's motion with Rule 56(d) declarations from Erica Sutter and Loren K. Smith and, in the alternative, argues factual disputes—including factual disputes based on Dr. Smith's expert report—defeat CDK's summary judgment motion. (Dkt. No. 106-2; Dkt. No. 191-1.) CDK moves to strike Ms. Sutter's declaration for violating Local Rule 7-5(b), (Dkt. No. 130), and to exclude Dr. Smith's expert opinion under Federal Rule of Evidence 702. (Dkt. No. 140).

## DISCUSSION

### I. CDK'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 allows for summary judgment when the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

When the party moving for summary judgment would not bear the burden of proof at trial,

it can meet its summary judgment burden by (1) "produc[ing] evidence negating an essential element of the nonmoving party's case," or (2) "after suitable discovery, . . . show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Regarding the second approach, "[t]he nonmoving party, of course, must have had sufficient time and opportunity for discovery before a moving party will be permitted to carry its initial burden of production by showing that the nonmoving party has insufficient evidence." *Id.* at 1105-06 (citing *Celotex*, 477 U.S. at 326). So, pursuant to Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may" defer considering the motion or deny it, allow time to conduct discovery, or issue another appropriate order. *See* FED. R. CIV. P. 56(d). Otherwise, if the "moving party carries its burden of production," the nonmoving party must "produce enough evidence to create a genuine issue of material fact" to defeat the motion for summary judgment. *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322).

"Assertions in expert affidavits do not automatically create a genuine issue of material fact." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995). Instead, courts must "look at the record to determine whether, in light of any undisputed facts, the inferences to be drawn from the expert's affidavits are reasonable." *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992)); *see also Brook Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

CDK moves for summary judgment on Tekion's monopolization and attempted monopolization claims on the ground there is no factual dispute CDK does not possess monopoly power and there is no dangerous probability it will.

**A. Monopolization Claim (Cause of Action I)**

Section 2 of the Sherman Act "makes it unlawful to 'monopolize, or attempt to

monopolize, or combine or conspire . . . to monopolize' a market." *Epic Games, Inc. v. Apple*, Inc., 67 F.4th 946, 998 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024), and *cert. denied*, 144 S. Ct. 682 (2024) (quoting 15 U.S.C. § 2). "To establish liability under § 2, a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (cleaned up).

Monopoly power is "the substantial ability 'to control prices or exclude competition.'" *Epic Games*, 67 F.4th at 998 (quoting *United States v. Grinnell Corp.*, 384 U.S. 564, 571 (1966)). Monopoly power "requires 'something greater' than market power." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 724 (9th Cir. 2026) (quoting *Eastman Kodak*, 504 U.S. at 481). "[M]onopoly power can be shown either directly . . . or indirectly." *CoStar Grp. v. Comm. Real Est. Exch.*, 150 F.4th 1056, 1068 (9th Cir. 2025) (citations omitted). Direct evidence of the exercise of monopoly power includes "evidence of either supracompetitive pricing or reduced output." *Id.* (citations omitted). Alternatively, to demonstrate market power by circumstantial or indirect evidence, a plaintiff must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d, 1195, 1202 (9th Cir. 1997) (cleaned up).

CDK seeks summary judgment on the ground Tekion cannot establish CDK's monopoly power in the relevant market. (Dkt. No. 88-2 at 10.) CDK asserts Tekion cannot prove market power directly, (Dkt. No. 133-1 at 5), and Tekion does not offer direct evidence of monopoly power. (*See* Dkt. No. 109-1 at 18-29.) So, Tekion must show market power by circumstantial evidence. At issue, then, is whether Tekion has evidence from which a reasonable trier of fact could find (1) CDK owns a dominant share of the relevant market, and (2) there are significant barriers to entry and expansion.

**1. Relevant Market**

"The relevant market for antitrust purposes is 'the area of effective competition'—i.e., 'the

arena within which significant substitution in consumption or production occurs.'" *Epic Games*, 67 F.4th at 975 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). "To conduct this inquiry, courts must determine which products have a reasonable interchangeability of use or sufficient cross-elasticity of demand with each other." *Id.* (cleaned up). "The relevant market must include both a geographic market and a product market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (citation omitted). "[T]o premise antitrust allegations on a submarket," a plaintiff must "allege restraints of trade within or monopolization of a small part of the general market of substitutable products." *Newcal Inds., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

In its monopolization cause of action, Tekion alleges the relevant market is "[t]he market for franchise DMS products and services" and that "CDK has substantial market power in *this market*." (Dkt. No. 1 ¶ 82 (emphasis added).)

In its summary judgment opposition, however, Tekion now argues that, in its original complaint, it "pleaded CDK's monopolization and attempted monopolization of the market of all franchise dealer groups, *and alternatively*, of an enterprise submarket." (Dkt. No. 109-1 at 11 (emphasis added).) Not so. In its original complaint—the operative complaint—in the section titled "RELEVANT PRODUCT MARKET," Tekion specifically alleges "[t]he relevant product market ***for the purposes of this complaint*** is the market for DMS for franchise dealerships in the United States." (*Id.* ¶ 63 (emphasis added); *see also id.* ¶¶ 63-65 ("RELEVANT PRODUCT MARKET" complaint section discussing only the market for DMS for franchise dealerships).) Further, the complaint's monopolization cause of action specifically alleges "monopolization of the market for franchise DMS products and services" with no mention of any submarket. (*Id.* ¶¶ 80-87.) The same is true for the attempted monopolization cause of action. (*Id.* ¶¶ 89-96.)

At the hearing, Tekion urged that, regardless of its complaint, CDK has been on notice of the alleged submarket because in the Court's Order denying CDK's motion to dismiss, the Court held "Tekion plausibly pleads CDK has monopoly power in the DMS market for franchise dealerships and in the submarket for large enterprise franchise dealers in the United States." (Dkt. No. 49 at 11.) But as Tekion knew then and knows now, that reference to the submarket was in

United States District Court
Northern District of California

error because the complaint, as explained above, expressly limited its relevant product market and monopolization allegations to the franchise DMS market. Indeed, in the parties' briefings on the motion to dismiss, CDK argued the relevant market was "the franchise DMS market," (Dkt. No. 23 at 16), and, instead of opposing that motion by pointing to a submarket, Tekion again represented "***Tekion defines the relevant market as the market 'for DMS[s] for franchise dealerships in the United States***'" and did not advance a submarket theory. (Dkt. No. 36 at 14 (emphasis added) (quoting Dkt. No. 1 ¶¶ 63-65).)

As further evidence that Tekion has always understood that its complaint encompasses only the franchise DMS market, its unsuccessful motion to amend its complaint specifically sought to amend the complaint's relevant product market allegations to expressly include the submarket. (*See* Dkt. No. 99-2 ¶¶ 67-70.) Tekion accordingly sought to change the section caption from "RELEVANT PRODUCT MARKET" to "RELEVANT PRODUCT ***MARKETS***." (*See id.* (emphasis added).) It also sought to amend the monopolization and attempted monopolization causes of action to include the submarket not alleged in the operative complaint. (*See id.* ¶¶ 85-101.) While the operative complaint includes only three passing references to an undefined "large franchise enterprise" submarket, (*see* Dkt. No. 1 ¶¶ 2, 30, 67), the proposed amended complaint includes dozens of references to the newly challenged submarket.[2] (*See* Dkt. No. 99-1 ¶¶ 1-2, 4-8, 10, 13-14, 18, 33, 38, 48, 58, 60, 65, 67, 69, 70, 72, 75, 78-79, 87-88, 95, 128, 129.) So, Tekion has understood since this lawsuit's inception that it expressly alleged monopolization and attempted monopolization of the franchise DMS market but no additional market or submarket. It is thus unsurprising that at no point has CDK accepted or argued based on a submarket. (*See, e.g.*, Dkt. No. 53 ¶¶ 63-66 (CDK's answer); Dkt. No. 88-2 at 10 (CDK's motion for summary judgment); Dkt. No. 126 at 7-8 (CDK's leave to amend opposition); Dkt. No. 133-1 at 12 (CDK's motion for summary judgment reply).) In fact, the only proper "notice" CDK

[2] In its order denying Tekion's motion for leave to amend, the Court assumed Tekion was seeking to "*replace* its allegations of a 'large submarket franchise dealers' submarket with two [different] submarkets" rather than allege a submarket for the first time. (Dkt. No. 184 at 6 (emphasis added).) Upon closer consideration, however, that assumption was wrong because Tekion did not include the submarket in its monopolization or attempted monopolization causes of action in its original complaint. (*See* Dkt. No. 1 ¶¶ 80-92.)

had of a submarket was in Tekion's motion for leave to amend, which was denied for lack of good cause and diligence under Federal Rule of Civil Procedure 16(b). (Dkt. No. 197 at 1.)

So, there is only one relevant market pled by Tekion: "the market for DMS for franchise dealerships in the United States." (Dkt. No. 1 ¶ 63; *see also id.* ¶ 82 (monopolization cause of action alleging CDK has "substantial market power" in "[t]h market for franchise DMS products and services"); *id.* ¶ 90 (attempted monopolization cause of action alleging CDK has "substantial market power" in "[t]h market for franchise DMS products and services").) CDK "does not contest that definition for purposes of this motion." (Dkt. No. 88-2 at 10.)

**2. Market Share**

"Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output." *Rebel Oil*, 51 F.3d at 1437. Courts "generally require a 65% market share to establish a prima facie case of market power," *id.* at 1206, but "a market share as low as 45-70% may support a finding of monopoly power, if accompanied by other relevant factors." *Movie 1 & 2 v. United Artists Commc'ns, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990); *see also CoStar*, 150 F.4th at 1070 ("[M]arket shares on the order of 60 percent to 70 percent have supported findings of monopoly power." (cleaned up)); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137, n.5 (9th Cir. 2022) ("Generally, 65% market share is sufficient to establish that a defendant has monopoly power."). Conversely, "numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power." *Rebel Oil*, 51 F.3d at 1438. That said, "market share, while being perhaps the most important factor, does not alone determine the presence or absence of monopoly power." *Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1204 (9th Cir. 1975). And, "[a] high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." *Oahu Gas Serv., Inc. v. Pac. Resources, Inc.*, 838 F.2d 360, 366 (9th Cir. 1988).

As a threshold matter, the parties disagree on the best measurement of market share in the DMS market. Tekion argues "[r]evenue is the correct measure." (Dkt. No 109-1 at 18.) CDK,

United States District Court
Northern District of California

however, argues physical dealership locations, or "rooftops," is the "more appropriate metric." (Dkt. No. 88-2 at 20.) Courts have not adopted a uniform measure of market power, varying their assessments with the dynamics of the market at issue and the evidence produced by the parties. *See, e.g., CoStar*, 150 F.4th at 1070 (using "dollar value" of commercial real estate listings); *Rebel Oil*, 51 F.3d at 1434-35 (using retail sales of gasoline); *Image Tech.*, 125 F.3d at 1207 (using number of photocopier parts sold); *United States v. Syufy Enters.*, 903 F.2d 659, 664-66 (9th Cir. 1990) (using both percentage of available first-run films and box office revenue); *see also* PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES & THEIR APPLICATION ¶ 535c (Sept. 2024 update) ("Generally, market shares should and have been based on output (whether measured by revenue *or* physical units." (emphasis added)). In this instance, both rooftops and revenue have utility in assessing the dynamics of monopoly power in the market for DMS among franchise dealerships. (*See* Dkt. No. 109-1 at 19 ("[T]he DMS market involves products that differ in price and quality: some DMSs offer more features than others, and, consequently, cost more."); Dkt. No. 109-2 ¶ 27 ("[In the] franchised dealer DMS market [,] buyer needs and expenditures increase both (a) as the size of a dealership rooftop increases and (b) as the number of dealership rooftops within the dealer group increases."); Dkt. No. 88-2 at 20 ("When a dealership switches DMS providers, it switches from one system to another, not one system to three."); Dkt. No. 88-3 ¶ 42 ("In markets like DMS (characterized by differentiated products and one-to-one substitution among alternatives) units provide a common denominator across products . . . .").) Put differently, while Tekion is correct that "[t]o be meaningful, market share calculations must reflect the competitive significance within the relevant market," (Dkt. No. 109-1 at 19), the Court, based on the record before it, sees both rooftops *and* revenue as having competitive significance within the DMS market. For example, some of the third-party industry reports cited by the parties use both metrics in analyzing the DMS market. (*See, e.g.*, Dkt. No. 89-18 at 20.) The Court thus cannot conclude as a matter of law that either rooftops or revenue are inadequate measures of market share in the DMS market. Instead, because CDK has the burden of production as the moving party, it must show an absence of a genuine dispute of material fact that it lacks market power by either metric.

Under either metric, Tekion alleges the relevant period for market power begins in "early 2023," (Dkt. No. 1 ¶ 40), and at the hearing confirmed the relevant time period was 2023 and 2024, ending with the filing of its complaint in December 2024. (Dkt. No. 218 at 4.) CDK did not dispute that time frame during the hearing. (*See id.*)

**a. Rooftops**

CDK argues its share of franchise dealerships by rooftops "peaked at 42.3% at year-end 2022 and declined to 36.4% as of March 2026." (Dkt. No. 88-2 at 15 (citing Dkt. No. 88-3 ¶¶ 47-49).) It bases these estimates on the number of "physical [franchise dealership] addresses with an installed DMS contract" from CDK divided against the number of franchise dealerships in the United States, as annually estimated by an industry publication. (Dkt. No. 88-3 at 29-30.) Tekion "dispute[s] [that] calculation of 36.4% market share . . . ." (Dkt. No 109-1 at 31.) Tekion instead highlights "multiple third-party analyses unconnected to this litigation" which peg CDK's market share by rooftops as higher. (*Id.* at 20.) First, Tekion identifies a 2022 analysis prepared by consultants in advance of CDK's purchase which estimates CDK "has ~50% [rooftop] market share." (Dkt. No. 109-1 at 10 (quoting Dkt. No. 88-7 at 3, 9).) Second, Tekion points to a 2023 slide from an investment bank, which describes CDK as "the DMS provider to >60% of North American dealerships." (*Id.* at 11 (quoting Dkt. No. 109-4 at 2).) Finally, Tekion identifies a 2023 lender presentation in which CDK repeats the 60% figure while also "suggest[ing] that the DMS-specific number is 46% (by rooftops)." (*Id.* (citing Dkt. No. 109-5 at 18).)

These statements are not enough to dispute CDK's evidence of its market share by rooftops. First, none of those representations was limited to the United States market for franchise dealers, which, as discussed above, is the relevant market. (*See* Dkt. No. 88-7 at 4 (describing CDK as "[p]rovid[ing] solutions to retail dealers for auto and *non-auto* retail locations in *North America*" (emphasis added)); Dkt. No. 109-4 at 2 ("CDK is the DMS provider to >60% of *North American* dealerships." (emphasis added)); Dkt. No. 109-5 at 18 (describing CDK's "*North America* Auto Site Penetration" (emphasis added)); *see also* Dkt. No. 133-1 at 14 n.4.) Second and more glaringly, Tekion, despite having received fact discovery on CDK's internal rooftop data, does not offer a competing analysis of that data or even identify pending discovery that



United States District Court
Northern District of California

would enable it to do so. Instead, Tekion relies on high-level statistics that pre-date CDK's internal data regarding the relevant time period. And, while Tekion's expert, Dr. Smith, says he "may not fully agree with some of the assumptions that support [CDK's rooftop] share calculations," he does not identify what assumptions he disagrees with, let alone why. (Dkt. No. 109-2 at 13.) If anything, Tekion has previously accepted the denominator used by CDK to calculate rooftops—roughly 18,000—is accurate. (*See* Dkt. No. 1 ¶ 1 ("Nationwide, approximately 18,000 franchise dealerships rely on DMS . . . ."); *id.* ¶ 63 (same).) So, based on the summary judgment record, a reasonable trier of fact could find that during the relevant period CDK had *at most* 42.3% of rooftops, declining to 36.4% as of March 2026.

**b. Revenue**

Both parties offer competing estimates of market share by revenue and challenge the reliability of the other's estimates. Tekion primarily relies on its expert, Dr. Smith, to establish that "CDK's revenue share of the broad franchise DMS market is not less than 50% and may be as high as 60%." (Dkt. No. 109-1 at 19-20.) To calculate revenue by DMS provider, including CDK, Dr. Smith combined revenue estimates prepared by McKinsey & Co. ("McKinsey") with rooftop share by dealer group size estimates prepared by Bain & Company ("Bain"). (Dkt. No. 112-01 ¶¶ 55-56.) "CDK's share based on these documents is approximately 55 percent." (*Id.* ¶ 56.) CDK criticizes Dr. Smith's calculations as "rest[ing] entirely on two 2022 third-party consultant analyses (McKinsey and Bain) that he did not prepare and cannot vouch for methodologically." (Dkt. No. 133-1 at 13.) And, "[e]ven if Smith's analysis were entirely sound, it would not establish CDK possesses a market share about 50%" because he based his analysis "entirely on 2022 data." (*Id.* at 14.)

For its part, CDK contends that "the only available evidence establishes CDK's share by revenue does not exceed 50%." (Dkt. No. 88-2 at 21.) CDK points to a report by Global Insight Services, a market research firm, estimating CDK "had 41.7% of U.S. franchise automotive DMS revenue is 2025" and that "share ha[d] declined since Tekion entered the market . . . ." (Dkt. No. 88-2 at 21 (citing Dkt. No. 88-3 ¶ 54).) CDK also identifies a separate report from Bain, "which put CDK's share by revenue at approximately 45%" in November 2024 (*Id.* at 22 (citing Dkt. No



United States District Court
Northern District of California

89-18 at 19; Dkt. No 89-19 at 2).) Tekion questions the methodology of the Global Insight Services report, arguing "neither CDK nor Dr. Snail explain how GIS obtained its data, performed its calculations, or ultimately arrived at its shares." (Dkt. No. 109-1 at 20.) Tekion does not address the Bain report. (*See* Dkt. No. 109-1.)

Even accepting Dr. Smith's opinions, on the present record, there are no genuine disputes of material fact over CDK's market share by revenue during the relevant time period. Under Dr. Smith's estimates, "CDK's revenue share in the all [sic] U.S. franchise market is approximately 55 percent in 2022." (Dkt. No. 109-2 ¶ 55.) Dr. Smith developed this opinion based on data from 2021 or even earlier. (Dkt. No. 218 at 18 (Tekion agreeing the data "was largely from '21"); Dkt. No. 201-2 ¶ 12 (McKinsey's representative "testified that the reported revenues are based on information from 2018 to 2021").) Dr. Smith did not purport to offer a post-2022 estimate.[3] And, even accepting Dr. Smith's opinion on CDK's market share in 2022, Tekion does not explain how Dr. Smith's 2022 figure supports an inference of a 50% market share by revenue in 2023 and 2024. Tekion instead highlights a 2023 presentation in which "CDK represented to lenders that its rooftop share had *increased* over the previous decade" and that it expected future growth. (Dkt. 109-1 at 20-21.) But backward-facing assessments of a period not at issue and vague forward-looking projections are insufficient to support a finding as to CDK's revenue during the relevant period. Tekion offers no contemporaneous evidence of CDK's market share by revenue during the time window—in 2023 and 2024—in which CDK allegedly engaged in anticompetitive behavior. (*See* Dkt. No. 109-1 at 10-11, 19-22.) The dearth of evidence put forward by Tekion is especially glaring given that it has had the benefit of full fact discovery.

In contrast, CDK offers evidence of how its market position shifted and diminished from 2022 onwards. Between 2024 and 2025, CDK lost "two of its largest dealership customers" when Asbury Automotive Group signed an agreement to switch to Tekion and Lithia agreed to switch to

---

[3] Dr. Smith does say "CDK's revenue share exceeds 50 percent and could be as high as 60 percent." (Dkt. No. 109-2 ¶ 54; *see also id.* ¶ 57.) However, this appears to be a summary of his opinion on market share in 2022, (*see id.* 55-56), and not a separate opinion on market share in 2023 through 2024. If it were an opinion on those years, that would raise independent concerns under Federal Rule of Evidence 702 as Dr. Smith does not indicate which "documents produced by CDK" formed the basis for that opinion.



United States District Court
Northern District of California

United States District Court
Northern District of California

Pinewood.AI. (Dkt. No. 88-3 ¶ 50.) More broadly, CDK's data shows it facilitated 1,173 data extractions for customers switching to competitors between 2023 and 2025. (*See* Dkt. No. 88-5 ¶ 5.) CDK expects to further "lose a net of 259 rooftops located in the United States to competitor vendors in 2026." (*Id.* ¶ 10.) Even drawing inferences in Tekion's favor, this evidence shows CDK's market share eroded from 2022 onwards. And a "declining market share may reflect an absence of market power" even if "it does not foreclose a finding of such power." *Oahu Gas*, 838 F.3d at 366 (quoting *Greyhound Comput. Corp. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 496 n.18 (9th Cir. 1977)). So, in relying on outdated market share estimates that do not account for market shifts during the time period relevant to this case, Tekion has failed to identify a genuine dispute of material fact that CDK's market share by revenue was at a sufficient threshold to create a presumption of monopoly power.

**3. Barriers to Entry**

Plaintiffs "'must [also] show that new rivals are barred from entering the market and [] that existing competitors lack the capacity to expand their output to challenge the predator's high price.'" *Malheur Forest,* 164 F.4th at 727 (quoting *Rebel Oil*, 51 F.3d at 1439). "Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'" *Rebel Oil*, 51 F.3d at 1439 (quoting *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427–28 (9th Cir.1993)). To find a defendant had monopoly power, "entry barriers must be significant—they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Id.* (citation omitted); *see also id.* (explaining barriers to entry "are insignificant when natural market forces will likely cure the problem"). "The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." *Id.*

Tekion identifies four specific barriers to entry: high switching costs for customers, network effects, the requirement to obtain OEM certifications, and significant initial capital costs.

(*See* Dkt. No. 109-1 at 22.) Taken together, Tekion argues there are "[d]isputes of material fact as to barriers to entry into the franchise DMS market" sufficient to foreclose summary judgment. (*Id.*)

**a. Switching Costs**

"[A] plaintiff must show that costs prohibit consumers from switching between market goods such that a locked-in effect in the relevant market occurs." *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 844 (N.D. Cal. 2024) (citations omitted); *see also Eastman Kodak*, 504 U.S. at 476-77 ("If the cost of switching is high, consumers who already have purchased the equipment, and are thus 'locked in,' will tolerate some level of service-price increases before changing equipment brands."). While "switching costs—whether monetary or non-monetary—[must] be 'significant,'" the plaintiff's showing "need not be extensive." *Epic Games*, 67 F.4th at 979.

Tekion argues "dealer switching costs" are "a classic barrier to entry and expansion" that provide "a competitive advantage for CDK." (Dkt. No. 109-1 at 22.) Tekion supports its position with analysis from secondary sources and "the testimony of several dealer representatives during discovery." (*Id.*) Some of the switching costs evidence Tekion identifies includes the following statements from dealers:

- "I don't want to retire in 10-20 years while still using [CDK], but that will likely happen." (Dkt. No. 112-12 at 28.)
- "A major challenge for any DMS provider in gaining market is the massive costs and risks for a dealership in switching DMS providers. (*Id.*)
- "The training alone from switching systems is a huge hurdle and can cost several hundred thousands of dollars in lost sales." (Dkt. No. 112-2 at 26.)
- "Changing a DMS is a hard, big thing to do, and it is not something that dealers like to do." (Dkt. No. 112-19 at 17.)
- "Improvements would have to be fairly significant [to switch]. It's probably a good six-month process just to switch over, so we're talking about six months worth of business disruption. That's pretty significant and so we would not switch for marginal improvement." (Dkt. No. 112-13 at 24.)



United States District Court
Northern District of California

- "[Switching DMS providers] is a disruptive change. Training on the new system, you know, data validation, ensuring everything converts properly, it's just disruptive at the time of change." (Dkt. No. 112-14 at 5.)

Against this backdrop, CDK argues "[w]hile some dealers may historically have been reluctant to switch DMS providers, undisputed evidence shows that reluctance is clearly surmountable" and thus not a significant barrier to entry. (Dkt. No. 88-2 at 26.) CDK supports this argument with data on "substantial customer churn," (*id.*), to support the idea a high level of "customer defection flatly contradicts any claim that switching costs prevent the market from self-correcting." (Dkt. No. 133-1 at 16.) However, the willingness of *some* customers to bear high-switching costs does not negate the significance of those costs. And, absent these costs, the customer churn rate could have been even higher during the relevant time period. Accordingly, Tekion has created a genuine dispute of material fact on whether switching costs present a barrier to entry in the DMS market.

**b. Network Effects**

"Network effects, or economies of scale in consumption" are "a classic barrier to entry." *CoStar*, 150 F.4th. 1056, 1071. "Services with network effects become more valuable as the number of users increases." *Id.*; *see also Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 780 (N.D. Cal. 2022) ("A direct network effect is present when a service becomes more valuable to users as additional others use the service." (cleaned up)). However, as CDK highlights, "Tekion lists network effects as a purported barrier but offers not a single argument . . . to support it." (Dkt. No. 133-1 at 16.) Thus, based on the record before it, there is no evidence network effects have created a barrier to entry in the DMS market.

**c. OEM Certifications**

"Regulation often helps entrench existing businesses by placing new entrants at a competitive disadvantage." *Syufy Enters.*, 903 F.2d at 673. Accordingly, the Ninth Circuit has held "legal license requirements" are a "main source[] of entry barrier[]." *Rebel Oil*, 51 F.3d at 1439. Here, Tekion argues OEM certifications, which ensure compatibility between a DMS and different original equipment manufacturers, are "needed" to compete in the DMS market and the



United States District Court
Northern District of California

requirement to gain the certifications constitutes a barrier to entry. (Dkt. No. 109-1 at 23.) In support, Tekion points to one estimate that OEM certifications can cost "up to $1m per brand." (*Id.* (quoting Dkt. No. 112-27 at 26).) And Tekion's COO describes obtaining an OEM certification as "an expensive, laborious, time-consuming process for a DMS provider." (Dkt. No. 112-28 ¶ 8.)

As a threshold matter, it is unclear whether OEM certifications are a "regulation" or "legal license" in the same manner found in Ninth Circuit case law. Perhaps recognizing as much, Tekion frames OEM certifications as "access to needed inputs, including licenses and relationships with necessary third parties," relying on a single citation to an out-of-circuit precedent. (Dkt. No. 109-1 at 22 (citing *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951 (10th Cir. 1990).)

Even assuming OEM certifications are sufficiently analogous to a legal license to create a barrier to entry, Tekion does not offer evidence these costs are unique to incumbents.[4] Instead, OEM certifications may be much like "the need to purchase and maintain specialized heavy equipment" to enter the market for forest stewardship services in *Malheur Forest Fairness Coalition v. Iron Triangle, LLC*. *Malheur Forest*, 164 F.4th at 727. There, as here, "Plaintiffs do not allege either that these costs 'were not incurred by incumbent firms but [were] incurred by new entrants' or that these costs 'deter entry while permitting [the defendant] to earn monopoly returns.' Nor do Plaintiffs allege that they were 'prevented from' entering the [relevant market] as a result." *Id.* (quoting *Rebel Oil*, 51 F.3d at 1439) (first alteration in original). Thus, the cost of OEM certifications "more accurately represent[s] the start-up costs that any player in the [DMS] market would encounter." *Id.*

Tekion identifies CDK's statement to potential lenders that its product "offering [] benefits from ties to OEMs," as suggesting incumbents have relationship advantages not available to new

---

[4] CDK argues OEM certifications "do not bar entry or impose costs on new entrants that incumbents do not face. Every DMS provider, CDK included, must obtain and maintain OEM certifications." (Dkt. No. 88-2 at 25.) But CDK does not offer any evidence to support this statement. (*See* Dkt. No. 218 at 25.) So, the record is silent as to whether incumbents face the same OEM certification costs.

entrants. (Dkt. No. 109-1 at 23 (quoting Dkt. No. 109-5 at 21); *see also* Dkt. No. 112-27 at 25 (Pinewood.AI, another new entrant, describing "OEM relationships and market 'know how' [as] . . . creating barriers to entry).) However, "ties to OEMs" are not the same as the ability to procure OEM certifications. And, Tekion was able to obtain 23 OEM certifications from 42 manufacturing brands within "2-3 years," which both "unlock[ed] . . . rollout to all 17000+ franchise dealers in the country" and was faster than any other company who had sought so many OEM certifications. (Dkt. No. 89-23 at 4-5.) However, because the record does not establish that incumbents must renew OEM certifications, and taking all inferences in Tekion's favor, a reasonable trier of fact could find OEM certifications pose an entry barrier.

**d. Capital Costs**

"[C]apital market evaluations imposing higher capital costs on new entrants" can constitute a barrier to entry. *Rebel Oil*, 51 F.3d at 1439; *Syufy Enters*., 903 F.3d at 667 (noting that up-front capital costs can be a barrier to entry for a certain type of industry, "like heavy manufacturing or mining, which requires onerous front-end investments that might deter competition from all but the hardiest and most financially secure investor"). Here, Tekion argues "evidence suggests that onerous initial investments to build the DMS platform and complete OEM integrations deter new entrants while allowing CDK to flourish." (Dkt. No. 109-1 at 25.) As evidentiary support, Tekion highlights it had to raise "more than $580 million in capital to date to enter the DMS market." (*Id.* at 24 (citing Dkt. No. 112-28 ¶ 10).) Yet, nowhere does Tekion suggest, let alone offer evidence, its capital costs, while high, are *higher* than those of incumbents. *See Los Angeles Land Co.*, 6 F.3d at 1428 ("However, the jury could not rationally construe this factor [of difficulty in obtaining financing] as a barrier to entry, as there was no evidence that the lenders who were willing to finance bowling equipment imposed higher financing costs on new entrants than on established firms."); *Malheur Forest*, 164 F.4th at 727; *DeSoto Cab Co. v. Uber Tech.*, No. 16-cv-06385-JSW, 2018 WL 102547483, at *8 (N.D. Cal., Sept. 24, 2018) ("The fact that entering a market requires a large capital investment, without more, does not constitute a barrier to entry."). Tekion's reliance on *Syufy Enterprises* is misplaced as the evidence does not support an inference the DMS market is similar to mining or manufacturing in terms of initial capital outlays; indeed,



United States District Court
Northern District of California

other than the dollars Tekion raised, there is no evidence as to what amount of money is required to enter the market. In its opposition and at the hearing, Tekion also relied on *United States v. Google LLC*, 747 F. Supp. 3d 1 (D.D.C. 2024), in which the court held, without comparing the relative costs of capital for new entrants vis-à-vis incumbents, "[h]igh capital costs [] constitute a substantial barrier to entry." *Id.* at 120. There, however, the plaintiff had made extensive evidentiary showings it took "billions of dollars" of "upfront capital investment" to enter the relevant product market. *Id.* In contrast, Tekion only offers the total amount of capital it raised "to fund its launch and development," (Dkt. No. 112-28 ¶ 10), but does not offer evidence on what portion was dedicated to entering the narrower DMS franchise market or even what the minimum needed to enter that market would be. So, on this record, no reasonable trier of fact could find capital costs a barrier to entry.

**e. Tekion's Entrance to the Market**

New market entrants can be indicative the market lacks barriers to entry. *See Syufy Enters.*, 903 F.3d at 664 ("If there are no significant barriers to entry . . . any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less."). That said, "[t]he fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers. If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power." *Rebel Oil*, 51 F.3d at 1440.

CDK argues "Tekion's own entry and rapid rise is itself powerful, unrebutted evidence that no cognizable barriers exist and that CDK lacks power to exclude competition." (Dkt. No. 88-2 at 23.) As support, CDK highlights that Tekion has "grown to nearly 10% of the market," (*id.* (citing Dkt. No. 88-3 ¶ 61)), and gained 60 percent of its new customers in 2025 directly from CDK. (*Id.* (citing Dkt. No. 89-11 at 46).) Tekion retorts that, given the value of the market "one would expect many entrants," not just Tekion and Pinewood.AI. (Dkt. No. 109-1 at 27.) Tekion also argues "most of Tekion's success has come in 2025" and later, which is "*after* Tekion sued CDK" such that litigation was needed to allow new entrants to prosper. (*Id.*)

But, in 2024, Tekion won the business of Asbury, one of CDK's largest customers. (*See*

Dkt. No. 88-3 ¶ 60.) So, there is no genuine dispute that Tekion has been able to "take significant business away from" CDK and thus "represent a challenge to the predator's market power." *See Rebel Oil*, 51 F.3d at 1440. And, Tekion consistently grew its revenue, its "number of rooftops live," and its "number of DMS units [] sold" during 2023 and 2024. (*See* Dkt. No. 89-3 at 7, 10-11, 14). In fact, *between* 2023 and 2024, the time at which CDK was allegedly wielding monopoly power, Tekion more than doubled its DMS-related revenue. (*See id.* at 7.) So, while Tekion is correct that its "entry into the market is [not] alone enough to resolve a dispute over CDK's monopoly power," (Dkt. No. 109-1 at 26), it supports an inference of weak barriers to entry.

***

Viewing the evidence in Tekion's favor as the non-moving party there is no genuine dispute that (1) CDK's market share was below 50% during the relevant time period, whether measured by rooftops or revenue, (2) at most, only customer switching costs and OEM certifications presented barriers to enter the DMS market for franchise dealers, and (3) Tekion was growing and successfully competing for CDK's customers throughout the relevant time period. Based on these undisputed facts and the record as a whole, no reasonable trier of fact could find that CDK possessed monopoly power; so, Tekion's monopolization claim must fail and CDK's motion for summary judgment on Count I is GRANTED.

**B. Attempted Monopolization (Cause of Action II)**

To prove a Sherman Act section 2 claim for attempted monopolization, a plaintiff "must show, inter alia, that there is a dangerous probability that [the defendant] will achieve monopoly power." *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1153 (9th Cir. 1997) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-60 (1993)). "Even if [the defendant] has a high market share, . . . a dangerous probability of achieving monopoly power can[not] exist absent evidence of barriers to new entry or expansion." *Id.* at 1154.

"[T[he minimum showing of market share required in an attempt case is a lower quantum than the minimum showing required in an actual monopolization case." *Rebel Oil*, 51 F.3d at

1438. Thus, when a plaintiff can "only succeed[] in proving a [market] share near 50%, this would suffice to support a jury finding of market power for the purposes" of an attempted monopolization claim. *Image Tech.*, 125 F.3d at 1207. But, "[c]ourts should be 'wary of the numbers game of market percentage' when considering attempt-to-monopolize claims." *Rebel Oil*, 51 F.3d at 1438 n.10 (quoting *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 533 (5th Cir. 1982)). Instead, courts should "carefully analyz[e] certain telltale factors in the relevant market: market share, entry barriers and the capacity of existing competitors to expand output." *Id.*

Here, for the same reasons Tekion's monopolization claim fails, so too does its attempted monopolization claim. Even with the lower market share required for an attempted monopolization claim, "[t]o pose a threat of monopolization, one firm alone must have the power to control market output and exclude competition." *Rebel Oil*, 51 F.3d at 1438, 1443 (quoting *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir.1989)). But, like the plaintiff in *Rebel Oil*, Tekion has "failed to produce sufficient evidence to support a finding that [defendant] is dangerously close to obtaining the power to monopolize the market." *Id.* To the contrary, the summary judgment record is undisputed that CDK's market share—whether measured by rooftops or revenue—has been falling. And, as before, Tekion offers no evidence on CDK's market share post-2022. Instead, the undisputed evidence compels the finding that existing market participants—including Tekion and CDK—regularly compete for each other's business, as marked by the churn among customers. So, even if "there is a genuine issue regarding market share and entry barriers, there appears to be no genuine issue regarding the ability of [] existing competitors to increase their output." *Id.*

Because no reasonable jury could find that "there is a dangerous probability" CDK will gain monopoly power, CDK's motion for summary judgment on Count II is GRANTED.

## II. CDK'S MOTION TO EXCLUDE THE OPINIONS OF LOREN K. SMITH

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

(a) the expert's scientific, technical, or other specialized knowledge

> will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702. "[A] proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and [] there is no presumption in favor of admission." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025).

Tekion retained Dr. Loren K. Smith to respond to Dr. Timothy Snail's report, which had concluded "[t]he putative U.S. franchise DMS market is characterized by competition among numerous rivals" and that "[t]he economic evidence is not consistent with Plaintiff Tekion's claim that CDK had monopoly power . . . based on its market share and the existence of barriers to entry." (Dkt. No. 88-3 ¶ 10.) Most relevant to CDK's motion, Dr. Smith opines Dr. Snail's market share estimates "rel[y] on rooftop counts," which "do not account for important competitive features of the DMS market." (*Id.* ¶ 12.) Dr. Smith instead suggests "[m]easuring shares by revenues [better] reflects the complexity and intensity of DMS services," and "CDK's revenue share . . . is significantly higher than the rooftop share Dr. Snail estimated," but "[a] proper calculation of revenue shares will require customer-product-level data from CDK and several other rivals that [Dr. Smith] understand[s] has not yet been produced." (*Id.*) Furthermore, "documents produced by CDK to date indicate that CDK's revenue share exceeds 50% and could be as high as 60 percent in the broadly defined U.S. franchise dealer market," and "CDK's share of narrower markets exceed 60 percent and could exceed 70 percent." (*Id.* ¶ 54; *see also id.* ¶¶ 55-56 (elaborating on documents).)

CDK argues Dr. Smith's opinions are not relevant to its summary judgment motion, his opinion that franchise DMS market shares should be measured based on sales revenue is unreliable, and his estimated market share by revenue is unreliable, irrelevant, and based on insufficient data. (Dkt. No. 138-3 at 5-7.)

United States District Court
Northern District of California

### A. Relevance to Partial Summary Judgment

CDK argues Dr. Smith's opinions do not "offer any opinion as to the case-determinative issue of monopoly power raised" by its motion for partial summary judgment. (Dkt. 138-3 at 12.) However, "market share" is "perhaps the most important factor" in determining monopoly power. *Pac. Coast*, 526 F.2d at 1204. Dr. Smith offers opinions on CDK's market share. (*See, e.g.*, Dkt. No. 112-01 ¶¶ 54-57.) And "[e]xpert opinion testimony is relevant if the knowledge underlying it has a 'valid . . . connection to the pertinent inquiry.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S 137, 149 (1999)). Such opinion testimony "need not establish every element that the plaintiff must prove, in order to be admissible." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). So, contrary to CDK's suggestion, Dr. Smith's opinions on market share are relevant to deciding CDK's motion for partial summary judgment.

### B. Opinion on Revenue vs. Rooftops

CDK next argues Dr. Smith's opinion that revenue, not rooftop count, is the appropriate measure of market share is "unreliable because it fails to follow the weight authority mandating a unit-based measurement" in a DMS-like market. (Dkt. No. 138-3 at 14.) As discussed at length above, the Court cannot conclude a reasonable factfinder could not find monopoly power based on revenue market share and, accordingly, revenue is a permissible measure of market share in the franchise DMS market. To the extent CDK believes revenue is a *weaker* measure than rooftops, it remains free to use "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to attack the use of revenue. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).

### C. Opinion on CDK's Market Share by Revenue

CDK also argues Dr. Smith's opinion on CDK's market share by revenue is "unreliable and irrelevant." (Dkt. No. 138-3 at 21.)

#### 1. Reliability

Dr. Smith opines "documents produced by CDK to date indicate that CDK's revenue share exceeds 50 percent and could be as high as 60 percent in the broadly defined U.S. franchise dealer

market." (Dkt. No 112-1 ¶ 54.) Dr. Smith based this opinion on a methodology employing four steps. First, Dr. Smith took "estimates of average monthly revenue by DMS provider" from a 2022 McKinsey report produced in connection with an anticipated acquisition of CDK. (*Id.* ¶ 55.) Second, Dr. Smith "estimate[d] each DMS provider's rooftop count of different dealer group sizes" from a 2022 Bain report produced for CDK. (*Id.*) Third, Dr. Smith multiplied those two numbers together to get each provider's revenue for each subset of dealer group sizes. (*Id.*) Finally, Dr. Smith aggregated those revenue figures to create an overall picture of the market in 2022, including CDK's market share. (*Id.* ¶¶ 55-56.)

Tekion has not shown it is more likely than not that Dr. Smith's opinion is "the product of reliable principles and methods." FED. R. EVID. 702(c); *see also Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 148; *Daubert*, 509 U.S. at 592-93, 597) (cleaned up) (concluding a court must "assess whether the reasoning or methodology underlying the [expert's] testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. It is not the correctness of the expert's conclusions that matters, but the soundness of his methodology."). Here, since Dr. Smith did not have insight into the methodologies employed in the McKinsey and Bain reports, he took their figures as given. (*See* Dkt. No. 138-8 at 43 ("I don't know the methodology of any of the consultants."); *id.* at 24 ("Q: Right. So you—and you don't know exactly what Bain's methodology was for this study it did, right? A: That's right.").) Nor did Dr. Smith attempt to learn the methodology employed by the consultancies. (*Id.* at 24-25 ("I'm just taking this analysis as it is in the document. That's it.").) Thus, the reliability of Dr. Smith's opinion rises and falls with the reliability of the McKinsey and Bain reports. Yet, neither report sufficiently reveals its methodology to allow the Court to perform its "gatekeeping function" of examining "what basis they have for saying" an opinion. *United States v. Valencia-Lopez*, 971 F.3d 891, 900 n.8 (9th Cir. 2020). Put differently, the unavailability of the methodology behind the numbers relied on by Dr. Smith for his opinion makes the expert's principles and methods "unreliable" under Rule 702(c).

For example, Dr. Smith does not explain the methodology used by McKinsey to arrive at

its estimates nor can the Court find such explanation in the McKinsey report. (*See* Dkt. No. 109-2 ¶ 55 (Dr. Smith's description of the McKinsey report); Dkt. No. 112-12 (McKinsey report).) While McKinsey explains that it used a sample of dealerships, it did not explain what was included in the "Average rooftop fee" charged by the DMS provider to the dealership. (Dkt. No. 112-12 at 21.)[5] Instead, on the same slide Dr. Smith relies on, McKinsey simply offers its sources as "Expert insights, press search, 2022 Auto Dealership Survey, N=151." (*Id.*) And, McKinsey does not explain the methodology by which its sample size of 151 dealerships was selected. (*See* Dkt. No. 138-3 at 24.) Similarly, neither Dr. Smith nor Bain explains the methodology used to conclude there were 16,700 rooftops in the franchise dealership market in 2022. (*See* Dkt. No. 109-2 at ¶ 55 (Dr. Smith's description of the Bain report); Dkt. No. 112-2 (Bain report).) Bain just marks its slide with "Source: NADA; Central public filings (10Ks, Investor updates); Analyst reports; Market participant interviews; Company websites; Automotive Today, Brookfield analysis, Project Central Scenarios Model." (Dkt. No. 112-2 at 32.) Dr. Smith also fails to explain why Bain's rooftop estimate for CDK is more reliable than the internal rooftop data CDK produced based on a "count of physical addresses with an installed DMS contract." (Dkt. No. 88-4 ¶¶ 4-5, 7-8; *see also* Dkt. No. 88-3 at 46.) At bottom, Tekion argues the Court should accept the underlying reports because they "were prepared by internationally recognized firms at the direction of a sophisticated institutional investor." (Dkt. No. 166-5 at 22.)

That is not enough under the requirements of Rule 702. Under Rule 702(c), Tekion has not shown that it is more likely than not Dr. Smith's "testimony is the product of reliable principles and methods" because neither the parties, Dr. Smith, nor the Court have any idea of the methods McKinsey and Bain deployed before their conclusions were incorporated by Dr. Smith. And, while "[a]n expert is permitted to rely on the opinion of another expert," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 124347, at *1 (N.D. Cal. Jan. 8, 2013), the other expert's methodology must be sufficiently clear for the Court to perform its Rule 702

[5] In an August 2026 deposition occurring after Dr. Smith prepared his opinions, a McKinsey representative confirmed the average rooftop fee "may" include products other than "core DMS." (Dkt. No. 201-4 at 4.) This disclosure underscores the opacity of the estimates Dr. Smith relied upon.

gatekeeping duties. Otherwise, the Court cannot "assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *City of Pomona v. SQM North Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). To accept the estimates from the Bain and McKinsey reports without knowing how the consultancies calculated those numbers would abandon that duty. *See In re Phenylpropanolamine (PPA) Products Liability Litigation*, 289 F. Supp. 2d 1230, 1238 (W.D. Wash. 2003) ("[E]xperts must explain the process by which they reached their conclusions and identify some type of objective source demonstrating their adherence to [sound methodology]."); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (holding a non-testifying expert cannot "hide behind" the testifying expert when the non-testifying expert's "study was not cut and dried," thereby "rais[ing] questions that only the [non-testifying] expert could answer"); *In Re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) ("Where the soundness of the underlying expert judgment is in issue, the testifying expert cannot merely act as a conduit for the underlying expert's opinion." (cleaned up)). So, Tekion is wrong when it argues CDK's objections are "appropriate subjects for cross-examination, not grounds for exclusion." (Dkt. No. 166-5 at 23.)

**2. Relevance**

CDK also argues that because Dr. Smith's opinion relies on data from 2022, which predates the alleged period of CDK's anticompetitive activity, it is "irrelevant." (Dkt. No. 138-3 at 25-26.) "Expert opinion testimony is relevant if the knowledge underlying it has a 'valid . . . connection to the pertinent inquiry.'" *Sandoval-Mendoza*, 472 F.3d at 654 (quoting *Kumho Tire*, 526 U.S. at 149); *see also Primiano*, 598 F.3d at 567 ("What is relevant depends on what must be proved.") Tekion is trying to establish CDK's market share by revenue in the years following 2022. Accordingly, Tekion is correct that Dr. Smith's opinion, if reliable, provides "a useful baseline against which anticompetitive effects can be assessed." (Dkt. No. 166-5 at 24.) The opinion need not be the best possible expert opinion to be useful. *See Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) ("The relevancy bar [to expert testimony] is low."). And, the sole case CDK cites to argue against relevance, *Fail-Safe, L.L.C. v. A.O. Smith Corp.*,

744 F. Supp. 2d 870 (E.D. Wis. 2010), discussed the *reliability* of the expert's testimony, not its relevance. *See id.* at 887-88. So, Dr. Smith's opinion on market share by revenue is relevant.

***

Because Tekion has not met its burden to show admissibility "by a preponderance of the evidence," *Engilis*, 151 F.4th at 1049, given Dr. Smith's opinion on market share by revenue is based on statistics compiled by McKinsey and Bain using unknown methodologies, the Court GRANTS CDK's motion to exclude his opinion on market share by revenue as unreliable under Rule 702.[6] Nevertheless, his opinion—even if not excluded—would not alter the Court's conclusions on summary judgment for the reasons previously stated. In particular, his opinion as to CDK's 2022 revenue share is insufficient to support a finding CDK had a 50% or greater share of the relevant market by revenue in 2023 and 2024 in light of the record as a whole.

## III. TEKION'S RULE 56(D) DECLARATION

Rule 56(d) permits denial or continuance of a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." FED. R. CIV. P. 56(d). A party requesting a Rule 56(d) continuance bears the burden of setting forth "specific facts it hopes to elicit from further discovery" and demonstrating that the facts sought not only exist but are also "essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). "The party seeking additional discovery also must demonstrate that he or she acted diligently to pursue discovery in the past." *Arroyo v. Int'l Paper Co.*, 611 F. Supp. 3d 824, 831 (N.D. Cal. 2020) (citing *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001)); *see also Pfingston v. Ronan Eng'g Co.,* 284 F.3d 999, 1005 (9th Cir. 2002) ("The failure to conduct discovery diligently is grounds for the denial of a [Rule 56(d)] motion.").

When a party delays in seeking discovery or taking depositions, a court can refuse to delay in ruling on motions for summary judgment. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d

[6] Because, as discussed above, the Court limits the relevant market to the "market for DMS for franchise dealerships in the United States," CDK's request to exclude Dr. Smith's opinion on market share in submarkets is denied as moot. (*See* Dkt. No. 138-3 at 26-27.)

912, 921 (9th Cir. 1996) ("[T]he district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past."); *Mackey v. Pioneer Nat. Bank*, 867 F.2d 520, 524 (9th Cir. 1989) ("A movant cannot complain [when a district court proceeds to summary judgment] if it fails diligently to pursue discovery before summary judgment."); *Landmark Dev. Corp. v. Chambers Corp.*, 752 F.2d 369, 372-73 (9th Cir. 1985) (approving district court ruling on summary judgment when a "[f]ailure to take further depositions apparently resulted largely from plaintiffs' own delay"). Here, Tekion advances two main reasons for delaying ruling on partial summary judgment: (1) CDK has not produced revenue data that would allow it to calculate more precise, updated estimates of CDK's revenues, and (2) it is still seeking revenue data from third-party DMS providers to better calculate the overall size of the relevant market. (Dkt. No. 109-1 at 16-18; Dkt. No. 191-1.)

**A. CDK's Production**

Tekion relies on its expert, Dr. Smith, to calculate CDK's market share in the DMS market. In a declaration supporting Tekion's 56(d) request, Dr. Smith states:

> An economically meaningful ('unbundled') price for CDK's DMS product (and layered applications) should be determined by evaluating how the total revenue paid to CDK varies, on average, as the composition of CDK products consumed by a dealership varies. This analysis requires information on the total revenues (inclusive of DMS, layered apps, and add-ons) that CDK earns from dealerships combined with information on how those revenues vary as the attributes of the bundle and customer-types varies.

(Dkt. No. 191-1 ¶ 10.) Without such granular data, Dr. Smith says he has been limited to "revenue data based only on [CDK's] own definition of what constitutes a DMS product or service." (*Id.*; *see also* Dkt. No. 109-1 at 8 (describing CDK as providing only its "aggregate self-reported DMS revenue figures").) He opines these "self-reported" figures for DMS will "understate the true prices franchise dealers pay to utilize CDK's DMS." (Dkt. No. 191-1 ¶ 11.) Tekion had initially pursued this information from CDK via an interrogatory, RFP No. 203, served on March 18, 2026. (*Id.* ¶ 18.)

Dr. Smith's declaration does not support continuing summary judgment. First, Tekion has not been diligent in seeking this information. Prior to Dr. Smith's declaration, the Court addressed



United States District Court
Northern District of California

a discovery dispute on this very issue. (*See* Dkt. No. 116-1.) In the joint discovery letter, Tekion sought to enforce RFP No. 203 against CDK. (*Id.* at 3.) CDK objected. (*Id.* at 5-7.) At a June 17, 2026 hearing, CDK conceded it would "include every product that [Tekion] identified in [its] complaint that [it] refer[s] to as DMS." (Dkt. No. 156 at 11; *see also id.* at 11-12 ("[CDK] will give [Tekion], on a rooftop basis, all revenue from every product that [Tekion] ha[s] identified as DMS, period.").) But CDK still declined to include "revenue for products that [Tekion] didn't define in the complaint or the interrogatory answer as being part of the product market for which [Tekion is] seeking relief for monopolization," such as printers or routers. (*Id.* at 12, 15; *see also* Dkt. No. 191-1 ¶ 14 (Dr. Smith describing Tekion as missing data on "non-layered application add-ons" such as "printing products and services" and "networking services").) The Court then "ordered CDK to produce the documents it offered to produce at the hearing." (Dkt. No. 146.) And, on July 2, 2026, CDK produced the material. (Dkt. No. 202-1 ¶ 15.) So, the Court has already ruled on this dispute and it therefore is not cause for continuing summary judgment.

Further, if after receiving CDK's court-ordered discovery Tekion believed it had grounds to ask the Court to reconsider its ruling, it should have raised the issue with the Court. But it did not. Nor did Tekion take the Court up on its offer to file a supplemental opposition to summary judgment using the newly disclosed material. (*See* Dkt. No. 146; Dkt. No. 156 at 19.) Instead of filing a supplemental opposition with the evidence the Court ordered disclosed at the June 17, 2026 hearing, or, if CDK did not comply with that order, raising it to the Court, Tekion chose to have its expert submit a declaration reiterating that he needed more comprehensive data from CDK, including the very categories—such as printer services—the Court declined to compel. (*See* Dkt. No. 191-1 ¶ 14.) Moreover, fact discovery is now closed in this case, (*see* Dkt. No. 158), and "Rule 56(d) does not reopen discovery; rather it forestalls ruling on a motion for summary judgment in cases where discovery is still open and provides the prospect of defeating summary judgment." *Dumas v. Bangi*, No. 1:12-CV-01355-LJO, 2014 WL 3844775, at *2 (E.D. Cal. Jan. 23, 2014).

Second, Tekion has not shown that incorporating additional revenue data for "non-layered application add-ons" into its expert's analysis would show dominant market share, let alone

United States District Court
Northern District of California

monopoly power. In Dr. Smith's 56(d) declaration, he offers *no* analysis using the revenue data CDK produced in July 2026 to project what additional data might yield. As the Court previously suggested during the June discovery hearing, an expert could make assumptions about CDK's discounting practices "even without the [requested] revenue" and, if Tekion did so, CDK "can't object . . . because they refuse[d] to produce it." (Dkt. No. 156 at 19.) Yet, Dr. Smith made no such assumptions and, accordingly, offered no predictions of the magnitude of the missing data. Thus, while additional revenue data may allow Tekion to complete its preferred form of revenue analysis, it has not offered any reason to think such analysis would defeat summary judgment.

So, Tekion has not shown a continuance to seek further revenue data from CDK is warranted.

**B. Third-Party Production**

Dr. Smith also states "a reliable market-share analysis requires comparable revenue data for at least a large portion of the DMS market" but that he lacks such data presently. (Dkt. No. 191-1 ¶ 20.) In November 2025, Tekion served subpoenas for documents on three other DMS providers: Reynolds and Reynolds Company ("Reynolds"), Dealertrack, Inc., and DealerBuilt, Inc. (Dkt. No. 111 ¶¶ 21, 28, 33.) All three offered to provide a subset of the documents Tekion sought but opposed providing other portions. (*Id.* ¶¶ 21-37.) Accordingly, in May 2026, Tekion filed motions to compel against each in various district courts. (*Id.* ¶¶ 27, 32, 37.) It subsequently received "sufficient documents" from DealerBuilt in June 2026 and voluntarily dismissed its motion to compel. *See Tekion Corp. v. CDK Global, LLC*, No. 26-mc-09001-MBB, Dkt. No. 8 (W.D. Mo. June 12, 2026).

For several reasons, Tekion has not shown the additional third-party discovery would defeat summary judgment or that Tekion even has a good faith basis for believing CDK's revenue is higher than the existing production shows. *See Terrell v. Brewer*, 935 F.2d 1015, 1018 (9th Cir. 1991) ("The party seeking additional discovery also bears the burden of showing that the evidence sought exists. Denial of a [Rule 56(d)] application is proper where it is clear that the evidence sought is almost certainly nonexistent or is the object of pure speculation."). First, Tekion's primary basis for believing the market share data from Reynolds and Dealertrack would show

United States District Court
Northern District of California

CDK's market power is the same 2022 estimates from Dr. Smith that, as discussed above, are grounded in an unreliable methodology. Second, Tekion is seeking a more limited set of data from Reynolds and Dealertrack than it is from CDK, (*see* Dkt. No. 111 ¶¶ 22, 33), even though, with respect to CDK, Tekion claims the complete, unbundled data is necessary to determine the "true price" of DMS. (Dkt. No. 191-1 ¶ 10.) So, anything obtained from the Reynolds and Dealertrack would, under Dr. Smith's preferred methodology, not allow for an estimate of the "true price" of DMS. Third, even if Tekion obtains the documents it seeks, it will still only have a partial perspective on the DMS market because Tekion has not sought discovery against other DMS providers such as Auto/Mate, Autosoft, Dominion DMS, Quorum, or PBS Systems. (*See* Dkt. No. 111 ¶ 20 (confirming Tekion had only sought data from three non-party DMS providers).) Fourth, Tekion received "sufficient documents" from DealerBuilt in June 2026 but did not even attempt to incorporate that discovery into its analysis, such as, for example, by comparing DealerBuilt's actual, disclosed market share to the estimates of DealerBuilt's market share from various third-party reports cited throughout the parties' filings in order to demonstrate the reliability or predictive value of those third-party reports.

Moreover, aside from what third-party discovery might show, Tekion has not been diligent in seeking this additional discovery. At the time Tekion moved to compel third parties in other district courts, the fact discovery deadline was less than two months away.[7] (Dkt. No. 87 at 2.) Tekion had known since July 2025 when the fact discovery was set to close, (*see* Dkt. No. 50), and it was up to Tekion to get the discovery, including from third parties, it needed by the deadline. Instead, two of three of Tekion's motions to compel remain pending. *See Tekion Corp. v. CDK Global, LLC*, No. 26-mc-00006 (S.D. Ohio 2026) (proceedings against Reynolds); *Tekion Corp. v. CDK Global, LLC*, No. 26-cv-03231-MLB-JEM (N.D. Ga. 2026) (proceedings against Dealertrack). And, more broadly, Tekion has long known that it would need third-party revenues

---

[7] In fact, at the time Tekion sought to compel, the original pretrial order's fact discovery cut-off of April 27, 2026 had already passed and the parties had only just stipulated to extend fact discovery to June 26, 2026. (*See* Dkt. No. 87 at 2.) In the stipulation to extend case deadlines, Tekion did not mention any plans to seek third-party discovery. (*See* Dkt. No. 86.) And Tekion did not further seek to extend the fact discovery cut-off.

if it was seeking relief on a theory that CDK's revenues gave it a monopoly market share. The failure to even seek subpoenas, let alone file motions to compel, on third-party data until eleven months after filing its lawsuit does not provide a good basis for delaying CDK's pending motion. *See Pfingston*, 284 F.3d at 1005 ("The failure to conduct discovery diligently is grounds for the denial of a Rule 56(f) motion."); *see also Michelman v. Lincoln Nat. Life Ins. Co.*, 685 F.3d 887, 899 n.7 (9th Cir. 2012) ("[F]ormer Rule 56(f) . . . is substantively the same as current Rule 56(d).").

***

So, because Tekion has not shown additional discovery would defeat summary judgment and has not diligently sought that additional discovery prior to filing its Rule 56(d) declaration, its request to delay summary judgment is DENIED.

## IV. CDK'S MOTION TO STRIKE ERICA R. SUTTER'S DECLARATION

Local Rule 7-5(b) provides:

> An affidavit or declaration may contain only facts, must conform as much as possible to the requirements of FED. R. CIV. P. 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefor. An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.

N.D. CAL. CIV. L.R. 7-5(b); *see also King County v. Rasmussen*, 299 F.3d 1077, 1082 (9th Cir. 2002) ("Declarations [] are supposed to set forth facts as would be admissible in evidence [and] should not be used to make an end-run around the page limitations of Rule 7 by including legal arguments outside the briefs." (cleaned up)).

Tekion submits Erica R. Sutter's declaration to support its Rule 56(d) opposition to CDK's motion for summary judgment. (Dkt. No. 111.) CDK moves to strike paragraphs 3 and 38-53 of her declaration for containing legal argument in violation of Local Rule 7-5(b). (Dkt. No. 130.)

However, CDK's reply brief asserts its motion is now moot. According to CDK, Tekion's Rule 56(d) argument duplicates its subsequent discovery requests, which the Court resolved in the June 17, 2026 hearing. (Dkt. Nos. 117, 146.) Specifically, because the Court denied Tekion's discovery requests, except for certain data CDK has now produced, CDK argues Tekion's Rule

56(d) argument is now moot, making Ms. Sutter's declaration and CDK's motion to strike portions of her declaration moot as well. (Dkt. No. 163 at 2.)

To the extent CDK's motion is not moot, pursuant to Local Rule 7-5(b), the Court rules as follows:

- **Paragraph 3**: The Court STRIKES the second sentence to the extent it makes a legal argument why the Court should deny CDK's motion for partial summary judgment appropriate for Tekion's opposition brief, rather than a Rule 56(d) declaration.
- **Paragraphs 38-41**: The Court STRIKES these paragraphs because they elaborate on the legal standard under Federal Rule of Civil Procedure 56(d), and Tekion nonetheless represents they "introduce no legal argument that is absent from Tekion's legal brief." (Dkt. No. 153 at 8.)
- **Paragraphs 42-52**: Paragraphs 42-43 explain the information Tekion seeks from further discovery, paragraphs 44-48 describe Tekion's basis for believing this information exists, and paragraphs 49-52 explain why the data is essential to opposing CDK's motion for summary judgment. As CDK does not explain why this information violates Local Rule 7-5(b), the Court DENIES the motion to strike paragraphs 42-52.
- **Paragraph 53**: The Court STRIKES this paragraph because it makes legal argument why the Court should defer decision on CDK's early summary judgment motion, which is inappropriate for a declaration and should instead be included in Tekion's opposition brief.

So, to the extent Tekion disputes its Rule 56(d) objection to CDK's motion for summary judgment is now moot, the Court STRIKES paragraphs 3, 38-41, and 53 of Ms. Sutter's declaration to the extent described above.

## CONCLUSION

For the reasons stated above, the Court GRANTS CDK's motion for summary judgment as to Tekion's monopolization and attempted monopolization claims and DENIES Tekion's request under Rule 56(d) to delay or deny summary judgment. The Court also GRANTS IN PART and DENIES IN PART both the motion to exclude Dr. Smith's opinions and to strike Ms. Sutter's declaration.

This Order disposes of Docket Nos. 90, 130, 140, 192.

**IT IS SO ORDERED.**

Dated: November 10, 2026



JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California